## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| SHONICE G. GARNETT,<br>810 5th Street NW, 4th Floor,<br>Washington, DC 20001, | ) ) ) ) ) | |
| RICHARD MESSICK, JR.,<br>1665 Lamont Street NW, Apt 4,<br>Washington, DC 20010, | ) ) ) ) | |
| LINDA MURPH,<br>1006 47th Street, NE,<br>Washington, DC 20019, | ) ) ) ) | Civil Action No. 1:17-cv-1757 |
| TRACEY ROSS,<br>4309 3rd Street SE, Apt 302,<br>Washington, DC 20032, | ) ) ) ) ) | CLASS ACTION COMPLAINT |
| *Individually, and on behalf of all others<br>similarly situated,* | ) ) ) | |
| *and* | ) ) | |
| BREAD FOR THE CITY,<br>1525 7th Street NW,<br>Washington, DC 20001, | ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) ) | |
| LAURA ZEILINGER, in her official capacity<br>as Director of the DISTRICT OF COLUMBIA<br>DEPARTMENT OF HUMAN SERVICES,<br>c/o DC Office of the Attorney General<br>441 4th Street NW,<br>Washington, DC 20001, | ) ) ) ) ) ) ) ) | |
| *Defendant.* | ) ) | |

_____

## PRELIMINARY STATEMENT

1.      This action arises from Defendant's systemic failures that deny Supplemental Nutrition Assistance Program ("SNAP") benefits, also known as "food stamps," to needy households.   Specifically, Defendant fails: (1) to timely process SNAP applications; (2) to provide recipients required to recertify their SNAP eligibility a timely opportunity to do so; and (3) to provide notice of such delayed processing and the right to seek an administrative hearing. As a result, Defendant systematically and unlawfully fails to provide timely SNAP benefits to hundreds of eligible families in the District of Columbia each month.   Defendant's ongoing failures mean that households are deprived of desperately needed assistance to help them feed their families and suffer hunger as a result.

2.      Shonice G. Garnett, Richard Messick, Jr., Linda Murph, and Tracey Ross (collectively "Individually Named Plaintiffs") are low-income residents of the District of Columbia who either have filed initial or recertification applications for SNAP or are SNAP recipients who were required to recertify their eligibility in order to retain ongoing SNAP benefits.   Organizational Plaintiff Bread for the City ("Bread") is a not-for-profit organization that, through the operation of its two facilities, provides necessary safety-net support to the District of Columbia's low-income community, many of whom are SNAP applicants or recipients in the District of Columbia.

3.      Plaintiffs are harmed by Defendant's policies and practices of failing to: (1) process initial and recertification applications for SNAP and provide SNAP benefits to eligible households in a timely manner; (2) provide the opportunity for SNAP recipients to complete the recertification process and have SNAP benefits for the new certification period issued in a timely manner; and (3) send written notice of processing delays and of the

opportunity for an administrative hearing to households subject to Defendant's delayed initial and recertification application processing.

4.      Accordingly, Plaintiffs bring this action on behalf of themselves—and the Individually Named Plaintiffs also bring this action on behalf of proposed classes of similarly situated low-income DC families and individuals—seeking relief in the form of a declaratory judgment and preliminary and permanent injunctive relief enjoining Defendant from: (1) failing to timely process SNAP initial and recertification applications and issue SNAP benefits to eligible households in a timely manner; (2) failing to allow recipients of SNAP benefits to apply for recertification and complete the recertification process in a timely manner, and failing to provide SNAP benefits for the new certification period within the mandated timeframes to those eligible; and (3) failing to provide applicants with a written notice regarding the delay in processing their SNAP application and their right to request an administrative fair hearing.

## JURISDICTION

5.      Jurisdiction over this action is conferred upon this Court by 28 U.S.C. § 1331, which provides for jurisdiction in the United States district courts over civil actions arising under the Constitution, laws, or treaties of the United States.

6.      This action is brought under 42 U.S.C. § 1983 to redress the deprivation of federal statutory and constitutional rights.

## PARTIES

7.      Plaintiff Shonice G. Garnett resides in the District of Columbia.

8.      Plaintiff Richard Messick, Jr. resides in the District of Columbia.

9.      Plaintiff Linda Murph resides in the District of Columbia.

10.     Plaintiff Tracey Ross resides in the District of Columbia.

11.     Plaintiff Bread for the City is a not-for-profit organization organized under DC law that, through the operation of its two centers, provides necessary safety-net support to the District of Columbia's low-income community, many of whom are SNAP applicants or recipients of SNAP benefits in the District of Columbia.  Bread supports its clients and their families with comprehensive and holistic services, including a food program, a clothing program, a medical clinic, a social services program, a legal clinic, and other advocacy efforts.

12.     Defendant Laura Zeilinger is the Director of the District of Columbia Department of Human Services ("DHS"), the agency responsible for administering SNAP in the District of Columbia and ensuring compliance with federal law relating to SNAP.  Defendant Zeilinger is sued in her official capacity.

**STATUTORY AND REGULATORY SCHEME**

**Overview**

13.     In 1964, Congress established the federally funded, state-administered Food Stamp Program in order to "safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households."  7 U.S.C. § 2011; 7 C.F.R. § 271.1.

14.     Effective October 1, 2008, the federal Food Stamp Program was renamed the Supplemental Nutrition Assistance Program, and the federal Food Stamp Act was renamed the Food and Nutrition Act of 2008 ("SNAP Act").  Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, §§ 4001–02, 122 Stat. 1853 (2008).

