**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
SHONICE G. GARNETT, *et al.*,           )
                                        )
                        *Plaintiffs*,   )
                                        )   Civil Action No. 1:17-cv-1757
            v.                          )
                                        )
LAURA ZEILINGER,                        )
                                        )
                        *Defendant*.    )
_____ )

**<u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................. iii

PRELIMINARY STATEMENT ............................................................................1

STATUTORY AND REGULATORY SCHEME....................................................3

   I.     THE FEDERAL SNAP ACT ...................................................................3

   II.    APPLICATION PROCESSING REQUIREMENTS FOR INITIAL APPLICANTS ..4

   III.   NOTIFICATION AND PROCESSING REQUIREMENTS FOR RECERTIFICATION APPLICANTS ...........................................................6

   IV.   NOTICE AND HEARING RIGHTS FOLLOWING PROCESSING DELAYS .........7

STATEMENT OF FACTS ....................................................................................7

   I.     DEFENDANT'S ADMINISTRATION OF SNAP IN THE DISTRICT OF COLUMBIA...........................................................................................7

   II.    DEFENDANT'S FAILURE TO TIMELY PROCESS INITIAL AND RECERTIFICATION SNAP APPLICATIONS ......................................8

   III.   DEFENDANT'S FAILURE TO ISSUE NOTICE TO SNAP RECIPIENTS TO BEGIN RECERTIFICATION ................................................................12

   IV.   EXPERIENCE OF INDIVIDUALLY NAMED PLAINTIFFS AND OTHER DISTRICT OF COLUMBIA SNAP APPLICANTS AND RECIPIENTS ...............13

        A.    Individually Named Plaintiffs .........................................................13

                1. Shonice G. Garnett .................................................................14

                2. Richard Messick, Jr. ..............................................................15

                3. Linda Murph .........................................................................16

                4. Tracey Ross............................................................................16

        B.    Declarations of Other District of Columbia SNAP Applicants and Recipients ................................................................................17

   V.    EXPERIENCE OF ORGANIZATIONAL PLAINTIFF BREAD FOR THE CITY ..19

ARGUMENT.......................................................................................................21

   I.     PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION .................................................................22

        A.    Individuals Suffer Irreparable Injury When They Are Unlawfully Deprived of SNAP Benefits..........................................................23

        B.    Individually Named Plaintiffs Suffer Irreparable Injury *Per Se* Because They Have Been Deprived of Their Constitutional and Statutory Rights to Adequate Notice...............................................25

        C.    Organizational Plaintiff Bread Suffers Irreparable Injury Because It Depletes Its Already Scarce Resources to Serve Individuals Unlawfully Deprived of SNAP Benefits ......................................26

   II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE METIRS .................27

        A.    Defendant's Policies and Practices Result in the Ongoing Failure or Refusal to Comply with Federal SNAP Timeliness Requirements ...............27

i

B.      Defendant Fails to Provide Notice to SNAP Recipients of the Need to Recertify Their Eligibility, Depriving Them of the Opportunity to Complete the Recertification Process and Maintain Continued Benefits. ..............................................................................................................34

C.      Defendant Fails to Provide Adequate Notice in Violation of the Due Process Clause and Federal SNAP Act Requirements ...................................37

III.    THE BALANCE OF EQUITIES STRONGLY FAVORS GRANTING A PRELIMINARY INJUNCTION .................................................................................39

IV.     GRANTING A PRELIMINARY INJUNCTION WOULD ADVANCE THE PUBLIC INTEREST .................................................................................................................40

V.      THE COURT SHOULD WAIVE RULE 65(C)'S REQUIREMENT THAT A BOND BE POSTED .................................................................................................................41

CONCLUSION....................................................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**CASES:**

*Am. Fed'n of Gov't Emps., AFL-CIO v. United States,*
104 F. Supp. 2d 58 (D.D.C. 2000) ..................................................................... 23

*Apotex, Inc. v. FDA,*
No. 06 Civ. 627, 2006 WL 1030151 (D.D.C. Apr. 19, 2006) ................................ 23

*Atkins v. Parker,*
472 U.S. 115 (1985) .......................................................................................... 38

*Booth v. McManaman,*
830 F. Supp. 2d 1037 (D. Haw. 2011) .................................................. 21, 33, 41

*Briggs v. Bremby,*
792 F.3d 239 (2d Cir. 2015) ........................................................................ 21, 32

*Briggs v. Bremby,*
No. 12 Civ. 324, 2012 U.S. Dist. LEXIS 172018 (D. Conn. Dec. 4, 2012)......... 21, 24, 39, 40

*Cate v. Oldham,*
707 F.2d 1176 (11th Cir. 1983)......................................................................... 25

*Daniels v. Woodbury Cty., Iowa,*
742 F.2d 1128 (8th Cir. 1984) .......................................................................... 38

*Deerfield Med. Ctr. v. City of Deerfield Beach,*
661 F.2d 328 (5th Cir. 1981) ............................................................................ 25

*DSE, Inc. v. United States,*
169 F.3d 21 (D.C. Cir. 1999) ............................................................................ 41

*Elrod v. Burns,*
427 U.S. 347 (1976) .......................................................................................... 25

*Fund for Animals, Inc. v. Espy,*
814 F. Supp. 142 (D.D.C. 1993) ....................................................................... 40

*Goldberg v. Kelly,*
397 U.S. 254 (1970) ............................................................................ 23, 25, 37, 38

*Gonzalez v. Pingree,*
821 F.2d 1526 (11th Cir. 1987)......................................................................... 27

*Hamby v. Neel*,
   368 F.3d 549 (6th Cir. 2004) ........................................................................38

*Harley v. Lyng*,
   653 F. Supp. 266 (E.D. Pa. 1986) ...........................................................21, 24

*Haskins v. Stanton*,
   794 F.2d 1273 (7th Cir. 1986) ...........................................................21, 24, 40

*Haskins v. Stanton*,
   621 F. Supp. 622 (N.D. Ind. 1985)...............................................................41

*Kapps v. Wing*,
   404 F.3d 105 (2d Cir. 2005) .........................................................................38

*Kyne v. Leedom*,
   148 F. Supp. 597 (D.D.C 1956)....................................................................23

*League of Women Voters of the U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016)....................................................................22, 26

*Lopez v. Heckler*,
   713 F.2d 1432 (9th Cir. 1983) ......................................................................41

*M.K.B. v. Eggleston*,
   445 F. Supp. 2d 400 (S.D.N.Y. 2006)...........................................................22

*Mallette v. Arlington Cty. Emps.' Supplemental Ret. Sys. II*,
   91 F.3d 630 (4th Cir. 1996) ..........................................................................38

*Marsh USA, Inc. v. Schuhriemen*,
   183 F. Supp. 3d 529 (S.D.N.Y. 2016)...........................................................41

*Mayhew v. Cohen*,
   604 F. Supp. 850 (E.D. Pa. 1984) .................................................................38

*Nat'l Treasury Emps. Union v. United States*,
   101 F.3d 1423 (D.C. Cir. 1996).....................................................................26

*Pharm. Soc. of N.Y., Inc. v. Dep't of Soc. Servs.*,
   50 F.3d 1168 (2d Cir. 1995) .........................................................................42

*Phila. Welfare Rights Org. v. O'Bannon*,
   525 F. Supp. 1055 (E.D. Pa. 1981) ...............................................................38

*Reynolds v. Giuliani*,
   35 F. Supp. 2d 331 (S.D.N.Y. 1999)..............................................................33

*Reynolds v. Giuliani*,
  506 F.3d 183 (2d Cir. 2007) ............................................................27

*Robertson v. Jackson*,
  766 F. Supp. 470 (E.D. Va. 1991).............................................. 28, 33

*Robertson v. Jackson*,
  972 F.2d 529 (4th Cir. 1992) ..........................................................21

*Robidoux v. Kitchel*,
  876 F. Supp. 575 (D. Vt. 1995).................................................. 21, 33

*Rodriguez v. United States*,
  983 F. Supp. 1445 (S.D. Fla. 1997)..................................................23

*Schroeder v. Hegstrom*,
  590 F. Supp. 121 (D. Or. 1984) .......................................................39

*Southside Welfare Rights Org. v. Stangler*,
  156 F.R.D. 187 (W.D. Mo. 1993) .....................................................24

*Washington v. Fla. Agency for Persons with Disabilities*,
  658 F. Supp. 2d 1332 (N.D. Fla. 2009) .............................................42

*White v. Roughton*,
  530 F.2d 750 (7th Cir. 1976) ...........................................................38

*Willis v. Lascaris*,
  499 F. Supp. 749 (N.D.N.Y. 1980) ........................................ 22, 23, 25

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)............................................................................21

*Withrow v. Concannon*,
  942 F.2d 1385 (9th Cir. 1991) .........................................................33

**REGULATIONS:**

7 C.F.R. § 272.5..........................................................................................5

7 C.F.R. § 273.2..................................................................................*passim*

7 C.F.R. § 273.10................................................................................*passim*

7 C.F.R. § 273.15..................................................................................7, 37

7 C.F.R. § 277.1..........................................................................................4

7 C.F.R. § 277.4..........................................................................................4

**RULES:**

Federal Rule of Civil Procedure 65 ............................................................................1

**STATUTES:**

7 U.S.C. § 2011 ..........................................................................................................4

7 U.S.C. § 2013 ..........................................................................................................4

7 U.S.C. § 2014 ..........................................................................................................4

7 U.S.C. § 2019 ..........................................................................................................4

7 U.S.C. § 2020 ...................................................................................................*passim*

7 U.S.C. § 2025 ..........................................................................................................4

Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, 122 Stat.
    1853 (2008) .........................................................................................................3

**OTHER AUTHORITIES:**

Legal Aid Soc'y of the Dist. of Columbia & D.C. Fiscal Policy Inst., *Testimony
    for Public Oversight Hearing on the Performance of the Economic Security
    Administration of the Department of Human Services* (Mar. 12, 2015) ..................8

Zach Rausnitz, *How an Ambitious New Computer System Crashed the
    Department of Human Services*, Wash. City Paper (May 25, 2017) ......................9

Lizbeth Silbermann, U.S. Dep't of Agric., *Clarifications for Reporting on the
    Certification Section of the FNS-3666B* (Jan. 11, 2017) .......................................11

## PRELIMINARY STATEMENT

This case challenges unlawful delays in providing Supplemental Nutrition Assistance Program ("SNAP") benefits, commonly referred to as "food stamps," to thousands of eligible applicants and to recipients required to recertify their SNAP eligibility throughout the District of Columbia. Defendant Laura Zeilinger oversees the District of Columbia Department of Human Services ("DHS"), which administers SNAP in the District of Columbia. Plaintiffs Shonice G. Garnett, Richard Messick, Jr., Linda Murph, and Tracey Ross (collectively "Individually Named Plaintiffs"), on behalf of themselves and two proposed classes of District of Columbia residents, along with Organizational Plaintiff Bread for the City ("Bread"), seek a class-wide preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure enjoining Defendant from failing or refusing to: (1) process initial and recertification applications for SNAP and provide SNAP benefits to eligible households in a timely manner; (2) provide the opportunity for SNAP recipients to complete the recertification process and have SNAP benefits for the new certification period issued in a timely manner; and (3) send written notice of processing delays and of the opportunity for an administrative hearing to households subject to Defendant's delayed initial and recertification application processing.[1]

