## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHONICE G. GARNETT, *et al.*,<br><br>             *Plaintiffs,*<br>v.<br><br>LAURA ZEILINGER,<br><br>             *Defendant.* | Civil Action No. 17-1757 (CRC) |

### DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

In this lawsuit, plaintiffs challenge the administration of the Supplemental Nutrition Assistance Program (SNAP), alleging the District of Columbia (the District)[1] has violated due process and the Food and Nutrition Act of 2008 (SNAP Act). Specifically, plaintiffs allege the District fails to: (1) timely process SNAP applications and recertifications; (2) timely provide SNAP beneficiaries an opportunity to complete the recertification process; and (3) timely send notice to SNAP beneficiaries of processing delays and the opportunity for an administrative hearing. Plaintiffs now seek a preliminary injunction based on these perceived failures, but they cannot meet the requirements for granting the extraordinary injunctive relief they seek.

---

[1] Laura Green Zeilinger, in her official capacity as the Director of the District of Columbia Department of Human Services, is named as the sole defendant in this case. Defendant is referred to as "the District" throughout this opposition.

Even assuming the SNAP Act provides a private right of action, plaintiffs are not entitled to injunctive relief because they are unlikely to succeed on the merits, nor can they establish irreparable harm because any lapse they experienced regarding their SNAP benefits has been rectified. As set forth in the attached Declaration of the Director of the District of Columbia Department of Human Services, Laura Green Zeilinger, plaintiffs' motion is based on outdated and inaccurate information regarding the District's administration of SNAP. And the challenges plaintiffs allegedly encountered—except for plaintiff Bread for the City, which lacks standing to assert a claim—are mainly attributable to caseworker errors that are insufficient to justify injunctive relief. Thus, for the reasons discussed below, judicial intervention is unnecessary and plaintiffs' motion for preliminary injunction should be denied.

## BACKGROUND

### I.   The District's Administration of Public Assistance Programs

The District of Columbia Department of Human Services (DHS) is a health and human services agency that empowers District of Columbia residents to reach their full potential by providing economic assistance and supportive services. (Ex. A, Zeilinger Decl. ¶ 4.) DHS serves more than a third of the District's population, helping more than 250,000 residents. (*Id.* ¶ 98.) The Economic Security Administration (ESA), a division within DHS, is responsible for making eligibility determinations for federally and locally funded public assistance programs, including SNAP, Temporary Assistance for Needy Families (TANF), Medical Assistance benefits, the Interim

Disability Assistance Program, Program on Work Employment and Responsibility, and General Assistance for Children. (*Id.* ¶¶ 6-7.)

District residents seeking cash, nutrition, or medical assistance apply for such benefits through ESA. (*Id.* ¶¶ 9-12.) ESA processes applications, verifies information through various local and federal databases, requests supporting documentation from applicants and third parties, and interviews applicants as required by law. (*Id.*) ESA then determines whether applicants meet the eligibility criteria for the selected assistance program(s) and notifies them in writing of the eligibility decision. (*Id.*) For cash and nutrition assistance programs, including SNAP, ESA issues benefits on an Electronic Benefit Transfer (EBT) Card through the District's EBT Office. (*Id.*) The EBT Office is operated by a subcontractor of the Office of Finance and Treasury (OFT), part of the Office of the Chief Financial Officer (OCFO), the District agency responsible for administering financial matters. (*Id.*) The OFT subcontractor creates and distributes the EBT Cards to eligible beneficiaries. (*Id.*) The benefits are loaded by the EBT Office once the beneficiary (or an authorized representative) has retrieved the card. (*Id.*)

Most public assistance programs, including SNAP, require beneficiaries to periodically reapply, renew, or recertify their eligibility for benefits. (*Id.* ¶ 10.) Under federal regulations, failure to timely complete this process results in the termination or lapse of benefits. (*Id.*) As required by federal law, SNAP benefits are issued for a limited period of time, and beneficiaries must regularly reapply to receive ongoing benefits. (*Id.*) Thus, SNAP beneficiaries must complete a new application

(recertification) on a periodic basis, verify certain information, and re-interview with ESA, which will allow them to receive SNAP benefits for another certification period. (*Id.* ¶ 29.)

Applicants may apply for SNAP benefits, drop off verification documents, complete interviews, make case inquiries, and request assistance with any benefit-related problem, at any of DHS's five Service Centers, located in Anacostia, Congress Heights, Fort Davis, H Street, and Taylor Street. (*Id.* ¶¶ 13-16.) ESA also operates a 24-hour Call Center that provides assistance to applicants and beneficiaries in completing these tasks. (*Id.* ¶¶ 17-20.) ESA Social Services Representatives (SSRs) process all public assistance program applications and recertifications, including those for SNAP, with assistance from eligibility determination systems that automate the process of checking whether an applicant or beneficiary meets the appropriate eligibility criteria. (*Id.* ¶ 11.) These systems also generate written notices to applicants and beneficiaries regarding eligibility determinations. (*Id.*)

## II.   The SNAP Act

Congress enacted the Food Stamp Act of 1964 to create a permanent program that would both support American agriculture and provide nutrition assistance to indigent individuals and families. A Short History of SNAP, U.S.D.A., *available at* https://www.fns.usda.gov/snap/short-history-snap (last visited Nov. 1, 2017). In October 2008, the Food Stamp Program was renamed the Supplemental Nutrition Assistance Program and the Food Stamp Act became the Food and Nutrition Act of

2008 (SNAP Act). Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, §§ 4001-02, 122 Stat. 1853 (2008).

Eligible applicants are entitled to SNAP benefits within 30 days after the date of application. 7 U.S.C. § 2020(e)(3); 7 C.F.R. § 273.2(a), (g)(1). For individuals in need of immediate assistance, benefits are provided on an expedited basis, within seven days of an application. 7 U.S.C. § 2020(e)(9)(A); 7 C.F.R. § 273.2(i)(3)(i). The SNAP Act and implementing regulations also require timely processing of recertifications, allowing eligible individuals who certify on time an opportunity to receive benefits "no later than 30 calendar days after the date the household received its last allotment." 7 U.S.C. § 2020(e)(4); 7 C.F.R. § 273.14(d)(1). A mid-certification is the periodic report certain individuals must complete and provide mid-way through a twelve-month SNAP certification period. 7 C.F.R. § 273.12(a)(5)(iii)(B). Individuals are entitled to notice regarding the expiration of SNAP benefits and the need to recertify before the expiration of the certification period. *Id.* § 273.14(a). In addition, an applicant is entitled to written notice if a completed initial application has not been timely processed, and the notice must include information regarding appeal rights, including the right to a hearing. 7 U.S.C. § 2020(e)(10); 7 C.F.R. §§ 273.10(g)(1)(iii), 273.15(a).

