## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **SHONICE G. GARNETT,** *et al.*,<br><br>                    *Plaintiffs*,<br><br>v.<br><br>**LAURA ZEILINGER,**<br><br>                    *Defendant.* | Civil Action No. 17-1757 (CRC) |

### DECLARATION OF LAURA GREEN ZEILINGER IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I, Laura Green Zeilinger, declare as follows:

1.      I am the Director of the District of Columbia (the District) Department of Human Services (DHS).

2.      I have been committed to underserved populations throughout my career. Prior to my position as DHS Director, I served as the Deputy Director and then Executive Director of the United States Interagency Council on Homelessness, where I was responsible for the implementation of *Opening Doors: Federal Strategic Plan to Prevent and End Homelessness*, an effort that includes the coordination of Federal homelessness policies among nineteen federal departments and agencies, as well as partnerships with state and local communities, non-profits, and the private sector. I also previously served as DHS Deputy Director for Program Operations and led efforts to create permanent supportive housing for persons experiencing homelessness and housing stability for District residents.

Exhibit A

3.     I provide the following facts in response to Plaintiffs' Motion for Preliminary Injunction and Motion for Class Certification based upon my personal knowledge and information provided to me in connection with my official duties.

### Agency Background

4.     The mission of DHS is to empower every District resident to reach their full potential by providing meaningful connections to work opportunities, economic assistance, and supportive services. DHS has a staff of over 900 employees.

5.     DHS is the agency that determines eligibility for locally and federally funded public assistance benefits programs in the District.

6.     DHS both determines eligibility for and administers the federally funded Supplemental Nutrition Assistance Program (SNAP, formerly known as Food Stamps) in the District. The DHS Economic Security Administration (ESA) is the specific Administration within DHS that administers the District's SNAP program.

7.     In addition to SNAP, ESA also is responsible for determining eligibility and administering the District's cash assistance programs:  Temporary Assistance for Needy Families (TANF), Interim Disability Assistance (IDA), Program on Work, Employment and Responsibility (POWER), Refugee Cash Assistance (RCA), Burial Assistance (BA), and General Assistance for Children (GC). ESA also determines eligibility for medical assistance programs and subsidized child care.

8.     ESA is currently undergoing a monumental organizational transformation to improve service delivery to its customers with the implementation of a new eligibility determination information technology (IT) system, and a complete

2

Exhibit A

redesign of ESA's business processes, which will significantly enhance the services provided to District customers. These changes are described below.

### ESA Makes Eligibility Determinations for Public Assistance Programs

9.     Individuals seeking cash, food, or medical assistance from the District apply through ESA. ESA processes applications and attempts to verify applicant-provided information by checking with local and federal databases, requesting supporting documentation from applicants, and, if necessary, contacting third parties. ESA also conducts in-person interviews with all SNAP applicants and, when required by law, for other programs. ESA uses the information gathered to determine whether the applicant meets the eligibility requirements for the assistance program(s) for which he or she applied and notifies applicants in writing of the eligibility decision.

10.     Most of the public assistance programs require benefit recipients to periodically reapply, recertify, or renew their eligibility for benefits. Failure to timely do so will result in a termination or lapse of the recipient's benefits.

11.     ESA caseworkers or Social Services Representatives (SSRs) process public assistance program applications and recertifications with assistance from eligibility determination IT systems that automate the process of checking whether an applicant or recipient meets the eligibility factors for the program and that generate written notices to customers about eligibility determinations.

12.     For cash and food assistance programs, ESA issues benefits to customers on an Electronic Benefit Transfer (EBT) card, which can be used like a

Exhibit A

credit or debit card to make qualified purchases. ESA issues the benefits by transmitting information from its systems to the District's EBT office, which is managed by the Office of Finance and Treasury (OFT) within the District Office of the Chief Financial Officer (OCFO), the District agency responsible for administering the District's financial matters. The District's EBT office generates and distributes the EBT cards containing the ESA-issued benefits to eligible customers. The physical EBT card is not created and loaded with a customer's benefits until the customer or the customer's representative comes to an EBT office location to pick it up. There are two EBT office locations:  645 H Street, N.E., and 1649 Good Hope Road, S.E.

### The DHS Service Centers

13.     ESA administers and determines eligibility for benefits at five DHS Service Centers located throughout the District:  Anacostia, Congress Heights, Fort Davis, H Street, and Taylor Street. The DHS Service Centers are open Monday through Friday, except for holidays. On Wednesdays, all five Service Centers stay open for an additional three hours to serve customers.

14.     The five Service Centers are staffed by approximately 230 ESA caseworkers. Each of the five Service Centers interacts with approximately 150 to 200 customers daily, conducting interviews, accepting and processing applications and recertifications, accepting and processing customer reports of change in circumstances, and assisting customers with various issues relating to the District's public assistance programs.

15.     A customer may visit any one of the five DHS Service Centers to apply

Exhibit A

or recertify for benefits, drop off requested verification documents, submit documentation of changes in circumstance, complete interviews, inquire about their cases, and request assistance with any benefit problem.

16.    Customers are not "assigned" to a specific service center. Rather, DHS has a "no wrong door" policy, which allows customers to visit any of the five Service Centers regardless of where they live in the District.

### The DHS Call Center

17.    Historically, District residents had to conduct all transactions and inquiries regarding public benefits in person at one of the five DHS Service Centers. To better serve its customers, in 2012 DHS established a Call Center that allows applicants and recipients to complete many of the same tasks over the telephone.

18.    The Call Center is available Monday through Friday, except holidays, and functions like a Service Center, enabling customers to conduct their transactions from any location, and at their convenience. The Call Center is staffed by approximately 50 employees who have access to the same IT systems and case information as at a Service Center, allowing staff to directly access customer case information, provide immediate answers to specific questions, and update a case file (such as a customer's change of address).

19.    The Call Center also has a self-service Interactive Voice Response (IVR) hotline, which is available 24 hours a day, seven days a week, and handles 85% to 90% of calls without requiring a customer to speak with a DHS employee. Inquiries handled by the IVR hotline include confirming receipt of recently submitted

Exhibit A

documents and providing automated information regarding benefit status and paid benefit amounts. Customers who require assistance in a language other than English are connected to the Language Line for translation services.

20.     On a monthly basis, Call Center data, including call volume, is compiled and reviewed by DHS staff to discuss wait times. The Call Center flags major issues in real time by reaching out to other units in the agency as they happen so that problems that may affect multiple beneficiaries can be identified and resolved quickly, sometimes on the same day.

### Division of Program Operations (DPO) Deputy Mailbox

21.     To address those instances when an issue is escalated beyond the Call Center or Service Center, DHS established the Division of Program Operations (DPO) deputy email box (DPO.deputy@dc.gov).

22.     The DPO mailbox is specifically made accessible to advocacy groups, such as the Legal Aid Society and Bread for the City, customers' legal representatives, the D.C. Council, and the Executive Office of the Mayor to address any outstanding customer concerns.

23.     Both the Legal Aid Society and Bread for the City are aware of and frequently use the DPO Deputy email to raise concerns.

24.     Through the DPO mailbox, DHS has created an avenue for customers' representatives to resolve issues without visiting a Service Center. Advocates may email the DPO mailbox regarding an unresolved issue, and DPO coordinates with the appropriate District staff to provide a resolution to the inquiry.

Exhibit A

25.     As email inquiries are received, the inquiries are assigned to a team of specially-trained ESA caseworkers. The entire team views each email and works to resolve issues expeditiously. This team also has the capacity to escalate issues to other parts of the agency for assistance and resolution.

26.     More than half of the advocate inquiries received by the DPO deputy mailbox are resolved immediately or within three business days. Requests were resolved on average within three days in April 2017 and are resolved on average within half a day currently.

## The District's SNAP Program

27.     SNAP benefits are granted for a finite time period or a "certification period," as mandated by federal law. Certification periods may be two months, six months, twelve months, or 24 months, depending on the eligibility category of the recipient.

28.     A mid-certification is the periodic report that certain SNAP customers must complete and return to ESA midway through a twelve-month SNAP certification period. 7 C.F.R. § 273.12(a)(5)(iii)(B).

