## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
SHONICE G. GARNETT, *et al*.,           )
                                        )
                     *Plaintiffs*,      )
                                        )   Civil Action No. 1:17-cv-1757
              v.                        )
                                        )
LAURA ZEILINGER,                        )
                                        )
                     *Defendant*.       )
_____)

## PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

Defendant asks this Court to believe that Plaintiffs' claims are based only on "isolated" errors or glitches resulting from the implementation of a new computer system, DCAS, and business process overhaul.  Yet, more than a year has passed since Defendant implemented these changes, and Defendant's violations remain widespread and unremediated.  The bottom line is that Defendant uses a faulty computer system with insufficient oversight or knowledge of its flaws.  As a result of this dysfunctional process, District residents lose their much-needed SNAP benefits and cannot put food on their tables.  And despite Defendant's claims, the mechanisms she allegedly has in place to identify and respond to errors plainly are too slow and ineffective to prevent harm to affected beneficiaries.

Plaintiffs satisfy each of the four factors governing preliminary injunctive relief and are entitled to a preliminary injunction.  First, Plaintiffs are likely to succeed on the merits of each of their three claims: that Defendant fails to (1) timely process initial and recertification applications; (2) send notice of the need to apply for recertification; and (3) provide notice of delays in processing applications and issuing benefits.  Second, Plaintiffs will suffer irreparable harm—literally going hungry—absent preliminary relief.  Third, the balance of the equities tips in Plaintiffs' favor, as here the inequity is great and the administrative burden is no more than what is required to meet federal requirements.  Fourth, a preliminary injunction would serve the public interest of ensuring that our government abides by crucial federal laws protecting needy District residents.  Finally, Plaintiff Bread for the City has standing in this case.[1]

---

[1]   Defendant failed to address Plaintiffs' request that the Court waive Federal Rule of Civil Procedure 65(c)'s bond requirement, ECF 24-2 at 41, and thus has conceded this argument.  *See Twelve John Does v. District of Columbia*, 117 F.3d 571, 577 (D.C. Cir. 1997).

## ARGUMENT

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Plaintiffs contend that Defendant violates federal law in three ways: by failing to (1) timely process initial and recertification applications; (2) send notice of the need to apply for recertification; and (3) provide notice of delays in processing applications and issuing benefits. Plaintiffs are likely to succeed on each of their three claims.

### A.   Defendant Systematically Fails to Timely Process Applications

Plaintiffs submitted evidence in support of their motion showing that Defendant fails to timely process initial and recertification SNAP applications in accordance with federal requirements.  Instead of acknowledging the systemic nature of this problem, Defendant attempts to pin her untimely processing of applications on adaptation to new technology and inevitable caseworker errors.  These mistakes, she claims, are "isolated" and caught quickly when they occur.  However, Defendant's argument is undercut by the data, her own admissions, and evidence from Declarants demonstrating widespread untimeliness in application processing.

#### 1.   Recent Data and Defendant's Own Admissions Show Widespread Failures to Timely Process Applications

##### a.   FNS's Recent Findings that Defendant Violates Timely Processing Requirements

Recent findings from FNS show that Defendant's untimely application processing is the worst in the country.  In October 2017, FNS required Defendant to submit a corrective action plan (CAP) based on its "poor application processing timeliness" (APT).  Attach. 1, Decl. of Jennifer Mezey in Supp. of Pls.' Reply ("Mezey Decl."), Ex. O at FNS FOIA 01392.  Using its "most recent data," *id.*, FNS found that Defendant timely processed initial applications only 79.49% to 88.45% of the time from October 2016 to March 2017.  Attach. 2, Decl. of Mary R. Mannix in Supp. of Pls.' Reply ("Mannix Decl."), Ex. B at NCLEJ 000003.  The District of

Columbia was the only reporting state to timely process fewer than 90% of applications during the relevant time period. *See id.*

In her Opposition, Defendant argued that Plaintiffs relied on outdated evidence. ECF 31 at 13. However, FNS's recent findings, unavailable to Plaintiffs when they moved, simply echo its March 23, 2017 report finding that Defendant failed to timely process applications.[2] ECF 24-9 at 10 (finding failure to timely process regular and expedited applications and observing that "error[s] in the DCAS system" frequently resulted in "inability to process the SNAP case timely"). Consequently, updated FNS data, the most current available, confirms that Defendant fails to process at least one of every ten applications timely.

### b.   Defendant's Revised FNS-366B Reports

The original 366Bs that Defendant prepared and submitted to FNS were, by her own admission, Attach. 3, Excerpts of Tr. of Rule 30(b)(6) Dep. of Laura Zeilinger ("Zeilinger Dep."), at 61-63, riddled with errors that DHS failed to even notice, let alone correct, for months. Defendant has offered shifting and unclear explanations as to why the original data was incorrect and the new data is more accurate. But even assuming that the revised 366Bs are correct—for which Defendant offers little assurance—the new data confirms Defendant's widespread failure to timely process applications.

In the most recent quarter (July to September 2017), Defendant untimely processed over half (56%) of approved recertification applications. Mezey Decl., Ex. P at 4. Taking both initial and recertification applications together, over one-third (34%) of approved applications were

---

[2]    Defendant claims that the March 23 FNS report is unreliable because it contains data that Defendant herself misreported to FNS. ECF 31 at 13-14. But Defendant conflates the FNS-366B data she inaccurately reported with FNS's March 23 report, based on a sample of 77 cases from three service centers. ECF 24-9 at 5. Thus, the findings of the March 23 report are not affected by Defendant's misreported data.

overdue.  *Id.*  Such untimeliness is persistent; the revised 366Bs show that in previous quarters, Defendant untimely processed 58% and 59% of approved recertification applications.  *Id.* at 2 (January–March 2017), 3 (April–June 2017).

Defendant suggests that this delay can be attributed to applicant fault in failing to timely recertify or submit verification documents.  ECF 31-1, ¶¶ 129-30.  But courts have rejected such arguments where, as here, the defendant "fails to provide any persuasive evidence that applicant fault is the primary reason for delay."  *Briggs v. Bremby*, No. 3:12-CV-00324 VLB, 2012 WL 6026167, at *16 (D. Conn. Dec. 4, 2012), *amended on reconsideration*, No. 3:12-CV-00324 VLB, 2014 WL 1246696 (D. Conn. Mar. 24, 2014), *aff'd*, 792 F.3d 239 (2d Cir. 2015).  But even assuming applicants were at fault for half of overdue approved initial and recertification applications (3,198 of 6,397), Defendant still would have untimely processed 17 percent of all approved applications (3,198 of 18,728) in the most recent quarter.  *See* Mezey Decl., Ex. P at 4.