15.     The federal government provides complete funding to states for all SNAP benefits and also at least 50% of a state's costs to administer the program.  7 U.S.C. §§ 2013(a), 2019, 2025(a); 7 C.F.R. §§ 277.1(b), 277.4.

16.     Under the SNAP Act and regulations, the term "state" includes the District of

Columbia.  7 C.F.R. § 271.2.

17.　　Participating states designate a single state agency (hereinafter "administering agency") responsible for administering the program and complying with the federal SNAP requirements.  7 U.S.C. § 2020(a), (d), (e).

18.　　DHS is the single state agency responsible for administering SNAP in the District of Columbia.

19.　　Under federal law, to be eligible for SNAP assistance, a household's net income must be below the federal poverty line and its available resources may not exceed $2,000 (or, where a household includes a member 60 years of age or older, $3,000).  7 U.S.C. § 2014(c), (g). The District has availed itself of an option to expand eligibility to households with gross income at or below 200% of the federal poverty line.  D.C. Code 4-261.02(b).

20.　　The administering agency must provide SNAP benefits to all eligible households who submit an application for participation in SNAP.  7 U.S.C. § 2014(a).

**Filing of Applications, Eligibility Interviews, and Verification**

21.　　The application filed on day one by an individual or household seeking to apply for SNAP need only include the applicant's name, address, and the signature of a responsible household member or the household's authorized representative.  *Id.* § 2020(e)(2)(B)(iv); 7 C.F.R. § 273.2(c)(1).

22.　　Under the SNAP Act and implementing regulations, the administering agency must permit households to file an application on the first day that they contact the local SNAP office during office hours.  7 U.S.C. § 2020(e)(2)(B)(iii); 7 C.F.R. § 273.2(c)(1), (c)(2)(i).

23.　　The administering agency must "encourage" households to file an application the same day the household or its representative contacts the SNAP office in person or by telephone

and expresses interest in obtaining SNAP or expresses concerns that indicate food insecurity.  7 U.S.C. § 2020(e)(2)(B)(iii); 7 C.F.R. § 273.2(c)(2)(i).

24.     The administering agency must document the date the application was filed by recording the date of receipt at the SNAP office.  7 C.F.R. § 273.2(c)(1)(iv).

25.     The administering agency must make information regarding SNAP's requirements and procedures generally available and must explain to SNAP applicants their rights and responsibilities concerning eligibility for benefits.  *Id.* §§ 273.2(c)(4), (e)(1); 272.5(b).

26.     The administering agency must schedule an interview for all SNAP applicant households who are not interviewed on the day they submit their applications and must schedule all interviews as promptly as possible to ensure eligible households receive an opportunity to participate within 30 days after the application is filed.  *Id.* § 273.2(e)(3).

27.     The administering agency may conduct interviews required in connection with determining eligibility at the SNAP office, at another mutually acceptable location, or by telephone under specified circumstances.  *Id.* § 273.2(e).

28.     The administering agency must notify each household that misses its interview that it missed the scheduled interview and that the household is responsible for rescheduling a missed interview.  If the household contacts the administering agency within the 30-day application processing period, the administering agency must schedule a second interview.  The administering agency may not deny a household's application prior to the 30th day after application if the household fails to appear for the first scheduled interview.  If the household requests a second interview during the 30-day application processing period and is determined eligible, the administering agency must issue prorated benefits from the date of application.  *Id.* § 273.2(e)(3).

29.     As part of the application process, applicants must verify certain information related to their eligibility as prescribed by 7 C.F.R. § 273.2(f).

30.     At the time of application, the administering agency must notify the household of the verification requirements it must meet and offer to assist the household in obtaining required verification as required by 7 C.F.R. § 273.2(c)(5), (f)(5).

31.     The administering agency must give households at least 10 days to provide the required verification. *Id.* § 273.2(f).

32.     For households that qualify for expedited processing, as described in ¶¶ 35–37, the administering agency must verify the applicant's identity through a collateral contact or readily available documentary evidence as provided in 7 C.F.R. § 273.2(f)(1) and must make reasonable efforts to verify other eligibility factors within the expedited processing standard, but it cannot delay SNAP benefits beyond seven days solely because these eligibility factors cannot be verified. *Id.* § 273.2(i)(4).

33.     If the administering agency approves a household for benefits, it must provide SNAP benefits from the date the application was filed. *Id.* §§ 273.2(a)(2); 273.10(a)(1)(ii).

**Timely Processing and Benefit Issuance Requirements for Initial Applications**

34.     The administering agency must provide eligible applicants with an opportunity to participate in SNAP no later than 30 days after the date of application.  7 U.S.C. § 2020(e)(3); 7 C.F.R. § 273.2(a), (g)(1).

35.     The administering agency must provide expedited issuance of SNAP benefits to households with very low income and liquid resources, households whose housing costs exceed the sum of their income and liquid resources, and certain migrant and seasonal worker households.  7 U.S.C. § 2020(e)(9); 7 C.F.R. § 273.2(i)(1).

36.     For households eligible for expedited service, the administering agency must provide benefits no later than the seventh day following the date an application is filed.  7 U.S.C. § 2020(e)(9)(A); 7 C.F.R. § 273.2(i)(3)(i).

37.     The administering agency must affirmatively identify households eligible for expedited service at the time the household requests assistance.  For example, a receptionist, volunteer, or other employee shall be responsible for screening applications as they are filed or as individuals come in to apply.  7 U.S.C. § 2020(e)(9); 7 C.F.R. § 273.2(i)(2).