---

[1]     In an August 31, 2017 letter, counsel for Plaintiffs informed the Court that, in addition to filing this Motion for Preliminary Injunction, the Individually Named Plaintiffs intended "to seek a temporary restraining order directing the Defendant immediately to process their outstanding applications and to provide them with the assistance to which they are entitled." On September 1, 2017, the Court issued a Minute Order directing "that any such motion be included with plaintiffs' motion for a preliminary injunction." After receiving the August 31, 2017 letter, Defendant's counsel informed Plaintiffs' counsel that Defendant has provided SNAP benefits to the four Individually Named Plaintiffs. Plaintiffs' counsel is determining whether Defendant has provided the named Plaintiffs all the benefits to which they are entitled. Based on representations by Defendant's counsel that Defendant will resolve outstanding issues with Plaintiffs, the Individually Named Plaintiffs are not seeking a temporary restraining order at this time. *See* Attachment 1, Decl. of Jennifer Mezey in Supp. of Pls.' Mot. for Prelim. Inj. ("Mezey

Defendant's failures are systemic, and they stem in significant part from her recent implementation of a new application processing system that has impacted many of the District's most vulnerable residents seeking access to food assistance.  Without the support of this critical nutrition assistance program, low-income families deplete their meager resources, tax the generosity of friends and relatives, and unsuccessfully turn to over-stressed food resource centers, such as soup kitchens and food pantries like Bread, in an attempt to put food on the table for themselves and their families.  The harm that these households are suffering—in some cases, literally going to bed hungry—is the reason Plaintiffs seek this preliminary injunction.

The four factors governing preliminary injunctive relief strongly favor issuing a preliminary injunction in this case.  First, the proposed classes, comprising low-income individuals and families, will be irreparably harmed absent the requested injunctive relief because Defendant will continue to unlawfully delay processing initial and recertification SNAP applications.  In addition, SNAP recipients will continue to have their benefits improperly terminated due to Defendant's failure to provide them with federally mandated notice of the need to apply for recertification and of the deadline for doing so.  In both of these scenarios, the proposed classes face clear, irreparable harm—the deprivation of benefits to which they are entitled and the denial of their statutory rights and constitutional rights to Due Process.  Similarly, Bread will be forced to deplete its already scarce resources to provide food and services to individuals and families who have either suffered from application processing delays

---

Decl."), Ex. V, at LAS 000007–000009.  (This exhibit and all other declarations and exhibits cited herein are included in the Appendix of Exhibits.)  Defendant's actions in resolving these issues for Plaintiffs show both that Defendant admits that there are problems and that these problems were ongoing and unremediated by Defendant when this lawsuit was filed.

or had their benefits improperly terminated due to Defendant's failure to provide notice of the need to recertify.

Second, Plaintiffs' likelihood of success is strong.  Federal statutes and implementing regulations governing SNAP, as well as the constitutional requirements of Due Process, are clear.  Defendant consistently violates these requirements.  Third, the balance of equities tips in favor of Plaintiffs.  Defendant will suffer no harm by meeting her obligations under federal law, whereas low-income households will have difficulty putting food on the table (or, in the case of Bread, providing food to the community) due to Defendant's actions.  Fourth, an injunction is in the public interest.  Proper administration of SNAP serves not only the residents of the District of Columbia but also the other government programs and nonprofits that serve a population that Defendant has failed.

Pursuant to the Court's September 1, 2017 Minute Order, counsel for the parties met and conferred on September 7, 2017 "in a good faith effort to resolve or narrow the issues" raised by Plaintiffs' Motion for Preliminary Injunction.  Because those efforts were unsuccessful, Plaintiffs respectfully request that the Court grant the relief requested.

## STATUTORY AND REGULATORY SCHEME

## I.    THE FEDERAL SNAP ACT

SNAP provides vital nutrition assistance to indigent individuals and families.  Originally established by Congress as the federal Food Stamp Program in 1964,[2] the purpose of SNAP has been to "safeguard the health and well-being of the Nation's population by raising levels of

---

[2]    Effective October 1, 2008, the federal Food Stamp Program was renamed the Supplemental Nutrition Assistance Program and the federal Food Stamp Act was renamed the Food and Nutrition Act of 2008 ("SNAP Act").  Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, §§ 4001–02, 122 Stat. 1853 (2008).  The terms "SNAP" and "food stamps" are used interchangeably.

nutrition among low-income households." 7 U.S.C. § 2011.  The federal government provides complete funding for all SNAP benefits, as well as at least 50% of a state's (including the District of Columbia's) costs to administer the program.  *See* 7 U.S.C. §§ 2013(a), 2019, 2025(a); 7 C.F.R. §§ 271.2, 277.1(b), 277.4.  SNAP benefits may only be used at participating retail food stores to purchase food.  7 U.S.C. § 2013(a).

Defendant must provide SNAP benefits "to all eligible households who make application for such participation."  *Id.* § 2014(a).  Under federal law, to be SNAP eligible, a household's net income must be below the federal poverty line, and its available resources generally may not exceed $2,000.  *Id.* § 2014(c), (g).

## II.    APPLICATION PROCESSING REQUIREMENTS FOR INITIAL APPLICANTS

Defendant must permit households to file an application on the first day that they contact the local SNAP office during office hours.  7 U.S.C. § 2020(e)(2)(B)(iii); 7 C.F.R. § 273.2(c)(1), (c)(2)(i).  Indeed, she must "encourage" households to file an application the same day the household or its representative contacts the SNAP office in person or by telephone and expresses interest in obtaining SNAP or expresses concerns that indicate food insecurity.  7 U.S.C. § 2020(e)(2)(B)(iii); 7 C.F.R. § 273.2(c)(2)(i).  Defendant must provide ongoing SNAP benefits to eligible applicants no later than 30 days after the date of application.  7 U.S.C. § 2020(e)(3); 7 C.F.R. § 273.2(a), (g)(1).  And she must provide SNAP benefits on an expedited basis, within seven days of application, for certain households with very low income and liquid resources.  7 U.S.C. § 2020(e)(9); 7 C.F.R. § 273.2(i)(2), (i)(3)(i).[3]  Providing SNAP benefits within these

---

[3]    Expedited issuance of SNAP benefits is available to the following households in immediate need: (a) those with very low gross income and liquid resources (less than $150 per month and no more than $100, respectively); (b) those with combined gross income and liquid resources that are less than the monthly household rent or mortgage, and utilities; and (c) those

deadlines means providing households with active benefits that have been posted to their Electronic Benefits Transfer ("EBT") card for spending.  *See* 7 C.F.R. § 274.2(b).

SNAP application processing requirements are not onerous; they are designed to facilitate the provision of benefits within these mandated timeframes.  An initial application need only include the applicant's name, address, and the signature of a responsible household member or the household's authorized representative.  7 U.S.C. § 2020(e)(2)(B)(iv); 7 C.F.R. § 273.2(c)(1). Defendant must document the date the application was filed by recording the date of receipt at the SNAP office, make information regarding SNAP requirements and procedures generally available, and explain to SNAP applicants their rights and responsibilities concerning eligibility for benefits.  7 C.F.R. § 273.2(c)(1), (c)(4), (e)(1); *id.* § 272.5(b)(3).  Thereafter, Defendant must either interview the applicant on the day of application, or, if this is not possible, schedule an interview as promptly as possible to ensure an opportunity to participate within 30 days after the application is filed.  *Id.* § 273.2(e)(3).  SNAP applicants must verify certain information related to their eligibility, and Defendant must give households at least 10 days to provide this required verification.  *Id.* § 273.2(f).  If Defendant approves a household for benefits, she must provide SNAP benefits from the date the application was filed.  *Id.* §§ 273.2(a)(2), 273.10(a)(1)(ii).

For applicants entitled to expedited issuance of benefits, processing requirements are minimal.  Defendant must ensure that agency staff screen applications for expedited SNAP benefits as they are filed or as individuals come in to apply.  *See* 7 U.S.C. § 2020(e)(9); 7 C.F.R. § 273.2(i)(2).  Defendant must verify the identity of applicants identified as eligible for expedited SNAP benefits, but cannot delay the issuance of SNAP benefits beyond the required seven days

---

constituting destitute migrant or seasonal farmworker households.  7 U.S.C. § 2020(e)(9); 7 C.F.R. § 273.2(a)(2), (i)(1).

solely due to lack of verification of other eligibility factors (e.g., household residency, income, or liquid resources).  7 C.F.R. § 273.2(i)(4)(i).

### III.    NOTIFICATION AND PROCESSING REQUIREMENTS FOR RECERTIFICATION APPLICANTS

Defendant must certify SNAP households for a specified period of time (a "certification period"), at the end of which the household must "recertify" to continue participation in the program.  *Id.* § 273.10(f).  Federal law sets forth clear requirements for Defendant to expeditiously verify a household's ongoing eligibility before the end of its certification period and ensure eligible recipients' continued participation in the program.  Importantly, Defendant must notify each SNAP household of the expiration of its certification period by providing a Notice of Expiration ("NOE," also referred to as a "recertification notice") before the start of the last month of the certification period.  7 U.S.C. § 2020(e)(4).  Through the NOE, the agency notifies the household that it is due to recertify and that its benefits will expire if a recertification application is not submitted by a certain deadline.  The NOE must contain the date the certification period expires and the date by which a household must submit an application for recertification in order to receive uninterrupted SNAP benefits.  7 C.F.R. § 273.14(b)(1).

Defendant must provide eligible households an opportunity to receive SNAP benefits no later than 30 calendar days after the date the household received its last allotment or by its normal issuance date in the month following the end of its certification period.  *Id.* § 273.14(d).  Households that submit recertification applications by the fifteenth day of the last month of the certification period have timely applied for recertification; Defendant must provide an opportunity for those households, if still eligible, to participate in SNAP by the household's normal benefit issuance date in the month after the end of its current certification period.  *Id.* § 273.14(c)(2), (d).  Defendant must process recertification applications received after the

fifteenth day of the last month of the certification period, but before the end of the certification period, within 30 days from the date of application. *Id.* § 273.14(e)(1). As to those households found eligible, Defendant must provide a full month's SNAP allotment for the first month of the new certification period. *Id.*

## IV.   NOTICE AND HEARING RIGHTS FOLLOWING PROCESSING DELAYS

For those applicants whose initial or recertification applications have not been timely processed, the administering agency must send a written notice informing the affected household that its application has not been completed and is being processed, and must include certain other specified information, including information about the right to a hearing. *See* 7 U.S.C. § 2020(e)(10); 7 C.F.R. §§ 273.10(g)(1)(iii), 273.15 (a).