States and the District of Columbia have flexibility in determining SNAP eligibility. The District expanded the income threshold for categorically eligible beneficiaries from the federal 130% of the poverty line ($2,628 per month for a family of four) to 200% ($4,042 per month). *SNAP Eligibility*, DEP'T OF HUMAN SVCS.,

*available at* https://dhs.dc.gov/service/snap-eligibility (last accessed Nov. 15, 2017). The amount of the SNAP benefit, however, is set by the federal government. Lizbeth Silbermann, SNAP – Fiscal Year 2018 Cost-of-Living Adjustments, U.S.D.A. FOOD AND NUTRITION SVC. (July 28, 2017), *available at* https://fns-prod.azureedge.net/sites/default/files/snap/SNAP_Fiscal_Year_2018_Cost_of_Living _Adjustments.pdf (last accessed Nov. 15, 2017); *A Quick Guide to SNAP Eligibility and Benefits*, Ctr. on Budget and Policy Priorities (Sept. 14, 2017), *available at* https://www.cbpp.org/research/a-quick-guide-to-snap-eligibility-and-benefits    (last accessed Nov. 15, 2017) ("SNAP expects families receiving benefits to spend 30 percent of their net income on food."). Under the Food Stamp Expansion Amendment Act of 2014, the District uses local funds to ensure all beneficiaries receive at least $30 per month, even though the federal minimum is presently $15. D.C. Code § 4-261.04. There were an average of 123,975 D.C. SNAP beneficiaries per month between September 2016 and August 2017, the last month for which federal data is available. *Supplemental Nutrition Assistance Program (SNAP)*, U.S.D.A. FOOD AND NUTRITION SVC., *available at* https://www.fns.usda.gov/pd/supplemental-nutrition-assistance-program-snap (last accessed Nov. 15, 2017); Ex. I, Table of SNAP Participation at 2.

III.   The Creation of the District of Columbia Access System (DCAS)

ESA is currently undergoing a monumental transformation to improve service delivery with the implementation of a new eligibility processing system, and a Business Process Re-Engineering (BPR), both of which will significantly enhance

services provided to District residents. (Zeilinger Decl. ¶¶ 66-67.) Currently, there are two systems that support eligibility determinations for ESA's public assistance programs:  (1) the Automated Client Eligibility Determination System (ACEDS); and (2) the District of Columbia Access System (DCAS). (*Id.* ¶ 55.) ACEDS—the District's legacy system—will eventually be replaced by DCAS. (*Id.*)

DCAS has been developed in phases. (*Id.* ¶¶ 60-63.) Phase II was implemented in October 2016, and Phase III is scheduled to begin next year. (*Id.*) Phase I focused primarily on implementing the new Medicaid guidelines established under the Patient Protection and Affordable Care Act of 2010 and its regulations. (*Id.*) Phase II has focused on human services programs, including TANF and SNAP. (*Id.*) Phase III will focus on other programs, including all remaining forms of Medical Assistance and functionality to support Human Services Case Management. (*Id.*)

DCAS Phase II went "live" in October 2016 with the concurrence of the United States Department of Agriculture Food and Nutrition Service (FNS), the federal agency responsible for oversight of the federal SNAP program. (*Id.* ¶ 97.) When DCAS becomes fully implemented, it will be a "one-stop shop," determining eligibility for all public health and human services benefits offered by the District. (*Id.* ¶ 64.)

## IV.    The Individual Plaintiffs

Plaintiff Shonice Garnett applied for SNAP benefits in July 2016. (*Id.* ¶ 157.) Her application was timely processed but erroneously denied as a result of caseworker error. (*Id.*) When Ms. Garnett reapplied a year later on July 10, 2017, her application was timely processed and approved. (*Id.*) However, it was mistakenly approved for only the month of July 2017. (*Id.*) The District learned of this mistake

on August 28, 2017 when plaintiffs filed this action. (*Id.*) Ms. Garnett's benefits were re-activated the following day and she received retroactive payments for the thirteen previous months. (*Id.*) The funds were available to her by August 31, 2017, less than three days after the District learned she was experiencing a problem with her benefits. (*Id.*)

Plaintiff Richard Messick applied for SNAP benefits on January 10, 2017. (*Id.* ¶ 158.) A caseworker scanned, but failed to process, his application. (*Id.*) As reflected in a letter he sent to DHS Director Zeilinger on March 2, 2017, Mr. Messick contacted DHS in February 2017 and was told DHS could not locate his application. (*Id.*) When he reapplied on May 11, 2017, his application was timely processed. (*Id.*) And when the District learned in this lawsuit that Mr. Messick had not received benefits from January through April 2017, the retroactive payments were added to his account by August 31, 2017. (*Id.*) On October 3, 2017, Mr. Messick disputed the SNAP benefit amount and DHS subsequently issued a retroactive payment. (*Id.*) Mr. Messick submitted a mid-certification on October 27, 2017, and it was processed and approved three days later. (*Id.*)

Plaintiff Linda Murph was receiving SNAP benefits in January 2017. (*Id.* ¶ 159.) An isolated data import error from ACEDS to DCAS caused the termination of her benefits on January 16, 2017. (*Id.*) On March 7, 2017, Ms. Murph received retroactive payments for February and March 2017. (*Id.*) However, her certification period was mistakenly entered to end on February 28, 2017, so she did not receive benefits beginning in April 2017. (*Id.*) Once the District was notified of the problem

through this lawsuit, Ms. Murph received full retroactive payments and all funds were available by August 31, 2017. (*Id.*) Ms. Murph's certification period was corrected and now ends on April 30, 2018. (*Id.*)

Plaintiff Tracey Ross received SNAP benefits through the end of her June 2017 certification period. (*Id.* ¶ 160.) On April 29, 2017, DHS sent Ms. Ross a notice of expiration of benefits. (*Id.*) However, an error prevented Ms. Ross from receiving the termination notice by June 30, 2017. (*Id.*) Once the District was notified of the error through this lawsuit, Ms. Ross's benefits were promptly reactivated and she received a retroactive payment for the months of July and August 2017. (*Id.*) Her certification period was extended to November 30, 2017 to allow for recertification. (*Id.*) A recertification interview was scheduled for November 9, 2017, and Ms. Ross must recertify by November 30, 2017. (*Id.*)

Plaintiff James Stanley failed to submit a recertification application before the end of his certification period. (*Id.* ¶ 161.) This may have occurred because of a vendor's error, which failed to print and send recertification notices at the end of June 2017. (*Id.*) DHS learned of this error in September 2017 and provided all individuals whose SNAP benefits terminated on August 31, 2017—based on the failure to submit a recertification—an opportunity to recertify until September 30, 2017. (*Id.*) DHS conducted robocalls to advise beneficiaries to recertify, and mailed reminders informing beneficiaries that a submitted application by September 30, 2017 containing at least their name, address, and signature would be treated as a recertification. (*Id.*) Any beneficiary who recertified during the grace period received

retroactive payment. (*Id.*) There is no record that Mr. Stanley submitted a recertification application prior to September 30, 2017, and he was required to reapply for SNAP benefits. (*Id.*) Mr. Stanley reapplied on November 2, 2017. (*Id.*)

Plaintiff Roderick Gaines also failed to submit a recertification application before the end of his certification period. (*Id.* ¶ 162.) This, too, may have occurred because of the vendor's error described above. (*Id.*) DHS provided all affected beneficiaries an opportunity to recertify until September 30, 2017. (*Id.*) Mr. Gaines received both a reminder notice and bi-weekly robocalls, ECF No. 27-4 at ¶5, but did not recertify. (*Id.*) As a result, Mr. Gaines is aware that he must reapply for SNAP benefits. (*Id.*)

Plaintiff Kathryn Harris was sent notice on July 30, 2017, informing her that she needed to recertify by September 30, 2017, either in-person or by mail. (*Id.* ¶ 163.) Legal Aid incorrectly emailed Ms. Harris's recertification application to the DHS Call Center after business hours on September 14, 2017. (*Id.*; ECF No. 27-6 at ¶5.) Ms. Harris's recertification application was processed on October 20, 2017, and all necessary benefits were loaded to her EBT Card. (Zeilinger Decl. ¶ 163.) As in the cases of Mr. Stanley and Mr. Gaines above, the District learned of the difficulties experienced by Ms. Harris when plaintiffs filed their Amended Complaint on October 13, 2017. (*Id.*)

## LEGAL STANDARD

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council,*

*Inc.*, 555 U.S. 7, 22 (2008)). Preliminary injunctive relief is appropriate only when the movant demonstrates:  (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 20.