29.     Before their certification period ends, SNAP recipients are notified and provided an opportunity to recertify their eligibility, which will allow them to receive SNAP benefits for another certification period.

30.     To recertify, a SNAP recipient must fill out a recertification form and complete an interview, and all required supporting verifications must be accepted.

31.     If a SNAP recipient fails to recertify before the end of his or her

Exhibit A

certification period, then the recipient's case will be terminated. After the case is terminated, the customer has a thirty-day grace period, during which, if the recertification form is completed and submitted, the customer's case will be reopened and benefits pro-rated. After the grace period concludes, the customer must reapply for SNAP benefits. In these instances, SNAP recipients must complete a new application, undergo information verification, and participate in another in-person interview with ESA.

32.   For many years, FNS has awarded performance bonuses to states with the highest performance in certain aspects of the SNAP Program. (FNS SNAP Program Improvement, available at https://www.fns.usda.gov/snap/snap-program-improvement.)

33.   DHS has consistently outperformed the vast majority of states in its administration of its SNAP Program through DHS's focus on making sure that District citizens have access to and can obtain SNAP benefits timely.

34.   From FY11 to FY15, the District received performance bonuses four times, varying from $400,000 to almost $800,000, as one of the top five states for best program access.[1] The District was first in FY11, second in FY12, first in FY13, and second in FY15.

---

[1] FNS, SNAP High Performance Bonuses, available at https://fns-prod.azureedge.net/sites/default/files/snap/FY2011-High-Performance-Bonuses.pdf; https://fns-prod.azureedge.net/sites/default/files/snap/FY2012-High-Performance-Bonuses.pdf; https://fns-prod.azureedge.net/sites/default/files/snap/FY2013SNAPHighPerformanceBonuses.pdf; https://fns-prod.azureedge.net/sites/default/files/snap/FY2015HighPerformanceBonuses.pdf.

Exhibit A

35.     FNS calculates this measure using the Program Access Index, which "is designed to indicate the degree to which low-income people have access to SNAP benefits." (FNS, *Calculating the Supplemental Nutrition Assistance Program (SNAP) Program Access Index: A Step-By-Step Guide for 2012*, Feb. 2014, available at https://fns-prod.azureedge.net/sites/default/files/PAI2012.pdf.)

36.     For FY12 and FY13, the District also received performance bonuses, of approximately $600,000 each year, as one of the top six states for Best Application Processing Timeliness Rate. (*See supra*, ¶ 34, n.1.)

37.     And from FY11 through FY15, the District was in the top ten among all states for Application Processing Timeliness.[2] The District was eighth in FY11, fifth in FY12, fourth in FY13, sixth in FY14, and eighth in FY15.

### Federal Oversight of the SNAP Program

38.     The U.S. Department of Agriculture (USDA), through its Food and Nutrition Service (FNS), is the federal agency responsible for oversight and compliance with the federal SNAP program. FNS's oversight of state SNAP programs is divided by region, and each region has a Regional Administrator that oversees a

---

[2] FNS, FY11 through FY15 Application Processing Timeliness, available at https://fns-prod.azureedge.net/sites/default/files/snap/FY2011ApplicationProcessingTimeliness.pdf.pdf; https://fns-prod.azureedge.net/sites/default/files/snap/FY2012ApplicationProcessingTimeliness.pdf.pdf; https://fns-prod.azureedge.net/sites/default/files/snap/FY2013SNAPApplicationProcessingTimeliness.pdf; https://fns-prod.azureedge.net/sites/default/files/snap/FY2014ApplicationProcessingTimeliness.pdf; https://fns-prod.azureedge.net/sites/default/files/snap/FY2015ApplicationProcessingTimeliness.pdf.

Exhibit A

Regional SNAP Director and his or her staff.

39.    FNS's oversight is broad and in-depth and covers many aspects of the SNAP Program, including but not limited to payment accuracy, error rates for both negative cases (households for which participation was denied, suspended, or terminated) (also known as the Case and Procedural Error Rate (CAPER)) and active cases (households participating in SNAP), program access, and application processing timeliness rates.

40.    Each fiscal year, FNS issues a SNAP Management Evaluations (MEs) memorandum, identifying national target areas and other at-risk program areas where resources should be directed for that fiscal year. (FNS, *Supplemental Nutrition Assistance Program - Fiscal Year 2017 National Target Areas for Management Evaluations*, June 30, 2016, available at [https://fns-prod.azureedge.net/sites/default/files/snap/SNAP%20FY17%20National%20Target%20Areas%20for%20Management%20Evaluations%20%282%29.pdf](https://fns-prod.azureedge.net/sites/default/files/snap/SNAP%20FY17%20National%20Target%20Areas%20for%20Management%20Evaluations%20%282%29.pdf).)

41.    FNS requires states to submit a SNAP Corrective Action Plan (CAP) twice a year if certain percentage benchmarks are not met. The CAP must cover the areas specified in FNS Administrative Notice 33-15, which may include previously identified deficiencies as well as areas identified annually by FNS as target areas for the Management Evaluations.

42.    In their Amended Complaint, plaintiffs refer to DHS's November 2016 CAP. (*See, e.g.,* Am. Compl. ¶ 85.) But the November 2016 CAP pertained to the old system, ACEDS, and thus is not relevant to plaintiffs' claims in this case.

Exhibit A

43.     Despite this robust oversight, in a 2014 study of state and federal efforts to combat SNAP recipient fraud, the Governmental Accountability Office (GAO) concluded that "FNS does not have consistent and reliable data on states' anti-fraud activities because its reporting guidance lacks specificity." (GAO, *Supplemental Nutrition Assistance Program: Enhanced Detection Tools and Reporting Could Improve Efforts to Combat Recipient Fraud*, GAO-14-641, Highlights Page (Aug. 21, 2014), at 2, available at https://www.gao.gov/products/GAO-14-641.) As a result, the GAO recommended that "[a]dditional oversight efforts, such as providing guidance to states for reporting consistent data, could improve FNS's ability to monitor states and obtain information about more efficient and effective ways to combat recipient fraud." (*Id.*)

44.     In addition, the USDA Office of Inspector General (OIG) released a report in September 2015, finding that FNS did not have adequate quality control (QC) processes in place to monitor and ensure the integrity of SNAP error rate determinations. (USDA OIG, Audit Report No. 27601-0002-41, *FNS Quality Control Process for SNAP Error Rate* (Sep. 2015), at 2, available at https://www.usda.gov/oig/webdocs/27601-0002-41.pdf.) The OIG recommended that FNS consider changing its QC process, issuing guidance to states, and amending its policies "to ensure error rates are accurate and determined in compliance with regulations." (*Id.*)

45.     As a result of these reports, FNS implemented a series of changes.

46.     FNS revamped the form used to collect recipient integrity performance

Exhibit A

information (FNS-366B) because "State reporting lacks consistency and form FNS–366B data elements and instructions are not clearly defined." (FNS Notice of Proposed Information Collection and Request for Comments, 80 Fed. Reg. 38427, 38428 (July 6, 2015).)

47. FNS also changed the frequency of the FNS-366B from an annual to a quarterly submission beginning in FY17. (FNS Guidance, *Clarifications for Reporting on the Certification Section of the FNS-366B*, Jan. 11, 2017, available at https://fns-prod.azureedge.net/sites/default/files/snap/366B-Certifications-Question-and-Answer.pdf.) Significant questions arose regarding the revised form FNS-366B, which required additional clarification in January 11, 2017. (*Id.*) FNS issued further clarification six months later. (FNS, *Clarification on the Three Ways Initial SNAP Application Processing Timeliness Is Measured*, June 2, 2017, available at https://fns-prod.azureedge.net/sites/default/files/snap/Triple%20Timeliness%20Memo%2023May2017.pdf (FNS "seeks to clarify the three existing data collection and monitoring procedures").)

48. FNS also finalized rulemaking, initially proposed in 2011, regarding Review of Major Changes in Program Design and Management Evaluation Systems. (FNS Notice of Final Rulemaking, 81 Fed. Reg. 2725 (Jan. 19, 2016).)