Instead, it is likely that the 366Bs actually *understate* the extent of Defendant's failure to timely process applications.  As Defendant has recognized, the correct measure of processing time begins to run from the date an application is filed with the agency.  Zeilinger Dep. at 83. However, individuals cannot submit applications directly through DCAS; instead, they submit paper applications that Defendant manually enters into DCAS.  Because Defendant's 366Bs report the filing date in DCAS, *id.* at 84, the application processing time will be accurate only if DCAS reflects the date an application was actually submitted.

But because Defendant often inputs an *incorrect*, later filing date into DCAS, the 366Bs undercount the true number of processing days.  Defendant has admitted to FNS that DCAS is incapable of reflecting the correct filing date when an application is entered into the system more than five days after receipt.  ECF 31-7 at 5.  FNS independently found that Defendant failed to

"protect[] the filing date of SNAP applications," with workers entering incorrect dates into the system.  ECF 24-9 at 6.  In responding to FNS's findings, DHS admitted to week-long gaps between the actual application filing date and the DCAS filing date, and in many instances could not determine the filing date because the underlying application had been lost.  Mezey Decl., Ex. Q at FNS FOIA 00527-28.  Declarant Nelson Bostic illustrates the point:  although Mr. Bostic submitted his application on November 16, the DCAS filing date reflected on his approval notice was December 26, making it appear that Defendant processed his application the same day it was received rather than 40 days later.  Attach. 4, Decl. of Nelson Bostic ("Bostic Decl."), Ex. B, C.

Moreover, because of the limitations in the information requested, the 366Bs fail to capture the full extent of Defendant's untimely processing.  The reports do not capture instances where applications are never processed.  For example, Mr. Messick's application, lost by Defendant, ECF 31-1, ¶ 158, would not be counted as overdue because Defendant never processed it.  *See also* ECF 24-47, ¶¶ 9, 11.  The 366Bs also do not capture processing delays for application denials (rather than approvals), Zeilinger Dep. at 50, or any delay between application approval and when benefits are uploaded to a customer's EBT card.  *See* 7 C.F.R. § 274.2(b) (timely application processing entails both determining eligibility and providing households with active benefits posted to their EBT cards by required deadlines).

Finally, Defendant's shifting explanations for the inaccuracy of her initial 366Bs raise further questions about whether these "corrected" reports reflect the full extent of Defendant's untimely processing.  Prior to this litigation, Defendant apparently made no effort to check the 366B's accuracy, as the content was not shared with staff who "may have understood that the data did not look right."  Zeilinger Dep. at 94.  As a result, Defendant incorrectly completed the 366Bs in at least five separate ways, *id.* at 61-62, only one of which was referenced in her

declaration.  ECF 31-1, ¶¶ 136-37.  When pressed about the nature of these errors, Defendant offered generalized explanations but could not or was instructed not to explain the specifics of these errors and how she corrected them.  Zeilinger Dep. at 27-28, 70-74, 105-06.  Instead, Defendant repeatedly emphasized that the system was "very complex" and she was "not the foremost expert on this form."  *Id.* at 48; *see also id.* at 50, 56, 67, 106 (Defendant describing her lack of expertise).  Nor could Defendant explain with any specificity what she did to ensure that the reports now are accurate beyond stating that a team pulled a sample of cases.  *Id.* at 70-75.

In fact, Defendant compiles the 366Bs in direct contravention of FNS instructions.  During her deposition, Defendant stated that she reports application processing based on applications *filed* during the monitoring period, not those *processed* during the monitoring period.  *Id.* at 28-31, 45-48, 55.  The practice of recording processing time for only applications filed in the quarter, rather than for all applications processed in the quarter (but potentially filed in prior quarters) conflicts with FNS instructions.[3]  By reporting only on applications filed and processed in the quarter, Defendant omits applications filed in a prior quarter but untimely processed in the reporting quarter, which will inevitably make her performance look better.  In sum, Defendant provides no reason to trust that these revised reports reflect the full extent of her agency's untimely application processing.

### c.   Defendant's Admissions of Untimely Processing to FNS

Defendant's Opposition fails to address her own agency's reports submitted to FNS showing widespread problems with application processing.  For example, Defendant ignores the

---

[3]   See Food & Nutrition Serv., U.S. Dep't of Agriculture, Clarifications for Reporting on the Certification Section of the FNS-366B, at 8 (Jan. 11, 2017), https://fns-prod.azureedge.net /sites/default/files/snap/366B-Certifications-Question-and-Answer.pdf ("The data recorded on the FNS-366B is meant to represent the entire universe of cases processed in a quarter . . . ."); *id.* at 1 ("All certification actions occurring in the specified reporting quarter should be aggregated on the FNS 366B and reported to FNS within 1 month of the end of the reporting quarter.").

May 2017 CAP her agency submitted to FNS that noted a "deficiency . . . of untimely processing of food stamp recertification[s]" and the discovery of "several system defects" that Defendant was still "in the process of stabilizing."  ECF 24-14 at 23-24.[4]  Defendant also ignores seven of her own reports to FNS from April to July 2017 revealing that applications routinely were "stuck" in DCAS and failing submission, such that the applications could not be processed or benefits authorized.  *See* ECF 24-2 at 31 n.9.  More recent reports to FNS show that between 87 to 209 applications were failing submission each week from September 4 through December 16, 2017.[5]  Indeed, throughout October and November, DHS listed "[a]pplications going to wrong status" upon submission as a DCAS system issue that required attention.[6]  In November and December, DHS's SNAP Help Desk also received recurring calls about "application errors" and the inability to authorize benefits for customers.[7]

## 2. Recurring Errors in Individual Cases Further Demonstrate Defendant's Systemic Inability to Timely Process Applications

Defendant argues that her failure to timely process applications is the result of "isolated caseworker errors" that do not represent a systemic problem.  ECF 31 at 12.  This argument, however, is unsupported by the facts.  The nature of Defendant's errors processing the Individual Plaintiffs and Declarants' SNAP applications point to underlying systemic lapses resulting in widespread failures to process applications within the required timeframes.

---

[4]  Plaintiffs' citations to the May 2017 CAP belie Defendant's claims that Plaintiffs rely solely on CAPs from November 2014 through 2016.  Defendant instead picks and chooses which pre-DCAS information to cite.  *Compare* ECF 24 at 15 (characterizing pre-DCAS information as "irrelevant"), *with* ECF 31-1, ¶ 34 (touting pre-DCAS performance from FY11 to FY15).