38.     The length of time the administering agency has to deliver SNAP benefits to eligible households is measured from the date the application is filed in the SNAP office.  7 C.F.R. § 273.2(c)(1).

39.     SNAP benefits are typically provided through an Electronic Benefits Transfer ("EBT") system, with benefits accessed by households using reusable plastic EBT cards.  *Id.* § 274.1.

40.     Providing an opportunity to participate in SNAP within the timeframes outlined above means providing households with a PIN and an active EBT card with benefits that have been posted to the household's account and are available for spending.  Administering agencies that mail EBT cards and PINs must do so in time to ensure that the benefits can be spent after they are received but before the applicable time period expires.  *Id.* § 274.2(b).

## Certification Periods

41.     The administering agency must certify households in accordance with the eligibility rules and procedures set forth in the SNAP Act and implementing regulations.  *See generally* 7 U.S.C. §§ 2014(a); 2020(e)(3), (e)(4), (e)(9) (implemented by 7 C.F.R. Part 273).

42.     The administering agency must certify households for a specified period of time.

7 C.F.R. § 273.10(f).

**Timely Recertification of Eligibility**

43.     In order to receive SNAP benefits after the end of its certification period, a household must submit an application for recertification and be found eligible.

44.     Before the start of the last month of the household's certification period, the administering agency must provide each household with a Notice of Expiration ("NOE") of its certification period and the need to submit an application for recertification to receive ongoing SNAP benefits.  7 U.S.C. § 2020(e)(4).

45.     As to each household that applies for recertification by the specified date and is eligible, the administering agency must provide the SNAP allotment no later than one month after the household received its last allotment issued pursuant to the prior certification period. *Id.*

46.     The requirements in 7 U.S.C. § 2020(e)(4) are implemented by 7 C.F.R. § 273.14, which requires the administering agency, *inter alia*, to provide the required NOE to households by specified dates, to recertify eligibility, and to issue continuing benefits within specified timeframes to eligible households that timely complete a recertification application.

47.     The administering agency must provide households with a NOE containing, *inter alia*, the date the certification period expires and the date by which a household must submit an application for recertification in order to receive uninterrupted SNAP benefits.  7 C.F.R. § 273.14(b)(1).

48.     The administering agency must provide households with notices of required verifications and the due date for such verifications, and give the household at least 10 days to provide the required information.  *Id.* § 273.14(b)(4).

49.     The administering agency must provide any household whose eligibility is not determined by the end of its current certification period due to the time period allowed for submitting missing verification an opportunity to participate, if eligible, within five working days after the household submits the missing verification.  *Id.* § 273.14(b)(4).

50.     To expedite the recertification process, administering agencies are encouraged to send with the NOE a recertification form, an interview appointment letter that allows for either in-person or telephone interviews, and a statement of needed verification required by 7 C.F.R. § 273.2(c)(5).  *Id.* § 273.14(b)(1)(iii).

51.     Administering agencies must schedule interviews so that the household has at least 10 days after the interview to provide verification before the certification period expires. *Id.* § 273.14(b)(3)(iii).

52.     If a household misses a scheduled interview, the administering agency must send the household a Notice of Missed Interview that may be combined with a notice of denial.  If the household misses its scheduled interview and requests another interview, the administering agency must schedule another interview.  *Id.*

53.     The administering agency must provide eligible households an opportunity to receive SNAP benefits no later than either 30 calendar days after the date the household received its last allotment or by its normal issuance date in the month following the end of its certification period.  *Id.* § 273.14(d).

54.     Households that submit recertification applications by the fifteenth day of the last month of the certification period have timely applied for recertification and the administering agency must provide an opportunity for those households, if still eligible, to participate in SNAP by the household's normal benefit issuance date in the month after the end of its current

certification period.  *Id.* § 273.14(c)(2), (d).

55.    Administering agencies must process recertification applications received after the fifteenth day of the last month of the certification period, but before the end of the certification period, within 30 days from the date of application and, as to those households found eligible, must provide a full month's SNAP allotment for the first month of the new certification period.  *Id.* § 273.14(e)(1).

**Notice and Hearing Rights**

56.    When the administering agency proposes to reduce or terminate a household's SNAP benefits during its certification period, federal law requires the agency to provide the household with timely and adequate notice and the opportunity for a fair hearing and continued benefits until the hearing decision is issued.  7 U.S.C. § 2020(e)(10) (implemented by 7 C.F.R. §§ 273.13, 273.15).

57.    The regulation implementing 7 U.S.C. § 2020(e)(10) provides that "timely" notice of a reduction or termination of benefits (adverse action), is a notice that is mailed at least 10 days before the date upon which the adverse action becomes effective.  7 C.F.R. § 273.13(a)(1).

58.     The regulation implementing 7 U.S.C. § 2020(e)(10) provides that a notice of adverse action is considered adequate if it explains in easily understandable language, among other things, the following:   the proposed action; the reason for the proposed action; the household's right to request a fair hearing; and the availability of continued benefits.  7 C.F.R. § 273.13(a)(2).

59.    The regulation implementing 7 U.S.C. § 2020(e)(10) requires the administering agency to provide the opportunity for a fair hearing to any household aggrieved by an action of the State agency that affects the participation of the household in SNAP.  7 C.F.R. § 273.15(a).

60.     In addition, when the administering agency delays in processing a household's initial application or application for recertification, the agency must send written notice to the household informing it, *inter alia*, that processing of the application has not been completed.  *Id.* § 273.10(g)(1)(iii).