## STATEMENT OF FACTS

## I.   DEFENDANT'S ADMINISTRATION OF SNAP IN THE DISTRICT OF COLUMBIA

DHS's Economic Security Administration ("ESA") administers SNAP in the District of Columbia. It operates five service centers throughout the District where SNAP applicants and recipients can file initial or recertification applications. Mezey Decl., ¶ 23. A "combined application" for public benefits, which serves as an application for SNAP benefits, can be obtained from the DHS website or in person from a service center. *Id.* ¶ 24. Although the completed application can either be mailed to a service center or submitted in person, many applicants choose to submit the application in person. *Id.* ESA's Policy Manual provides that ESA shall interview an applicant who applies in person on the day she files the application, or, if this is not possible, on the next working day. Mezey Decl., Ex. A, at ESA 000011. For mailed or forwarded applications, ESA must schedule the interview as soon as possible to ensure that an eligible applicant can receive benefits timely. *Id.*

DHS generally requires most SNAP recipients to recertify their eligibility once every twelve months and, as part of that process, to have an interview. Mezey Decl., ¶ 28. When DHS sends current SNAP recipients a NOE of the current certification period and the need to apply for recertification, the agency does not include a recertification application. Instead, DHS typically includes in the NOE a date for the SNAP recipient to conduct an in-person interview at the service center. *Id.* ¶ 29. Typically, the recipient completes the recertification application at the interview. *Id.* ¶ 30. Defendant automatically terminates food stamps cases that she has not affirmatively "recertified prior to the end of [the household's] current certification period." Mezey Decl., Ex. B at ESA 000045.

## II.     DEFENDANT'S FAILURE TO TIMELY PROCESS INITIAL AND RECERTIFICATION SNAP APPLICATIONS

SNAP applicants and recipients have long suffered lengthy wait times to be seen by a worker at ESA service centers and DHS staff routinely turns away people from service centers when the service center cannot handle any more clients. *See Testimony for Public Oversight Hearing on the Performance of the Economic Security Administration of the Department of Human Services* (Mar. 12, 2015), http://www.dcfpi.org/wp-content/uploads/2015/12/Joint-ESA-Oversight-Testimony-from-Legal-Aid-and-DCFPI.pdf. The unlawful refusals to assist low-income families and the unconscionable wait-times worsened beginning in October 2016, when the District of Columbia replaced its legacy computer eligibility system (the Automated Client Eligibility Determination System or "ACEDS") used to administer SNAP and other benefit programs with the District of Columbia Access System ("DCAS," also called "DC Link"). Mezey Decl., ¶ 34; *id.*, Ex. E, at FNS FOIA 00069-00070.

DCAS was not ready to be implemented. Prior to implementation of the new system, the Food and Nutrition Service of the United States Department of Agriculture ("FNS"), the federal

agency responsible for overseeing states' compliance with the mandates of the SNAP Act and implementing regulations, warned DHS that the testing methodology DHS had been using for the new system was "not sufficient to prove that DC is ready to Go Live [with DCAS] as planned." Mezey Decl., Ex. C, at FNS FOIA 00078.  Specifically, FNS explained that DHS's failure to conduct a live production pilot violated relevant SNAP regulations and resulted in a "current testing methodology … [that] is not sufficient to prove system readiness." *Id.*; *see also* Mezey Decl., Ex. D, at FNS FOIA 00083–00084.  FNS warned that risks resulting from failure to conduct a live pilot included reduced SNAP access by low-income families and individuals, delayed application processing, and untimely benefit issuance.  Mezey Decl., Ex. C, at FNS FOIA 00079.  FNS further advised DHS that "[l]aunching a system without having conducted a live pilot is against the intent of the regulations and against our best advice, and by doing so, FNS wishes DHS to know that it proceeds with the deployment of DC Link at its own risk." *Id.* Despite FNS's warnings, Defendant did not conduct a live pilot prior to implementing the new system.  Zach Rausnitz, *How an Ambitious New Computer System Crashed the Department of Human Services*, Wash. City Paper (May 25, 2017), http://www.washingtoncitypaper.com/news/article/20862623/how-an-ambitious-new-computer-system-crashed-the-department-of-human-services.

In December 2016, FNS conducted a targeted review of the implementation of DCAS and reported the findings of this review to DHS in a March 2017 report.  Mezey Decl., Ex. E, at FNS FOIA 00069.  The report found an alarming number of deficiencies with DCAS implementation, which impacted the timeliness of application processing and issuance of benefits.  FNS observed that: (1) DHS did not provide eligible SNAP households an opportunity to participate in SNAP within 30 days; (2) DHS did not timely provide expedited benefits to

those recipients who were eligible for expedited processing; and (3) service centers were not protecting the filing date of SNAP applications (thereby furthering the likelihood of delayed issuance). *See id.* at FNS FOIA 00071–00072. The FNS report also noted that approximately 18% of the sampled cases contained an error attributable to DCAS and that some of these errors resulted in the inability to timely process SNAP cases. *Id.* at FNS FOIA 00075.

DHS staff, in interviews, repeated many of the same concerns. They complained that their "ability to serve customers efficiently and effectively were [sic] severely impacted and expressed frustration with DCAS" and stated that applications that took 20 minutes to process in the old ACEDS system took approximately 90 minutes to process in DCAS. *Id.* at FNS FOIA 00069. In addition, DHS staff reported that the "new case processing is often very error-prone and leads to system errors and the inability to process the case timely." *Id.*

FNS interviews with SNAP clients seeking to apply or recertify their eligibility also made clear that DCAS implementation issues were denying applicants and recipients their right to timely apply for and receive benefits. SNAP clients also described to FNS "long wait times and the need to make multiple trips to the service center to apply for benefits or resolve errors in their SNAP case." *Id.* at FNS FOIA 00069–00070. Data collected regarding the operation of DHS's call center reflected these issues as well, demonstrating "a vast increase in customer calls regarding missing benefits, inaccurate benefits, and nonfunctioning EBT cards." *Id.* at FNS FOIA 00070.

Data reported by DHS to FNS for the period October 2016 through December 2016 documents the widespread untimely processing of initial applications following flawed implementation of DCAS. During this period, DHS reported that it made a total of 4,546 initial SNAP application decisions, of which 3,258 were application approvals. DHS reported that it

10

approved 2,253 (69.15%) of these 3,258 applications late (i.e., beyond the federally mandated 30-day deadline).  Mezey Decl., Ex. F, at FNS FOIA 00082.  Similarly, during the same period, DHS reported that, of the 5,633 expedited SNAP application approvals, 5,110 (90.71%) were approved late (i.e., beyond the federally mandated seven-day deadline for households that qualify for expedited processing).[4]  *Id.*

Defendant has consistently failed to timely process recertification applications.   In Corrective Action Plans from November 2014 through November 2016, Defendant has repeatedly observed "untimely processing of Food Stamp recertification[s]" and "improper termination or suspension for failure to meet reporting requirements."  Mezey Decl., Ex. W, at DC FOIA 0003288, 0003291; Ex. X, at DC FOIA 00003314, 00003326; Ex. Y at DC FOIA 00003348, 00003357; Ex. Z at DC FOIA 00003408, 00003418; Ex. I at DC FOIA 00003443, 00003452.  DHS continues to process recertifications untimely.  DHS's May 2017 Corrective Action Plan noting a continued "deficiency … of untimely processing of Food Stamp recertification[s] that lead to improper denial errors."[5]  Mezey Decl., Ex. J, at FNS FOIA 00499.

Recent correspondence between FNS and DHS indicate that problems stemming from the implementation of DCAS persist.  In a June 2017 internal email, for example, an FNS

---

[4]     FNS has issued guidance making clear that cases in columns (d)-(g) of Exhibit F are "based on the number of days the case was overdue when approved," rather than "the total number of processing days" it took for the application to be approved.  *See* Lizbeth Silbermann, U.S. Dep't of Agric., *Clarifications for Reporting on the Certification Section of the FNS-3666B* (Jan. 11, 2017), https://fns-prod.azureedge.net/sites/default/files/snap/366B-Certifications-Question-and-Answer.pdf.  For example, an application that was processed 36 days after the application date would be 6 days overdue and would be recorded in column (d) as being between 1-30 days overdue.  *Id.*

[5]     Although the Corrective Action Plan itself lists the date as April 2017, FNS refers to the report as the May 2017 Fiscal Year 2017 Corrective Action Plan.  Mezey Decl., Ex. L, at FNS FOIA 00455.  To avoid confusion, we refer to this document as the May 2017 Corrective Action Plan.

representative expressed concern that "the situation with DCAS performance has not improved markedly and the project governance continues to be a moveable target and missing the mark." Mezey Decl., K, at FNS FOIA 00460.  In addition, FNS's July 5, 2017 response to DHS's May 2017 Corrective Action Plan informed DHS that FNS "remain[ed] concerned about customer complaints related to DCAS implementation issues."  Mezey Decl., Ex. L, at FNS FOIA 00455.

Defendant issues no notice to SNAP applicants that their applications will not be processed within the federally mandated processing deadlines and, therefore, fails to advise the applicant of the reason for the delay and the action the applicant may take to challenge the delay, including requesting an administrative fair hearing.

## III.   DEFENDANT'S FAILURE TO ISSUE NOTICE TO SNAP RECIPIENTS TO BEGIN RECERTIFICATION

In addition to Defendant's failure to process initial and recertification SNAP applications timely, Defendant has systematically failed to issue notices to SNAP recipients in advance of the end of their certification period informing them of the need to apply to recertify their benefits.  In its March 2017 report, FNS found that DCAS had failed to send notices of approval or denial to SNAP applicants:  for example, in 67% of the denied cases reviewed, no denial notice had been sent to the SNAP applicant.  Mezey Decl., Ex. E, at FNS FOIA 00072.  FNS also found that DCAS frequently fails to create or send a notice of required verification to SNAP applicants or produced notices containing incorrect information.  *Id.*  FNS stated that it was "highly concerned that DCAS does not issue notices timely and/or correctly to SNAP applicants and households" and that "the system so often fails to generate a correct notice."  *Id.*

DHS has also admitted that DCAS routinely fails to generate correct notices.  In April 2017, DHS reported that notices are "failing due to data validation errors on a daily basis." Mezey Decl., Ex. M, at FNS FOIA 00126.  In a separate April 2017 report, DHS noted "a job

12

failure for recert[ification] notices which caused notices on 4/11 to fail."  Mezey Decl., Ex. N, at

FNS FOIA 00191.  In May 2017, DHS noted that, in attempting to "clean up . . . data in cases

which is impacting notices," the agency had recently "discovered an additional 7,000 erroneous

records with data issues," further contributing to notice issuance problems.  Mezey Decl., Ex. O,

at FNS FOIA 00293.  DHS also observed in May 2017 that the agency had "received input from

service centers about Recert[ification] . . . notices which have dates issues."  *Id.*

DHS's own data documents significant notice issuance problems.  For example, in the

week of January 24, 2017, 26% of all DCAS notices for the week failed to successfully generate.

Mezey Decl., Ex. P, at FNS FOIA 00016235.  In the week of April 10, 2017, 19% of all DCAS

notices for the week failed to successfully generate (a total of 6,093 notices).  Mezey Decl., Ex.