Demonstrating a likelihood of success on the merits is a free-standing requirement for a preliminary injunction. *Sherley*, 644 F.3d at 393 (quotation omitted). In addition, "proving irreparable injury is a considerable burden, requiring proof that the movant's injury is certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (internal citations and quotation marks omitted). If a party fails to make a sufficient showing of irreparable injury, a court may deny a motion for preliminary relief without considering the other factors. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).

Finally, even if the movant demonstrates a likelihood of success *and* irreparable injury, the court still "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987).

## ARGUMENT

### I.  Plaintiffs are Unlikely to Succeed on the Merits.

Plaintiffs allege violations of the SNAP Act and due process under the Fifth and Fourteenth Amendments, arguing the District fails to:  (1) timely process SNAP

11

applications and recertifications; (2) timely provide SNAP beneficiaries an opportunity to recertify; and (3) timely send notice to SNAP beneficiaries of processing delays and the opportunity for an administrative hearing. (Am. Compl. ¶¶ 3, 171-73; ECF No. 24-2 at 1.) But even assuming the SNAP Act provides a private right of action[2] and the Court considers plaintiffs' due process claim solely under the Fifth Amendment—because the Fourteenth Amendment does not apply to the District—plaintiffs are unlikely to prevail on the merits.

Plaintiffs' motion for preliminary injunction is based on inaccurate information and, contrary to their contention, the District ensures timely processing of applications and recertifications, and provides due process. The difficulties alleged by plaintiffs—except for Bread for the City, which lacks standing—were primarily caused by isolated caseworker errors. Plaintiffs' experiences confirm the District's ability to address individualized errors. Each plaintiff's SNAP benefit issue was promptly addressed within days of the District learning of it through filings in this lawsuit. The District has completely redesigned its business process at each ESA

---

[2] Most federal circuits, including the D.C. Circuit, have not ruled on whether there is a private right of action to enforce provisions of the SNAP Act. Four circuits have held that there is a private right of action. *See, e.g.*, *D.O. v. Glisson*, 847 F.3d 374, 378 (6th Cir. 2017); *Briggs v. Bremby*, 792 F.3d 239, 241 (2d Cir. 2015); *Gonzalez v. Pingree*, 821 F.2d 1526, 1530 (11th Cir. 1987); *Victorian v. Miller*, 813 F.2d 718, 724 (5th Cir. 1987); *Haskins v. Stanton*, 794 F.2d 1273, 1275 (7th Cir. 1986). District courts in other circuits have disagreed. *See, e.g.*, *Almendares v. Palmer*, 284 F. Supp. 2d 799, 808-10 (N.D. Ohio 2003); *Krieger v. Loudoun Cty., Dep't of Soc. Servs.*, 2014 WL 4923207, at *4 (W.D. Va. July 15, 2014). *But see Whitaker v. State of Cal.*, 1995 WL 691881, at *5 (N.D. Cal. Nov. 16, 1995) (assuming, without deciding, that a private right of action exists under 7 U.S.C. § 2020(g), even though the United States argued that there is no private right of action).

Service Center, and has developed several procedures to resolve the issues DHS staff identify, or beneficiaries or advocates report, including workarounds to address issues that arise as the District implements its new and improved eligibility processing system. The District has undertaken all of these measures in regular consultation with FNS, and continues to work with FNS to ensure eligible District residents receive SNAP benefits in a timely manner. Because "a failure to show a likelihood of success on the merits is alone sufficient to defeat a preliminary-injunction motion," plaintiffs' motion for preliminary injunction should be denied. *Smith v. Henderson*, 944 F. Supp. 2d 89, 96 (D.D.C. 2013).

### A.   Processing of SNAP Applications and Recertifications (Claim I)

#### 1.   Plaintiffs' Request for Injunctive Relief is Based on Outdated and Inaccurate Information; the District Ensures Timely Processing of Applications and Recertifications.

In Claim One of the Amended Complaint, plaintiffs wrongly allege that the District fails to timely process SNAP applications and recertifications, and does not provide SNAP benefits to eligible households in a timely manner. (Am. Compl. ¶ 171; ECF No. 24-2 at 8.)

Plaintiffs' contention that the District fails to timely process SNAP applications is based primarily on a March 23, 2017 report by FNS, which examined the first months of the DCAS rollout, October through December 2016. (ECF No. 24-2 at 36.) Relying on the March 2017 report, plaintiffs assert that, during this period, DHS approved 69.15% of SNAP applications beyond the 30-day deadline established by federal regulations. (*Id.*) However, that figure is based on inadvertently inaccurate

information reported to FNS on the District's FNS-366B Program and Budget
Summary Statement Report Certification Section for the first quarter of FY 2017.
(Zeilinger Decl. ¶¶ 125-26.) The inaccurate information reflected the total number of
processing days for SNAP applications during that period, instead of the number of
days applications exceeded the timeframe required for timely processing (30 days for
regular applications and 7 days for expedited applications). (*Id.*) For expedited
applications, plaintiffs assert that DHS approved 90.71% beyond the 7-day deadline.
(ECF No. 24-2 at 36.) But that figure also is based on inadvertently inaccurate
information reported by DHS, consisting of total processing days instead of overdue
days. (Zeilinger Decl. ¶¶ 125-26.) Because of these errors, the FNS-366B report for
the first quarter of FY 2017 inaccurately portrays DHS with more untimely cases.
(*Id.* ¶ 127.)

The FNS-366B form also does not provide an accurate picture of a state's
timeliness efforts and rates because FNS has instructed that "[a]ll approved
applications that are overdue are counted in columns (d) - (g) even if the reason the
case was overdue is because of a client caused error." (*Id.* ¶ 130.) DHS is in the process
of formally correcting and resubmitting its FNS-366B for the first quarter of FY 2017.
(*Id.* ¶ 131.) But even after it is corrected, it is not an accurate reflection of DHS's
current operation of SNAP because the figures are outdated. (*Id.*)

Plaintiffs incorrectly rely on DHS's Corrective Action Plans (CAPs) from
November 2014 through November 2016 to argue that there are "widespread failures"
that prevent the timely processing of recertifications. (ECF No. 24-2 at 37.) But those

CAPs analyzed data from ACEDS, not DCAS. (Zeilinger Decl. ¶ 42.) Plaintiffs' reliance on data from January 2016 through September 2016—prior to the October 2016 DCAS launch—is irrelevant. Plaintiffs also speculate that "the high rate of recertification denials likely includes many recertification applications" that DHS received and did not process. (Am. Compl. ¶ 86.) This statement is not supported by any data. (Zeilinger Decl. ¶ 128.) In addition, these recertification denial numbers do not exclude customers who belatedly recertify for SNAP. (*Id.* ¶ 129.)