49. FNS also issued a memorandum notifying all states that it would not be releasing a SNAP national payment error rate for FY16, but instead "will remain focused on conducting the FY 2017 review" and "working with [states] to achieve our mutual goal of integrity in this important nutrition assistance program." (FNS Mem.,

Exhibit A

*FY 2016 SNAP Payment Error Rate*, June 30, 2017, available at https://fns-prod.azureedge.net/sites/default/files/snap/FY2016-Payment-Error-Rate-Memo.pdf.)

50. Recently, on October 17, 2017, FNS notified all states that:

The United States Department of Agriculture's Food and Nutrition Service (FNS) is working to improve the integrity of the Supplemental Nutrition Assistance Program (SNAP) Quality Control (QC) system. As a part of this effort, starting in Federal Fiscal Year 2015, FNS conducted reviews of State agency operations, issued clarifying guidance, conducted training, and worked closely with State agencies as they developed and implemented corrective action plans to improve the reliability of the data used for the SNAP payment error rate.

To date, FNS QC integrity initiatives have focused only on the payment error rate process. FNS has now determined an expanded focus is necessary to ensure that additional measures and reporting that rely on underlying QC data, specifically the case and procedural error rate (CAPER) and the application processing timeliness (APT) rate, remain free of bias. Therefore, FNS is postponing the announcement of CAPER and APT rates, and associated bonuses, until we can review the reliability of State reported data in these areas.

Proper administration of the SNAP QC system is our shared responsibility and essential to guaranteeing the program is run efficiently, effectively, and with the utmost integrity. **FNS will provide additional details about future actions to ensure the integrity of the CAPER and APT measures in the coming months.**

(**Exhibit B**, FNS Letter to DHS, Oct. 17, 2017 (emphasis added).)

51. SNAP is a heavily regulated, highly complex federal program, and in the past two years, FNS has issued numerous memoranda, guidance, and clarifications to the states regarding changes to its policies, rules, and QC and other processes. (*See, e.g.,* FNS, *State Agency Requirements for Required and Missing Verification for Regular Initial Applications*, June 28, 2017 ("FNS has received several inquiries"); FNS, *Delay of Effective Date for Interim Final Rule SNAP: Eligibility, Certification,*

13

Exhibit A

*and Employment and Training Provisions of the Food, Conservation and Energy Act of 2008*, June 7, 2017 ("These provisions increased requirements for group living arrangements and drug and alcohol treatment centers. Commenters expressed significant concerns that the changes were overly burdensome and did not provide enough flexibility for State agencies. FNS is putting a stay in the effective date of these changes in order to further review comments received and consider if additional changes to the amendments are needed."); FNS, *Clarification on the Three Ways Initial SNAP Application Processing Timeliness Is Measured*, June 2, 2017 (FNS "seeks to clarify the three existing data collection and monitoring procedures"); FNS, *Cases of Severely Delayed Certification due to State Agency Fault*, Apr. 10, 2017 ("FNS recently became aware of the need to clarify guidance"); FNS, *Guidance for Improving State Timeliness Rates and Standardizing the Escalation Process*, Mar. 18, 2016 (memorandum "is intended to update earlier guidance"), available at https://www.fns.usda.gov/snap/policy.)

52.     At the ground level, however, and on a more week-to-week basis, state agencies interact primarily with the regional SNAP directors and their staff.

53.     The regional SNAP directors conduct regular audits of different aspects of a state's SNAP program, such as biweekly meetings with IT and program staff, monthly meetings with the IT team and CMS and FNS staff, an annual IT review with CMS and FNS, and the Management Evaluations review process.

54.     FNS staff has 24/7 access to the DCAS system through personal login credentials for monitoring and oversight purposes.

Exhibit A

## The Creation and Development of DCAS

55.     Currently, there are two major IT systems that support eligibility determinations for ESA's public assistance programs: (1) the Automated Client Eligibility Determination System (ACEDS); and (2) the District of Columbia Access System (DCAS). ACEDS is the District's 25-year-old legacy system, which processes Medical Assistance. ACEDS ultimately will be replaced by DCAS, the District's new eligibility processing system, as additional benefit programs are integrated.

56.     To effectuate reforms under the Patient Protection and Affordable Care Act of 2010 (Pub. L. No. 111-148, 124 Stat. 119) and applicable regulations (the ACA), the District was awarded federal grant funding on September 27, 2012 to build a new integrated automated eligibility system. This funding applied not only to Medicaid systems, but to certain federally-funded programs administered by the United States Department of Health and Human Services (HHS) and United States Department of Agriculture (USDA), such as TANF and SNAP, so long as the system components were integrated and beneficial to Medicaid programs.

57.     DCAS was designed to have modules to address different programs. The new ACA-related automated eligibility system, known as DC Health Link, is supported by the DCAS Health Care Reform (HCR) module. SNAP and TANF are supported by the Curam Global Income Support System (CGISS) module within DCAS.

58.     Although CGISS is the module that processes all SNAP benefits for District customers, DHS refers to the entire system as DCAS and generally does not

15

differentiate between modules within DCAS.

59. DCAS is able to automatically calculate complicated timeframes and connect directly to federal databases, offering significant improvements and enhanced capabilities compared to ACEDS. It is designed to maintain more precise customer data, manage local programs more effectively, and produce more precise, flexible reporting.

60. DCAS has been developed in phases.

61. Phase I focused on implementing new Medicaid processes and eligibility determinations established under the ACA. DCAS's HCR module (Phase I) went live on October 1, 2013, with the rest of the nation's ACA systems. At the time, the District was recognized as one of the few states that never experienced a website crash.

62. DCAS Phase II, which focused on human services programs, including TANF and SNAP, was implemented on October 11, 2016.

63. Phase III, which is scheduled to begin the design process in 2018, will focus on other programs, including all remaining forms of Medical Assistance and functionality to support Human Services Case Management.

64. When DCAS becomes fully implemented, it will be a "one-stop shop" that integrates eligibility processing for all public health and human services benefits offered by the District. DCAS eventually will offer both a customer-facing web portal and a mobile portal.

65. All aspects of the project to retire ACEDS and implement DCAS as the single portal for all public health and human services benefits offered by the District

Exhibit A

are closely monitored and overseen by federal agencies, including the United States Centers for Medicare and Medicaid Services (CMS), the federal agency within HHS that is responsible for oversight and monitoring compliance with all Medicaid rules, and the USDA Food and Nutrition Service (FNS), the federal agency responsible for oversight of the SNAP program.

### Business Processes Reengineering to Improve Customer Service

66.     In December 2015, recognizing the opportunity to improve customer service and complement the upcoming DCAS Phase II launch, ESA engaged a vendor to conduct a massive reorganization and reengineering of all DHS Service Center business processes.

67.     Under this business process reengineering (BPR), ESA retrained all Service Center employees, introduced new workflow tracking systems, and enforced a new standard for customer service.

68.     DHS rolled out changes over a six-month period, from November 2016 through May 2017, during which DHS Service Centers adopted DHS's new and improved business processes. Each DHS Service Center also received ongoing support from the vendor until the processes had become fully engrained.

69.     The principal feature of DHS's improved business process is "one-and-done," which means that when a customer interacts with an SSR at a Service Center, the SSR makes all efforts to complete the customer's request. This extended interaction is the cornerstone of the improved business process, seeking to avoid the need for a customer to make multiple visits to a Service Center. In the initial

Exhibit A

assessment, the BPR team realized that because the Service Centers' focus was on keeping the line moving, customer interactions were kept as short as possible, and thus customers often left a Service Center without achieving their intended purpose. Although the BPR process may seem counterintuitive, requiring SSRs to spend more time with each customer reduces repeat visits and eventually waiting times. Although the waiting time at Service Centers was longer shortly after the BPR launch, wait times have since become shorter due to the reduction in repeat visits.