[5]  Mezey Decl., Ex. R at FNS FOIA 001427; Ex. S at FNS FOIA 001475; Ex. T at FNS FOIA 001517; Ex. U at FNS FOIA 001564; Ex. V at FNS FOIA 001611; Ex. W at FNS FOIA 001648.

[6]  Mezey Decl., Ex. R at FNS FOIA 001418; Ex. S at FS FOIA 001467; Ex. T at FNS FOIA 001549.

[7]  Mezey Decl., Ex. U at FNS FOIA 001567; Ex. V at FNS FOIA 001613; Ex. W at FNS FOIA 001651.

In her Opposition, Defendant concedes that she failed to timely process many Individual

Plaintiffs' and Declarants' applications, admitting that her agency:

- Completely failed to process Plaintiff Messick's initial application and failed to maintain a record of that application, ECF 31-1, ¶ 158;

- Terminated Plaintiff Murph's benefits due to a "data import error," restored her benefits, but then immediately terminated them again due to inexplicably entering the next recertification date in the past, *id.* ¶ 159;

- "[E]rroneously denied" Plaintiff Garnett's application due to an unknown "caseworker error" and then "mistakenly approved" the reapplication for only a month, *id.* ¶ 157;

- Failed to ask for Declarant Moore's application verification documents and denied an increase in benefits for a newborn, *id.* ¶ 164;

- Failed to timely process Declarant Bonilla de Leonzo's application because Defendant "improperly scanned" it into the system. *Id.* ¶ 165.

Defendant also ignores the following evidence of additional untimely processing

submitted by Plaintiffs:

- **Failure to timely process Plaintiff Harris's recertification application.** Defendant notes that counsel submitted Ms. Harris' application by email after business hours, *id.* ¶ 163, but fails to explain why this prevented her agency from timely processing the application in the weeks following submission. *See* Mezey Decl., ¶¶ 22-24, 28 (discussing DHS's instructions regarding email submission of applications).

- **Failure to timely process Declarant Moore's initial application.** Defendant ignores Ms. Moore's allegation that Defendant took nearly three months to process her family's application, ECF 24-38, ¶¶ 11, 13, 16-17, instead focusing only on a caseworker's failure to increase benefits after the application was belatedly approved. When alerted to this delay by counsel, Defendant offered to compensate Ms. Moore with a food card but then refused to provide this card when Ms. Moore attempted to retrieve it. *Id.* ¶¶ 17-18.

- **Failure to timely process Declarant Telson's recertification application.** Defendant ignores the fact that her agency terminated Ms. Telson's SNAP benefits in December 2016 despite timely submission of a recertification application. ECF 24-40, ¶ 6. Although Ms. Telson repeatedly contacted Defendant regarding this error, Defendant failed to reinstate Ms. Telson's benefits until several months later. *Id.* ¶¶ 6-12. Defendant then terminated Ms. Telson's benefits a second time due to a "computer software problem," and a third time due to Defendant's failure to provide a Notice of Expiration. *Id.* ¶¶ 13-15.

Nor can Defendant claim that the failures to comply with processing deadlines were

unique to the circumstances surrounding the shift to DCAS. Indeed, Defendant still fails to timely process applications. For example, Defendant could not even timely process the applications of two named Plaintiffs in this lawsuit despite Plaintiffs' counsel emailing the applications directly to DHS and copying Defendant's counsel. Attach. 5, Decl. of James Stanley ("Stanley Decl."), ¶¶ 5-10; Attach. 6, Decl. of Roderick Gaines ("Gaines Decl."), ¶¶ 7-10. Although both Plaintiffs qualified for expedited processing, Defendant failed to process these applications within the 7-day expedited timeframe or even the ordinary 30-day deadline. Stanley Decl., ¶ 8; Gaines Decl., ¶¶ 7, 11. Defendant only provided benefits after counsel inquired about the delay and, even then, did not reply for a week regarding Mr. Stanley or *at all* regarding Mr. Gaines. Stanley Decl., ¶¶ 9-10; Gaines Decl., ¶ 11. This raises the question: if Defendant cannot timely process applications for named plaintiffs in this case, how can Defendant timely process applications for the remainder of the proposed class?

The experience of Declarants provides the answer: Defendant does not. Instead, Defendant failed to timely process the following individuals' applications:

- **Nelson Bostic:** After improperly terminating Mr. Bostic's benefits in June 2017 without providing notice of the need to recertify, Defendant then failed to timely process his new application. Although counsel submitted Mr. Bostic's application on November 16, Defendant failed to provide any benefits at all (and then only $5) until December 26. Bostic Decl., ¶¶ 10, 12. It took Defendant until January 4, 2018, a week after counsel checked on the already overdue application, to provide Mr. Bostic with his full benefits. *Id.* ¶¶ 11-12.

- **Bruce Meraviglia:** After improperly terminating Mr. Meraviglia's benefits in October 2017 without providing notice of the need to recertify, Defendant told Mr. Meraviglia that she could not fully process his complete and approved application because "the agency's software would not allow [his] benefits to be uploaded." Attach. 7, Decl. of Bruce Meraviglia ("Meraviglia Decl."), ¶ 9. Defendant failed to resolve this technical issue even with the intervention of technical support and a supervisor at the service center.[8] *Id.*

---

[8]     After Legal Aid filed a fair hearing request on behalf of Mr. Meraviglia, he was able to obtain a full month of retroactive benefits for October 2017.

Defendant contends that "isolated caseworker errors" caused these issues and do not amount to a systemic problem.  But these errors stem from the same root cause: a dysfunctional application processing system.   Indeed, Defendant admits that the following occurs when processing applications:  (1) completed applications go unprocessed, ECF 31-1, ¶ 158; (2) when this happens, Defendant has no record that the application was made—even when the applicant has proof of submission, *see id.*; ECF 24-34; 24-35; (3) staff enter impossible recertification deadlines, including dates in the past, ECF 31-1, ¶ 159; and (4) failure to scan a document properly can stop an application from ever being processed, *id.* ¶ 165.  These problems add up. As FNS found in its March 23, 2017 report, 18% of the cases sampled had an error attributable to DCAS.  ECF 24-9 at 10.   The errors are not flukes.   Rather, Defendant's system leads to numerous mistakes, lacks safeguards to catch them, and cannot remedy them once they occur.