## FACTS COMMON TO THE CLASS

### SNAP Administration in the District of Columbia

61.     In the District of Columbia, DHS's Economic Security Administration ("ESA") administers SNAP.  ESA maintains five service centers throughout the District where SNAP applicants and recipients can file initial or recertification applications and follow up on other questions or concerns regarding their cases.

62.     According to the DHS website, applicants can obtain a SNAP application (a "Combined Application") from the DHS website, fill it out, sign it and submit it in person or by mail to a service center.   D.C. Dep't of Human Servs., *Apply for Benefits*, https://dhs.dc.gov/service/apply-benefits (last visited Aug. 23, 2017).

63.     Many applicants go in-person to a service center to either submit an application or to obtain an application which they then submit.

64.     ESA's Policy Manual provides that an applicant who applies in person shall be interviewed on the day she files the application.  D.C. Dep't of Human Servs., *ESA Policy Manual*,   pt.   III,   § 1.8.1,   https://dhs.dc.gov/sites/default/files/dc/sites/dhs/page_content/ attachments/ESA_Policy_Manual_Combined_Revised.pdf (last visited Aug. 24, 2017).  If it is not possible to conduct an interview that day, ESA's Policy Manual provides that the agency is to schedule the interview for the next working day.  *Id.*  For mailed or forwarded applications,

the interview is to be scheduled as soon as possible to ensure that an eligible applicant can receive timely SNAP benefits. *Id.*

65. When DHS sends current SNAP recipients a NOE of the certification period and the need to apply for recertification, it does not include a recertification application but instead typically includes in the NOE a date for the SNAP recipient to conduct an in-person interview at the service center. Typically the recipient completes the recertification application at the interview.

66. If DHS does not affirmatively determine that a household subject to recertification is eligible for a new certification period, the household will not receive benefits after the end of the current certification period. *Id.* at pt. VIII, § 4.3.

**Widespread Problems Following Implementation of New Computer System**

67. Beginning in October 2016, the District of Columbia replaced its legacy computer eligibility system (the Automated Client Eligibility Determination System, "ACEDS") used to administer SNAP and other benefit programs for the District of Columbia with a new system, the District of Columbia Access System ("DCAS" or "DC Link").

68. Prior to the roll out of DCAS, the Food and Nutrition Service of the United States Department of Agriculture ("FNS") warned DHS that the testing methodology DHS had been using was "not sufficient to prove that DC is ready to Go Live as planned." Among other things, FNS warned of risks of reduced program access, worker backlogs, delayed application processing, and untimely benefit issuance. At that time, FNS advised DHS that "[l]aunching a new system without having conducted a live pilot is against the intent of the regulations and against our best advice, and by doing so, FNS wishes DHS to know that it proceeds with the deployment of DC Link at its own risk."

69.     Despite FNS's warnings, Defendant did not conduct a live pilot prior to going live with the new system.

70.     In December 2016, FNS conducted a special review of implementation of DCAS. The report summarizing the findings of this review was transmitted to DHS through a March 23, 2017 letter.

71.     The report found, among other errors, that: (1) eligible households did not receive an opportunity to participate within 30 days; (2) recipients who were eligible for expedited SNAP benefits received them untimely; (3) errors in DCAS "resulted in the inability to process the SNAP case timely"; (4) service centers were not protecting the filing date of SNAP applications; (5) DCAS failed to send a notice of approval or denial to SNAP applicants; and (6) DCAS failed to create or send a Notice of Required Verification to SNAP applicants or the notice contained incorrect information.

72.     The FNS report also noted that, in interviews, DHS staff reported that their "ability to serve customers efficiently and effectively was severely impacted by the new DCAS system" and stated that applications that took 20 minutes to process in the old ACEDS system took approximately 90 minutes to process in DCAS.  In addition, DHS staff reported that the "new case processing is often very error-prone and leads to system errors and the inability to process the case timely."

73.     The FNS report also noted that SNAP clients who were interviewed expressed "a great deal of frustration . . . linked to long wait times and the need to make multiple trips to the service center to apply for benefits or resolve errors in their SNAP case.  This complaint was confirmed by Call Center data, which saw a vast increase in customer calls regarding missing benefits, inaccurate benefits, and nonfunctioning EBT cards."

74.     The FNS report also noted that approximately 18% of the sampled cases contained an error attributed to DCAS and that some of these errors resulted in the inability to process SNAP cases timely.

75.     In May 2017, DHS submitted a Corrective Action Plan responding to prior quality control findings.

76.     In a June 2017 internal email, an FNS representative expressed concern that "the situation with DCAS performance has not improved markedly and the project governance continues to be moveable target and missing the mark."

77.     In FNS's July 5, 2017 response to DHS's May 2017 Corrective Action Plan, the federal agency informed DHS that it "remain[ed] concerned about customer complaints related to DCAS implementation issues."

**Application and Recertification Data**

78.     For the period October 2016 through December 2016, DHS made a total of 4,546 initial SNAP application decisions, of which 3,258 were application approvals.  According to data submitted by DHS to FNS, DHS approved 2,253 (69.15%) of these 3,258 applications late (i.e., beyond the 30-day deadline established by federal regulations).  No timeliness data was reported for applications that were denied.

79.     For the period October 2016 through December 2016, DHS approved 5,633 expedited SNAP applications.  Of these 5,633 expedited application approvals, 5,110 (90.71%) were approved late (i.e., beyond the 7-day deadline established by federal regulations), according to data submitted by DHS to FNS.