N, at FNS FOIA 00191.  And, in the week of May 29, 2017, more than 12% of all DCAS notices

for the week failed to successfully generate (a total of 1,395 notices).  Mezey Decl., Ex. Q, at

FNS FOIA 00388.  These widespread notice failures have led to a backlog of notices that are

overdue to be sent out to SNAP applicants and recipients.  As DHS explained to FNS shortly

after implementation of DCAS, the "backlog is increasing faster than we can catch up."  Mezey

Decl., Ex. AA, at DC FOIA 00015862.  As of July 5, 2017, the backlog of SNAP-related notices

totaled 1,750, including 300 NOEs that had not yet been sent to SNAP recipients informing them

of their need to recertify.  Mezey Decl., Ex. R, at FNS FOIA 00436.

## IV.  EXPERIENCE OF INDIVIDUALLY NAMED PLAINTIFFS AND OTHER DISTRICT OF COLUMBIA SNAP APPLICANTS AND RECIPIENTS

### A.  Individually Named Plaintiffs

Individually Named Plaintiffs and the proposed classes they seek to represent are low-

income District residents who either:  (1) have filed initial or recertification applications for

SNAP and are awaiting action by Defendant regarding such applications; or (2) are current

SNAP recipients who were required to recertify their eligibility in order to retain ongoing SNAP benefits but have received no notice informing them of the need to recertify, thus depriving them of an opportunity to complete the recertification process.[6]

### 1.    Shonice G. Garnett

Plaintiff Shonice G. Garnett is a 49-year-old resident of the District of Columbia who has no income and lives in a homeless shelter.  Attachment 2, Decl. of Shonice G. Garnett ("Garnett Decl."), ¶¶ 1–4.  Based on her lack of income, she qualifies for expedited SNAP application processing.  Defendant failed to process Ms. Garnett's application within the federally mandated seven-day deadline for applicants who qualify for expedited processing.  On July 10, 2017, Ms. Garnett applied for SNAP benefits at the DHS H Street Service Center.  *Id.* ¶ 6.  After completing her initial application, Ms. Garnett met with a DHS staff member who informed her that her application for SNAP benefits had been approved and that she would hear back within five to seven days about how to pick up her EBT card containing her benefits.  *Id.* ¶ 7.  Ms. Garnett, however, received no phone calls or letters regarding her application or her EBT card.  On August 14, 2017, after several weeks passed with no information from DHS, Ms. Garnett visited the DHS EBT office to see if she could pick up her EBT card, but there was no card available for her.  *Id.* ¶ 10.

As of August 24, 2017, DHS still had not provided Ms. Garnett with notice of the status of her application or with access to the benefits to which she is entitled on an expedited basis based on her lack of income.  *Id.* ¶ 9.  Without SNAP benefits, Ms. Garnett is unable to obtain adequate food.  The shelter in which she stays only provides residents with breakfast and dinner,

---

[6]    The description of the facts relevant to each Individually Named Plaintiff reflects the facts as they existed on August 28, 2017, when Plaintiffs commenced this action.

and the meals that it does provide often cannot meet her specialized nutritional needs. *See id.* ¶ 13. As a result, she often skips meals and goes hungry. *Id.*

### 2. Richard Messick, Jr.

Plaintiff Richard Messick, Jr. is a resident of the District of Columbia who lives alone and is currently unemployed. Attachment 3, Decl. of Richard Messick, Jr. ("Messick Decl."), ¶¶ 1–2. Defendant failed to process Mr. Messick's January 2017 SNAP application within the federally mandated 30-day deadline. Mr. Messick went to the DHS Taylor Street Service Center on January 13, 2017 to apply for SNAP, but he was unable to meet with a caseworker because the service center stopped seeing SNAP applicants that day. *Id.* ¶ 5. He left his application and other documents in a DHS drop box and received a date-stamped receipt. *See id.* ¶¶ 6–7; *id.*, Ex. A (Messick Food Stamp Receipt Jan. 13, 2017). On January 31, 2017, Mr. Messick went to the DHS H Street Service Center to provide additional documentation, but he was again told that the service center had stopped seeing clients, so he placed the additional documents in a drop box and received another date-stamped receipt. Messick Decl., ¶¶ 6–7; *id.*, Ex. B (Messick Food Stamp Receipt Jan. 31, 2017). In February, after not receiving any notice regarding the status of his SNAP application, Mr. Messick called the DHS call center and learned that there was no record of his SNAP application in the system. He received no response when he sent Defendant a letter about his SNAP application in early March. Messick Decl., ¶¶ 9–10. By May 2017, DHS had still failed to provide any notice regarding the status of Mr. Messick's January application, so he submitted a new application on May 11, 2017. *Id.* ¶ 11. DHS approved this application, but provided Mr. Messick with only pro-rated benefits for May and benefits for June, rather than benefits back to his original application date in January. *Id.* ¶¶ 12–13.

As of August 24, 2017, DHS had not advised Mr. Messick as to the status of his January

2017 application.  *Id.* ¶ 15.  He did not receive any SNAP benefits from the period of January 13, 2017 (his first application date) to May 11, 2017, even though he was eligible for such benefits. *See id.* ¶ 16.  Mr. Messick endured hardship during the months that he went without SNAP benefits.  He expended significant time and resources to travel to food pantries and churches in order to sustain himself.  *Id.* ¶ 17.  As a vegetarian, he had difficulty obtaining food that met his nutritional needs from these sources.  *Id.*

### 3.    Linda Murph

Plaintiff Linda Murph is a 56-year-old resident of the District of Columbia who currently lives alone in subsidized housing.  Attachment 4, Decl. of Linda Murph ("Murph Decl."), ¶¶ 1–2. Defendant failed to process Ms. Murph's application for recertification within the federally mandated deadlines.  As an ongoing SNAP participant, Ms. Murph completed a recertification application at the DHS H Street Service Center in April 2017.  *Id.* ¶ 4.  During her visit, DHS staff reviewed her application and informed her that she was "good to go."  They did not inform her of any further steps necessary to complete her recertification application.  *Id.* ¶ 5.

Despite Ms. Murph timely completing a recertification application, DHS terminated her benefits in June 2017.  *Id.* ¶ 6.  DHS has failed to provide Ms. Murph with any notice regarding the delay in processing her recertification application or whether that application has been approved or denied.  *Id.*  Ms. Murph has faced significant hardship in the absence of SNAP benefits, including being forced to use money that would normally pay for her phone bill to buy food.  *Id.* ¶ 7.

### 4.    Tracey Ross

Plaintiff Tracey Ross is a 55-year-old resident of the District of Columbia.  Attachment 5, Decl. of Tracey Ross ("Ross Decl."), ¶¶ 1–2.  Defendant deprived Ms. Ross of an opportunity to

complete the SNAP recertification process by failing to provide her with a notice informing her of the need to recertify.  Ms. Ross had been a SNAP participant until July 2017, when DHS terminated her benefits without notice.  *Id.* ¶¶ 5–6.  On or about July 10, 2017, Ms. Ross went to the DHS Congress Heights Service Center, where she learned that her benefits had been terminated and was told by a DHS representative that she would receive a letter explaining why. *Id.* ¶¶ 7–8.  DHS never sent her such a letter.  *Id.*  On August 1, 2017, in a call joined by a Legal Aid attorney, a DHS employee stated that DHS had terminated Ms. Ross's SNAP benefits because she did not apply to recertify her eligibility for SNAP by June 30, 2017.  *Id.* ¶ 9.  The employee claimed that DHS mailed Ms. Ross a notice informing her of the need to recertify, but Ms. Ross never received such a letter.  *Id.* ¶ 10.

Ms. Ross has faced significant hardship since her SNAP benefits were terminated, including struggling to pay for food while also attempting to pay for rent, utilities, and prescription medications.  *Id.* ¶ 11.

### B.     Declarations of Other District of Columbia SNAP Applicants and Recipients

Plaintiffs' Motion is further supported by the declarations of other low-income District residents who have also experienced delays in the processing of their initial or recertification applications or have been deprived of an opportunity to complete the recertification process due to Defendant's failure to meet the requirements of the SNAP Act and implementing regulations. These declarations provide additional evidence beyond just the data and the reports to show the impact of Defendant's unlawful actions on the lives of low-income families and individuals.

For example, the following declarants speak to the harm they suffered when Defendant delayed processing their initial or recertification applications well beyond the federally mandated deadlines:

- **Diamond Moore:** DHS failed to process the October 2016 SNAP application of Ms. Moore, a single mother of five children, until January 2017. *See* Attachment 6, Decl. of Diamond Moore ("Moore Decl."), ¶¶ 2–3.

- **Sandra Bonilla de Leonzo:** DHS failed to process the March 2017 SNAP application of Ms. Bonilla de Leonzo, a single mother caring for two children, until mid-May 2017. *See* Attachment 7, Decl. of Sandra Bonilla de Leonzo ("Bonilla de Leonzo Decl."), ¶¶ 2, 4–8.

- **Elizabeth Telson:** In December 2016, DHS terminated the SNAP benefits of Ms. Telson, a homeless individual living on the streets, despite her timely submission of an application for recertification. DHS failed to provide Ms. Telson with any SNAP benefits until late-February 2017 and did not provide her with full SNAP benefits until late-May 2017, nearly six months after her benefits terminated. *See* Attachment 8, Decl. of Elizabeth Telson ("Telson Decl."), ¶¶ 2, 6.

The following additional declarants describe the consequences of DHS terminating their SNAP benefits without providing them adequate notice of the need to complete a recertification application, thus depriving them of the opportunity to recertify and keep their SNAP benefits:

- **Elizabeth Telson:** DHS terminated Ms. Telson's SNAP benefits again in August 2017 due to an alleged failure to recertify without ever having provided her with notice that she was due to recertify. *See* Telson Decl. ¶¶ 22–24.

- **Ebony Coe:** In July 2017, DHS terminated Ms. Coe's SNAP benefits due to an alleged failure to recertify, but DHS never provided Ms. Coe with any notice that she was due to recertify. *See* Attachment 9, Decl. of Ebony Coe ("Coe Decl."), ¶¶ 3–5.

- **Grant Lester:** In July 2017, DHS terminated the SNAP benefits of Mr. Lester, an elderly individual, without providing him any advance notice that he was due to recertify. *See* Attachment 10, Decl. of Grant Lester ("Lester Decl."), ¶¶ 2, 5.

- **Yesica Guevara:** DHS terminated the SNAP benefits of Ms. Yesica Guevara, a single mother of two, in December 2016 due to a technical error and again in May 2017 due to an alleged failure to recertify. *See* Attachment 11, Decl. of Yesica Guevara ("Guevara Decl."), ¶¶ 2, 10–11 & Ex. A (Guevara Administrative Review Conference Report and OAH Remand Order). DHS admits that "the agency did not issue adequate or timely notification to [Ms. Guevara] of the recertification or of the termination of [her] SNAP benefits." *Id.* Ex. A.