Contrary to plaintiffs' assertion, the District did not "disregard" FNS's guidance prior to or during the DCAS launch. DHS has worked closely with FNS throughout the DCAS project. (*Id.* ¶ 104.) In fact, FNS issued a "concurrence" e-mail following a successful "Mock Pilot," authorizing DHS to "go live" with DCAS on October 11, 2016. (*Id.* ¶ 95.) DHS worked closely with FNS to develop the Mock Pilot prior to the DCAS launch. (*Id.* ¶ 85.) Because of the unique characteristics of the District of Columbia, FNS had approved DHS's use of a Mock Pilot in lieu of a "Live Pilot." (*Id.* ¶ 86.) The Mock Pilot, which was developed under the guidance and approval of FNS, was designed to meet Live Pilot goals by "testing" DCAS with a sample of beneficiaries and comparing case results to ACEDS on a daily basis. (*Id.*) FNS conducted two site visits and 29 meetings with the DHS information technology (IT) team to ensure the District would be ready for the "cutover," the two-week period in which ACEDS would be "turned off" and DCAS would be "turned on." (*Id.*) DHS would not have gone forward without approval from FNS.

Plaintiffs' assertion that DCAS is "error-prone," or that DCAS prevents DHS from processing a case in a timely manner, is also unsupported. (Am. Compl. at ¶ 75.) As discussed in Section II, there are effective mechanisms in place to ensure SNAP applications and recertifications are timely processed. Plaintiffs' reliance on the dissatisfaction certain DHS employees may have expressed to FNS immediately following the DCAS launch, should be considered in the appropriate context. On October 11, 2016, approximately 450 DHS staff members, including 250 ESA caseworkers, transitioned from ACEDS, a system some employees had been using every day for over 20 years. (*Id.* ¶ 101.) Unsurprisingly, some DHS employees experienced frustration transitioning to a new system in which they could not use the program codes, screen codes, notice serial numbers, and reporting codes they had spent years memorizing. (*Id.*) But temporary employee difficulties do not establish that the District is unable to timely process SNAP applications and recertifications.

The District ensures initial SNAP applications and recertifications are timely processed by tracking all customer interactions and document submissions through PathOS, a workflow management tool used at each ESA Service Center. (Zeilinger Decl. ¶¶ 71, 111.) PathOS is a central component of ESA's improved business process, and tracks applications and recertifications that are received in-person, by mail, or facsimile. (*Id.* ¶ 71.) When a customer visits a Service Center, the reason for the visit is recorded in PathOS. (*Id.* ¶ 72.) All ESA employees working as SSRs are logged into PathOS during business hours, and PathOS distributes work among all logged-in SSRs. (*Id.* ¶ 71.) When an SSR is finished processing paperwork or interacting with

an individual, the SSR marks the task as complete and the system assigns the SSR the next available task, helping to reduce waiting times and to ensure case-related paperwork is timely processed at each Service Center.[3] (*Id.*)

All SSRs have been trained and instructed that cases should be processed on a "one-and-done" basis, meaning an individual's first interaction with an SSR at a Service Center should be the only interaction. (*Id.* ¶ 73.) This extended interaction is the cornerstone of the improved business process, seeking to prevent the need for customers to make multiple visits to a Service Center. (*Id.* ¶ 69.) Currently, ESA Service Centers have an 83% on-the-spot completion rate. (*Id.* ¶ 74.) For the remaining ESA customers, the case is marked as an open task in PathOS and sent to the "non-lobby" work queue for resolution as quickly as possible. "Non-lobby" work, which solely involves processing paperwork, is checked daily by Service Center management to ensure tasks are completed in a timely manner. (*Id.* ¶ 75.) In October 2017, new non-lobby SNAP applications were completed on average in 3.88 days, and non-lobby SNAP recertifications were completed on average in 6.75 days. (*Id.* ¶ 76.)

---

[3]   Most of the processing issues alleged by plaintiffs occurred before the implementation of PathOs. For example, plaintiff Richard Messick visited the Taylor Street Service Center on January 13, 2017, just prior to the February 6, 2017 implementation of PathOS at that Service Center. (*Id.* ¶ 76.) If PathOS had been in place when Mr. Messick visited, it would have ensured his application was tracked and processed in a timely manner. (*Id.*)

## 2. The Processing Issues Alleged by the Individual Plaintiffs and Declarants Do Not Warrant Injunctive Relief.

The circumstances relating to the named plaintiffs and other declarants do not justify injunctive relief. The processing issues identified are not indicative of a general failure to timely process initial applications and recertifications.

Ms. Garnett and Mr. Messick's SNAP applications were not timely processed because of caseworker error, and Ms. Murph experienced a lapse in benefits because of an isolated data import error from ACEDS to DCAS. (Zeilinger Decl. ¶¶ 157-59.) Plaintiffs' SNAP benefits were promptly restored once the District was notified of the problems they were experiencing.[4] (*Id.*) The same is true for the eight individuals who submitted declarations in support of plaintiffs' motion for preliminary injunction. (*Id.* ¶¶ 164-71.)

Declarant Diamond Moore applied for SNAP benefits in October 2016 shortly after the birth of her youngest child. (*Id.* ¶ 164.)  She submitted paperwork but when she requested to add benefits for her newborn child in November 2016, she was not asked for verification documents and, as a result, her benefits were not increased.

---

[4]   Although plaintiffs' counsel is fully aware of the procedures the District undertakes to investigate any problems a SNAP customer may experience, plaintiffs' counsel instead elected to wait until filing this lawsuit to notify the District of the difficulties experienced by the individual plaintiffs. Prior to the filing of the Complaint on August 28, 2017, the District was unaware plaintiffs Garnett, Messick, Murph, and Ross were due benefits they were not receiving. Plaintiffs incorrectly assert that the District's actions in resolving these issues "show both that [the District] admits that there are problems and that these problems were ongoing and unremediated by [the District] when this lawsuit was filed." (ECF No. 54-2 at 1-2 n.1.) In fact, they show plaintiffs' disregard for the District's established procedures—of which plaintiffs' counsel were well aware—to ensure such problems were promptly addressed.

(*Id.*) Ms. Moore notified the District of this problem in January 2017, benefits were increased in February 2017, and retroactive payments were made on March 17, 2017. (*Id.*) Ms. Moore received a mid-certification notice on September 19, 2017, and her benefits are active through December 31, 2017. (*Id.*)

Declarant Sandra Bonilla De Leonzo applied for SNAP benefits in March 2017. (*Id.* ¶ 165.) Her application was not timely processed because it was improperly scanned by a caseworker. (*Id.*) Ms. Bonilla De Leonzo reapplied for benefits in May 2017 and the application was timely processed. (*Id.*) She has not requested retroactive payments for March or April 2017 and DHS lacks sufficient information to determine whether she was eligible to receive SNAP benefits for those months. (*Id.*) Ms. Bonilla De Leonzo was required to complete her mid-certification by October 31, 2017. (*Id.*)

Declarant Elizabeth Telson was certified to receive SNAP benefits through July 31, 2017 but she was not sent a termination notice until August 1, 2017. (*Id.* ¶ 166.) When the District learned of this error on August 29, 2017, Ms. Telson's certification period was extended through September 30, 2017. (*Id.*) She submitted her recertification application through Legal Aid Society on September 25, 2017, and completed an interview by phone two days later. Her SNAP benefits are certified through March 31, 2018. (*Id.*)

For these reasons, plaintiffs are unlikely to prevail on Claim One.