70.     The second principle of BPR is "hand-off" reduction, which means that caseworkers should perform more work on the spot, rather than handing off incomplete cases to other caseworkers for completion. Previously, when several caseworkers were responsible for a series of tasks relating to a particular case, issues may not have timely been resolved. Reducing hand-offs, and requiring caseworkers to resolve issues while the customer is present, prevents errors and case-related issues from being neglected. In addition, Service Centers no longer transfer work from one location to another. Cases received at a particular Service Center are processed at that center, including documents that are dropped off or mailed. This ensures that documents are located, scanned, and processed in a timely manner.

71.     PathOS, a new workflow management tool used at the Service Centers, is a central component of ESA's business process reengineering program. It is a computer system that all SSRs must be logged into during business hours. The system distributes work among all logged-in SSRs while tracking their interactions with customers. When an SSR is finished with a customer or processing paperwork,

the SSR marks the task as complete, and the system assigns the SSR the next task. This system also helps to reduce waiting times, as it assigns customers to available caseworkers. PathOS has the capability of providing information to Service Center management regarding the length of time customers have been waiting and which customers' documents require processing.

72.     When a customer visits a DHS Service Center, the reason for the visit is initially recorded by a Social Services Assistant and placed into a PathOS "path" or work queue. Because the customer came in to a Service Center, the customer's visit is placed in the "lobby" work queue. PathOS tracks the customer's visit, including wait time, time spent with an SSR, and open tasks associated with the customer. PathOS also tracks verification paperwork submitted to Service Centers to ensure applications are timely processed by assigning those tasks to SSRs for completion.

73.     All SSRs have been trained and instructed that cases should be processed on a "one-and-done" basis. This means that an SSR's goal is to reduce the number of visits each customer will make to a Service Center. This is accomplished by helping customers obtain all necessary verification paperwork on-the-spot, often by placing phone calls or accessing electronic information.

74.     Since BPR was implemented, DHS examines how many customers return more than once to a Service Center within 90 days. Currently, DHS Service Centers have an 83% on-the-spot completion rate, meaning that over the past 90 days, 83% of client interactions are completed in one visit, often including a same-day determination of benefits.

Exhibit A

75.     For ESA customers who are unable to complete a task at the DHS Service Center, the case is marked as an open task in PathOS and sent to the "non-lobby" work queue for resolution as quickly as possible. The "non-lobby" work involves processing paperwork and does not include interaction with a customer. All cases remaining in the "non-lobby" work queue are checked daily by Service Center management to ensure tasks are completed in a timely manner.

76.     In the case of plaintiff Richard Messick, Mr. Messick visited the Taylor Street Service Center on January 13, 2017, but BPR and the PathOS system were not rolled out at that location until February 6, 2017. If BPR had been in place earlier, Mr. Messick's January 2017 application would have been tracked and processed in a timely manner. In October 2017, new non-lobby SNAP applications were completed on average in 3.88 days, and non-lobby SNAP recertifications were completed on average in 6.75 days.

77.     After adoption of DHS's new business process, including PathOS, DHS's Service Center wait times and repeat visits are decreasing on a monthly basis.

78.     Most Service Centers reach full customer processing capacity between 11:00am and 4:00pm, but busy times will vary depending on customer needs. When a Service Center reaches capacity on a given day, the staff notifies customers that they have three options:  (1) drop off documents (the documents are then scanned by the front desk, the task is entered into PathOS, and the customer is provided a receipt); (2) return on another day; or (3) contact the Call Center to make an inquiry or report a change.

Exhibit A

79.    The average lobby wait time for new SNAP applications decreased by 7.5% from May to August 2017, from 134 to 124 minutes.

80.    The average lobby wait time for SNAP recertifications decreased by 29% from May to August 2017, from 128 to 91 minutes.

### DHS and FNS Planning and Design for DCAS Phase II Launch

81.    In 2014, because of the upcoming major change to the District's SNAP program system with the implementation of DCAS, DHS contacted FNS and began working with FNS staff to plan for the transition to and implementation of DCAS Phase II, which would administer the District's SNAP program.

82.    FNS requires states to conduct a "Live Pilot" for large system changes or rollouts. A Live Pilot is, essentially, a rollout of the new system to only a small portion of customers. For example, in other states, a Live Pilot can be rolled out county-by-county because customers are permitted to access services only in the county where they reside.

83.    However, such a county-by-county rollout was not feasible in the District of Columbia, a single city-jurisdiction with no counties. It also was not feasible for the District to conduct a Live Pilot using the five DHS Service Centers. First, as explained above, the District has a "no wrong door" policy, allowing customers to visit any Service Center regardless of where in the District they live. Second, the Live Pilot design would have required the District to "launch" the new system at one DHS Service Center but continue processing benefits through ACEDS, the legacy system, at the other four DHS Service Centers. A Live Pilot design for a jurisdiction like the

Exhibit A

District carried significant, unmitigable risks. For example, if a customer requested services at the Pilot Service Center, and then visited another Service Center over the course of the test period, the customer's information would not be accessible at the other center (and vice versa). This would have created opportunities for fraud, waste, and abuse, allowing customers to apply concurrently for benefits at the Pilot Service Center and at another DHS Service Center using ACEDS, not to mention confusion among customers and workers.

84.    The Live Pilot design was not workable for the District or its residents because it would have required customers to visit only one Service Center during the pilot period. For example, in the case of declarant Luelanda Williams, Ms. Williams stated in her declaration that she decided to visit a Service Center that was less crowded than her "regular" Service Center. If ESA had employed a Live Pilot design as described above, it would have been forced to turn Ms. Williams away.

85.    For these reasons, starting in 2014, DHS worked closely with FNS in monthly meetings to produce and approve a plan that involved a "Mock Pilot"— instead of a Live Pilot—before the DCAS launch. The Mock Pilot was developed under the guidance and approval of FNS to meet the Live Pilot goals of testing the system with a significant sample of actual customers and comparing case results to ACEDS on a daily basis. FNS reviewed the Mock Pilot and provided ongoing support and technical assistance during the drafting process. DHS also presented user and pilot testing data on a weekly basis to FNS.

86.    On May 6, 2016, FNS approved DHS's decision to move to the Mock Pilot

Exhibit A

phase. During the Mock Pilot phase, FNS conducted two site visits and scheduled 29 meetings with the DHS IT team to ensure details were shared, plans were understood, and the District would be ready for the "cutover," the two-week period in which ACEDS would be turned off and DCAS would be turned on. After the "cutover" is completed, then DCAS Phase II would be launched and "go live." When a system "goes live," it moves from the Design, Development, and Implementation (DDI) phase into its Operations and Maintenance (O&M) phase. "Going live" indicates the system has completed its construction phase and it becomes the system of record.

87.     DHS completed the Mock Pilot with FNS and then proceeded to the two-week "cutover" period in anticipation of the planned "go live" launch of DCAS on August 16, 2016.

88.     Then, in the middle of the two-week cutover, FNS sent the August 3, 2016 letter referenced in Paragraph 68 of the Complaint, informing DHS that anything less than a Live Pilot was insufficient. (FNS Letter to DHS, Aug. 3, 2016, Mezey Decl. Ex. C (ECF No. 24-7).)

89.     Given the extensive planning and work conducted by DHS—jointly with FNS—over the prior two years, the August 3, 2016 letter was a surprise.

90.     After this letter was received, DHS and the FNS Regional Administrator and staff met on August 11, 2016 and discussed the available options. (**Exhibit C**, DHS Letter to FNS, Aug. 16, 2016.)

91.     In the end, FNS helped to design a supplemental plan that would ensure a high comfort level with the previously-approved Mock Pilot. This supplemental plan

Exhibit A

required DHS to answer 23 detailed questions regarding the eligibility system's stability over a period of five weeks. As a result, FNS obtained a thorough and in-depth understanding of the system's capabilities.

92.     During this period, DHS conducted additional testing in accordance with the Test Pilot, and FNS signed off on each of the 23 questions as it was met by DHS. The 23 questions related to areas of concern discussed by DHS and FNS.