Defendant's claim that the agency's new PathOS workflow system ensures that applications are tracked and timely processed similarly is unpersuasive.   ECF 31 at 16. Defendant failed to timely process applications of many Individual Plaintiffs and Declarants months *after* implementing PathOS.  *See, e.g.*, ECF 24-32, ¶ 6 (4 months after implementation at H Street Service Center); ECF 24-47, ¶ 9 (2 months after implementation at Fort Davis Service Center).  Nor does Defendant's claim that "83% of client interactions are completed in one visit" demonstrate timely processing of SNAP applications.   ECF 31-1, ¶ 74.   This is because "completing a client interaction" is not equivalent to fully processing SNAP applications.  What Defendant vaguely refers to as "client interactions" could include basic tasks like accepting a client's documents or responding to a client's inquiry.  *See id.* (admitting these "completed" interactions do not always "includ[e] a same-day determination of benefits").  And even when the task is application-related, "completing" the application could mean making an eligibility

determination without actually providing benefits on an EBT card. *See* Meraviglia Decl., ¶ 9 (application approved during visit but benefits not uploaded); Attach. 8, Decl. of Lisa Smith ("Smith Decl."), ¶¶ 8-13 (Defendant repeatedly said she could not upload benefits).

Because Defendant lacks the necessary safeguards to prevent and correct technical errors and caseworker mistakes, those errors will recur over and over. In a similar case involving Defendant's widespread failures to timely process Medicaid applications and renewals in DCAS, this Court found "unconvincing" the "District's attempt to separate the mistakes of individual District employees from the systemic issue[s] plaguing the Medicaid system." *Salazar v. District of Columbia*, 177 F. Supp. 3d 418, 430 (D.D.C. 2016). The Court explained: "[T]he two are interrelated. Just as the complexity of the system increases the opportunity for individual errors, individual errors combine to form systemic problems." *Id.* So too here.

### B. Defendant Consistently Fails to Notify Recipients of the Need to Recertify Their Eligibility, Resulting in Improper Termination of Their Benefits

Defendant again argues that her failure to send the required Notices of Expiration ("NOEs") informing beneficiaries of the need to recertify is not widespread. But Defendant's own admissions establish that these failures have recurred multiple times over recent months and have adversely affected thousands of vulnerable SNAP beneficiaries.

#### 1. Defendant Admits to Recent, Widespread Failures to Send NOEs that Improperly Terminated Thousands of Beneficiaries

Defendant's admissions reflect that, far from committing "isolated" errors, her agency has recently failed to send NOEs to thousands of households, causing widespread termination of benefits in September, October, and December of 2017, and likely in prior months as well.

##### a. September Terminations Due to Defendant's "Vendor Error"

Due to Defendant's conceded "vendor error," all 4,500 households due to recertify by September—including Individual Plaintiffs Gaines and Stanley—never received a NOE

informing them of the need to recertify.  Zeilinger Dep. at 130; ECF 31 at 9-10.  According to

Defendant's deposition testimony, this error occurred when the agency's contracted vendor

failed to populate, print, and mail the required NOEs at the end of June 2017.  Zeilinger Dep. at

124-27.  Because Defendant automatically terminates benefits at the end of a certification period

absent a completed recertification, *id.* at 65-66, any household who was not independently aware

of its recertification deadline would have lost benefits due to Defendant's failure to provide the

required notice.  Defendant estimates that about 3,500 households did not recertify by the end of

their certification period and likely lost benefits for some period of time.  *Id.* at 140, 144.

Approximately 1,260 households—28% of those affected—did not regain benefits within 30

days of termination and may remain without benefits now.  *See* id. at 150.

### b.      October Terminations Due to Unexplained "Technical Issue"

Defendant also admitted that a separate notice failure caused improper termination of

benefits in October 2017.  This error affected so many SNAP recipients that DHS recorded an

automated message for its Call Center number advising that a "technical issue" prevented

customers from "receiv[ing] timely notification to renew [their] SNAP benefits," causing their

benefits to "terminat[e] for October 2017."  ECF 33-3, ¶ 3.  Indeed, Defendant admitted that

"SNAP recertification notices were not mailed out to customers" due to recertify by October

2017.  Attach. 9, Decl. of Diane Yancey ("Yancey Decl."), Ex. A.  Defendant also alluded to this

error in recent reports to FNS.  *See* Mezey Decl., Ex. W at FNS FOIA 001639 (listing "October

notices, SNAP batches" as an issue requiring attention).  Multiple Plaintiffs and Declarants were

affected that same month.  *See* Yancey Decl., ¶ 8; Meraviglia Decl., ¶ 6; ECF 27-6, ¶¶ 3-5.

### c.      Notice Failures Affecting December Benefits

Defendant's recent reports to FNS discuss "[l]arge notice failure affecting benefit

delivery for Dec[ember] 1."  Mezey Decl., Ex. V at FNS FOIA 001597; Ex. W at FNS FOIA

001639.  Indeed, a DHS Call Center representative informed Declarant Joseph Carver—who was due to recertify by December 2017 but never received an NOE—that "a lot of people" due to recertify that month "did not get a notice telling them they needed to recertify" and thus the agency gave them an extra month of benefits for December.  Attach. 10, Decl. of Joseph Carver ("Carver Decl."), ¶ 11.  Defendant apparently failed, however, to conduct any further outreach to these customers about their recertification deadline: DHS terminated Mr. Carver's benefits in January 2018 without ever providing the required notice to recertify.  *Id.* ¶¶ 5, 9.  He remains without benefits.  Declarant Moore was likely a victim of the same notice failures.  *See* Attach. 11, Supp. Decl. of Diamond Moore ("Moore Decl."), ¶¶ 8-9, 12.

> ### d.  Defendant's Recent Admissions to FNS Regarding Additional Notice Problems

Defendant's own recent reports to FNS detail additional notice failures impacting beneficiaries.  The most recently available report to FNS shows a "higher than 14% error rate" in December, with over 2,000 notices failing in one day alone, Mezey Decl., Ex. W at FNS FOIA 001660, contradicting Defendant's claim that notice failure rates have steadily decreased to 5 or 6%.  ECF 31 at 21.  Moreover, Defendant recently informed FNS that she discovered "several issues" of an "unknown cause" affecting notices and requiring attention,[9] as well as the need for "trigger date and content amendments" for recertification and other notices.[10]  Defendant also reported to FNS in November an October failure of "[c]ritical batch jobs" affecting notices, Mezey Decl., Ex. T at FNS FOIA 001537, an issue that still required "further watching" and additional research as of late December.  Mezey Decl., Ex. W at 1639.