80.     For the period October 2016 through December 2016, DHS reported to FNS that it approved 3,738 recertifications and denied 5,376 recertifications, for a total of 9,114

recertification decisions and a recertification denial rate of 58.98%.  DHS did not report any late recertification approvals.

81.     According to data provided by DHS, for the months of January 2016 through September 2016, between 44 to 50% of the SNAP terminations each month were due to an alleged failure by the customer to complete the SNAP recertification process.

82.     DHS's Corrective Action Plan from November 2016 responding to quality control findings noted a negative error rate of 29.74% for fiscal year 2016, a 7.027% increase from the prior year, with one major error being "[i]mproper termination or suspension for failure to meet reporting requirements."  The report elsewhere noted a District-wide deficiency of "[u]ntimely processing of Food Stamp recertifications."

83.     Since SNAP households due for recertification can only receive ongoing SNAP benefits if DHS affirmatively determines they are eligible for the new certification period, the high rate of recertification denials likely includes many recertification applications, like those of Plaintiff Murph, that DHS had received but had not processed in time to authorize benefits for the new certification period, thereby resulting in the wrongful denial of SNAP recertification applications and the resulting delays in their receipt of ongoing SNAP benefits.

84.     Recertification applicants, such as Plaintiff Ross, never even received the required NOE informing them of the need to recertify, let alone a Notice of Missed Interview from DHS, with the result that DHS denied them the opportunity to recertify and to continue receiving SNAP benefits on a timely basis after the end of their current certification period.

85.     DHS's policies and practices of failing to allow SNAP households to complete the SNAP application recertification process and to process SNAP recertification applications and

issue benefits to eligible households within the timeframes required by federal law and implementing regulations are ongoing.

**Failure to Send Notices to SNAP Applicants and Recipients**

86. In its March 2017 report concerning DCAS, FNS stated that it was "highly concerned that DCAS does not issue notices timely and/or correctly to SNAP applicants and households" and that "the system so often fails to generate a correct notice." The report noted that, in 67% of the denied cases reviewed, no denial notice had been sent to the SNAP applicant.

87. Reports prepared by DHS following DCAS implementation have noted widespread problems with the system's ability to successfully generate and send notices. In April 2017, a report prepared by DHS stated that notices are "failing due to data validation errors on a daily basis." In May 2017, DHS noted that it had "discovered an additional 7,000 erroneous records with data issues," further contributing to this problem.

88. Reports prepared by DHS indicate that a significant percentage of DCAS notices fail to successfully generate and send each week. For example, in the week of January 24, 2017, 26% of all DCAS notices for the week failed to successfully generate. In the week of April 10, 2017, 19% of all DCAS notices for the week failed to successfully generate (a total of 6,093 notices). And, in the week of May 29, 2017, more than 12% of all DCAS notices for the week failed to successfully generate (a total of 1,395 notices).

89. Reports prepared by DHS also acknowledge that there is a significant backlog of notices that are overdue to be sent out to SNAP applicants and recipients. As of July 5, 2017, there was a backlog of 1,750 SNAP-related notices that needed to be sent out.

90.     This backlog includes NOEs that must be sent to SNAP recipients informing them of the need to recertify.  As of July 5, 2017, the backlog included 300 such notices (referred to as "recertification notices").

91.     Reports prepared by DHS have also acknowledged specific job failures and other problems impacting recertification notices.  Specifically, in April 2017, DHS noted "a job failure for recert[ification] notices which caused notices on 4/11 to fail."  In May 2017, DHS stated that the agency had "received input from service centers about Recert[ification] . . . notices which have date issues."

92.     DHS's policies and practices of failing to provide SNAP recipients with legally required notices concerning their benefits—including NOEs informing SNAP applicants of the need to recertify—are ongoing.

### FACTS REGARDING INDIVIDUALLY NAMED PLAINTIFFS

**Plaintiff Shonice G. Garnett**

93.     Plaintiff Shonice G. Garnett resides in the District of Columbia.

94.     Ms. Garnett lives in a shelter and does not have any income.

95.     On July 10, 2017, Ms. Garnett applied for food stamps at Defendant's H Street Service Center.

96.     On July 26, 2017, Ms. Garnett called the Defendant's Call Center.  The automated system stated that her SNAP application was received and pending.

97.     On August 14, 2017, Ms. Garnett went to Defendant's office that distributes EBT cards and was told that no card was available for her to pick up.

98.     Defendant has not notified Ms. Garnett whether her SNAP application has been approved or denied.

99.     Defendant has not provided Ms. Garnett with an EBT card, which she needs to spend the food stamps once Defendant processes Ms. Garnett's SNAP application.

**Plaintiff Richard Messick, Jr.**

100.    Plaintiff Richard Messick, Jr. resides in the District of Columbia.

101.    Mr. Messick lives by himself and is currently unemployed.  He pays $1,150 in rent.

102.    Mr. Messick applied for food stamps on January 13, 2017.

103.    DHS provided Mr. Messick with a receipt for submitting his SNAP application.

104.    Defendant never processed Mr. Messick's January 2017 SNAP application.

105.    Mr. Messick submitted a second SNAP application for food stamps in May 2017. Defendant found Mr. Messick eligible for food stamps based on this application.  However, Defendant still has not processed his January 13, 2017 application.