- **Julia Whaley:** In August 2017, DHS terminated the SNAP benefits of Ms. Whaley, an individual with disabilities recovering from a stroke, due to an alleged failure to recertify, but DHS never provided Ms. Whaley with any notice that she was due to recertify. *See* Attachment 13, Decl. of Julia Whaley ("Whaley Decl."), ¶¶ 2, 3, 6.

- **Luelanda Williams:** In March 2017, DHS terminated the SNAP benefits of Ms.

Luelanda Williams, the sole caretaker of five minor children, due to an alleged failure to recertify. *See* Attachment 12, Decl. of Luelanda Williams ("Williams Decl."), ¶¶ 4, 9. DHS admits that "the agency issued an inadequate notice of SNAP recertification" because the notice informed Ms. Williams that she was due to recertify in September 2017 rather than February 2017, causing her to miss the recertification deadline. *Id.* Ex. A (Williams Administrative Review Conference Report).

## V.   EXPERIENCE OF ORGANIZATIONAL PLAINTIFF BREAD FOR THE CITY

It is not only Individually Named Plaintiffs, members of the proposed classes, and other District residents who have been harmed by Defendant's failures. Organizational Plaintiff Bread has also been directly impacted by the enlarged demand for community-based charitable food resources resulting from Defendant's failure to timely process SNAP applications and issue SNAP benefits to eligible households.

Bread is a 501(c)(3) nonprofit organization headquartered in the District of Columbia that provides a number of direct services, including food, clothing, medical care, and legal and social services, to District residents living in poverty. Attachment 14, Decl. of George A. Jones ("Jones Decl."), ¶¶ 3–4. Bread operates two Centers, through which it delivers most of its services for free to its client base. *Id.* Bread's food program serves thousands of households with low incomes throughout the District of Columbia each year, including many who are current SNAP applicants or recipients. *Id.* ¶ 5. It includes two food pantries that provide nutritious groceries to clients living near the federal poverty line, and it operates twice-monthly farmers markets that also make available fresh produce to the community. *Id.*

In or around October 2016, the month when DHS implemented the new DCAS system, Bread's food program employees noticed a significant increase in demand for the program's services and resources as compared to the same time in the previous year. *Id.* ¶ 6. In particular, program staff noticed significant demand increases from individuals in Wards 7 and 8—the District of Columbia wards with the lowest per-capita income. *Id.* ¶ 7. In these wards, Bread's

food program provided emergency food packages to 52% more households, and provided emergency food bags 54% more times, between October 2016 and May 2017 compared with the same period the previous year. *Id.* Bread also witnessed increased demand over the entire District, providing emergency food packages to 38% more households between October 2016 and May 2017 than it had during that period in the previous year. *Id.* ¶ 8.

Bread's Representative Payee Program, which in 2016 helped more than 800 individuals manage their public benefits, also witnessed a significant number of its clients request additional funds for food. *Id.* ¶¶ 14–15. Between October 2016 and May 2017, the program saw a 33% increase in requests for additional funds for food compared with the number of similar requests made during the same period in the previous year.[7] *Id.* ¶ 15.

Bread's interest in delivering a broad range of free services to low-income District residents has been impaired as a result of the increased demand for services through its food program. Due to the dramatic increase in food expenses beginning in October 2016, Bread has been forced to reduce its food program budget in fiscal year 2018 by $260,000 to maintain a balanced budget. *Id.* ¶ 9. In addition, Bread's Legal Clinic, which provided legal services and referrals to more than 5,500 low-income individuals in 2016, has seen an increased demand for assistance with SNAP-related problems. *Id.* ¶ 10. The Clinic has therefore needed to divert more staff time to address this need, which has in turn taken away staff time for clients' other legal issues. *Id.* ¶¶ 10, 16.

Bread is not alone in observing these significant impacts on its client population. In June 2017, Martha's Table—a community organization that provides food and education resources to

---

[7]     Bread for the City has only calculated data regarding its Representative Payee Program and demand for food assistance through May 2017. *Id.* at ¶¶ 7 n.1, 15 n.2.

low-income individuals—reported that "[i]n the first 5 months of 2017," the organization had "seen a dramatic increase" in the number of individuals obtaining food through the organization's no-cost lobby market.   Mezey Decl., Ex. S, at LAS 000006.   In July 2017, Martha's Table reported that the organization had seen a 50% increase in demand for food in June 2017 as compared to June 2016.   *Id.* at LAS 000005.

## ARGUMENT

To secure a preliminary injunction, a movant must establish: (1) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (2) "that he is likely to succeed on the merits," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest."   *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008).   These four factors all strongly favor granting the requested relief.

Courts routinely grant injunctive relief in cases like this one that concern delays or improper administration of SNAP benefits and other public benefits.   *See, e.g.*, *Robertson v. Jackson*, 972 F.2d 529, 536 (4th Cir. 1992) (affirming order enjoining defendant to timely provide food stamps to eligible households); *Haskins v. Stanton*, 794 F.2d 1273, 1276–77 (7th Cir. 1986) (affirming order granting preliminary relief to redress violations of Food Stamp Act that prevent applicants from obtaining timely benefits); *Briggs v. Bremby*, No. 12 Civ. 324, 2012 U.S. Dist. LEXIS 172018, at *2 (D. Conn. Dec. 4, 2012) (preliminarily enjoining defendant from failing to provide food stamps on a timely basis), *aff'd,* 792 F.3d 239 (2d Cir. 2015); *Booth v. McManaman*, 830 F. Supp. 2d 1037, 1046 (D. Haw. 2011) (same); *Robidoux v. Kitchel*, 876 F. Supp. 575, 579 (D. Vt. 1995) (enjoining defendant to comply with food stamps timely processing requirements); *Harley v. Lyng*, 653 F. Supp. 266, 277 (E.D. Pa. 1986) (enjoining defendant to

assure that food stamps are made available in a timely manner to households eligible for expedited issuance).

Courts also routinely grant preliminary relief in actions concerning provision of public assistance to low-income recipients. *See, e.g.*, *M.K.B. v. Eggleston*, 445 F. Supp. 2d 400, 439–40 (S.D.N.Y. 2006) (supplementing preliminary injunction order in case alleging that defendant provided inadequate notice of eligibility determinations to noncitizens eligible for public assistance, Medicaid, or food stamps); *Willis v. Lascaris*, 499 F. Supp. 749, 760 (N.D.N.Y. 1980) (preliminary injunction granted as to inadequate notice regarding reduction in food stamps benefits). This Court should similarly grant the injunctive relief requested here.

## I.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

Plaintiffs are entitled to a preliminary injunction because the harm they experience is "certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm. . . [and is] beyond remediation." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (citations and internal quotation marks omitted, alterations adopted). District SNAP applicants and recipients are forced to go hungry and their lives are otherwise disrupted, presenting a "certain and great" harm to their safety and well-being that is incapable of being remediated. *Id.* at 8. Defendant's actions deprive these families and individuals of an essential source of support that helps them survive at the edge of poverty. Likewise, Defendant's actions force Bread to divert its scarce resources away from other aspects of the holistic services that it provides to District residents in order to address the consequences of Defendant's failure to comply with the SNAP Act and its implementing regulations.

**A. Individuals Suffer Irreparable Injury When They Are Unlawfully Deprived of SNAP Benefits**

District applicants and recipients are suffering the loss of benefits to which they are entitled under federal law, which in and of itself constitutes irreparable harm. *See Apotex, Inc. v. FDA*, No. 06 Civ. 627, 2006 WL 1030151, at *17 (D.D.C. Apr. 19, 2006) (loss of "a statutory entitlement . . . is a harm that has been recognized as sufficiently irreparable"); *Kyne v. Leedom*, 148 F. Supp. 597, 601 (D.D.C 1956) (loss of a "statutory right" "works irreparable harm"). Moreover, the harm is all the greater because SNAP applicants and recipients cannot sue the government for money damages resulting from the deprivation of SNAP benefits. *See Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 104 F. Supp. 2d 58, 76 (D.D.C. 2000) (irreparable harm existed where plaintiffs could not sue the government to recoup lost benefits). Nor could monetary damages, even if available, fully compensate these families and individuals for the severe harm suffered as a result of loss of benefits—inadequate resources to feed themselves and their families and resulting hunger.

For indigent people, such as those in this action, the potential harm is devastating, for every day that they survive without subsistence-level benefits is a day of "brutal need" causing physical and emotional effects that cannot be compensated with later payments. *Goldberg v. Kelly*, 397 U.S. 254, 260–65 (1970). Loss of even a small proportion of subsistence benefits to which poor people might be entitled constitutes irreparable injury warranting preliminary relief. *See Willis*, 499 F. Supp. at 759 ("[e]ven a slight change in food stamp allotments effects [sic] a public assistance household's ability to procure the necessities of life"); *Rodriguez v. United States*, 983 F. Supp. 1445, 1450 (S.D. Fla. 1997) (recognizing that deprivation of food stamps and Social Security benefits, which the court described as "subsistence level benefits that assist

23

[Plaintiff Class] in meeting their most basic needs," would "cause severe hardship on the Plaintiff Class, including homelessness, lack of food, and possible death").

Indeed, courts regularly conclude that irreparable harm ensues from the loss of food stamps to needy families. *See, e.g.*, *Haskins*, 794 F.2d at 1276–77 ("[T]he deprivation of food is extremely serious and is quite likely to impose lingering, if not irreversible, hardship upon recipients." (internal quotation marks omitted)); *Briggs*, 2012 U.S. Dist. LEXIS 172018, at *57 ("The denial of essential public benefits like food stamps which help provide for basic nutrition and sustenance undeniably constitute irreparable harm."); *Southside Welfare Rights Org. v. Stangler*, 156 F.R.D. 187, 191 (W.D. Mo. 1993) ("The human suffering, emotional trauma and physical injury that will result from an inability to get food by this country's most needy is too obvious . . . . Irreparable injury is clearly present . . . .").

The harm suffered by individuals eligible to receive food stamps is exacerbated in the case of those, such as Plaintiff Shonice G. Garnett, who are eligible for expedited issuance:

> For those households eligible for expedited issuance . . . thirty days without aid could mean hunger, malnutrition, or even starvation, as both houses of Congress recognized in legislative history declaring that households qualifying for expedited issuance need "immediate" help to buy food.

*Harley*, 653 F. Supp. at 273.

The stories of the Individually Named Plaintiffs and the declarants document the harm they suffered when Defendant deprived them of SNAP benefits to which they were entitled. They lacked the resources to buy food for themselves and their families and to meet the nutritional needs of their households. For example, in the absence of SNAP, low-income District residents turn to homeless shelters, food pantries, or other resources to eat, but sufficient food is often unavailable. *See e.g.*, Garnett Decl., ¶ 13; Messick Decl., ¶ 17; Williams Decl., ¶ 15. Others have been unable to feed minor children in their household, *see* Bonilla de Leonzo Decl.,

¶ 10; Williams Decl., ¶ 15, forced to seek food assistance from family members or friends, *see* Ross Decl., ¶ 11; Guevara Decl., ¶ 15, or forced to forgo timely payment of other vital necessities, such as rent, utilities, or medical expenses, *see* Murph Decl., ¶ 7; Ross Decl., ¶ 11; Moore Decl., ¶ 16; Bonilla de Leonzo Decl., ¶ 10; Guevara Decl., ¶ 15.  Plaintiffs therefore clearly demonstrate irreparable harm.