### B. <u>Notice of SNAP Recertifications (Claim II)</u>

In Claim Two, plaintiffs allege the District fails to allow SNAP beneficiaries an opportunity to complete the recertification application process. (Am. Compl. ¶ 172;

ECF No. 24-2 at 8.) Specifically, plaintiffs contend that DHS's alleged failure "to provide SNAP recipients with legally required notices concerning their benefits—including [Notices of Expiration] informing SNAP applicants of the need to recertify—are ongoing." (Am. Compl. ¶ 95.) As explained below, plaintiffs are mistaken.

### 1. Plaintiffs' Request for Injunctive Relief is Based on Outdated and Inaccurate Information; the District Ensures SNAP Beneficiaries Receive Notice of Recertification.

Plaintiffs once again rely on the inaccurate March 2017 FNS report, noting that FNS was concerned following its December 2016 review that DCAS did not issue notices timely or correctly, and that 14 of the 21 denied SNAP applicants reviewed had not received denial notices. (ECF No. 24-2 at 41-42.) In June 2017, DHS informed FNS that a workaround was in place to ensure all "failed" notices were sent manually through a semi-automated mail-merge process. (Zeilinger Decl. ¶¶ 135-36.) Once they are generated, mail-merged notices are sent to a print vendor for mailing, and the notices are recorded in the beneficiary's case. (*Id.*) It is likely that these workaround notices had not yet been uploaded to DCAS when FNS personnel reviewed the cases in December 2016.

DCAS successfully generates an average of 4,500 SNAP recertification notices each month, including Notices of Expiration. (*Id.* ¶ 143.) If the system does not generate a notice, it is often a symptom of data issues relating to a specific case, such as an incorrect address or missing information regarding the beneficiary. (*Id.* ¶ 138.) But if a notice fails to generate because of a data error, that does not automatically

indicate the notice is untimely sent. (*Id.*) Data validation errors are examined through a quality assurance and monitoring process and the notices are manually sent to beneficiaries through the mail-merge process. (*Id.*) Plaintiffs rely on "DHS sampling throughout 2017," which is limited to notice failures from only January, April, and May 2017. (ECF No. 24-2 at 42.) Those notice failures were part of a backlog that was tracked manually and reported to FNS. (*Id.* ¶ 141.)

As of August 1, 2017, all backlog notices had been sent with an appropriate addendum. (*Id.* ¶¶ 141-42.) Where there was an adverse result, actions were taken to ensure benefits were either extended or the individual was given an opportunity to recertify. (*Id.*) In addition to eliminating the backlog, the District has observed that fewer notices are "failing" each week. (*Id.*) As reported to FNS, the system notice failure rate was approximately 10 to 13% on a weekly basis during June and July 2017. (*Id.*) The rate dropped to 6 to 10% as of August 2017, and it averaged 5% in the most recent report to FNS. (*Id.*) The District expects these rates to decrease further in the coming months. (*Id.*)

### 2. The Notice Issues Alleged by the Individual Plaintiffs and Declarants Do Not Warrant Injunctive Relief.

Plaintiffs cannot demonstrate that there is a widespread failure to send notices to SNAP beneficiaries based on the circumstances presented by the individual plaintiffs and other declarants.

An error prevented plaintiff Ms. Ross from receiving a notice of termination of benefits in June 2017. (*Id.* ¶ 160.) But once the District was notified of the error, her benefits were promptly reactivated and she received retroactive payments for the

months of July and August 2017. (*Id.*) In the cases of plaintiffs Mr. Stanley and Mr. Gaines, their failure to submit a recertification application may be connected to a vendor's error, which failed to print and send recertification notices at the end of June 2017. (*Id.* ¶¶ 161-62.) DHS learned of this error and provided individuals notice and an opportunity to recertify by September 30, 2017. (*Id.*) Mr. Stanley failed to recertify but recently reapplied for benefits on November 2, 2017. (*Id.*) Mr. Gaines must now reapply for SNAP benefits only because he failed to recertify despite having received a reminder notice and bi-weekly robocalls. (*Id.*; ECF No. 27-4 at ¶5.)

Declarant Ebony Coe was sent a recertification notice on April 29, 2017, indicating that her benefits would be terminated on June 30, 2017. (Zeilinger Decl. ¶ 167.) She alleges that she did not receive a termination notice and that her benefits were subsequently terminated. (*Id.*) However, Ms. Coe recertified her eligibility on July 5, 2017, within the grace period, and her SNAP benefits were available on July 12, 2017. (*Id.*) Ms. Coe's certification period has been extended through August 31, 2018. (*Id.*)

Declarant Yesica Guevara states that her SNAP benefits were terminated without notice on December 31, 2016. (*Id.* ¶ 168.) A fair hearing review conducted in July 2017 determined that her SNAP benefits were terminated without proper advance notice. (*Id.*) As a result, her benefits were reinstated May 1, 2017 through July 31, 2017 to provide her an additional opportunity to recertify and she received retroactive payments back to January 2017. (*Id.*) Ms. Guevara submitted a recertification application in early July 2017 and completed an interview on August

1, 2017. (*Id.*) Her application and interview revealed that her income exceeds the eligibility criteria for SNAP. (*Id.*) In spite of this, she still received retroactive payments for August and September 2017, but her benefits terminated on September 30, 2017 based on her reported income. (*Id.*)

Declarant Julia Whaley was sent notice on May 29, 2017, indicating that she needed to recertify or her benefits would terminate on July 31, 2017. (*Id.* ¶ 169.) Although the subsequent termination notice sent on August 1, 2017 was untimely, Ms. Whaley's benefits were reinstated on September 18, 2017. (*Id.*) Ms. Whaley voluntarily dismissed her request for a fair hearing on October 17, 2017, following the issuance of retroactive payments and approval for a new certification period. (*Id.*)

Declarant Luelanda Williams applied for SNAP on October 7, 2016, and received benefits through February 28, 2017. (*Id.* ¶ 170.) She received a timely recertification in December 2016, but failed to recertify until March 24, 2017. (*Id.*) In April 2017, Ms. Williams received retroactive payments for March and April 2017. (*Id.*) Based on her eligibility, Ms. Williams has received SNAP benefits from June 2017 to the present. (*Id.*)

Finally, Declarant Grant Lester was sent a recertification notice on April 29, 2017, indicating that his benefits would expire at the end of June 2017. (*Id.* ¶ 171.) Mr. Lester did not recertify until July 10, 2017. (*Id.*) As a result, he received a pro-rated SNAP benefit for July 2017 rather than a full monthly benefit, because the late certification was not the District's fault. (*Id.*) Mr. Lester was approved for full SNAP benefits going forward. (*Id.*)

For these reasons, plaintiffs are unlikely to prevail on Claim Two.

C. **Notice of Delays and Appeal Rights (Claim III)**

In Claim Three, plaintiffs allege the District fails to provide written notice and an opportunity for a fair hearing to SNAP applicants whose applications are not processed within the mandated timeframes, in violation of the SNAP Act and the Due Process Clause of the Fifth and Fourteenth Amendments. (Am. Compl. ¶ 173.)