93.     On September 23, 2016, I sent a letter to FNS requesting concurrence with DHS's decision to "go live" with the DCAS Phase II launch on October 11, 2016. (**Exhibit D**, DHS Letter to FNS, Sep. 23, 2016.) "Concurrence" is the official FNS status that allowed the District to "go live" with the DCAS Phase II launch. DHS would not have gone live without concurrence from FNS.

94.     On September 26, 2016, the DCAS team met with FNS staff and also provided further information.

95.     Later that day, I received an email from Lynn Jordan at FNS, providing concurrence for the DCAS launch scheduled for October 11, 2016 and stating:

> This is in regard to your 9/23/16 letter requesting FNS concurrence with DC's decision to Go Live with R2.0 on 10/11/16. FNS accepts the summary information presented by the DCAS team today, 9/26/16, and I have attached my sign-off on the three questions which were remaining. The DC and FNS teams working to support DCAS have agreed to continue to follow-up on various items, as appropriate, and will also continue ongoing conference calls to discuss the project's status. We will follow-up with a written response to confirm this concurrence.
>
> FNS appreciates the ongoing cooperation of you and your staffs to support SNAP.

(**Exhibit E**, Email correspondence between DHS and FNS re: final sign-offs and

Exhibit A

concurrence to "go live," Sep. 26, 2016.)

96.   I also received a personal congratulatory email from Patricia Dombroski, the FNS Administrator for the Mid-Atlantic Region, stating "I wanted to express my appreciation for your leadership and partnership throughout this project. Eric [Ratchford] will be sending the official correspondence on my behalf." (**Exhibit F,** Email correspondence between DHS and FNS, Sep. 26, 2016.) Eric Ratchford, the Regional SNAP Director, and Lynn Jordan were copied on the email.

97.   With FNS's concurrence in hand, DHS proceeded and "went live" with DCAS Phase II on October 11, 2016.

### DCAS Phase II Implementation and FNS Ongoing Monitoring and Oversight

98.   DHS developed DCAS to implement the requirements under the ACA and simultaneously took measures to improve service delivery and transform into a modernized, efficient, and customer-oriented provider of human services. Any agency with a plan of this scale and ambition will experience some operational setbacks. ESA administers complex federal benefits programs and serves over 250,000 District residents, and employs over 650 people who are learning to use a new IT system while implementing enhanced business processes.

99.   DHS conducted significant planning, testing, and training in preparation for the DCAS Phase II "go live" launch and to obtain FNS's concurrence to proceed.

100.   As with the implementation of any new system, DCAS encountered its share of problems early in the DCAS launch, but they were identified and resolved

Exhibit A

quickly. DHS took steps to ensure that customers cases were fixed and resources for food were made available. For example, when problems were encountered early in the DCAS launch, DHS gave out gift cards to local grocery stores to ensure that customers still had their needs met in the interim.

101.    In addition, it has taken time for staff to become familiar with and accustomed to recording information in DCAS. ESA caseworkers have spent years using and memorizing ACEDS program codes, screen codes, notice serial numbers, and reporting codes. But on October 11, 2016, approximately 450 DHS staff members, including 250 ESA caseworkers, were trained and required to transition away from ACEDS, a system some employees had been using every day for over 20 years, to a completely new system. The transition for those DHS employees has not been easy.

102.    Plaintiffs allege that DHS's policies result in an ongoing failure to allow SNAP customers access to benefits, citing isolated incidents involving the individual plaintiffs and other declarants. DHS does not have policies or procedures to prevent a customer from obtaining the benefits he or she is entitled to receive. To the contrary, DHS has spent the last three years designing, constructing, testing, and launching a new eligibility processing system that aims to provide better service, increased access, and more reliable data.

103.    Since the DCAS launch, DHS has planned and implemented BPR designed to reduce processing time, improve customer tracking, reduce Service Center wait times, and improve access to services. During this time, DHS also has increased staff training, and launched internal "escalation pathways."

Exhibit A

104.   In addition, from "go live" on October 11, 2016 until the present, FNS has been a consistent presence at DHS. FNS staff communicate and work with DHS on a weekly basis to monitor, investigate, and address the issues that will arise with the implementation of any new system, as it did with DCAS.

### FNS Review During the Week of December 12, 2016 and DHS's Response

105.   In addition to its regular weekly monitoring activities, FNS conducted an on-site review during the week of December 12, 2016—two months after the DCAS implementation.

106.   In a letter to DHS dated March 23, 2017, FNS transmitted its methodology for the review and nine findings requiring corrective action. (Mezey Decl. Ex. E (ECF No. 24-9).)

107.   In its review, FNS's "objective was to identify the challenges District DHS staff were experiencing in processing cases with DCAS, and how those challenges may impact the accuracy and timeliness of SNAP benefits" and to "assess[] DCAS' compliance with Federal regulations regarding application processing." (*Id.* at 1.)

108.   In its Methodology section, FNS noted that its review was based on interviews of DHS staff and customers, data collection and review, and case file reviews. (*Id.* at 3.) In that section, FNS reported that customers expressed frustration with long wait times and the need for multiple trips to Service Centers and that this was confirmed by Call Center volume data. (*Id.*) FNS also reported that DHS employees expressed frustration with the new DCAS system and complained that

Exhibit A

DCAS impaired their ability to serve customers and that it took much longer to process a case in DCAS (90 minutes) as compared to ACEDS (20 minutes). (*Id.* at 3.)

109.    It is unknown how the DHS staff arrived at the 90-minute calculation. (*Id.*) But comparing the time to process cases in ACEDS compared to DCAS (especially right after DCAS "went live") is not an effective measure of the new system's capabilities. The DCAS technology allows for additional information to be captured during the customer's SNAP interview. For example, to process a case in ACEDS, the SSR would ask the customer several questions, and then based on that information, the SSR would make a determination and document the end result in ACEDS. By contrast, in DCAS, as each question is asked, the SSR types the answer in the system. Thus, DCAS not only allows, but requires SSRs to input more complete information in each customer's case file, which allows for more thorough QC review and reporting. In addition, this comparison between ACEDS and DCAS case processing time does not account for ESA's business process reengineering, which requires more thorough customer interactions.

110.    During the Mock Pilot described above, a portion of the testing involved two SSRs seated next to each other and processing the same client. One SSR would process the case in ACEDS, and the other in DCAS, while a tester timed both interactions. During this test, the team discovered that, on average, an additional 5 minutes was needed to process the case in DCAS.

111.    As described above, DHS uses a new workflow system called PathOS to track all customer interactions. PathOS data show that the average SNAP customer

interaction for October 2017 was 68 minutes for an application and 51 minutes for a recertification.

112.    On September 11, 2017, DHS randomly selected and timed 12 SNAP customer interactions with SSRs, recording the time it took to complete a new SNAP application, recertification, and mid-certification. Although the processing time varied based on actual customer needs and the limited sample, the results were all well under 90 minutes, as shown in the chart below.

| Activity | ESA Employee | Time | |
|----------|--------------|------|--|
| **Lobby –Mid-certification** | SSR1 | 11:54 to 12:21 | 27 MINUTES |
| **Lobby –Mid-certification** | SSR2 | 1:18 to 1: 39 | 21 MINUTES |
| **Lobby – New SNAP Application** | SSR1 | 9:28 to 9:52<br>9:38 to 10:07<br>9:53  to 10:26 | 32 MINUTES<br>29 MINUTES<br>29 MINUTES |
| **Lobby –New SNAP Application** | SSR2 | 9:29 to 9:48<br>10:07 to 11:08 | 14 MINUTES<br>61 MINUTES |
| **Lobby – SNAP recertification** | SSR1 | 9:32 to 9:56<br>9:58 to 10:25 | 24 MINUTES<br>27 MINUTES |
| **Lobby –SNAP recertification** | SSR2 | 10:15 to 11:04<br>2:11 to 3:26<br>2:40 to 3:00 | 49 MINUTES<br>25 MINUTES<br>20 MINUTES |

113.    As to the customer frustration and Call Center data recounted by FNS in its March 23, 2017 letter, it is not unexpected to receive a higher level of inquiries and complaints in the context of a new IT system launch. Nevertheless, there has been an overall downward trend in the number of complaints to the Call Center numbers since the DCAS implementation. This can be attributed to the District's continuing improvement in service delivery. Currently, the total number of incoming calls per month is almost back to pre-DCAS levels.