---

[9]     Mezey Decl., Ex. T at FNS FOIA 001509; Ex. V at FNS FOIA 001597; Ex. W at FNS FOIA 001639.

[10]    Mezey Decl., Ex. R at FNS FOIA 001415; Ex. S at FNS FOIA 001464.

### e.      Terminations in Summer 2017 Due to Failure to Provide NOEs

In their initial motion, Plaintiffs presented evidence from five Declarants of improper benefits terminations in May, July, and August 2017 due to Defendant's failure to provide NOEs informing them of the need to recertify. *See* ECF 24-40, 43, 44, 45, 49. New Declarants demonstrate additional terminations in June and July 2017 due to these same failures. *See* Attach. 12, Decl. of Christina Duncan ("Duncan Decl."), ¶ 3; Bostic Decl., ¶ 3.

In her Opposition, Defendant concedes that she failed to send timely termination notices to some Declarants but insists that NOEs were timely sent. ECF 31-1, ¶¶ 166-69, 171. But Defendant also admitted in her deposition testimony that DCAS only records whether a given notice was transmitted to the vendor, not whether the vendor ultimately printed and mailed the notices. Zeilinger Dep. at 133-35. Indeed, DCAS showed that the NOEs in question had been sent when they actually had not for individuals Defendant terminated after the vendor error. *Id.*; Gaines Decl., ¶¶ 5-6 (told that NOE was sent although Defendant concedes that it was subject to vendor error). Thus, there is no basis to trust Defendant's claim that her agency properly provided NOEs to these Declarants prior to terminating their benefits.[11]

These are only the failures of which Plaintiffs are aware. At the deposition, Defendant refused to answer questions about whether additional notice failures had occurred since the "vendor error" or about why the agency had made corrective robocalls to beneficiaries on other occasions. Zeilinger Dep. at 150, 155, 166. Yet, Defendant's admissions above suggest that these notice failures are widespread and recurring, necessitating an injunctive remedy to protect the plaintiff class from improper terminations.

---

[11]    Defendant, in fact, implicitly conceded her failure to send an NOE to Mr. Bostic by providing him with benefits retroactive to his June 2017 termination date. *See* Bostic Decl., ¶ 14.

2.    **Defendant's Claim that She Monitors and Quickly Addresses Notice Failures Is Unpersuasive**

In her Opposition, Defendant admits that notice failures are ongoing, ECF 31-1, ¶¶ 136, 142, but contends that DHS quickly discovers these failures and employs workarounds to prevent adverse impact to beneficiaries.  ECF 31 at 20.  Yet, Defendant's handling of the vendor error demonstrates the ineffectiveness of her agency's procedures for monitoring, investigating, and responding to notice failures that arise.

First, the vendor error illustrates that Defendant lacks quality control procedures.  Prior to discovery of the error, Defendant had no procedures to ensure that she properly populated, printed, and mailed notices.  Her agency only discovered the error when affected beneficiaries informed service center staff that they had lost their benefits, months after the error occurred. Zeilinger Dep. at 130.  Despite her lack of monitoring of the vendor up until that time, there is no evidence that Defendant investigated whether the vendor had committed similar errors in the past that required remediation.  Defendant testified that she now has a "feedback loop" in place for the vendor to report mistakes but could not answer any questions about how this operated.  *Id.* at 153-54.

Second, Defendant's response to the vendor error demonstrates her failure to investigate the root causes of her errors.  Defendant could not explain what led to the vendor error; she testified only that the vendor "made a mistake" and didn't act "as required in their contract."  *Id.* at 124.  Nevertheless, Defendant continues to work with this vendor, *id.* at 165-66, and apparently feels no desire to understand why the underlying error occurred.  Without that understanding, she cannot ensure that the error will not repeat.

Third, Defendant lacks methods to accurately identify individuals affected by her errors. Defendant testified that someone in the District government tracked how many people the

vendor error affected and how many regained their terminated benefits, *id.* at 138-39, but she could not explain how that tracking occurred, what form it took, or who performed it. *Id.* at 145-48. She only knew "that there was a process by which they were understanding" who regained their benefits. *Id.* at 148. Given Defendant's failure to contact all affected beneficiaries, as discussed below, there is no reason to believe that Defendant knows whom the error affected.

Finally, Defendant fails to take appropriate remedial measures for households affected by her errors. Despite recognizing that the vendor error affected *all* households due to recertify by September 2017, Defendant opted to only reinstate the benefits of individuals who came in to recertify on their own or in response to reminders she allegedly sent. *Id.* at 144. In other words, households went without benefits unless and until they learned that their benefits terminated, came into a service center, and waited for Defendant to process their recertifications. This lack of response impermissibly placed the responsibility on beneficiaries to rectify the mistakes of Defendant. Defendant was instructed not to answer how DHS made this decision and did not know whether FNS had approved this remedial approach. *Id.* at 156-57, 163.

Defendant claims she made robocalls and sent reminder letters telling affected households that they would be given a full month of benefits if they recertified within the 30-day grace period. Yet Defendant belatedly and inconsistently sent the robocalls and reminder letters, if at all. *See* Stanley Decl., ¶ 4 (no reminder letter or robocall); Gaines Decl., ¶ 4 (no reminder letter). This is unsurprising, given that Defendant compiled the contact list using nebulous tracking methods and mailed reminders using the same vendor responsible for the underlying error. Zeilinger Dep. at 165-66. Indeed, Defendant testified that she did not know how or whether her agency ensured that everyone adversely impacted received a robocall. *Id.* at 163-64.

These communications, when sent at all, were belated and unclear. The reminder letters

were not mailed until September 14, and Mr. Gaines did not receive his robocall until September 12, Gaines Decl., ¶ 4; Mezey Decl., Ex. X, leaving beneficiaries only two weeks to take advantage of the grace period, if they received a reminder at all.  Neither reminder explained why benefits were terminated.  *See* Gaines Decl., ¶ 4; Mezey Decl., Ex. X.  Up until that point, affected households were told only that benefits had terminated because Defendant "could not establish contact" with them.  *See* ECF 27-3 at 2; ECF 27-5 at 2.  Nor did the robocalls or the letters explain how to get benefits reinstated.  Both reminders simply told individuals to fill out an application but did not explain that they would receive a full month of benefits if they recertified within the 30-day grace period.  *See* Gaines Decl., ¶ 4 (robocall); Mezey Decl., Ex. X (letter).  A reasonable beneficiary would not be able to understand from these reminders why their benefits terminated or how they could get them reinstated.  The paucity of these remedial measures suggests that those households affected by Defendant's admitted notice failures in October and December may still be without benefits.  Indeed, affected beneficiaries like Ms. Yancey and Mr. Meraviglia were only able to obtain full retroactive benefits when counsel filed a fair hearing request.  Yancey Decl., ¶ 8; *see supra* n.7.  Mr. Carver remains without any benefits.  Carver Decl., ¶ 5.  Defendant's failure to monitor, investigate, and remediate ongoing notice failures underscores the need for an injunctive remedy to protect the proposed class.