**Plaintiff Linda Murph**

106.    Plaintiff Linda Murph resides in the District of Columbia.

107.    Ms. Murph currently resides in subsidized housing.

108.    Until late April 2017, Ms. Murph's sole income was $659 per month in federal Supplemental Security Income.

109.    In late April 2017, Ms. Murph began working as a security guard with irregular hours and gross earnings averaging $550 gross every two weeks.  Beginning in July 2017, her hours started to become more regular.

110.    Ms. Murph was an ongoing SNAP recipient who is required to apply to recertify her eligibility periodically.

111.    In April 2017, Ms. Murph went to Defendant's H Street Service Center to apply to recertify her food stamps eligibility.

112.    Ms. Murph completed the necessary paperwork and was informed by one of Defendant's agents that nothing further was required at that time.

113.    Defendant has not processed Ms. Murph's application for SNAP recertification.

114.    Defendant has not provided Ms. Murph with food stamps since May 2017.

**Plaintiff Tracey Ross**

115.    Plaintiff Tracey Ross resides in the District of Columbia.

116.    Ms. Ross was an ongoing SNAP recipient who was required to apply to recertify her eligibility periodically.

117.    Defendant had previously certified Ms. Ross as eligible for food stamps through the end of June 2017.

118.    Defendant terminated Ms. Ross's food stamps effective July 2017 for allegedly failing to apply to recertify her eligibility for another certification period.

119.    Defendant did not provide Ms. Ross with a NOE informing her of the need to apply to recertify her food stamps eligibility.

## FACTS REGARDING ORGANIZATIONAL PLAINTIFF BREAD FOR THE CITY

120.    The mission of Bread for the City is to provide residents of the District of Columbia with comprehensive services, including food, clothing, medical care, and legal and social services, in an atmosphere of dignity and respect.

121.    Each year, Bread's food program provides much-needed food to thousands of individuals and families living in poverty in the Washington, DC area who are unable to secure food on their own.  In 2016, Bread distributed food to roughly 24,000 individuals and fed an average of 8,000 people a month.

122.    Beginning in or about October 2016, staff at Bread's food program witnessed a significant increase in demand for its services as compared to the demand at the same time in 2015.

123.    The experience of Bread's food program employees is consistent with Bread's data for food served beginning in October 2016.  For example, the number of households in Wards 7 and 8 (the wards in the District with the lowest per capita income) that received an emergency food package from Bread's food program increased by 52% during the period of October 2016 through May 2017, as compared to the same time period the prior year.  The number of times emergency bags of food were provided also increased—by 54%—in these wards over this time period.  Across all wards in the District, 38% more households received emergency food packages from Bread during the period of October 2016 through May 2017, as compared to the same period the prior year.  The number of times emergency bags of food were provided across the District also increased—by 41%—during this time period.

124.    To meet this need, Bread has been compelled to divert its scarce resources to ensure that its food program is adequately resourced and staffed so that the individuals and families served by the food program are able to secure basic nutritional needs.  Because Bread's food expenses increased so significantly beginning in October 2016, the organization will need to reduce its food program budget in fiscal year 2018 by $260,000 to maintain a balanced budget.

125.    Each year, Bread's Legal Clinic provides legal advice and representation mainly in the areas of landlord-tenant, family, and public benefits law, including to individuals and families who are terminated from public benefits (such as food stamps) or have had their applications for assistance denied.  In 2016, Bread's Legal Clinic, consisting of 15 attorneys, provided legal assistance and referrals that benefited roughly 5,534 individuals.

126.    Beginning in or about October 2016, employees of Bread's Legal Clinic observed a greater need among their clients seeking assistance with their food stamps. Following this observation, Bread's Legal Clinic created an internal system for referrals and devoted more of its staff time to providing assistance/referrals to Bread clients with questions about their food stamps. Between May 9, 2017 and August 15, 2017, for example, Bread's lawyers received 55 referrals from Bread's other programs for individuals who self-identified that they were experiencing problems with their food stamps. The food stamps referrals included individuals whose initial and recertification applications were not timely processed, some whose benefits were terminated without notice, others who had their benefit amounts decreased without notice, and others who were given the wrong amount of benefits.

127.    To meet this need, Bread's Legal Clinic has diverted a portion of its scarce resources to: (1) developing an internal system for identifying and referring individuals who are having problems with food stamps; (2) expanding its ability to respond to these increased complaints from clients about SNAP application and recertification processing; and (3) referring meritorious improper food stamp terminations and application delays referrals to other DC legal services organizations, such as Legal Aid, for legal advice and representation.

128.    Each year, Bread's Representative Payee Program helps individuals who cannot manage their own Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits by receiving benefits on their behalf and managing expenditures for their food, rent and other needs. In 2016, Bread assisted, through its Representative Payee Program, roughly 800 people who live with disabilities.

129.    Beginning in or about October 2016, staff at Bread's Representative Payee Program witnessed a significant increase in the requests by its disabled SSDI and SSI

beneficiaries for additional funds for food, beyond the amount originally planned for with the representative payee.  Specifically, Bread's Representative Payee Program experienced a 33% increase in requests for additional funds for food between October 2016 and May 2017, as compared with the number of requests between October 2015 and May 2016.  Bread also experienced a 42% increase in emergency food requests during this same period, as compared to the same period last year.

130.    On information and belief, Defendant's failure to timely process initial and recertification applications for SNAP and to timely issue SNAP benefits to eligible individuals and families as alleged in this Complaint have contributed to the increased burdens on Bread's food, legal, and representative payee programs.