> **B.  Individually Named Plaintiffs Suffer Irreparable Injury *Per Se* Because They Have Been Deprived of Their Constitutional and Statutory Rights to Adequate Notice**

Defendant's failure to comply with constitutional, statutory, and regulatory mandates to provide adequate notice also causes *per se* irreparable harm to the Individually Named Plaintiffs.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (the loss of constitutional rights "unquestionably constitutes irreparable harm"); *Cate v. Oldham*, 707 F.2d 1176, 1188–89 (11th Cir. 1983) (the very violation of certain fundamental constitutional rights can satisfy the irreparable harm requirement in obtaining preliminary injunctive relief); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (loss of constitutional freedoms, even for minimal periods of time, can constitute irreparable injury justifying preliminary injunction).  Here, Defendant has failed, in derogation of well-established procedural due process safeguards set forth in *Goldberg* and its progeny, as well as specific requirements set forth in the SNAP Act and its implementing regulations, to provide written notice to individuals subject to application processing delays of the fact of this delay and the right to a fair hearing to challenge it. *Goldberg*, 397 U.S. at 267–68 ("a recipient [must] have timely and adequate notice detailing the reasons for a proposed [action]"); 7 C.F.R. § 273.10(g)(1)(iii).  The due process deprivation resulting from this lack of notice constitutes irreparable harm.  *Willis*, 499 F. Supp. at 759 ("plaintiffs will suffer irreparable harm if they are not provided with a meaningful notice which explains how and why their food stamp allotment" will be impacted).

### C. Organizational Plaintiff Bread Suffers Irreparable Injury Because It Depletes Its Already Scarce Resources to Serve Individuals Unlawfully Deprived of SNAP Benefits

Organizational Plaintiff Bread, which provides charitable food and legal assistance to low-income District residents, likewise suffers irreparable harm.  Bread has seen its limited resources strained by its efforts to aid numerous clients facing hunger and other hardships due to Defendant's failed administration of SNAP.  *See* Jones Decl., ¶¶ 6–14.

The effects of Defendant's failure to administer SNAP in accordance with federal law has already been felt by Bread.  The D.C. Circuit has held that "[a]n organization is harmed if the actions taken by the defendant have perceptibly impaired the organization's programs."  *League of Women Voters*, 838 F.3d at 8 (internal quotation marks omitted and alterations adopted).  That is the case here, where "[D]efendant's conduct has made [Bread's] *activities* more difficult."  *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996).  Bread has been forced to "expend its precious time and resources to remedy" Defendant's failure to timely process initial and recertification applications for SNAP and issue timely notices for recertification.  Jones Decl., ¶ 17.  And due to the dramatic increase in the number of clients requiring food assistance beginning in October 2016—when DHS first implemented DCAS— Bread had no choice but to reduce its food program budget in fiscal year 2018 by $260,000 to maintain a balanced budget.  *Id.* ¶ 9.  Without a preliminary injunction, Bread's struggles will only intensify.

Moreover, the harm to Bread is irreparable because once Bread has expended its staff time and resources, "there can be no do over and no redress."  *League of Women Voters*, 838 F.3d at 9.  Bread's injury cannot be remedied by a larger budget in the future.  The clients that Bread is unable to help due to the strain on its staff time and resources cannot be helped retroactively.  Bread's clients require assistance with urgent food, legal, housing, and medical

problems.  If Bread cannot serve these clients now because the organization lacks the resources to do so based on Defendant's failures, these clients will go unserved, and Bread's mission will continue to be frustrated.

Plaintiffs, including Organizational Plaintiff Bread, therefore clearly demonstrate irreparable harm.

## II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

As set forth below and in the accompanying declarations and exhibits, Defendant is engaged in several policies and practices that violate constitutional, statutory, and regulatory requirements.  First, Defendant's failure to timely process initial and recertification applications and to provide SNAP benefits in a timely manner violates the federal SNAP Act and implementing regulations, which require timely eligibility determinations and timely provision of benefits to eligible households.  Second, Defendant's failure to provide SNAP recipients with a notice informing them of the need to recertify deprives these recipients of an opportunity to recertify in contravention of the SNAP Act and implementing regulations.  Finally, Defendant violates the Due Process Clause, as well as the SNAP Act and its implementing regulations, by failing to provide notice and the right to a hearing when processing of an application is delayed. Hence, this Court should preliminarily enjoin defendant from committing further violations.

### A. Defendant's Policies and Practices Result in the Ongoing Failure or Refusal to Comply with Federal SNAP Timeliness Requirements

Defendant's duty to comply with federal SNAP mandates is unequivocal.  The District "is free not to participate in the scheme of cooperative federalism established under the [SNAP] . . . Act[], but if it decides to join, it must comply with federal requirements" of the Act as a condition of the continued receipt of federal funding.  *Reynolds v. Giuliani*, 506 F.3d 183, 201– 02 (2d Cir. 2007) (internal quotation marks omitted); *see also Gonzalez v. Pingree*, 821 F.2d

1526, 1528, 1530 (11th Cir. 1987) (noting that "Title 7 U.S.C. § 2020(e)(9) speaks in imperative, not merely permissive, terms" and that SNAP benefits are "a matter of statutory entitlement" (internal quotation marks omitted)).  States choosing to participate in SNAP "do so under an agreement to operate the Program within their state in accordance with applicable federal laws and regulations and in accordance with their own state's Food Stamp Plan."  *Robertson v. Jackson*, 766 F. Supp. 470, 471 (E.D. Va. 1991).

Defendant must provide SNAP benefits to eligible applicants no later than 30 calendar days after the date of application.  7 U.S.C. § 2020(e)(3); 7 C.F.R. § 273.2(a), (g)(1).  For destitute individuals and households in immediate need of assistance, Defendant must provide SNAP benefits to eligible households on an expedited basis, no later than the seventh calendar day following the date of application.  7 U.S.C. § 2020(e)(9)(A); 7 C.F.R. § 273.2(i)(3)(i).

The federal SNAP Act and implementing regulations also establish specific requirements for timely processing of applications for recertification.  7 U.S.C. § 2020(e)(4); 7 C.F.R. § 273.14.  Upon timely completing an application for recertification, all "[e]ligible households shall be provided an opportunity to receive benefits no later than 30 calendar days after the date the household received its last allotment."  7 C.F.R. § 273.14(d)(1).  Further, Defendant must notify households of expiration dates, provide applications, schedule interviews, and recertify eligible households prior to the expiration of the certification periods.  *Id.* § 273.14(a).

Defendant has routinely failed to meet these legal obligations, causing needless suffering due to hunger or the need to forgo other necessities to avoid hunger.  Defendant's own admissions and other evidence show Defendant's failure to timely process initial applications and timely provide benefits to eligible households.  In the face of warnings from FNS of reduced program access, worker backlogs, delayed application processing, and untimely benefit issuance

if Defendant implemented DCAS without conducting a live pilot, Defendant proceeded to do so anyway in October 2016.  Mezey Decl., Ex. C, at FNS FOIA 00078–00079.  The consequences were immediate and clear.  For the period of October 2016 through December 2016, DHS reported that, of the 3,258 application approvals for this period, the agency had approved 2,253 (69.15%) late (i.e., beyond the federally mandated 30-day deadline).  Mezey Decl., Ex. F, at FNS FOIA 00082.  Similarly, during the same period, DHS reported that, of the 5,633 expedited SNAP applications approved during this period, 5,110 (90.71%) were approved late (i.e., beyond the federally mandated seven-day deadline for households that qualify for expedited processing). *Id.*

Defendant's timeliness may actually be worse than the reported data suggests due to Defendant's failure to protect the application filing date, registering applications as filed on the date a caseworker processes the application rather than the date the applicant actually filed the application.  FNS's targeted review of DCAS implementation found that, "[i]n many cases, the eligibility workers did not protect the SNAP application filing date" and that, "[i]n several cases . . . FNS reviewers were unable to determine the correct filing date of the application because there was no signed application in the case record."  Mezey Decl., Ex. E, at FNS FOIA 00071. This violation has implications for the accuracy of DHS data about timeliness of application processing.  If DHS is measuring its application processing time from the date the caseworker registers the application in the system rather than the date the application is actually filed, DHS will appear to be processing applications more quickly than it actually is.

Moreover, FNS's targeted review of DCAS implementation confirmed that the system was leading to untimely application processing.  FNS found that DHS was failing to timely provide benefits to eligible households within the federally mandated seven- and 30-day

deadlines and that, in many cases, "[e]rror in the DCAS system . . . resulted in the inability to process the SNAP case timely."  Mezey Decl., Ex. E, at FNS FOIA 00071–00072, 00075.  DHS staff interviewed in connection with the report also complained that their "ability to serve customers efficiently and effectively was severely impacted by the new DCAS system" and that the "new case processing is very error-prone and leads to system errors and the inability to process the case timely."  *Id.* at FNS FOIA 00071–00072.

Evidence also suggests widespread failures by Defendant to timely process recertification applications.  DHS's Corrective Action Plans from November 2014 through November 2016 have consistently noted District-wide deficiencies of "untimely processing of Food Stamp recertifications."  Mezey Decl., Ex. W, at DC FOIA 003291; Ex. X, at DC FOIA 00003326; Ex. Y, at DC FOIA 00003357; Ex. Z at DC FOIA 00003418; Ex. I, at DC FOIA 00003452.  Indeed, data collected by DHS indicate widespread terminations due to an alleged failure to complete the annual recertification process.  For example, for the months of January 2016 through September 2016, between 44 to 50% of the SNAP terminations each month were due to an alleged failure by the customer to complete the SNAP recertification process, many of which likely stem from the above-noted deficiency of failure to timely process recertification applications.[8]  Mezey Decl., Ex. H, at DC FOIA 00002175–00002198.

Defendant's untimely processing of initial and recertification applications persist.  DHS's May 2017 Corrective Action Plan noted a continuing "deficiency . . . of untimely processing of Food Stamp recertification[s] that lead to improper denial errors."  Mezey Decl., Ex. J, at FNS FOIA 00499.  In this same document, DHS also acknowledged that "several system defects have

---

[8]    In the data reported in Exhibit H, the fields with "denial closure reason" coded as ' ' refer to closure due to an alleged failure to complete the recertification process.  Mezey Decl., Ex. G, at LAS 000001.

been discovered that affect benefits, notices, and reports" and that the agency is still "in the process of stabilizing the system." *Id.* at FNS 000500. In addition, DHS reports to FNS from April to July 2017 consistently observed problems with applications getting "stuck" and failing submission, such that applications could not be processed and benefits could not be authorized.[9] During that same time period, between 76 and 334 applications were failing submission every two weeks.[10] In a June 2017 internal email, FNS expressed concern that "the situation with DCAS performance has not improved markedly and the project governance continues to be a moveable target and missing the mark." *See* Mezey Decl., Ex. K, at FNS FOIA 00460. In addition, in its July 2017 response to DHS's May 2017 Corrective Action Plan, FNS noted ongoing concern about "customer complaints related to DCAS implementation issues." Mezey Decl., Ex. L, at FNS FOIA 00455.