The Due Process Clause of the Fourteenth Amendment reads in pertinent part: "No State shall … deprive any person of life, liberty, or property without due process of law …." U.S. Const. amend. XIV. Thus, by its terms, the Fourteenth Amendment applies only to the States—it does not apply to the federal government or the District of Columbia. *Powers-Bunce v. District of Columbia*, 479 F. Supp. 2d 146, 153-54 (D.D.C. 2007) (citing *Bolling v. Sharpe*, 347 U.S. 497, 498 (1954) (holding that the Fourteenth Amendment does not apply to the District of Columbia)); *see also Butera v. District of Columbia*, 235 F.3d 637, 645 n. 7 (D.C. Cir. 1987) (explaining that while due process violations are typically analyzed under the Fourteenth Amendment, the District of Columbia, which is not a state, is subject to the Due Process Clause of the Fifth Amendment); *Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009). Because plaintiffs only sue the District of Columbia, the Fourteenth Amendment is inapplicable.

But even under the Fifth Amendment, plaintiffs cannot demonstrate a violation of due process, or the SNAP Act, because the District will provide an additional notice informing beneficiaries of any processing delays. All official notices

generated and sent by DHS currently contain information regarding appeal rights and available legal representation. (Ex. H.) Therefore, because plaintiffs cannot demonstrate that the District fails to provide "any notice" of delayed processing of applications and recertifications, or of the right to request a fair hearing, plaintiffs are unlikely to prevail on Claim Three.

### D. Plaintiff Bread for the City Lacks Standing.

Plaintiffs contend that Bread for the City (Bread) has organizational, not associational, standing. (ECF No. 24-2 at 19) ("Organizational Plaintiff Bread has also been directly impacted"). In particular, plaintiffs argue Bread has been forced to divert its resources because of the District's alleged failure to comply with requirements under the SNAP Act. (Am. Compl. ¶¶ 152, 155, 160, 162.)

Contrary to plaintiffs' assertions, Bread lacks standing to assert any claims in this case. That is because an organization, "like an individual plaintiff, [must] show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *People for the Ethical Treatment of Animals v. United States Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (quotations omitted).

Diversion of resources is insufficient to support Bread's claim to organizational standing. The D.C. Circuit has "consistently held that self-inflicted harm doesn't satisfy the basic requirements for standing. Such harm does not amount to an 'injury' cognizable under Article III." *Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006); (cited in *Pub. Citizen, Inc. v. Nat'l*

*Highway Traffic Safety Admin.*, 489 F.3d 1279, 1290 (D.C. Cir. 2007)); *but see Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 935 (D.C. Cir. 1989) (Wald, J., dissenting) ("Standing is defeated only if it is concluded that the injury is so completely due to the plaintiff's own fault as to break the causal chain."). For example, "[a]n organization's diversion of resources to litigation or to investigation in anticipation of litigation is considered a 'self-inflicted' budgetary choice that cannot qualify as an injury in fact for purposes of standing." *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011). All of Bread's alleged injuries are self-inflicted.

First, Bread's contention that it has diverted resources to its food program, is not an injury-in-fact fairly traceable to the District because it is the result of plaintiff's own actions. As explained in the Declaration of DHS Director Zeilinger, the issues concerning the individual plaintiffs could have been resolved had they been reported though the established channels and procedures that are well-known (and regularly used) by Bread. (Zeilinger Decl. ¶ 156.) Within days of receiving notification of problems experienced by the individual plaintiffs, the District resolved each issue. Plaintiffs' apparent litigation tactic to reveal problems only when filing this lawsuit bears "at least some of the hallmarks of a 'self-inflicted' injury not caused by the agency action. * * * [and Bread, at least,] lack[s] standing because the links in the chain of causation between the challenged Government conduct and the asserted injury are far too weak." *Pub. Citizen, Inc.*, 489 F.3d at 1290-91 (omitting internal quotations and citations); *See also Nat'l Family Planning & Reprod. Health Ass'n, Inc.*, 468 F.3d at 831 (association lacked standing because its injury was "self-

inflicted" insofar as it "ha[d] within its grasp an easy means for alleviating the alleged uncertainty")).

Second, the claim that Bread has diverted resources to its Legal Clinic suffers from the same defect of self-injury as the alleged diversion to its food program, but it may also not be a true injury-in-fact at all. As the D.C. Circuit has observed:

> An organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit. * * * The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization.

*Nat'l Taxpayers Union v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (internal quotations and citations omitted); *accord ASPCA v. Feld Entm't, Inc.*, 398 659 F.3d 13, 25 (D.C. Cir. 2011) ("an organization's diversion of resources to litigation or to investigation in anticipation of litigation is considered a self-inflicted budgetary choice that cannot qualify as an injury in fact for purposes of standing."). As Bread acknowledges, assisting individuals in applying for benefits such as SNAP is a core part of its mission. (Am. Compl. ¶ 153.) Simply because Bread has done more of this in 2017, on its own, does not constitute an injury-in-fact. "If the challenged conduct affects an organization's activities, but is neutral with respect to its substantive mission, [the D.C. Circuit has] found it entirely speculative whether the challenged practice will actually impair the organization's activities." *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (internal quotation omitted).

Bread has a separate traceability problem. Plaintiffs' contention that changes in SNAP processing caused Bread injury is based on changes "[b]eginning in or about

October 2016." (Am. Compl. ¶¶ 150, 154; *see also* ECF No. 24-2 at 26-27.) But October 1, 2016, was also the start of the federal government's 2017 Fiscal Year and, thus, the start of significant changes in federal and state SNAP policies around the country, including changes in the District's policies. (Ex. J, SNAP Mass Change Notice - FY17.) For example, changes to District law meant that "cash benefits for most cash programs are increasing by 15.3%." (*Id.*) "These cash benefits are counted when we calculate SNAP benefits." (*Id.*) This means that SNAP benefits for many families decreased, even though their overall benefits increased through cash assistance programs. SNAP beneficiaries who expected SNAP to cover the same percentage of their food budgets may have relied on other resources for assistance—including Bread and Martha's Table—through no fault of the District.

An examination of relevant data does not support plaintiffs' assertion that a change in District policies or procedures caused a decrease in SNAP participation beginning in October 2016. Although there was a decrease in the number of individuals served in October 2016 (-4.54%), there was only a small decrease in November (-0.90%), all of which was regained by an increase in December (+5.88%). (Ex. K, Chart of SNAP Participation Monthly Changes; Ex. I, Table of SNAP Participation.) And although there was a decrease in February 2017 (-4.89%), there were increases in June 2017 (2.06%) and August 2017 (1.54%). (Ex. L, Chart of SNAP Participation.) Notably, similar trends occurred in the same months in Maryland, Virginia, and the entire Mid-Atlantic Region. *Id.*

In sum, the data simply does not support plaintiffs' contention that there was a significant change in the District in October 2016 related to SNAP application processing or participation. And because Bread's claim to organizational standing is wholly reliant on the effects of that purported change on its day-to-day operations, it has no standing. Even if the data supported its position, Bread has not alleged the type of injury-in-fact required for organizational standing.