Exhibit A

114.   As part of its review, FNS also issued nine findings requiring corrective action. (Mezey Decl. Ex. E (ECF No. 24-9).)

115.   On June 22, 2017, DHS responded to FNS's March 23, 2017 letter, addressing each one of FNS's findings with extensive information and corrective actions. (**Exhibit G**, DHS Letter to FNS, June 22, 2017.) The corrective actions included additional staff training, written guidance, new procedures around case processing and notices, and DCAS system fixes, such as additional validations to help prevent caseworker errors ("Additional validation to prevent Caseworkers from manually creating new cert period when recert entry already exists"). (*Id.*)

116.   DHS and FNS continue to meet on a weekly basis to continue fine-tuning staff procedures and the DCAS system.

### Timely Processing of SNAP Applications and Recertifications

117.   In support of their claim of untimely processing of SNAP applications and recertifications, plaintiffs cite to (1) DHS's CAP from November 2016 (*see, e.g.*, Am. Compl. ¶ 85), (2) data for the months of January 2016 through September 2016 provided by DHS under FOIA (*see, e.g.*, Am. Compl. ¶ 84), and (3) data reported by DHS to FNS on the newly revised form FNS-366B (Mezey Decl. Ex. F (ECF No. 24-10)). Each is either not relevant or incorrect or misinterpreted by plaintiffs.

118.   First, as noted above, the November 2016 CAP pertained to the old system, ACEDS, and thus is not relevant to plaintiffs' claims in this case.

119.   Second, data for the months of January 2016 through September 2016 also clearly pertain to ACEDS, the system prior to DCAS, and are not relevant to

Exhibit A

plaintiffs' claims in this case.

120.    Third, data cited by plaintiffs from the FNS-366B form for the period of October to December 2016 (*see, e.g.*, Am. Compl. ¶¶ 81-83) is incorrect and is in the process of being corrected and re-submitted to FNS. In addition, as explained below, plaintiffs misinterpret and misunderstand the information provided on the FNS-366B form.

121.    As noted above (¶¶ 44-45), FNS revamped the FNS-366B form, prompted by the 2014 GAO Report, because the "data elements and instructions are not clearly defined." (FNS Notice of Proposed Information Collection and Request for Comments, 80 Fed. Reg. 38427, 38428 (July 6, 2015).)

122.    Once the revised form was finalized, states were required to submit the revised form beginning in Federal Fiscal Year 2017 (FFY17). In addition, FNS changed the frequency of the FNS-366B from an annual to a quarterly submission, also beginning in FFY17. The first quarter of FFY17 was October 1, 2016 through December 31, 2016, and the FNS-366B report for that first quarter was due February 1, 2017.

123.    Given these changes, FNS recognized the need for further clarification, and on January 11, 2017, FNS issued a clarification memorandum on how to complete the newly revised FNS-366B form. (FNS Guidance, *Clarifications for Reporting on the Certification Section of the FNS-366B*, Jan. 11, 2017, available at https://fns-prod.azureedge.net/sites/default/files/snap/366B-Certifications-Question-and-Answer.pdf.) FNS issued additional clarification six months later. (FNS, *Clarification*

31

Exhibit A

*on the Three Ways Initial SNAP Application Processing Timeliness Is Measured*,
June 2, 2017, available at https://fns-
prod.azureedge.net/sites/default/files/snap/Triple%20Timeliness%20Memo%2023Ma
y2017.pdf (FNS "seeks to clarify the three existing data collection and monitoring
procedures").)

124.   The first quarter of FFY17 was October 1, 2016 through December 31,
2016—the first three months of the DCAS launch. Thus, DHS was faced with a
confluence of factors:  the launch of an entirely new eligibility and data system; a
newly revised FNS-366B form, which had never been used before; and a change to
quarterly instead of annual reporting using that newly revised form. In addition, the
first quarter report was due February 1, 2017, less than a month after the FNS
clarification was issued on January 11, 2017.

125.   DHS submitted its FNS-366B for the first quarter of FFY17, and
continued to submit its quarterly reports, but realized later that it had misapplied
the new instructions. DHS notified FNS that the reports would need to be corrected
and resubmitted.

126.   The Certification Section of the FNS-366B is used to track the number
of initial and recertification SNAP applications approved or denied (due to
ineligibility, which does not include closed cases) and whether such determinations
were timely or overdue. In the report, columns D through G for line 4 should be
calculated based on the number of days the case exceeded the timeframe for timely
application processing (*i.e.*, 30 days for regular applications and 7 days for expedited

applications). However, DHS misinterpreted the instructions and calculated the number of total processing days, instead of merely the number of overdue days.

127.   Because of this error, the FNS-366B report for the first quarter of FFY17 inaccurately portrays DHS with more untimely cases than was the case. This inaccurate report for the period of October to December 2016 is cited by plaintiffs in support of their claims and their motion for preliminary injunction. (*See, e.g.*, Am. Compl. ¶¶ 81-83.)

128.   Plaintiffs speculate that "the high rate of recertification denials likely includes many recertification applications" that DHS received and did not process. (Am. Compl. ¶ 86.) This statement is not supported by any data.

129.   In addition, these recertification denials include customers who belatedly recertify for SNAP. As noted above (¶ 28), if a SNAP recipient fails to recertify before the end of his or her certification period, then the recipient's case will be terminated. After the case is terminated, the customer has a thirty-day grace period, during which, if the recertification form is completed and submitted, the customer's case will be reopened and benefits pro-rated from the form's approval date. Depending on the timing, these customers may be included in the FNS-366B as recertification denials, even though they later recertify and receive SNAP benefits, or as overdue recertification approvals once they do recertify. (FNS Guidance, *Clarifications for Reporting on the Certification Section of the FNS-366B*, Jan. 11, 2017, at 6-7, available at https://fns-prod.azureedge.net/sites/default/files/snap/366B-Certifications-Question-and-Answer.pdf.) In addition, FNS acknowledges that there

Exhibit A

is a conflict in the regulations regarding treatment of recertifications submitted during the grace period and has stated that "[d]ue to this conflict, FNS will provide guidance to all State SNAP agencies as part of this year's efforts to clarify SNAP policy on recertifications." (*Id.* at 7.)

130.   The FNS-366B form also does not provide an accurate picture of a state's timeliness efforts and rates because FNS has instructed that "[a]ll approved applications that are overdue are counted in columns (d) - (g) even if the reason the case was overdue is because of a client caused error." (*Id.* at 3-4.)

131.   Even after DHS formally corrects and resubmits its FNS-366B for the first quarter of FFY17, the report can only be interpreted as a reflection of DHS's operation of the SNAP program one year ago.

132.   DHS has made significant progress over the course of the last year. Today DHS tracks all customer interactions through PathOS, including tracking applications and recertifications (whether received in person or by mail or fax), and assigns them for completion in real time, which helps to ensure that applications and recertifications are processed timely.

### Timely Notices to SNAP Beneficiaries and Notice of Appeal Rights

133.   DHS sends out on average approximately 55,000 SNAP notifications per month. Some of the notices are still generated manually, but DHS continues to make progress towards full automation of notice generation through DCAS.

134.   In its March 23, 2017 letter, FNS indicated it was concerned that DCAS was not issuing notices timely and/or correctly to SNAP applicants and households.

Exhibit A

(FNS Letter to DHS, Mar. 23, 2017, at 6; also Mezey Decl. Ex. E (ECF No. 24-9).) FNS asked DHS to "develop and implement interim procedures to ensure clients are notified of the determination of benefits and the requirements of the SNAP program timely." (*Id.*)

135.   In its June 22, 2017 response, DHS described its current, interim procedure of using a manual mail-merge process to send out notices that were not sent out via DCAS. (**Exhibit G**, DHS Letter to FNS, June 22, 2017, at Attachment page 9.)