### C.    Defendant Fails to Provide Notice of Appeal Rights and Processing Delays

Defendant does not dispute that: (1) the SNAP Act and the Due Process Clause of the Fifth Amendment require her to provide notice of processing delays and appeal rights to applicants subject to processing delays; and (2) she does not currently provide such notice.[12]

---

[12]    Defendant points out that official DHS notices contain appeal rights but does not claim to send any notices to applicants suffering processing delays while awaiting an eligibility determination.  ECF 31 at 24-25.  Appeal rights on notices that never reach affected individuals

Defendant claims that she "*will* provide an additional notice informing beneficiaries of any processing delays" in the future, but provides no specifics or timeline for doing so.  ECF 31 at 24 (emphasis added).  Mere promises to do better in the future are insufficient.  *See Booth v. McManaman*, 830 F. Supp. 2d 1037, 1043 (D. Haw. 2011) ("This Court cannot simply defer to the wait-and-see approach advocated by the Defendant, particularly in light of the seriousness of the harm").  Such a promise is particularly hollow given that Defendant often cannot identify applications subject to delayed processing.  *See* ECF 31-1, ¶ 158.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

Defendant has not rectified the problems for the plaintiff classes, or even for all Individual Plaintiffs.  Worse still, Defendant's remedial mechanisms are sorely inadequate to prevent future harm.  Without the relief sought by Plaintiffs, this vulnerable population will continue to suffer irreparable harm.

### A.    Defendant Has Not Rectified Her Violations of Federal Law

Defendant asserts that "the problems experienced by the individual plaintiffs have been rectified."  ECF 31 at 30.  This is patently untrue.  Defendant conceded that she failed to send NOEs to Plaintiffs Gaines and Stanley due to the vendor error, yet refused to grant them retroactive benefits to the termination date.  *Id.* at 9-10; Stanley Decl., Ex. A; Gaines Decl., Ex. A.  Additionally, Defendant required Mr. Gaines and Mr. Stanley to submit new applications to regain their benefits; those applications, submitted in fall 2017, were subject to illegal processing delays, despite follow-up from counsel.  Stanley Decl., ¶¶ 3-10; Gaines Decl., ¶¶ 3-12.

Moreover, this case is brought not just on behalf of the Individual Plaintiffs but also the plaintiff classes, who have suffered—and will continue to suffer, absent injunctive relief—from

---

do nothing to avoid SNAP Act and Due Process violations.

Defendant's actions.  Broader class-wide problems have not been resolved, see discussion *supra* Part I, and counsel continue to see SNAP recipients who are unable to access the benefits to which they are legally entitled.  Indeed, many of the declarants affected by Defendant's violations remain without benefits at this time.  *See, e.g.*, Carver Decl., ¶¶ 4-7 (78-year-old with severe disabilities without benefits since beginning of January); Duncan Decl., ¶¶ 3, 16 (72-year-old woman without benefits since July 2017); ECF 31-1, ¶ 165 (single mother remains without full retroactive benefits despite Defendant's admitted failure to timely process first application).

## B. Defendant's Remedial Channels Are Insufficient to Prevent Irreparable Harm

Defendant concedes that "operational setbacks" and "system errors" are ongoing and inevitable, ECF 31 at 30, but claims that such errors do not cause irreparable harm because they are quickly discovered and remedied by DHS staff.  However, addressing violations *after* they have occurred does nothing to avoid the irreparable harm that indigent families suffer in the interim each day they go without access to food assistance.  *See Salazar*, 177 F. Supp. 3d at 433 (noting the severe harm that indigent individuals "suffer[] from the time their benefits lapse erroneously until the District can fix the error and make benefits retroactive").  Moreover, Defendant has proven that she is unable to quickly discover or resolve violations when they are reported by beneficiaries or even when they are reported by Plaintiffs' counsel.

### 1. Defendant Fails to Respond to Violations Reported by SNAP Recipients

Defendant complains in her Opposition that she was unable to discover or resolve the problems of Individual Plaintiffs and Declarants because Plaintiffs' counsel failed to report them.  ECF 31 at 18, 30.  Yet, many of the Plaintiffs and Declarants reported these violations to Defendant on multiple occasions by visiting service centers, calling the Call Center, and even sending letters directly to Defendant Zeilinger herself—but Defendant failed to act on these

19

reports until this litigation was filed. *See* ECF 31 at 8; ECF 24-47, ¶ 9, 11; ECF 24-40, ¶¶ 9, 11, 13. Defendant also claims to have only discovered the errors in her FNS-366B reports and the notice failures causing October terminations when these issues were brought to her attention as part of this litigation. Zeilinger Dep. at 37-38; ECF 41, Tr. at 20:4. Defendant's apparent inability to uncover and address violations without the assistance of Plaintiffs' counsel underscores the need for a class-wide injunctive remedy in this case.

Further, the remedial channels that Defendant claims are available to beneficiaries acting without the assistance of counsel—the Call Center, Service Centers, and technical triage—are slow and ineffective. *Cf.* ECF 31 at 30-36. The Call Center requires onerous hold times and is often unable to resolve beneficiaries' concerns. Customers routinely spend close to an hour on hold while waiting to speak with a representative. *See* Smith Decl., ¶¶ 10-14 (5 calls totaling several hours); Moore Decl., ¶ 8 (on hold for over an hour); Duncan Decl., ¶ 11 (on hold for 50 minutes); Carver Decl., ¶¶ 6, 8-12 (on hold for over 30 minutes on each of 3 calls). Data reported by DHS to FNS indicates that from November 13 to December 15, 2017, 43 to 48% of callers abandoned the call before speaking with a representative.[13] Even when customers can get through to a representative, the representative often provides inaccurate information or cannot assist them. *See* Smith Decl. ¶¶ 9-12; Yancey Decl. ¶ 9; Gaines Decl. ¶ 5.