131.    Bread is not alone in observing these significant impacts on its client population. In June 2017, Martha's Table—a community organization that provides food and education resources to low-income individuals—reported that "[i]n the first 5 months of 2017," the organization had "seen a dramatic increase" in the number of individuals obtaining food through the organization's no-cost lobby market.   In July 2017, Martha's Table reported that the organization had seen a 50% increase in the number of shoppers at its no-cost lobby market in June 2017 as compared to June 2016.

132.    By devoting increased staff and volunteer time and otherwise diverting resources to providing assistance to individuals and families whose initial and recertification applications for SNAP were not timely processed, Bread diverted scarce resources away from other aspects of the holistic services that it provides to DC residents.

133.    If Defendant had timely processed initial and recertification applications for SNAP and timely issued SNAP benefits to eligible individuals and families, Bread would have

been able to devote more of its resources to the organization's other programs and/or clients.  For example, Bread would have provided food and legal services to more or different clients in urgent need of food, social services, and legal services assistance.

134.    Defendant's policies or practices have significantly frustrated Bread's purpose of providing low-income residents of the District of Columbia with food, clothing, medical care, legal services, and social services.  As a result of Defendant's wrongdoing, Bread has diverted, is diverting, and will continue to divert scarce resources—including staff time—to:  (1) identifying and counseling clients; (2) investigating complaints; (3) making referrals to other legal services organizations, including Legal Aid; and (4) providing additional food and resources for food to individuals and families whose initial or recertification applications for SNAP were unnecessarily delayed or improperly processed.

135.    Bread has no plain, adequate, or complete remedy at law.  It has suffered, is suffering, and will continue to suffer irreparable injury as a result of Defendant's continuing unlawful conduct.

## CLASS ALLEGATIONS

136.    Individually Named Plaintiffs bring this action under Federal Rule of Civil Procedure Rule 23(a) and (b)(2) on behalf of two classes defined as follows:

a.  All District of Columbia residents, since June 1, 2016:  (1) who have applied, are applying, or will apply for SNAP benefits through an initial or recertification application; and (2) who have had or will have the processing of such application delayed beyond the timeframes mandated by law.

b.  All District of Columbia SNAP recipients, since June 1, 2016:  (1) who have been or will be required to submit a recertification application to maintain

SNAP benefits; (2) as to whom Defendant has failed or will fail to issue notice of the need to recertify; and (3) who have been or will be terminated from participation in SNAP due to Defendant's failure to issue such notice.

137.    These classes are so numerous that joinder of all members is impracticable.  Each month, thousands of people in the District of Columbia file initial applications for SNAP benefits, and thousands of current SNAP recipients are required to recertify their eligibility to continue receiving SNAP benefits.  These classes also include individuals whose identity is not available and, as to future class members, is not readily available, making joinder of all members of the classes a practical impossibility.

138.    According to data maintained by FNS, 119,677 persons in the District of Columbia participated in SNAP as of May 2017.  *See* FNS, *Supplemental Nutrition Assistance Program:  Number of Persons Participating* (Aug. 4, 2017), http://www.fns.usda.gov/ sites/default/files/pd/29SNAPcurrPP.pdf.  For the same period, 69,399 households in the District of Columbia participated in SNAP.  *See* FNS, *Supplemental Nutrition Assistance Program: Number of Households Participating* (Aug. 4, 2017), http://www.fns.usda.gov/ sites/default/files/pd/30SNAPcurrHH.pdf.

139.    There are numerous questions of fact and law common to the classes concerning whether Defendant fails to timely process initial and recertification applications for SNAP and fails to give households required to recertify their SNAP eligibility the opportunity to complete the recertification process so as to provide timely SNAP benefits to eligible individuals and households.  Similarly, a common question exists as to whether Defendant provides adequate notice to SNAP applicants of the failure to timely process applications and of the right to an administrative hearing to challenge this delay.

140. The Individually Named Plaintiffs seeking to represent the classes present claims that are typical of the claims of the classes. Both the Individually Named Plaintiffs and absent members of the classes: (1) did not have their initial or recertification applications for SNAP processed in a manner so as to ensure the timely receipt of SNAP benefits and did not receive notice of such delay or the opportunity for a fair hearing; or (2) were required to recertify but were not issued NOEs informing them of the need to do so, and were therefore terminated from participation in SNAP.

141. The Individually Named Plaintiffs will fairly and adequately protect the interests of the classes. There are no conflicts between the interests of the Individually Named Plaintiffs and the classes, and the Individually Named Plaintiffs and the proposed classes are represented by the Legal Aid Society of the District of Columbia, the National Center for Law and Economic Justice, and Hogan Lovells US LLP, whose attorneys are experienced in class action litigation and will adequately represent the class. Legal Aid has litigated numerous cases in the US District Court for the District of Columbia filed as class actions. In the past several years alone, Legal Aid served or is serving as counsel or lead counsel in the following matters: *Kinard v. E. Capitol Family Rental L.P.*, No. 15-cv-1935 (D.D.C. Nov. 2, 2015); *Heard v. U.S. Social Sec. Admin.*, No. 15-cv-00230 (D.D.C. Feb. 18, 2015); and *Lipscomb v. The Raddatz Law Firm PLLC*, No. 14-cv-1958 (D.D.C. Nov. 19, 2014). The National Center for Law and Economic Justice has litigated numerous public benefits class action cases, including SNAP application delay cases, in federal and state courts throughout the country, including Rhode Island, New York, Nebraska, Georgia, Connecticut, Indiana, Hawaii, Maryland, and Arizona. Hogan Lovells US LLP has litigated numerous class actions matters in both federal and state courts and the

District of Columbia, including, for example, *District of Columbia v. Reid*, 104 A.3d 859 (D.C. 2014).