The stories of families and individuals document the prevalence of Defendant's unlawful actions. *See* Garnett Decl., ¶¶ 5–10 (applicant eligible for seven-day expedited processing of SNAP application remained without eligibility determination or benefits 45 days after applying); Messick Decl., ¶¶ 5–12 (applicant eligible for 30-day processing of SNAP application had still not received eligibility determination or benefits nearly four months after applying, causing him to file new application); Moore Decl., ¶¶ 3, 17–20 (applicant and mother of five eligible for 30-day processing of SNAP application did not receive eligibility determination or benefits until more than two months after applying); Bonilla de Leonzo Decl., ¶¶ 4–8 (applicant with two

---

[9]     Mezey Decl., Ex. N, at FNS FOIA 00168; Ex. O, at FNS FOIA 00263; Ex. Q, at FNS FOIA 00364; Ex. T, at FNS FOIA 00212; Ex. U, at FNS FOIA 00315; *see also* Mezey Decl., Ex. M, at FNS FOIA 00126; Ex. R, at FNS FOIA 00409.

[10]    Mezey Decl., Ex. M, at FNS FOIA 00138–00139; Ex. N, at FNS FOIA 00179–00180; Ex. O, at FNS FOIA 00274–00275; Ex. Q, at FNS FOIA 00374; Ex. R, at FNS FOIA 00420; Ex. T, at FNS FOIA 00223–00224; Ex. U, at FNS FOIA 00325–00326.

minor children eligible for 30-day processing of SNAP application did not receive eligibility determination or benefits until well beyond the deadline); Murph Decl., ¶¶ 4–6 (SNAP recipient who timely completed her recertification application in April 2017 nonetheless had benefits terminated due to Defendant's failure to timely process application); Telson Decl., ¶¶ 6–15 (SNAP recipient who timely completed her recertification application in November 2016 nonetheless had benefits terminated due to Defendant's failure to timely process application and remained without full benefits until late-May 2017).

In many of these cases, vulnerable individuals—many of whom are caring for family members or struggling with disabilities of their own—were forced to make repeated calls or visits to DHS service centers, where they had to stand in long lines to obtain any information about the status of their applications, often to no avail. *See* Messick Decl., ¶¶ 9–11 (applicant returned to service center at 3:30 a.m. to reapply for benefits after being unable to meet with caseworker on prior visits due to capacity and after two phone calls and letter were unsuccessful); Williams Decl., ¶¶ 2, 5–8 (single mother caring for five children was unable to meet with caseworker on three separate visits to service center to try to resolve improper termination of benefits); Telson Decl., ¶¶ 9, 11, 13, 18 (homeless individual made four calls to DHS Call Center and in-person trip to service center to try to resolve improper termination of benefits).  In many instances, it was only after the intervention of legal counsel that DHS finally processed these individuals' applications. *See, e.g.*, Moore Decl., ¶¶ 17, 19, 23.

This is not how the system should work.  And it is in clear violation of federal law. Courts have enjoined similar violations of SNAP Act requirements, ordering state agencies to fully and absolutely comply with federal mandates to timely provide SNAP benefits.  In *Briggs v. Bremby*, 792 F.3d 239 (2d Cir. 2015), the Second Circuit upheld the issuance of a preliminary

injunction requiring the state agency to timely process food stamp applications, holding that the SNAP Act's timeliness processing standards impose an affirmative and binding obligation on the State to "complete certification and provide allotment of food stamp to all 'eligible households' within [statutorily prescribed] . . . time limits." *Id.* at 246; *see also Withrow v. Concannon*, 942 F.2d 1385, 1389 (9th Cir. 1991) ("Plaintiffs are entitled under [the Food Stamp Act] to [full] compliance, not substantial compliance."); *Reynolds v. Giuliani,* 35 F. Supp. 2d 331, 345–47 (S.D.N.Y. 1999) (ordering defendants "to process all applications for expedited food stamps . . . within the time frames required by law" following a finding that "applicants with emergency needs are not being provided with expedited food stamps within the seven day period imposed by federal law."); *Robidoux*, 876 F. Supp. at 580 (ordering defendant "to process *all* applications for benefits within the thirty day deadline specified by law" upon a finding of a "consistent 8-10% failure rate" in meeting food stamp processing timeliness requirements").

In *Robertson v. Jackson*, noting that "the value of the timely operation of the [SNAP] Program cannot be overestimated," 766 F. Supp. at 471, the court found "wide spread and serious violations of all timely processing standards for applicants." *Id.* at 473. It accordingly ordered systemic relief, including requiring the state to adhere, within seven months, to a standard of 0% of applications pending longer than mandatory processing timelines for both regular and expedited SNAP benefit applications, with an acceptable error rate not exceeding 3%. *Id.* at 479.

Similarly, in *Booth*, the District Court issued a preliminary injunction directing the Hawaii Department of Human Services to process SNAP applications and issue benefits to eligible households within federally mandated timeframes. 830 F. Supp. 2d at 1045. The court rejected the agency's argument that it was taking steps to address timeliness issues, noting: "This

Court cannot simply defer to the wait-and-see approach advocated by the Defendant, particularly in light of the seriousness of the harm incurred by Plaintiffs as a result of [the] . . . delay." *Id.* at 1043. Here, too, given the seriousness of the deprivation to Plaintiffs, and Defendant's disregard of FNS's warnings that the system's rollout would adversely impact eligible households' timely access to SNAP benefits, this Court should likewise not take a wait-and-see approach and should, instead, enjoin the Defendant to comply with federal law.

Defendant's performance is thus unquestionably unlawful, and warrants the issuance of relief from this Court. Plaintiffs seek preliminary relief to enjoin Defendant from failing or refusing to fully comply with these mandates. Plaintiffs have thus demonstrated a clear and substantial likelihood of success on the merits of their claims.

### B. Defendant Fails to Provide Notice to SNAP Recipients of the Need to Recertify Their Eligibility, Depriving Them of the Opportunity to Complete the Recertification Process and Maintain Continued Benefits.

In addition to failing to timely process initial and recertification applications, Defendant also has engaged in a systemic failure to provide notice to SNAP recipients informing them of the need to apply to recertify to maintain continued benefits. The SNAP Act and its implementing regulations specifically require such notice. *See* 7 U.S.C. § 2020(e)(4); 7 C.F.R. § 273.14(b)(1). Without such notice, SNAP recipients have no way of knowing that they are due to recertify, causing their benefits to terminate due to failure to complete the recertification process.

FNS reports and Defendant's own admissions have documented widespread failures by DCAS to successfully generate and send notices. In its March 2017 report concerning DCAS implementation, FNS stated that it was "highly concerned that DCAS does not issue notices timely and/or correctly to SNAP applicants and households" and that "the system so often fails to generate a correct notice." Mezey Decl., Ex. E, at FNS FOIA 00072. Moreover, Defendant

has admitted in reports to FNS that notices are "failing due to data validation errors on a daily basis." Mezey Decl., Ex. M, at FNS FOIA 00126. Indeed, DHS sampling throughout 2017 revealed a consistent trend of notice failure: in the week of January 24, 2017, 26% of all DCAS notices for the week failed to successfully generate. Mezey Decl., Ex. P, at DC FOIA 00016235. In the week of April 10, 2017, 19% of all DCAS notices for the week failed to successfully generate. Mezey Decl., Ex. N, at FNS FOIA 00191. And in the week of May 29, 2017, more than 12% of all DCAS notices for the week failed to successfully generate. Mezey Decl., Ex. Q, at FNS FOIA 00388. As a result of these frequent notice failures, there is a significant backlog of notices that are overdue to be sent out to SNAP recipients. As of July 5, 2017, this backlog contained 1,750 SNAP-related notices, with Defendant having only caught up through the end of April 2017, meaning that many of these notices were several-months old. Mezey Decl., Ex. R, at FNS FOIA 00436.

Defendant admits that these notice generation failures are ongoing. In its July 5, 2017 report to FNS, DHS explained that its "IT team needs to put together a plan to reduce the backlog and take appropriate action on notices that are past due." Mezey Decl., Ex. R, at FNS FOIA 00410. DHS also hoped to "identify the root cause" of these defects and perform code fixes but the "planned deployment date" to do so was still to be determined. *Id.* DHS also acknowledged that while the agency was taking steps to monitor and prevent notice failures, the agency did not have a process in place to "do a deep dive analysis at case level to assess which notices should have gone out." *Id.* at FNS FOIA 00437.

These ongoing notice failures have had a significant impact on the recertification notices sent to SNAP recipients notifying them of the need to recertify. As of July 5, 2017, 300 recertification notices were in the backlog of notices that had not yet been sent to SNAP

recipients.  *Id.*  In addition, an April 2017 DHS report noted job failures impacting recertification notices, Mezey Decl., Ex. N, at FNS FOIA 00191, and a May 2017 DHS report acknowledged "input from service centers about Recert[ification] notices . . . which have dates issues."  Mezey Decl., Ex. O, at FNS FOIA 00293.

This widespread failure to send notices to SNAP recipients informing them of the need to recertify have caused improper termination of benefits for Individually Named Plaintiffs, as well as other low-income residents of the District of Columbia.  *See* Ross Decl., ¶ 6 (SNAP recipient had benefits terminated in July due to Defendant's failure to provide notice of the need to recertify); Coe Decl., ¶ 3 (Defendant terminated SNAP benefits in July without providing notice of the need to recertify; SNAP recipient remains due an underpayment for lost benefits); Lester Decl., ¶ 5 (same); Guevara Decl., ¶ 11; *id.*, Ex. A at 2 (Defendant terminated SNAP benefits in May 2017 and admitted that it failed to provide notice of the need to recertify); Telson Decl., ¶ 16 (homeless woman has been without SNAP benefits since August due to Defendant terminating benefits without providing notice of need to recertify); Whaley Decl., ¶¶ 2–3 (63-year-old stroke victim has been without benefits since August due to Defendant terminating benefits without providing notice of need to recertify); *see also* Williams Decl., ¶¶ 4, 13 (Defendant terminated SNAP benefits in March 2017 and admitted that it provided notice containing incorrect recertification deadline).

Defendant's failure to notify SNAP recipients of the need to recertify violates the SNAP Act and implementing regulations, which require that Defendant must, before the start of the last month of a household's certification period, provide each household with a NOE informing the household that its certification period is ending and of the deadline to submit an application for recertification to receive ongoing SNAP benefits.  *See* 7 U.S.C. § 2020(e)(4); 7 C.F.R.

§ 273.14(b)(1).  Defendant's systemic violation of these requirements warrants the issuance of relief from this Court.