## II.   Plaintiffs Will Not Suffer Irreparable Harm if a Preliminary Injunction is Denied.

The D.C. Circuit has held that "failure to demonstrate irreparable harm is 'grounds for refusing to issue a preliminary injunction, even if the other three factors entering the [preliminary injunction] calculus merit such relief.'" *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F. 3d 290, 297 (D.C. Cir. 2006) (observing that there is "a high standard for irreparable injury")). Plaintiffs must show that "'[t]he injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Chaplaincy of Full Gospel Churches*, 454 F. 3d at 297. In addition, plaintiffs must demonstrate that the injury is "beyond remediation." *Id.* Although the factors relevant to a preliminary injunction "interrelate on a sliding scale … the movant must, at a minimum, demonstrate that irreparable injury is likely in the absence of an injunction." *Bill Barrett Corp. v. U.S. Dep't of Interior*, 601 F. Supp. 2d 331, 334-35 (D.D.C. 2009) (internal quotation marks and citations omitted) (emphasis in original).

Here, plaintiffs fail to carry their heavy burden for demonstrating irreparable injury.[5] The problems experienced by the individual plaintiffs have been rectified. Plaintiffs have not presented evidence of widespread issues that currently affect the District's ability to administrate SNAP benefits. And, given their reliance on outdated and inaccurate information, plaintiffs cannot demonstrate that these issues are likely to recur, or that any possible injury is beyond remediation. Given the transformation that ESA is undergoing, operational setbacks will occur and system errors will be discovered. But, as described below, the District has improved its business process and created several procedures to resolve issues as they are uncovered by DHS staff or reported by beneficiaries and advocates. As to the individual plaintiffs and other beneficiaries who submitted declarations in support of plaintiffs' request for injunctive relief, each problem could have been addressed quickly had it been reported though the established channels. These procedures are well-known and regularly used by plaintiffs' counsel and other community advocates.

### A. Business Process Re-Engineering (BPR)

In December 2015, recognizing the opportunity to improve customer service, ESA retained a vendor to conduct a massive reorganization and re-engineering of benefit eligibility processing at ESA Service Centers. (Zeilinger Decl. ¶ 66.) As part of the upgrade of business process, all Service Center employees were re-trained, new

---

[5] The District incorporates by reference its argument above regarding plaintiff Bread's lack of standing. Because Bread lacks standing, it cannot establish irreparable harm. *See* Section I.D above.

workflow tracking systems were introduced, and a new standard for customer service was implemented. (*Id.* ¶ 67.)

The principal feature of DHS's improved business process is the "one-and-done" procedure. (*Id.* ¶ 69.) As noted earlier, this means that when an individual interacts with an SSR at a Service Center, all efforts are made to complete the individual's request during the initial visit. In that initial assessment, the Business Process Re-Engineering (BPR) team realized that customer interactions were kept as short as possible because the Service Centers' focus was on "keeping the line moving," meaning customers often left a Service Center without fulfilling the purpose of their visit. (*Id.*) Requiring SSRs to spend more time with each customer reduces repeat visits and waiting times. (*Id.*) DHS examines how many customers return more than once to a Service Center within 90 days. (*Id.* ¶ 74.) Over the past 90 days, 83% of client interactions are completed in one visit, often including a determination of benefits. (*Id*)

The second principle of BPR is a reduction in "hand-offs," meaning caseworkers are performing more work on-the-spot, rather than passing incomplete cases to others. (*Id.* ¶ 70.) When several caseworkers were responsible for a series of tasks relating to a case, there may have been uncertainty over whose ultimate responsibility it was to process the case. (*Id.*) Reducing hand-offs, and requiring caseworkers to resolve issues while the customer is present, minimizes this uncertainty and reduces errors and case-related problems. (*Id.*) In addition, Service Centers no longer transfer work from one geographic location to another. (*Id.*) Cases

received at a Service Center are processed at that center, including documents that are dropped off or mailed. (*Id.*) This ensures documents are located, scanned, and processed in a timely manner. (*Id.*) Most Service Centers reach full customer processing capacity between 11:00 am and 4:00 pm, although busy times will vary depending on customer needs. (*Id.* ¶ 78.) When a Service Center reaches capacity, the staff notifies customers that they have three options:  (1) drop off documents (the documents are then scanned by the front desk, the task is entered into PathOS, and the customer is provided a receipt); (2) return on another day; or (3) contact the Call Center to make an inquiry or report a change.[6] (*Id.*)

Because of each Service Center's adoption of the new business process, including new workflow tracking software, wait times and repeat visits are decreasing. For example, the average lobby wait time for new SNAP applications decreased by 7.5% from May to August 2017, from 134 to 124 minutes. (*Id.* ¶ 79.) The average lobby wait time for SNAP recertifications decreased by 29% from May to August 2017, from 128 to 91 minutes. (*Id.* ¶ 80.)

### B.  The ESA Service Center

The five Service Centers located throughout the District assist eligible District residents in obtaining ESA program services five days a week. In total, approximately 230 ESA caseworkers work at the five Service Centers. (*Id.* ¶¶ 14-15.) Each of the five Service Centers interacts with approximately 150 to 200 customers daily, conducting

---

[6] Declarant Luelanda Williams was apparently informed of these options on two separate occasions. (ECF No. 24-47.) She then decided to visit a less crowded Service Center, met with a caseworker, and obtained her SNAP benefits. (*Id.*)

interviews, accepting applications and recertifications, and assisting customers with various issues relating to benefits. (*Id.*) Any SNAP customer experiencing a problem with his or her benefits may visit any of the five Service Centers to make inquiries and seek a prompt resolution. (*Id.*)

### C. The DHS Call Center

Historically, District residents conducted all eligibility transactions in person at one of ESA's five Service Centers. DHS now has a Call Center made up of approximately 50 employees who accept telephonic inquiries from customers concerning all ESA programs. (*Id.* ¶¶ 17-18.) This allows customers to conduct their transactions from any location and at their convenience. (*Id.*) The Call Center functions like a Service Center, allowing DHS Staff to directly access case information, provide immediate answers to specific questions, and update a case file. (*Id.*)

In addition, the Call Center Interactive Voice Response (IVR) hotline is also available 24 hours a day, seven days a week. (*Id.* ¶ 19.) IVR handles 85% to 90% of calls without requiring a customer to speak with a DHS employee. (*Id.*) Inquiries handled by the IVR include confirmation of recently submitted documents and information regarding benefit status and paid benefit amounts. (*Id.*) Customers who require assistance in a language other than English may be connected to the Language Line for translation services. (*Id.*)

Monthly Call Center data, including call volume, is studied to monitor customer concerns and staff efficiency. (*Id.* ¶ 20.) In the year prior to the DCAS launch, DHS received approximately 6,000 to 11,000 Call Center calls per month. (*Id.*

¶ 147.) During the months after the launch in October 2016, DHS observed an expected increase of approximately 16,000 calls per month. (*Id.*) But, from March 2017 through August 2017, call volume returned to normal levels, consisting of approximately 11,000 calls per month. (*Id.*)

### D. <u>Division of Program Operations (DPO) Deputy Mailbox</u>

Although DHS strives to provide each customer with the best customer service possible, there are times when an issue cannot be resolved through the Call Center or at a DHS Service Center. To remedy those situations, DHS established the Division of Program Operations (DPO) deputy email box (DPO.deputy@dc.gov), which is specifically accessible to advocacy groups, such as the Legal Aid Society and Bread for the City; other legal representatives for customers; the D.C. Council; and the Executive Office of the Mayor. (*Id.* ¶¶ 21-22.) For example, between March and June 2017, the DPO mailbox received 240 issue notification e-mails, pertaining to 176 different customers, from the Legal Aid Society and Bread for the City.[7] (*Id.* ¶ 148.)