136.   In this interim procedure, all "failed" notices from DCAS are sent manually through a semi-automated mail-merge process that takes the data from a specific case and produces a notice for mailing. "Failed" notices are those that should have been sent to customers, but were prevented by a validation error involving, for example, an incorrect address, incorrect calculation of a certification period, or other missing information. Once generated, the mail-merged notices are sent to a print vendor for mailing to respective customers, and the notices are documented in the customers' cases.

137.   DHS has a quality assurance process in place to detect notice failures and ensure adequacy of notice content. DHS closely monitors key notice dates (mid-month and end of month) for high-impact or high-volume notices, such as SNAP mid-certifications, recertifications, and terminations. This allows the IT team to monitor the volume of notices and proactively identify and resolve any notice-related issues. DHS monitors daily batch jobs to ensure that, if a batch job fails, DHS can quickly

re-run the job or process it through a mail merge. DHS also monitors its print vendor to ensure that notices sent to the vendor are processed and sent out.

138.    Data validation errors may occur because of several reasons, including when a case is missing information or contains an incorrect address. If a notice fails to generate because of a data error, that does not mean the notice is untimely sent. Data validation errors are examined through a quality assurance and monitoring process, and the notice is then manually sent to customers through the mail-merge process. As more notice fixes are deployed, there is a corresponding decrease in notice generation failures.

139.    The DCAS IT team also collaborates with the DCAS training team to establish a process for caseworkers who experience a data validation error when attempting to send notices while processing a case. The training team has developed a road map to address these issues, including address validation, which is the primary cause of notice failures.

140.    ESA management ensures that appropriate notices are sent in a timely manner by working closely with the IT team to determine how to address each instance of a failed notice, including efforts to increase detection and prevention, given the importance of ensuring customers are provided timely notice concerning their benefits.

141.    Plaintiffs cite to certain notice failures reported to FNS as part of DHS's weekly updates on the DCAS implementation. (*See generally* Am. Compl. ¶¶ 89-95.) These notice failures were part of a backlog that was tracked manually and reported

Exhibit A

to FNS. As of August 1, 2017, all backlog notices have been mailed to customers with an addendum. In cases where the backlog required a notice of adverse action, appropriate actions were taken to ensure the customer's benefits were either extended or they were provided an opportunity to recertify.

142.    As of August 1, 2017, the backlog of all pending SNAP notices has been cleared, including Notices of Expiration (NOEs). DHS closely monitors notices, and fewer notices are failing each week. As reported to FNS, the system notice failure rate was approximately 10 to 13% on a weekly basis during months of June and July 2017. The rate dropped to 6 to 10% as of August 2017, and it averaged 5% in the most recent report to FNS. These rates will continue to steadily decrease as more notice fixes are deployed as part of upcoming DCAS releases.

143.    Plaintiffs state that DHS's alleged failure "to provide SNAP recipients with legally required notices concerning their benefits—including NOEs informing SNAP applicants of the need to recertify—are ongoing."  Plaintiffs are mistaken. DCAS successfully generates an average of 4,500 SNAP recertification notices on a monthly basis.

144.    The District will provide an additional notice informing beneficiaries of any processing delays. All official legal notices generated and sent by DCAS or via mail merge contain information regarding a SNAP customer's appeal rights—that is, the opportunity to request a fair hearing before the District of Columbia Office of Administrative Hearings (OAH) to challenge any adverse actions or processing delays—and available legal representation. (*See, e.g.,* **Exhibit H**.)

37

Exhibit A

145.   When a request for a Fair Hearing is filed, DPO is immediately notified so that the issue may be resolved expeditiously. An Administrative Review before an ESA Hearing Officer also may provide customers an informal resolution to their claims.

### The District Has Implemented Procedures to
### Address Issues Relating to SNAP Benefits

146.   As part of any IT implementation of this magnitude, defects are discovered by users, customers, advocates, and the IT team. As discussed above, the DHS has several procedures to resolve issues as they are uncovered by staff or reported by customers and advocates, including the DHS Call Center, the DPO Deputy Mailbox, the Help Desk, and the Technical Triage process.

147.   In the year prior to the DCAS launch, DHS received approximately 6,000 to 11,000 Call Center calls per month. During the months after the launch, DHS saw an expected increase in calls to approximately 16,000 calls per month. And from March 2017 through August 2017, call volume returned to normal levels of approximately 11,000 calls per month.

148.   From March 2017 through June 2017, the DPO mailbox received 240 issue notification e-mails from the Legal Aid Society and Bread for the City, pertaining to 176 different customers.

149.   Both the Legal Aid Society and Bread for the City are aware of and frequently use the DPO Deputy email to make inquiries on behalf of SNAP beneficiaries. Prior to the filing of this lawsuit, there were no inquiries sent to the

Exhibit A

DPO mailbox relating to the SNAP issues raised by the seven individual plaintiffs in this case.

## Help Desk

150.   ESA caseworkers (also known as SSRs) who encounter issues in DCAS, or those who experience difficulty handling a specific task in the system, may call DHS's internal Help Desk to obtain live support from experts. This team is comprised of former SSRs who initially participated in testing the system and reviewing training materials. Currently, the average on-hold wait time for SSRs calling the Help Desk is 2 minutes.

151.   The Help Desk may encounter new system issues when contacted by SSRs. If this occurs, the Help Desk staff directly notifies the O&M IT team by initiating a ticket, which allows the issue to be investigated and resolved.

152.   Tickets are collected by management and other internal departments through an internal coordinator. All tickets are prioritized by DHS management based on the number of cases affected and the severity of the issue.

## Technical Triage

153.   The O&M IT team investigates each ticket based on priority and works with the DHS operations team, the DHS policy team, and DHS management to ensure that a proper solution is implemented in a timely fashion. All solutions must properly balance IT efficiency, policy compliance, and ease of operations.

154.   The IT team collaborates with the team members identified above to develop a short-term workaround to mitigate impact at the earliest possible date.

39

Exhibit A

Workarounds may include a specific manual task from SSRs or IT system tasks. The goal is to ensure customers are not affected by system issues and do not experience an interruption in their benefits.

155.   After each IT solution is developed, SSRs detailed to the IT team conduct extensive tests of the recommended solution. The new solution is incorporated into the system only after the IT team receives approval from these SSRs and ESA management. This "technical triage" procedure—which involves reporting issues, developing solutions, and communicating updates to users—is common to most complex IT systems.

## Individual Plaintiffs and Other Declarants

156.   Regarding the individual plaintiffs and other beneficiaries who submitted declarations in support of plaintiffs' Motion for Preliminary Injunction, each issue could have been resolved quickly had it been reported though the established channels described above. As noted earlier, these procedures are well-known and regularly used by both the Legal Aid Society and Bread for the City.

### *Plaintiff Shonice G. Garnett*

157.   ESA's records show that:

a.   Plaintiff Shonice Garnett applied for SNAP benefits in July 2016. Her application was timely processed but erroneously denied as a result of caseworker error.

b.   When Ms. Garnett reapplied a year later on July 10, 2017, her application was timely processed and approved. However, it was

40

Exhibit A

mistakenly approved for only the month of July 2017.

c. The District learned of this mistake on August 28, 2017 when plaintiffs filed this action. Ms. Garnett's benefits were reactivated the following day and she received retroactive payments for the thirteen previous months.

d. The funds were available to her by August 31, 2017, less than three days after the District learned she was experiencing a problem with her benefits.

*Plaintiff Richard Messick, Jr.*

158.   ESA's records show that:

a. Plaintiff Richard Messick applied for SNAP benefits on January 10, 2017. A caseworker scanned, but failed to process, his application.

b. As reflected in a letter he sent to DHS Director Zeilinger on March 2, 2017, Mr. Messick contacted DHS in February 2017 and was told DHS could not locate his application.

c. When he reapplied on May 11, 2017, Mr. Messick's application was timely processed.

d. When the District learned in this lawsuit that Mr. Messick had not received benefits from January through April 2017, the retroactive payments were added to his account by August 31, 2017.

e. On October 3, 2017, Mr. Messick disputed the SNAP benefit amount and DHS subsequently issued a retroactive payment.