Seeking assistance from a service center also involves prohibitive wait times. For instance, the week of November 21, 2017, the average wait time was 158 minutes overall— around 200 minutes at three of the busiest service centers. Mezey Decl., Ex. U at FNS FOIA 001562. These wait times, which FNS already deemed to be unacceptable, *see* ECF 24-15 at 4,

---

[13]     Mezey Decl., Ex. U at FNS FOIA 001568; Ex. V at FNS FOIA 001614; Ex. W at FNS FOIA 001652.

actually *undercount* the true wait because they do not count the time customers wait outside before the doors open.[14]  Because many service centers reach capacity as early as 11:00 am, ECF 31-1, ¶ 78, many customers begin lining up in the early hours of the morning to maximize their chances of being seen.  On ten recent visits by counsel to two DHS Service Centers—many of which occurred during sub-freezing temperatures—there was an average of 51.2 people in line before the doors opened at 7:30 a.m., and the first person in line on each visit reported arriving before 4:30 a.m.  Mezey Decl., ¶ 37; *see also* Meraviglia Decl., ¶¶ 7, 9 (3-hour wait time on each of 2 visits while on crutches); Duncan Decl., ¶ 6 (turned away from at-capacity service center in November); Carver Decl., ¶ 8 (could not endure wait times because of difficulty standing due to disability); Smith Decl., ¶ 9 (nearly 6 hours at service center with no resolution during visit).

The DHS Help Desk and technical triage resources touted by Defendant do not function any better.  Rather than resolving technological problems quickly, as Defendant claims, these mechanisms often take long periods of time to resolve the system errors impacting customers' cases.  *See* Smith Decl., ¶¶ 9-19 (IT ticket unresolved for over a month despite 5 Call Center calls, 4 attorney emails, and filing of fair hearing request); Meraviglia Decl., ¶ 9 (Service Center staff unable to activate benefits despite IT specialist and supervisor assistance).

### 2.    Even When SNAP Applicants Are Assisted By Counsel, Defendant's Responses Are Slow Or Nonexistent

As the discussion above demonstrates, the remedial channels available to SNAP recipients who lack counsel are slow and ineffective.  Even for recipients represented by counsel, Defendant fails to timely remedy her agency's violations.   *See* Gaines Decl., ¶¶ 7, 8, 10 (application not timely processed even though submitted to DHS and Defendant's counsel);

---

[14]    Test. of Laura Zeilinger, Council of the D.C. Comm. on Human Servs., Pub. Hr'g at 1:14:10 (Apr. 24, 2017), http://dc.granicus.com/MediaPlayer.php?view_id=2&clip_id=3902.

Stanley Decl., ¶¶ 7-10 (same); Duncan Decl., ¶ 9 (no response to attorney inquiry sent several weeks ago); Smith Decl., ¶¶ 16-18 (no response to 4 attorney emails until 2 weeks later, after filing fair hearing request); Bostic Decl., ¶¶ 11-13 (application submitted by counsel not timely processed; no response to follow-up inquiry for close to a month).  Indeed, Defendant's delay in responding to individual client issues and refusal to communicate regarding systemic problems has been longstanding.  *See generally* Mezey Decl., ¶¶ 4-15.  Because most SNAP recipients do not have counsel to advocate for them and because even counsel cannot obtain quick relief from Defendant, an injunctive remedy is necessary to prevent irreparable harm to the plaintiff classes.

## III.   THE BALANCE OF EQUITIES STRONGLY FAVORS GRANTING A PRELIMINARY INJUNCTION

Administrative burdens put upon the state to comply with federal law are insufficient to tip the balance of equities against Plaintiffs.  Particularly in cases involving SNAP benefits, courts have found that the dire harm to hungry citizens who are entitled to benefits outweighs any interest the state has in minimizing its administrative costs and labor.  Simply put, "the administrative burden 'is not overriding in the welfare context'" *Phila. Welfare Rights Org. v. O'Bannon*, 525 F. Supp. 1055, 1060 (E.D. Pa. 1981) (quoting *Goldberg*, 397 U.S. at 266) (case regarding food stamp benefits).  As stated by another court, "the need to the Plaintiff and class members [who rely on government assistance for food] is extreme and substantial.  Plaintiffs' suffering 'is far more compelling than the possibility of some administrative inconvenience or monetary loss to the government.'"  *Pimentel v. Dreyfus*, No. C11-119-MJP, 2011 WL 321778, at *7 (W.D. Wash. Jan 28, 2011) (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)); *see also, Briggs*, 2012 WL 6026167, at *19 ("Plaintiffs' vital and essential interest in the timely receipt of food stamps" far "outweighs any injury caused by requiring the Defendant to do what was already required [by federal law].").  Contrary to Defendant's assertions, a preliminary

injunction would not be a "diversion" of resources away from SNAP benefits; rather, it would simply require what federal law already mandates—timely processing of applications and provision of required notices.  *Cf.* ECF 31 at 37.

## IV.    GRANTING A PRELIMINARY INJUNCTION WOULD ADVANCE THE PUBLIC INTEREST

Plaintiffs simply ask for an order that Defendant follow the law.  Defendant is absolutely correct that "[t]he public interest is served by compliance with the SNAP Act and due process." ECF 31 at 37.  But it is a mischaracterization to assert that an order to comply with federal law would "alter the protective mechanisms that are mandated by the federal government."  *Id.* Plaintiffs are not asking that Defendant stop "review[ing] all SNAP applications and recertifications to ensure eligibility," *id.*; rather, Plaintiffs are asking that Defendant complete her review, determine eligibility, and issue benefits within the deadlines required by law.

Moreover, it is in the public interest to require that the government spend its money appropriately on the public benefits those funds were intended to support.  *See Rio Grande Cmty. Health Ctr. Inc. v. Armedáriz*, 792 F.3d 229, 232 n.2 (1st Cir. 2015) (state not harmed by being compelled to use Medicaid funds for their intended purpose); *Pimentel*, 2011 WL 321778, at *7 (the public's interest in conserving the resources of the state does not outweigh other interests in the provision of food stamps).  Because Plaintiffs have established that Defendant is not in compliance, the public interest would be served by a preliminary injunction that compels her to follow the law and to protect the rights of vulnerable, hungry citizens legally entitled to benefits.