142.   Declaratory and injunctive relief is appropriate with respect to the classes as a whole, because Defendant has acted on grounds applicable to all class members.

## STATEMENT OF CLAIMS

### FIRST CLAIM (SNAP)

143.   Defendant's policies, practices, and procedures of failing to process initial SNAP applications and to provide benefits to eligible households within seven or 30 days of the date of application, as appropriate, violate 7 U.S.C. § 2020(e)(3), (9) and implementing regulations, 7 C.F.R. § 273.2(a)(2), (g)(1), (i)(2), (i)(3)(i) and 7 U.S.C. § 2014(a).

### SECOND CLAIM (SNAP)

144.   Defendant's policies, practices, and procedures of failing to allow SNAP households to complete the SNAP recertification application process in time to receive benefits for the new certification period, to determine such households' eligibility within the required timeframes, and to provide SNAP benefits for the new certification period to those eligible violate 7 U.S.C. § 2020(e)(4) and implementing regulations, 7 U.S.C. § 2014(a) and 7 C.F.R. § 273.14.

### THIRD CLAIM (SNAP AND DUE PROCESS)

145.   Defendant's policies, practices, and procedures of failing to provide written notice and an opportunity to request a fair hearing to SNAP applicants whose applications Defendant has not processed within the mandated timeframes violates 7 U.S.C. § 2020(e)(10) and implementing regulations, 7 C.F.R. §§ 273.10(g)(1)(iii), 273.15(a), and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask that this Court enter judgment in favor of Plaintiffs and, for the Individually Named Plaintiffs, the classes they represent, as follows:

A.      Assume jurisdiction of this matter;

B.      Certify this action as a class action under Rule 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure with respect to the proposed classes identified herein;

C.      Declare that Defendant's policies and practices of failing:

(1)      to process all initial SNAP applications, including applications entitled to expedited processing, and to provide benefits to those eligible within the timeframes required by law violate Plaintiffs' and Plaintiff class members' rights under 7 U.S.C. § 2020(e)(3), (9) and implementing regulations, 7 U.S.C. § 2014(a) and 7 C.F.R. § 273.2(a)(2), (g)(1), (i)(2), (i)(3)(i);

(2)      to ensure that (1) SNAP households have the right to re-apply and complete the recertification application process in time to receive benefits for the new certification period and (2) Defendant determines such households' eligibility within the mandated timeframes and provides SNAP benefits to those eligible, violates 7 U.S.C. § 2020(e)(4) and implementing regulations, 7 U.S.C. § 2014(a) and 7 C.F.R. § 273.14; and

(3)      to provide a written notice and opportunity to request a fair hearing to SNAP applicants whose applications, including applications for recertification, have not been processed within the mandated timeframes violates 7 U.S.C. § 2020(e)(10) and implementing regulations, 7 C.F.R. §§ 273.10(g)(1)(iii),

273.15(a), and the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

D.      Preliminarily and permanently enjoin Defendant to: (1) process SNAP applications, determine applicant households' eligibility, and issue SNAP benefits to eligible households within the mandated timeframes; (2) provide SNAP recipients the right to re-apply and complete the recertification application process in time to receive benefits for the next certification period and determine eligibility and issue benefits within the mandated timeframes; and (3) provide written notice and opportunity to request a fair hearing to SNAP applicants, including recertification applicants, whose applications are not processed within the mandated timeframes;

E.      Award Plaintiffs litigation costs and reasonable attorney's fees, pursuant to 42 U.S.C. § 1988; and

F.      Grant such other, further, or different relief as the Court may deem just and proper.


Dated: August 28, 2017                         Respectfully submitted,

                                               ___/s Chinh Q. Le_____
                                               Chinh Q. Le (DC Bar No. 1007037)
                                               Jennifer Mezey (DC Bar No. 462724)*
                                               Chelsea Sharon (DC Bar No. 1016006)*
                                               LEGAL AID SOCIETY OF THE
                                                   DISTRICT OF COLUMBIA
                                               1331 H Street NW, Suite 350
                                               Washington, DC 20005
                                               202-628-1161 (Phone)
                                               202-727-2132 (Fax)
                                               cle@legalaiddc.org
                                               jmezey@legalaiddc.org

---

*        Certification to practice pursuant to LCvR 83.2(g) to be submitted.

csharon@legalaiddc.org

Marc Cohan[†]
Mary R. Mannix[†]
Travis W. England[†]
Katharine Deabler-Meadows[†]
NATIONAL CENTER FOR LAW
     AND ECONOMIC JUSTICE
275 7th Avenue, Suite 1506
New York, NY 10001
212-633-6967 (Phone)
212-633-6371 (Fax)
cohan@nclej.org

Peter R. Bisio (DC Bar No. 459256)
Lance Y. Murashige (DC Bar No. 1021562)[‡]
Emily Goldman (DC Bar No. 1032032)
HOGAN LOVELLS US LLP
555 13th Street NW
Washington, DC 20004
202-637-5600 (Phone)
202-637-5910 (Fax)
peter.bisio@hoganlovells.com

*Attorneys for Plaintiffs*

---

[†]    Application for admission *pro hac vice* to be sought.
[‡]    Admission to the US District Court for the District of Columbia pending.