### C. Defendant Fails to Provide Adequate Notice in Violation of the Due Process Clause and Federal SNAP Act Requirements

When Defendant subjects low-income households to delays in processing their initial and recertification applications, she also fails to provide notice of such delay to impacted households. None of the Individually Named Plaintiffs or other District residents who were subject to delays in processing their initial or recertification applications received any notice from Defendant of this delay or of the right to a hearing to challenge it.  *See* Garnett Decl., ¶¶ 6–11; Messick Decl., ¶¶ 5–15; Murph Decl., ¶¶ 4–6; Moore Decl., ¶¶ 11, 15; Bonilla de Leonzo Decl., ¶¶ 4–9; Telson Decl., ¶¶ 6–14, 16–23.  Such notice, however, is required by well-established due process principles and by the SNAP Act and implementing regulations.

First, the SNAP Act and implementing regulations clearly require that, when Defendant fails to timely process an initial or recertification application, Defendant must send a written notice to the affected household informing it, *inter alia*, that processing of the application has not been completed.  *See* 7 U.S.C. § 2020(e)(10); 7 C.F.R. §§ 273.10(g)(1)(iii), 273.15(a).

Second, due process requires that a public assistance recipient must be afforded timely notice of a determination affecting participation in a program and an opportunity to meaningfully contest the agency's decision.  *Goldberg*, 397 U.S. at 267–68.  In the landmark case of *Goldberg*, the Supreme Court held that individuals seeking to vindicate their entitlement to public benefits possess a property interest in those benefits and must be afforded procedural due process protections guaranteed by the Fourteenth Amendment to the Constitution.  The Court reasoned that public benefits are "a matter of statutory entitlement," which makes the interest in the receipt of such benefits a right rather than a privilege.  *Id.* at 262.

It is beyond dispute that plaintiffs have a constitutionally protected property interest in SNAP benefits.  "Food-stamp benefits, like welfare benefits at issue in *Goldberg v. Kelly* are a matter of statutory entitlement for persons qualified to receive them.  Such entitlements are appropriately treated as a form of property protected by the Due Process Clause . . . ." *Atkins v. Parker*, 472 U.S. 115, 128–29 (1985) (internal citations and quotation marks omitted).  And numerous courts have held that public benefits applicants, as well as recipients, have a protected property interest.  *See, e.g., Mallette v. Arlington Cty. Emps.' Supplemental Ret. Sys. II*, 91 F.3d 630, 637 (4th Cir. 1996) ("The Supreme Court has explained that a person may hold a property interest in a benefit even before it has been determined that she is, in fact, eligible for the benefit."); *Kapps v. Wing*, 404 F. 3d 105, 115–16 (2d Cir. 2005); *Hamby v. Neel*, 368 F.3d 549, 561–62 (6th Cir. 2004); *Daniels v. Woodbury Cty., Iowa*, 742 F.2d 1128, 1132 33 (8th Cir. 1984); *White v. Roughton*, 530 F.2d 750, 755 (7th Cir. 1976).

This case is comparable to *Philadelphia Welfare Rights Org. v. O'Bannon*, 525 F. Supp. 1055, 1060–61 (E.D. Pa. 1981), where a court found a state agency's "failure to provide advance notice . . . [of adverse action] seriously exacerbated the risk of erroneous deprivations . . . [to SNAP benefit recipients in violation of] well established principles of procedural due process." *Id.* at 1060.  The *O'Bannon* court noted that 4,000 households currently receiving SNAP benefits would be terminated without adequate advance notice and denied the "minimally adequate supply of food" that they obtain through the food stamp program.  *Id.* at 1058–59.  The court rejected the agency's claim of "preventing administrative inconvenience and cost [as reasons] for withholding [advance] and adequate notice."  *Id.* at 1060; *see also Mayhew v. Cohen*, 604 F. Supp. 850, 859 (E.D. Pa. 1984) (plaintiffs have "a substantial probability [of showing] that notice employed by the state does not allow recipients to pursue [their due process rights] in a

38

meaningful way"); *Schroeder v. Hegstrom*, 590 F. Supp. 121, 131 (D. Or. 1984) (injunctive relief granted where plaintiffs demonstrated likelihood of success on deficient notice claim violative of due process).

Here, Defendant fails to provide *any* notice of its delayed processing of initial and recertification applications and of the right to a fair hearing to challenge such delays, thereby depriving SNAP applicants and recipients of any effective opportunity to be heard, in contravention of well-established due process requirements.  Without adequate notice explaining the delay, SNAP applicants and recipients cannot understand the specific reason for the deprivation of benefits and cannot effectively exercise their appeal rights.  Given Defendant's failure to provide adequate notice of processing delays, the plaintiff class has a high likelihood of prevailing on the merits of this claim.

## III.   THE BALANCE OF EQUITIES STRONGLY FAVORS GRANTING A PRELIMINARY INJUNCTION

The equities in this case tip decidedly in favor of the Plaintiffs.  As explained above, the plaintiff class suffers the loss of assistance necessary for their very survival.   The harm Individually Named Plaintiffs and members of the proposed classes are suffering through the loss of subsistence benefits greatly outweighs any purported injury to Defendant should the Court grant the motion for preliminary injunctive relief.   Likewise, any alleged injury to Defendant cannot match the injury to Bread; absent preliminary injunctive relief, the organization will be forced to continue depleting its scarce resources and overextending its staff to compensate for Defendant's failures.

In *Briggs v. Bremby*, a recent case challenging SNAP application processing delays*,* the court found that the balance of hardships tipped "decidedly" in favor of plaintiffs.  The court explained that "the Plaintiffs' vital and essential interest in timely receipt of food stamps and the

resultant harm suffered through loss of timely benefits" clearly "outweigh[ed] any injury caused by requiring the Defendant to do what was already required under the Act." *Briggs*, 2012 U.S. Dist. LEXIS 172018, at *58.

Indeed, since Plaintiffs seek only Defendant's compliance with requirements of federal law, any claim that Defendant is unduly burdened should be rejected.  In affirming the grant of injunctive relief by the trial court, the Seventh Circuit stated in *Haskins v. Stanton*:

> Because the defendants are required to comply with the Food Stamp Act under the terms of the Act, we do not see how enforcing compliance imposes any burden on them.  The Act itself imposes the burden; this injunction merely seeks to prevent the defendants from shirking their responsibilities under it.  We also fail to see how enforcing a statute designed to promote the public welfare disserves the public.

794 F.2d at 1277.

That the balance of equities tips in favor of the Plaintiffs is clear.  Each day that the members of the plaintiff class are forced to go without needed assistance is another day that their well-being and that of their families is threatened.  Conversely, the requested relief would not impose any additional expenses or administrative difficulties on Defendant beyond those already required by federal law.

## IV.   GRANTING A PRELIMINARY INJUNCTION WOULD ADVANCE THE PUBLIC INTEREST

Finally, the injunctive relief requested by Plaintiffs would advance the public interest. By seeking enforcement of federal law and the protection of federal rights, the requested relief in this case promotes the public interest.  *See Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993) ("there is a strong public interest in meticulous compliance with the law by public officials").  As the court in *Haskins v. Stanton* stated:

> Congress has given the interest of the public foremost consideration in placing certain conditions and restrictions on the States' participation in the program.  The statute itself is a declaration of how the Food Stamp Program should be run in

order to best serve the public interest.  Therefore, the public interest will be best served . . . by granting injunctive relief to order the defendants to fulfill the statutory mandates of Congress in the Food Stamp Act.

621 F. Supp. 622, 629–30 (N.D. Ind. 1985).

Other courts have similarly held that the public interest favors enjoining the unlawful deprivation of basic subsistence benefits.  *See, e.g.*, *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) (concluding that public interest favored granting injunction regarding unlawful deprivation of Social Security benefits and explaining that "[o]ur society as a whole suffers when we neglect the poor, the hungry, the disabled, or when we deprive them of their rights or privileges"); *Booth*, 830 F. Supp. 2d at 1045 ("[O]rdering Defendant to comply with federally mandated timeliness requirements would serve to advance social welfare by ensuring that eligible low-income households receive needed assistance to provide food for themselves and their families.").

In short, Congress has made clear that it is in the public interest for persons eligible for food stamps to be able to apply, recertify, and receive their benefits on time and it would further the public interest to grant the injunctive relief Plaintiffs seek and prevent Defendant from denying these individuals the benefits intended by Congress.

## V.     THE COURT SHOULD WAIVE RULE 65(C)'S REQUIREMENT THAT A BOND BE POSTED

Plaintiffs request that the Court waive Federal Rule of Civil Procedure 65(c)'s bond requirement in view of the fact that Individually Named Plaintiffs are indigent and have brought an action that promotes the public interest.  Courts have broad discretion in determining the security required, and may dispense with the requirement entirely in certain circumstances.  *See, e.g.*, *DSE, Inc. v. United States*, 169 F.3d 21, 39 (D.C. Cir. 1999); *Marsh USA, Inc. v. Schuhriemen*, 183 F. Supp. 3d 529, 538 (S.D.N.Y. 2016).   Moreover, several circuits have

approved of dispensing with security for indigent plaintiffs.  *See, e.g., Pharm. Soc. of N.Y., Inc. v. Dep't of Soc. Servs.*, 50 F.3d 1168, 1174 (2d Cir. 1995) (waiving the security requirement for indigent plaintiffs suing under comprehensive federal health and welfare statutes to vindicate the public interest); *Washington v. Fla. Agency for Persons with Disabilities*, 658 F. Supp. 2d 1332, 1339 (N.D. Fla. 2009) (collecting cases).  In this case, Plaintiffs are likewise very low-income individuals surviving at the edge of poverty.  Waiving the bond poses no risk to Defendant, as Plaintiffs ask only that the Court order Defendant to comply with federal law requirements for timely application processing, timely issuance of benefits, and provision of adequate notice.

## CONCLUSION

Plaintiffs respectfully request that the Court grant their motion for preliminary injunctive relief.

Respectfully Submitted,

Date:   September 15, 2017

___/s Chinh Q. Le_____
Chinh Q. Le (DC Bar No. 1007037)
Jennifer Mezey (DC Bar No. 462724)*
Chelsea Sharon (DC Bar No. 1016006)*
LEGAL AID SOCIETY OF THE
    DISTRICT OF COLUMBIA
1331 H Street NW, Suite 350
Washington, DC 20005
202-628-1161 (Phone)
202-727-2132 (Fax)
cle@legalaiddc.org
jmezey@legalaiddc.org
csharon@legalaiddc.org

---

\*       Certification to practice pursuant to LCvR 83.2(g) submitted or to be submitted.

Marc Cohan[†]
Mary R. Mannix[†]
Travis W. England[†]
Katharine Deabler-Meadows[†]
NATIONAL CENTER FOR LAW
        AND ECONOMIC JUSTICE
275 7th Avenue, Suite 1506
New York, NY 10001
212-633-6967 (Phone)
212-633-6371 (Fax)
cohan@nclej.org

Peter R. Bisio (DC Bar No. 459256)
Lance Y. Murashige (DC Bar No. 1021562)
Emily Goldman (DC Bar No. 1032032)
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
202-637-5600 (Phone)
202-637-5910 (Fax)
peter.bisio@hoganlovells.com

*Attorneys for Plaintiffs*

---

[†]     Application for admission *pro hac vice* to be sought.