Through the DPO mailbox, DHS created an avenue for customers' legal representatives to resolve issues without visiting a Service Center. (*Id.* ¶ 24.) When advocates email the DPO mailbox regarding an unresolved issue, DPO coordinates with the appropriate District staff to provide a resolution to the inquiry. (*Id.* ¶ 25.) As email inquiries are received, they are assigned to a team of specially-trained ESA caseworkers. (*Id.*) The entire team views each email and works to resolve issues

---

[7] Prior to the filing of this lawsuit, there were no inquiries sent to the DPO mailbox relating to the SNAP issues raised by the seven individual plaintiffs in this case. (*Id.* ¶ 149.)

expeditiously. (*Id.*) This team also has the capacity to escalate issues to other parts of the agency for assistance and resolution. (*Id.*)

More than half of the inquiries received by the DPO mailbox are resolved immediately or within three business days. (*Id.* ¶ 26.) The average number of days to resolve requests sent to the DPO mailbox has dropped from over three business days in April 2017 to a half-day at present. (*Id.*)

## E. DHS Help Desk

SSRs who encounter issues in DCAS, or those who have difficulty handling a specific task in the system, may contact DHS's internal Help Desk to obtain live support from technical experts. (*Id.* ¶¶ 150-52.) This team is made up of former SSRs who participated in testing DCAS and received additional training. (*Id.*) Currently, the average on-hold wait time for SSRs calling the Help Desk is 2 minutes. (*Id.*) If the Help Desk encounters system issues when contacted by SSRs, the Help Desk staff directly notifies the Operations and Management IT team by initiating a "ticket," which allows the issue to be further investigated and resolved. (*Id.*)

## F. Technical Triage

The Operations and Management IT team investigates each ticket based on priority and works with the DHS operations team, the DHS policy team, and DHS management to ensure an appropriate solution is implemented in a timely manner. (*Id.* ¶¶ 153-55.) In addition, the IT team collaborates with DHS team members to develop a short-term workaround to mitigate impact as soon as possible. (*Id.*) Workarounds may include a specific manual task from SSRs or IT system modifications, ensuring customers are not affected by technical issues and do not

experience an interruption in their benefits. (*Id.*) After each IT solution is developed, SSRs detailed to the IT team conduct extensive tests of the recommended solution. (*Id.*) The new solution is incorporated into the system only after the IT team receives approval from these SSRs and ESA management. (*Id.*) This "technical triage" procedure—which involves reporting issues, developing solutions, and communicating updates to users—is common to most complex IT systems. (*Id.*)

### G. Fair Hearing Process and Administrative Review

In addition to DHS's internal problem-solving mechanisms, DHS reminds all beneficiaries, in every notice sent, that they have the right to a fair hearing before the District of Columbia Office of Administrative Hearings (OAH) to challenge any adverse actions or processing delays. (Ex. H.) When a request for a fair hearing is filed, DPO is immediately notified to ensure issues are addressed expeditiously. (Zeilinger Decl. ¶ 145.) An administrative review before an ESA Hearing Officer often provides customers an informal resolution to their claims. (*Id.*)

### III. The Balance of Equities Favors the District of Columbia and a Preliminary Injunction Is Not in the Public Interest.

Plaintiffs contend that the balance of equities tips decidedly in their favor because an injunction would simply require the District to comply with federal law. (ECF No. 24-2 at 47.) But plaintiffs are unable to demonstrate a likelihood of success on the merits or irreparable harm. Thus, even if this Court determines that the balance of hardships tips in favor of plaintiffs, that would not overcome plaintiffs' deficient showing with respect to the first two prongs. *Nat'l Tobacco Co., L.P. v. District of Columbia*, 2011 WL 4442771, at *9 (D.D.C. Sept. 14, 2011) (noting that the

Court's finding in plaintiff's favor "on the public interest and balance of equities prongs is not sufficient to outweigh [plaintiff's] weak showing on irreparable harm").

Furthermore, contrary to plaintiffs' representation, subjecting the District to an injunction and Court oversight would inevitably impose additional administrative burdens, including the diversion of critical resources dedicated to ensuring eligible District residents receive SNAP benefits in a timely manner. "When the issuance of a preliminary injunction, while preventing harm to one party, causes injury to the other, this factor does not weigh in favor of granting preliminary injunctive relief." *ConverDyn v. Moinz*, 68 F. Supp. 3d 34, 53 (D.D.C. 2014) (citing *Serono Labs, Inc. v. Shalala*, 158 F. 3d 1313, 1326 (D.C. Cir. 1998) and *Alina Health Servs. v. Sebelius*, 756 F. Supp. 2d 61, 69 (D.D.C. 2010)).

The public interest is served by compliance with the SNAP Act and due process. But plaintiffs cannot demonstrate that the District currently fails to comply with federal law, or that it deprives SNAP beneficiaries due process. Thus, the public interest would not be advanced by the requested injunction. *See, e.g.*, *Washington v. District of Columbia*, 530 F. Supp. 2d 163, 173 (D.D.C. 2008) ("[I]t is indisputably in the public's interest for government costs to be minimized.") (citing *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1474 (8th Cir. 1994)); *accord District of Columbia v. Masucci*, 13 F. Supp. 3d 33, 41-42 (D.D.C. 2014). Consistent with federal requirements, the District must review all SNAP applications and recertifications to ensure eligibility and avoid fraud, waste, and abuse. If the District were ordered to alter the protective mechanisms that are mandated by the federal government, it

could lose federal funding and put local funds at risk. To grant an injunction with those consequences is not in the public interest. But even if the Court determines that the public interest favors granting an injunction, that would not be sufficient to outweigh plaintiffs' failure to demonstrate an imminent risk of irreparable harm. *See, e.g., Nat'l Tobacco Co., L.P.*, 2011 WL 4442771, at *12.

Although for "several hundred years" courts sitting in equity have had the discretion to weigh the public interest in granting or denying injunctive relief, such courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 496 (1981) (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944) and quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). Because plaintiffs have failed to make the requisite showing, their request for the extraordinary remedy of an injunction should be denied.

## CONCLUSION

For the foregoing reasons, plaintiffs' Motion for Preliminary Injunction should be denied.

Dated: November 15, 2017.         Respectfully submitted,

> KARL A. RACINE
> Attorney General for the District of Columbia
>
> ELIZABETH SARAH GERE
> Deputy Attorney General
> Public Interest Division
>
> /s/ Toni Michelle Jackson
> TONI MICHELLE JACKSON (Bar No. 453765)
> Chief, Equity Section

38

/s/ Fernando Amarillas
FERNANDO AMARILLAS (Bar No. 974858)
ESTHER YONG MCGRAW (Bar No. 988479)
CONRAD Z. RISHER (Bar No. 1044678)
Assistant Attorneys General
441 Fourth Street, N.W., Suite 630 South
Washington, D.C. 20001
Telephone: (202) 442-9887
Facsimile: (202) 730-0646
Email: fernando.amarillas@dc.gov

*Counsel for Defendant Laura Zeilinger*