41

Exhibit A

    f. Mr. Messick submitted a mid-certification on October 27, 2017, and it was processed and approved three days later.

*Plaintiff Linda Murph*

159.   ESA's records show that:

    a. Plaintiff Linda Murph was receiving SNAP benefits in January 2017. An isolated data import error from ACEDS to DCAS caused the termination of her benefits on January 16, 2017.

    b. On March 7, 2017, Ms. Ross received retroactive payments for February and March 2017. However, her certification period was mistakenly entered to end on February 28, 2017, so she did not receive benefits beginning in April 2017.

    c. Once the District was notified of the problem through this lawsuit, Ms. Murph received full retroactive payments and all funds were available by August 31, 2017.

    d. Ms. Murph's certification period was corrected and now ends on April 30, 2018.

*Plaintiff Tracey Ross*

160.   ESA's records show that:

    a. Plaintiff Tracey Ross received SNAP benefits through the end of her June 2017 certification period.

    b. On April 29, 2017, DHS sent Ms. Ross a notice of expiration of benefits. However, an error prevented Ms. Ross from receiving the termination

Exhibit A

notice by June 30, 2017.

c. Once the District was notified of the error through this lawsuit, Ms. Ross's benefits were promptly reactivated and she received a retroactive payment for the months of July and August 2017.

d. Her certification period was extended to November 30, 2017 to allow for recertification. A recertification interview was scheduled for November 9, and Ms. Ross must recertify by November 30, 2017.

*Plaintiff James Stanley*

161.   ESA's records show that:

a. Plaintiff James Stanley failed to submit a recertification application before the end of his certification period. This may have occurred because of a vendor's error, which failed to print and send recertification notices at the end of June 2017.

b. DHS learned of this error in September 2017 and provided all individuals whose SNAP benefits terminated on August 31, 2017—based on the failure to submit a recertification—an opportunity to recertify until September 30, 2017. DHS also conducted robocalls to advise beneficiaries to recertify and mailed reminders informing beneficiaries that a submitted application by September 30, 2017 containing at least their name, address, and signature would be treated as a recertification. Any beneficiary who recertified during the grace period received retroactive payment.

Exhibit A

c. There is no record that Mr. Stanley submitted a recertification application prior to September 30, 2017, and he was required to reapply for SNAP benefits.

d. Mr. Stanley reapplied on November 2, 2017.

*Plaintiff Roderick Gaines*

162.    ESA's records show that:

a. Plaintiff Roderick Gaines failed to submit a recertification application before the end of his certification period. This, too, may have occurred because of the vendor's error described above.

b. DHS provided all affected beneficiaries an opportunity to recertify until September 30, 2017.

c. Mr. Gaines received both a reminder notice and bi-weekly robocalls (ECF No. 27-4 at ¶ 5) but did not recertify. As a result, Mr. Gaines is aware that he must reapply for SNAP benefits.

*Plaintiff Kathryn Harris*

163.    ESA's records show that:

a. Plaintiff Kathryn Harris was sent notice on July 30, 2017, informing her that she needed to recertify by September 30, 2017, either in-person or by mail.

b. Legal Aid incorrectly emailed Ms. Harris's recertification application to the DHS Call Center after business hours on September 14, 2017.

c. Ms. Harris's recertification application was processed on October 20,

2017, and all necessary benefits were loaded to her EBT Card.

    d. As in the cases of Mr. Stanley and Mr. Gaines above, the District learned of the difficulties experienced by Ms. Harris when plaintiffs filed their Amended Complaint on October 13, 2017.

*Declarant Diamond Moore*

164.    ESA's records show that:

    a. Declarant Diamond Moore applied for SNAP benefits in October 2016 shortly after the birth of her youngest child. She submitted paperwork but when she requested to add benefits for her newborn child in November 2016, she was not asked for verification documents and, as a result, her benefits were not increased.

    b. Ms. Moore notified the District of this problem in January 2017, benefits were increased in February 2017, and retroactive payments were made on March 17, 2017.

    c. Ms. Moore received a mid-certification notice on September 19, 2017, and her benefits are active through December 31, 2017.

*Declarant Sandra Bonilla De Leonzo*

165.    ESA's records show that:

    a. Declarant Sandra Bonilla De Leonzo applied for SNAP benefits in March 2017. Her application was not timely processed because it was improperly scanned by a caseworker.

    b. Ms. Bonilla De Leonzo reapplied for benefits in May 2017 and the

Exhibit A

application was timely processed.

c. She has not requested retroactive payments for March or April 2017, and DHS lacks sufficient information to determine whether she was eligible to receive SNAP benefits for those months.

d. Ms. Bonilla De Leonzo was required to complete her mid-certification by October 31, 2017.

*Affiant Elizabeth Telson*

166.   ESA's records show that:

a. Affiant Elizabeth Telson was certified to receive SNAP benefits through July 31, 2017, but she was not sent a termination notice until August 1, 2017.

b. When the District learned of this error on August 29, 2017, Ms. Telson's certification period was extended through September 30, 2017.

c. She submitted her recertification application through Legal Aid Society on September 25, 2017, and completed an interview by phone two days later.

d. Her SNAP benefits are certified through March 31, 2018.

*Declarant Ebony Coe*

167.   ESA's records show that:

a. Declarant Ebony Coe was sent a recertification notice on April 29, 2017, indicating that her benefits would be terminated on June 30,

Exhibit A

2017.

    b. She alleges that she did not receive a termination notice and that her benefits were subsequently terminated.

    c. However, Ms. Coe recertified her eligibility within the grace period on July 5, and her SNAP benefits were available on July 12, 2017.

    d. Ms. Coe's certification period has been extended through August 31, 2018.

*Declarant Yesica Guevara*

    168. ESA's records show that:

    a. Declarant Yesica Guevara states that her SNAP benefits were terminated without notice on December 31, 2016.

    b. A fair hearing review conducted in July 2017 determined that her SNAP benefits were terminated without proper advanced notice.

    c. As a result, her benefits were reinstated May 1, 2017 through July 31, 2017 to provide her an additional opportunity to recertify. In addition, retroactive payments were issued through January 2017.

    d. Ms. Guevara submitted a recertification application in early July 2017 and completed an interview on August 1, 2017. Her recertification revealed that her income exceeds the eligibility criteria for SNAP.

    e. She received retroactive payments for August and September 2017, but her benefits terminated on September 30, 2017 based on her reported income.

47

_Declarant Julia Whaley_

169.   ESA's records show that:

    a.   Declarant Julia Whaley was sent notice on May 29, 2017, indicating that she needed to recertify or her benefits would terminate on July 31, 2017.

    b.   Although the subsequent termination notice sent on August 1, 2017 was untimely, Ms. Whaley's benefits were reinstated on September 18, 2017.

    c.   Ms. Whaley voluntarily dismissed her request for a fair hearing on October 17, 2017 following the issuance of retroactive payments and approval for a new certification period.

_Declarant Luelanda Williams_

170.   ESA's records show that:

    a.   Declarant Luelanda Williams applied for SNAP on October 7, 2016 and received benefits through February 28, 2017.

    b.   She received a timely recertification in December 2016 but failed to recertify until March 24, 2017.

    c.   In April 2017, Ms. Williams received retroactive payments for March and April 2017.

    d.   Based on her eligibility, Ms. Williams has received SNAP benefits from June 2017 to the present.

*Declarant Grant Lester*

171.   ESA's records show that:

    a.   Declarant Grant Lester was sent a recertification notice on April 29, 2017, indicating that his benefits would expire at the end of June 2017.

    b.   Mr. Lester did not recertify until July 10, 2017. As a result, he received a pro-rated SNAP benefit for July 2017 rather than a full monthly benefit, because the late certification was not the District's fault. Mr. Lester was approved for full SNAP benefits going forward.

* * *

Exhibit A

* * *

I declare under penalty of perjury that the foregoing is true and correct, based upon my personal knowledge and information provided to me in the course of my official duties.

LAURA GREEN ZEILINGER
Director
District of Columbia Department of Human Services

11 15 17
DATE

Exhibit A