## V.    BREAD FOR THE CITY HAS STANDING

Defendant argues that Bread lacks standing because its injuries are not injuries-in-fact and are caused by Bread itself, not Defendant.  ECF 31 at 25-29.  This is not the case.  Bread suffers an actual injury-in-fact fairly traceable to Defendant's illegal actions, *People for the*

*Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) ("*PETA*"), and thus has shown the required "substantial likelihood' of standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (internal quotation marks omitted).

### A.    Bread Suffers an Injury-in-Fact

Defendant contends that Bread's injuries are self-inflicted, and thus are not injuries-in-fact, because it chose to assist more individuals on its own. ECF 31 at 27. This misunderstands Bread's injury. Bread's injury is not that it served more people, but that it had to divert finite resources away from other programs because of Defendant's failure to comply with federal law. *See* ECF 24-50, ¶ 16. The D.C. Circuit has upheld this type of injury-in-fact for decades. *See Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (increase in number of people requiring counseling because of defendant's discrimination constitutes an injury); *PETA*, 797 F.3d at 1095 (expending resources to investigate and respond to complaints of inhumane treatment because of USDA's failure to do so constituted injury).

Defendant also accuses Bread's Legal Clinic of manufacturing an injury in preparation for litigation. ECF 31 at 27. But Bread's Legal Clinic only diverted resources away from other Bread programs based on clients' needs. *See* ECF 24-50, ¶ 11. Voluntarily diverting resources from one part of an organization's budget to another to counteract an agency's unlawful actions, as Bread has done here, is not a "self-inflicted" injury. *See PETA*, 797 F.3d at 1097.

Defendant further contends that Bread caused its own injury because "the issues concerning the individual plaintiffs could have been resolved" if reported to Defendant. ECF 31 at 26. In doing so, Defendant accuses Plaintiffs of a factually impossible "litigation tactic." *Id.* Although Bread's Legal Clinic regularly alerts Defendant to food stamp problems, *see* ECF 25-50, ¶ 11; Mezey Decl., ¶ 6, Bread never alleges that it served the Individual Plaintiffs. Nor does any Individual Plaintiff report seeking assistance from Bread. It is thus unclear how Defendant

expects Bread to have alerted her to the violations suffered by Individual Plaintiffs.

### B.   Defendant's Actions Caused Bread's Diversion of Resources

Defendant argues that other causes beyond her control caused the dramatic increase in demand for food stamp-related services witnessed by Bread's employees.  ECF 31 at 27-28.  But the connection between Bread's injury and Defendant's actions is not theoretical or attenuated. *See Allen v. Wright*, 486 U.S. 737, 757 (1984).  Defendant failed to provide SNAP benefits to District residents.  Those residents sought help at Bread.  Bread was forced to divert resources from its other programs to meet those residents' needs.  This line of causation is straightforward.

Defendant contends that there was no significant decline in SNAP participation that could explain Bread's increased demand for food or legal services.  ECF 31 at 28.  While acknowledging a significant decrease in participation following DCAS's implementation in October 2016, she claims this participation was regained in later months.  *Id*.  But even a temporary decline in SNAP participation could increase Bread's food demand, as indigent individuals often seek out help from Bread and other community resources in the months until their benefits are reinstated.  *See* ECF 24-47, ¶ 15 (obtained food from Bread when SNAP benefits terminated); Duncan Decl. ¶ 16 (same).  Moreover, Defendant's claim that declines in SNAP participation were ultimately recouped is incorrect.  Between September 2016, the month before DCAS went live, and August 2017, the District's SNAP participation dropped by over 9,000 individuals,  ECF 31-9 at 2, likely contributing to Bread's increase in food demand over this time period.  Thus, because Bread has suffered injuries-in-fact that are fairly traceable to Defendant's illegal actions, it has demonstrated the requisite substantial likelihood of standing.

### CONCLUSION

Plaintiffs respectfully request that the Court grant their motion for preliminary injunctive relief.

Dated: February 2, 2018                    Respectfully submitted,

                                   /s Chinh Q. Le
                                   Chinh Q. Le (DC Bar No. 1007037)
                                   Jennifer Mezey (DC Bar No. 462724)[*]
                                   Chelsea Sharon (DC Bar No. 1016006)[*]
                                   LEGAL AID SOCIETY OF THE
                                         DISTRICT OF COLUMBIA
                                   1331 H Street NW, Suite 350
                                   Washington, DC 20005
                                   202-628-1161 (Phone)
                                   202-727-2132 (Fax)
                                   cle@legalaiddc.org
                                   jmezey@legalaiddc.org
                                   csharon@legalaiddc.org

                                   Marc Cohan[††]
                                   Mary R. Mannix[†]
                                   Travis W. England[††]
                                   Katharine Deabler-Meadows[†]
                                   NATIONAL CENTER FOR LAW
                                         AND ECONOMIC JUSTICE
                                   275 7th Avenue, Suite 1506
                                   New York, NY 10001
                                   212-633-6967 (Phone)
                                   212-633-6371 (Fax)
                                   cohan@nclej.org

                                   Peter R. Bisio (DC Bar No. 459256)
                                   Lance Y. Murashige (DC Bar No. 1021562)
                                   Emily Goldman (DC Bar No. 1032032)
                                   Kaitlin Welborn[††]
                                   Susan A. Musser[††]
                                   HOGAN LOVELLS US LLP
                                   555 13th Street NW
                                   Washington, DC 20004
                                   202-637-5600 (Phone)
                                   202-637-5910 (Fax)
                                   peter.bisio@hoganlovells.com

                                   *Attorneys for Plaintiffs*

---

[*]     Practicing pursuant to LCvR 83.2(g).
[†]     Application for admission *pro hac vice* to be sought.
[††]    Admitted to appear *pro hac vice*.

## CERTIFICATE OF SERVICE

I certify that, on February 2, 2018, I caused a copy of this Plaintiffs' Reply to Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction and accompanying materials to be served on the following via ECF:

Fernando Amarillas
Esther Yong McGraw
Conrad Z. Risher
Office of the Attorney General for the District of Columbia
441 4th Street, NW
Washington, DC 20001
202-442-9887
fernando.amarillas@dc.gov
esther.mcgraw@dc.gov
conrad.risher@dc.gov


Date:   February 2, 2018                         /s/ Chinh Q. Le
                                         Chinh Q. Le (DC Bar No. 1007037)
                                         LEGAL AID SOCIETY OF THE
                                             DISTRICT OF COLUMBIA
                                         1331 H Street NW, Suite 350
                                         Washington, DC 20005
                                         202-628-1161 (Phone)
                                         202-727-2132 (Fax)
                                         cle@legalaiddc.org

                                         *Attorney for Plaintiffs*