# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SHONICE G. GARNETT, *et al.*,<br><br>    *Plaintiffs,*<br>v.<br><br>LAURA ZEILINGER,<br><br>    *Defendant.* | Civil Action No. 17-1757 (CRC) |

## DEFENDANT'S SURREPLY IN SUPPORT OF OPPOSITION
## TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

Plaintiffs largely ignore the revised data submitted to the United States Department of Agriculture Food and Nutrition Service (FNS) regarding the processing of initial and expedited Supplemental Nutrition Assistance Program (SNAP) applications for Fiscal Year 2017. That is because under plaintiffs' calculation, the data reveals that the District of Columbia's (the District)[1] timeliness rate for initial and expedited applications ranged from 90% to 95% for Quarters 1 through 4 of Fiscal Year 2017, consistent with the most recent data submitted to FNS, which shows 95% timeliness for Quarter 1 of Fiscal Year 2018. Plaintiffs argue— generally without evidentiary support and by mischaracterizing the record—that problems with the District's administration of SNAP are "widespread and unremediated." Plaintiffs are misguided, perhaps because they continue to rely on

---

[1] Laura Green Zeilinger, in her official capacity as the Director of the District of Columbia Department of Human Services, is named as the sole defendant in this case. Defendant is referred to as "the District" throughout this surreply.

outdated and inaccurate information, citing isolated caseworker errors and delays caused by their own (or their legal representatives') failure to comply with well-known District procedures.

Contrary to plaintiffs' blanket assertions, the District has not violated the SNAP Act or due process. As explained in the District's opposition to plaintiffs' motion for preliminary injunction, the District has redesigned its business process at each Economic Security Administration Service Center, and has developed several mechanisms to ensure due process and timely processing of SNAP applications and recertifications. The District has undertaken these measures in collaboration with FNS and continues to work closely with FNS to ensure eligible District residents receive SNAP benefits in a timely manner. Any difficulties or lapses in benefits experienced by the named plaintiffs and other declarants have been rectified. Because the circumstances alleged by plaintiffs—except for Bread for the City, which lacks standing—do not warrant the extraordinary remedy of injunctive relief, plaintiffs' motion for preliminary injunction should be denied.

## ARGUMENT

### I.  <u>Plaintiffs Fail to Establish a Likelihood of Success on the Merits.</u>

As set forth in the District's opposition to plaintiffs' motion for preliminary injunction, the District ensures timely processing of SNAP applications and recertifications, and ensures beneficiaries receive notice of the need to recertify before the expiration of the certification period. (ECF No. 31 at 11-25, 29-36.) In response, plaintiffs contend that the District "systematically fails" to process applications and "consistently fails" to provide notice, citing "FNS's recent findings" and difficulties

allegedly encountered by the named plaintiffs and other declarants. Plaintiffs' disregard of recent data submitted to FNS and their reliance on isolated incidents that have been rectified, coupled with their misrepresentation of evidence, cannot justify injunctive relief.

A. Plaintiffs Disregard the Revised FNS-366B Reports for Fiscal Year 2017.

In their reply, plaintiffs essentially ignore the revised FNS-366B reports submitted to FNS, which include information on the processing of initial and expedited SNAP applications for Fiscal Year 2017. (ECF No. 44-2.) Perhaps that is because even under plaintiffs' calculation method, the data reflects the District's Fiscal Year 2017 timeliness rates for initial and expedited applications, respectively, as follows: 90.59% and 89.63% (Quarter 1); 92.06% and 91.92% (Quarter 2); 93.52% and 93.36% (Quarter 3); and 95.08% and 95.00% (Quarter 4). (ECF No. 44-2; *see also* Ex. A, Zeilinger Suppl. Decl. ¶ 11.) For Quarter 1 of Fiscal Year 2018—the most recent data submitted to FNS—the timeliness rates are similarly high: 94.97% and 94.81% for initial and expedited applications, respectively. (Ex. B, FNS-366B for Q1 FY2018; Zeilinger Suppl. Decl. ¶ 12.)

Plaintiffs state "recent findings" indicate the District's "untimely application processing is the worst in the country." (ECF No. 45 at 3.) But as shown in the underlying support (ECF No. 45-29), plaintiffs' contention is based on stale data from October 2016 through March 2017, the first six months of the District of Columbia Access System (DCAS) Phase II implementation. (Zeilinger Suppl. Decl. ¶ 16.) And it is unclear how plaintiffs reached their unsupported conclusion that the District untimely processes approximately one of every ten applications. (ECF No. 45 at 3-4.)

Plaintiffs simply highlight the timeliness rates for SNAP recertifications for Fiscal Year 2017, arguing that the District untimely processed 58% of recertifications from January to March 2017, 59% from April to June 2017, and 56% from July to September 2017. (ECF No. 45 at 4-5.) But as the District has explained, FNS rules require inclusion of beneficiaries in the overdue category of the FNS-366B even when the delay is attributed to beneficiaries. (ECF No. 31-1 (Zeilinger Decl. ¶ 129).) Recertification denials include beneficiaries who belatedly recertify for SNAP and, depending on the timing, these beneficiaries may be included in the FNS-366B as recertification denials, even though they later recertify and receive SNAP benefits, or as overdue recertification approvals once they do recertify. (*Id.*)

Plaintiffs concede that the FNS-366B report does not provide the most complete picture of a state's timeliness efforts and rates. (ECF No. 45 at 6; *see also* ECF No. 31-1 (Zeilinger Decl. ¶¶ 125-130).) However, their contention that the District prepares the FNS-366B form in "direct contravention of FNS instructions" to make its "performance look better" is unsupported. And plaintiffs' discussion of the errors that required resubmission of the FNS-366B reports is of no consequence, except to underscore that plaintiffs' initial request for injunctive relief relied on outdated and inaccurate information. (ECF No. 45 at 6-8.) Plaintiffs' reply fares no better. The new allegations presented by plaintiffs do not warrant a preliminary injunction.

B. <u>The Processing and Notice Issues Alleged by the Individual Plaintiffs and Declarants Do Not Warrant Injunctive Relief.</u>

As discussed below and in the District's opposition to plaintiffs' motion for preliminary injunction, the circumstances relating to the named plaintiffs and other declarants do not justify injunctive relief. Contrary to plaintiffs' contention, these alleged processing and notice issues are not indicative of a general failure to timely process initial SNAP applications and recertifications, nor of a general failure to provide adequate notice to SNAP beneficiaries. In fact, in FNS's March 18, 2016 guidance for improving state timeliness rates, FNS stated that it "considers an [application processing timeliness] rate of 95 percent and above acceptable performance." *See Guidance for Improving State Timeliness Rates and Standardizing the Escalation Process*, Food and Nutrition Svc. (Mar. 18, 2016), *available at* https://www.fns.usda.gov/snap/guidance-improving-state-timeliness-rates-and-standardizing-escalation-process (last accessed Feb. 21, 2018). To put it in perspective, DHS receives and processes about 8,000 to 9,000 initial applications and recertifications every month. (Zeilinger Suppl. Decl. ¶ 17.)

1. **Plaintiffs James Stanley and Roderick Gaines**

Plaintiffs James Stanley and Roderick Gaines failed to submit a recertification application before the end of their certification period. (Zeilinger Suppl. Decl. ¶¶ 19-20.) A vendor's error, which failed to print and send recertification notices at the end of June 2017, may have contributed to their failure. (*Id.*) However, after learning of this error in September 2017, the Department of Human Services (DHS) provided all individuals whose SNAP benefits terminated on August 31, 2017—based on the

failure to submit a recertification—an opportunity to recertify until September 30, 2017, the time allowed under FNS regulations. (*Id.*; 7 C.F.R. § 273.14(e).) Further, DHS conducted robocalls to advise beneficiaries to recertify, and mailed reminders informing beneficiaries that a submitted application by September 30, 2017 containing at least their name, address, and signature would be treated as a recertification. (Zeilinger Suppl. Decl. ¶ 19.) Any beneficiary who recertified during the grace period received retroactive payment. (*Id.*)

Mr. Stanley had until September 30, 2017 to submit a recertification application. (*Id.*) He reapplied on November 2, 2017. (*Id.*) Legal Aid submitted Mr. Stanley's SNAP application by email, a method not authorized by the SNAP application form instructions that are well-known to Legal Aid. (*Id.*; *see also* ECF No. 45-2, Mezey Aff. ¶¶ 17, 27.) Nevertheless, DHS began to process the emailed application and a Call Center employee contacted Mr. Stanley to conduct his SNAP interview the same day. (Zeilinger Suppl. Decl. ¶ 19.) Because Mr. Stanley submitted a statement that he occasionally has income from home improvement jobs, DHS requested additional information from Mr. Stanley regarding his income in the thirty days prior to the interview. (*Id.*) Legal Aid provided additional information by email on November 9, 2017, and when Legal Aid contacted the Division of Program Operations (DPO) deputy email box on December 5, 2017 to state that there appeared to be a problem with the application processing, DHS acted immediately. (*Id.*) DHS processed and approved the case with retroactive benefits to the application date, November 2, 2017, and the prorated amount and full SNAP benefits were issued to

Mr. Stanley's Electronic Benefit Transfer (EBT) Card on December 5, 2017. (*Id.*) A SNAP Approval Notice was issued the next day. (*Id.*)

Mr. Gaines, too, was required to reapply for SNAP benefits because he did not submit a recertification application prior to September 30, 2017, even though he received both a reminder notice and bi-weekly robocalls. (*Id.*; *see also* ECF No. 27-4 at ¶5.) Mr. Gaines, through Legal Aid, submitted the new SNAP application by email, again an unauthorized method, on November 22, 2017. (Zeilinger Suppl. Decl. ¶ 20.) In the expedited processing section of the application, Mr. Gaines did not answer all questions, but stated that his total income for the month would be $0. (*Id.*) However, Mr. Gaines did not attach copies of the verification documents required for DHS to process the application. (*Id.*) DHS contacted Mr. Gaines and requested the verification documents, including identification and confirmation that he is responsible for his own meals, as required by SNAP regulations. (*Id.*) Upon receipt of the necessary documentation, DHS processed the application and benefits were loaded on Mr. Gaines' EBT Card by January 9, 2018, including a retroactive payment to the application date. (*Id.*)

Importantly, as to plaintiffs Stanley and Gaines, and other declarants discussed below, there is no SNAP regulation that permits reinstatement of SNAP benefits after a certification period has expired; the individual must reapply and be deemed eligible for a new period. (ECF No. 31-1 ¶ 31.) SNAP regulations allow DHS to treat an application as a recertification if submitted during the thirty days after a certification period ends—known as the "grace period"—and those regulations specify

the conditions under which benefits are prorated. (*Id.*) However, there is no provision in the regulations allowing DHS to treat a SNAP application as a recertification once the grace period has expired. 7 C.F.R. § 273.14(e).

### 2. Declarant Nelson Bostic

On March 29, 2017, DHS sent Mr. Bostic a SNAP Notice of Expiration (NOE) informing him that his certification period would end May 31, 2017. (Zeilinger Suppl. Decl. ¶ 21.) Mr. Bostic did not recertify before May 31, 2017, or during the thirty-day grace period following the expiration of his certification period. (*Id.*) Mr. Bostic states that he was unable to reach anyone by telephone at the Fort Davis Service Center during the month of June 2017 to inquire about his SNAP benefits, ECF No. 45-32 ¶ 5, but that is highly unlikely. (*Id.*) The main telephone number for the Fort Davis Service Center routes to the DHS Call Center, which is staffed during business hours and allows customers to speak with an available representative. (*Id.*) Legal Aid contacted the DPO deputy email on October 19, 2017, to inquire about the May 2017 termination of Mr. Bostic's SNAP benefits. (*Id.*) The DPO Deputy email team researched Mr. Bostic's case and responded on October 27, 2017, providing information on why his SNAP benefits had expired, along with instructions on how Mr. Bostic could reapply. (*Id.*) Legal Aid submitted Mr. Bostic's new SNAP application by email, again an unauthorized method, on November 16, 2017. (*Id.*)

On December 18, 2017, Legal Aid contacted the DPO Deputy email team to state that there appeared to be a problem with the application processing. (*Id.*) Mr. Bostic's application was promptly processed and approved and a retroactive payment was issued to the application date, by January 4, 2018. (*Id.*) Legal Aid was once again

reminded that SNAP applications should be submitted in accordance with the application form instructions. (*Id.*)

### 3. Declarant Bruce Meraviglia

On July 31, 2017, DHS sent Mr. Meraviglia an NOE informing him that his certification period would end September 30, 2017, and that his SNAP benefits would terminate by September 30, 2017 unless he recertified by that date. (Zeilinger Suppl. Decl. ¶ 22.) DHS also sent Mr. Meraviglia a separate notice informing him that his benefits terminated. (*Id.*) Mr. Meraviglia did not recertify before September 30, 2017, but he visited a Service Center in the thirty-day grace period and submitted an application on October 13, 2017. (*Id.*) DHS requested verification documents from Mr. Meraviglia during his October 13, 2017 visit, and the information was provided on October 19, 2017. (*Id.*) SNAP benefits for the month of November 2017 were available on Mr. Meraviglia's EBT Card as of November 6, 2017, and the prorated SNAP benefits for the month of October 2017 were available by November 15, 2017. (*Id.*)

### 4. Declarant Lisa Smith

Ms. Smith was receiving benefits and sought to add SNAP benefits for a newborn daughter. (Zeilinger Suppl. Decl. ¶ 23.) DHS encountered technical difficulties adding the daughter to Ms. Smith's SNAP case after she submitted a new application for herself and her daughter on October 23, 2017. (*Id.*) Ms. Smith provided necessary verification documents in November 2017, and the information technology (IT) team resolved the issue on December 6, 2017. (*Id.*) DHS completed processing Ms. Smith's case the same day. (*Id.*) DHS provided Ms. Smith with retroactive SNAP benefits and approved her for ongoing benefits as of December 8, 2017. (*Id.*)

### 5.  Declarant Diane Yancey

On July 31, 2017, DHS sent Ms. Yancey an NOE informing her that her certification period would end September 30, 2017. (Zeilinger Suppl. Decl. ¶ 24.) Ms. Yancey did not recertify her SNAP benefits before September 30, 2017, or during the thirty-day grace period following the expiration of her certification period. (*Id.*) Ms. Yancey contacted the DHS Call Center on October 31, 2017, and was given information about her benefit status and steps required to regain eligibility for SNAP. (*Id.*) Legal Aid submitted Ms. Yancey's SNAP application by email, an unauthorized method,  on October 31, 2017. (*Id.*) DHS processed and approved Ms. Yancey's SNAP application on October 31, 2017, and granted her benefits prorated from that date. (*Id.*)

### 6.  Declarant Joseph Carver

On September 30, 2017, DHS sent Mr. Carver an NOE informing him that his certification period would end November 30, 2017. (Zeilinger Suppl. Decl. ¶ 25.) Mr. Carver did not recertify his SNAP benefits before November 30, 2017, or during the thirty-day grace period following the expiration of his certification period. (*Id.*) DHS sent Mr. Carver a SNAP termination notice dated November 29, 2017, indicating that his SNAP benefits would terminate. (*Id.*) Mr. Carver states that he attempted to reach the DHS Call Center after receiving his termination notice and visited the H Street Service Center in December 2017 and January 2018. (ECF No. 45-50 ¶7.) The DHS Call Center remained in operation during this period, and there is no indication in DHS's records that Mr. Carver called in December 2017 or visited the H Street Service Center in either month. (Zeilinger Suppl. Decl. ¶ 25.) When Mr. Carver spoke

with a Call Center representative in mid-January 2018, he was given information about his benefit status and the steps required to regain eligibility for SNAP. (*Id.*) Based on the information he provided regarding his limited mobility, DHS advised him that, as a special accommodation, he could submit his SNAP application by email. (*Id.*) DHS received Mr. Carver's application on January 23, 2018—it was emailed after hours on January 22—and his benefits were approved on February 16, 2018. (*Id.*)

### 7. Declarant Diamond Moore

On October 30, 2017, DHS sent Ms. Moore an NOE informing her that her certification period would end December 31, 2017. (Zeilinger Suppl. Decl. ¶ 26.) DHS also sent Ms. Moore a SNAP termination notice on December 15, 2017. (*Id.*) Ms. Moore did not recertify her SNAP benefits before December 31, 2017, and on January 9, 2018, she was informed by a caseworker that she needed to reapply. (*Id.*) She was told the same thing by a DHS Call Center representative on January 18, 2018. (*Id.*) Ms. Moore's SNAP application was processed, and prorated benefits were issued to her EBT Card that same day. (*Id.*) DHS informed Legal Aid on February 8, 2018, that Ms. Moore's benefit amount for the current certification period had changed because of her increased income. (*Id.*)

### 8. Declarant Christina Duncan

On April 29, 2017, DHS sent Ms. Duncan an NOE informing that her certification period would end June 30, 2017. (Zeilinger Suppl. Decl. ¶ 27.) Ms. Duncan did not recertify her SNAP benefits before June 30, 2017, or during the thirty-day grace period following the expiration of her certification period. (*Id.*) Ms.

Duncan discovered that she was not receiving benefits in July 2017, ECF No. 45-53 ¶ 4, and was informed by a DHS automated message months later that her SNAP benefits had terminated based on her failure to recertify. (*Id.*) Ms. Duncan was again informed of this in November 2017 by a DHS caseworker at a Service Center. (*Id.*) Ms. Duncan states that she obtained an application for SNAP on November 17, 2017, but DHS received no application until January 25, 2018. (*Id.*) Legal Aid submitted the application by email, an unauthorized method. (*Id.*) DHS processed and timely approved Ms. Duncan's SNAP application, issued an approval notice, and her SNAP benefits were available on her EBT Card by February 6, 2018. (*Id.*)

### C. Plaintiffs Mischaracterize the Evidence and Director Zeilinger's Deposition Testimony.

#### 1. Plaintiffs Misrepresent the Facts and Data.

In their reply, plaintiffs use phrases like "most recent data" to describe findings from October 2016 through December 2016 or March 2017, the first three to six months of the DCAS rollout, even though plaintiffs had data through December 2017 showing the District's improved timeliness data. (*See, e.g.*, ECF No. 45 at 2-3, 5 (*citing* "Mezey Decl., Ex. Q [ECF No. 24-9] at FNS FOIA 00527-28" *but see* ECF No. 24-9 at 1 ("week of December 12, 2016"); *see also* FNS FOIA 00527-24 (document dated "4/24/2017"); ECF No. 38 (the District produced "revised FNS-366B reports for Quarters 1 through 4 of FY2017" on December 13, 2017).)

Plaintiffs suggest the District "offers little assurance" the revised FNS-366B reports are correct, but the District produced Director Zeilinger for a Rule 30(b)(6) deposition where she explained the many steps taken by the District to ensure the

information is accurate. (Ex. C, Zeilinger Dep. 42:10-43:4 ("ESA worked with the DCAS reports team to fix the DCAS report…. That entailed an iterative process … and a sampling of cases to ensure that the report generated was accurate and correct [and we have] confidence and surety, through a great degree of sampling …").)

Plaintiffs also mischaracterize the evidence by conflating initial applications with recertifications. (ECF No. 45 at 3-4.) Plaintiffs contend that, for Quarter 4 of Fiscal Year 2017, "[t]aking both initial and recertification applications together, over one-third (34%) of approved applications were overdue." (*Id.*) But, as stated above, taking only initial applications, 95.08% were timely processed and 95.00% of expedited applications were timely processed. (Zeilinger Suppl. Decl. ¶ 11.) The District's timeliness rates have consistently improved since Quarter 1 of Fiscal Year 2017. (*Id.*) Contrary to plaintiffs' assertion, the data does not show that "untimeliness is persistent." (ECF No. 45 at 4.)

In addition, plaintiffs make several statements without even offering a citation—*see, e.g.*, ECF No. 45 at 3, 6-7—and their citations often do not support their arguments. For example, plaintiffs contend the District's FNS-366B report "omits applications filed in a prior quarter but untimely processed in the reporting quarter," but offer no citation to support this statement because the evidence demonstrates the contrary. (ECF No. 45 at 6.) Every FNS-366B submitted in Fiscal Year 2017 or Fiscal Year 2018, except Quarter 1 of Fiscal Year 2017, lists at least one application in column G, that is overdue "91+ days," meaning it was filed in the prior quarter. (ECF No. 44-2; Ex. B.) Plaintiffs also state the District "has admitted to FNS that DCAS is

incapable of reflecting the correct filing date when an application is entered into the system more than five days after receipt." (ECF No. 45 at 4.) But plaintiffs have identified no examples of attempts to enter an application more than five days after receipt and, in contrast, their citation includes the District explaining "the paper application backlog was virtually eliminated [on] April 1, 2017…." (*Id.*; *see also* ECF No. 31-7.) Plaintiffs also cite an FNS report of problems encountered in "the week of December 12, 2016," and the District's response, ignoring that such information is more than a year old and relates to the first weeks of the DCAS rollout. (ECF Nos. 31-7 at 1, 31 at 13, 31-1 ¶¶ 105-116.) And plaintiffs rely on the declaration of Nelson Bostic to "illustrate" the alleged problem of beneficiaries not receiving the benefits they deserved; but the declaration suggests, instead, a typographical error because "[t]he amount [of benefits he] received … was much more," not less, than what he thought would have been correct. (ECF No. 45-32 ¶ 14.)

Plaintiffs contend that references in DHS's bi-weekly reports to FNS about "stuck" applications in DCAS show "that the applications could not be processed or benefits authorized." (ECF No. 45 at 7.) But, even upon a cursory review, those reports demonstrate that plaintiffs are mistaken. Each reference indicates that DHS is doing additional work—work that was meant to be automated—because a programming problem "requir[es] IT cleanup" to ensure that cases are timely processed. (*See, e.g.*, ECF Nos. 24-18 at 8, 24-19 at 7, 24-21 at 7.) That does not mean the applications were untimely processed. The same is true of plaintiffs' allegation of

applications "failing submission" or "'going to wrong status' upon submission as a DCAS system issue that required attention." (ECF No. 45 at 7.)

Similarly, plaintiffs assert the print vendor's error meant, "any household who was not independently aware of its recertification deadline would have lost benefits due to Defendant's failure to provide the required notice," that this applied to "about 3,500 households," and that "[a]pproximately 1,260 households—28% of those affected—did not regain benefits within 30 days of termination and may remain without benefits now." (ECF No. 45 at 12.) Every one of these statements is false. First, only a household that failed to recertify timely *and* failed to recertify during the grace period despite multiple mailings and robocalls, ECF No. 31 at 9-10, 22, would have its benefits terminated pursuant to FNS regulations. Second, plaintiffs' numbers are pure fiction, as Director Zeilinger explained during her deposition. (Zeilinger Dep. 130:9-11, 140:13-20.) As to the households truly affected by the vendor's error, Dep. 142:2-6, Director Zeilinger explained that plaintiffs' assumption that those not recertifying had lost benefits was unsupported by the data. (Zeilinger Dep. 144:5-7 ("Did those individuals lose their SNAP benefits? [A.] Not necessarily."), 150:17-22 ("Are the other 27 percent of individuals who didn't recertify before the end of the grace period, are they still without benefits? [A.] I don't know. It is possible that they would have come in and made a new application and I don't know how many may have done that."); *see* above at 4.) To further clarify, Director Zeilinger stated:

> So 63 percent of the people who we contacted completed their recertification during the grace period. Inclusive of the people who had done that who we didn't contact, 72 percent of the recipients who needed

to recertify were certified all together by the end of the grace period, which I'll just add is higher than in normal months.

(Zeilinger Dep. 148:25-49:6; *see also Understanding the Rates, Causes, and Costs of Churning in the Supplemental Nutrition Assistance Program (SNAP)*, FOOD AND NUTRITION SVC. (Sept. 2014) at 40 (Table 3, col. "Stayers") (in Fiscal Year 2011, only 32 to 41% of SNAP recipients in certain states received SNAP benefits for the full year by recertifying, when required), *available at* https://www.urban.org/sites/default/files/publication/33566/413257-Understanding-the-Rates-Causes-and-Costs-of-Churning-in-the-Supplemental-Nutrition-Assistance-Program-SNAP-.PDF (last accessed Feb. 21, 2018).) And those who did not recertify included people who may have become ineligible or who failed to recertify timely and had to reapply for SNAP benefits. (Zeilinger Suppl. Decl. ¶ 13; *see also* ECF No. 31-1 at ¶ 168 (Declarant Guevara's benefits terminated after "[h]er recertification revealed that her income exceeds the eligibility criteria for SNAP").)

## 2.  Plaintiffs Misrepresent Director Zeilinger's Deposition Testimony.

At her deposition, Director Zeilinger did not suggest the original FNS-366B data was "riddled with errors," nor were her explanations "shifting and unclear." (ECF No. 45 at 3.) Rather, Director Zeilinger explained "there were several [specific] errors," primarily in how the data was *presented*, rather than its accuracy. (Zeilinger Dep. 61:20-21, 62:3-15 (numbers in overdue columns, though correctly counted, were shifted to the right as explained in ECF No. 31-1 ¶¶ 125-27), 62:16-23 (DHS separated initial from expedited applications where FNS wanted the total), 63:1-9 (inclusion of ACEDS in first three columns prevented accurate comparisons with the

16

timeliness columns given the legacy system's inability to provide timeliness data), 63:10-15 (incorrect count of expedited applications), and 63:16-20 (overcounting of recertifications).) Only the final two examples represented actual data errors, and both were insignificant.

Plaintiffs accuse Director Zeilinger of being unable to "explain with any specificity what she did to ensure that the [FNS-366B] reports now are accurate beyond stating that a team pulled a sample of cases." (ECF No. 45 at 6.) Actually, Director Zeilinger explained that the report "was querying fields that were not correctly distinguishing which cases were expedited and which cases were regular;" to fix this, the programmers selected the appropriate fields and the "team pulled sample cases to ensure that it was correct in the corrected report." (Zeilinger Dep. 70:20-71:13.) Director Zeilinger was unable to specify only "the date that the sampling process took place" and, "not being a statistician," was "not going to speculate [as to] what makes a statistically relevant sample size." (Zeilinger Dep. 71:14-72:15, 73:5-15.)

Plaintiffs suggest Director Zeilinger was insufficiently familiar with the details of SNAP or the questions posed at her deposition, and that she resorted to "shifting explanations" because she was unable to answer certain questions. (ECF No. 45 at 5-6.) That, too, is untrue. Plaintiffs repeatedly exceeded the scope of questions authorized by the Court but, after the District noted its objections, Director Zeilinger answered many of those questions. (*See, e.g.*, Zeilinger Dep. 89:7-13, 90:2-7, 121:10-13, 125:2-16.) Among the examples plaintiffs cite, Director Zeilinger was instructed

not to answer "how would the worker know" if an application was entitled to expedited processing, Dep. 27:18-21, after she had already answered "what is the difference between a regular application and an expedited application…." (Zeilinger Dep. 26:13-24.) When plaintiffs asked what "fields" the DCAS programmers set certain reports to query, Director Zeilinger replied that she is not a programmer and is not "the foremost expert" on programming. (Zeilinger Dep. 70:20-71:4.) Plaintiffs have no basis to discredit Director Zeilinger's testimony. *See, e.g.*, *Stanfill v. Talton*, 851 F. Supp. 2d 1346, 1366 (M.D. Ga. 2012) ("the Court would not expect [the administrator] to be an expert on all the technical aspects [but only to] possess more than [a] novice understanding"); *Ford v. Jalisco Mkt., Ltd. Liab. Co.*, No. 2:16-cv-619-CW-BCW, 2017 U.S. Dist. LEXIS 170012, at *10 (D. Utah Oct. 12, 2017) ("the Court does not expect Plaintiff to be an expert … but [only] to be able to give a genuine explanation, in lay-person terms" of the issue) (quotation omitted).

### D. <u>Plaintiff Bread for the City Lacks Standing.</u>

Plaintiffs' reply misstates the District's arguments regarding Bread for the City's (Bread) lack of organizational standing. It is not that Bread lacks standing "because it chose to assist more individuals on its own," but because its choice to provide assistance to its food and litigation programs is not a cognizable injury. (ECF No. 31 at 26-27.) Because of this misunderstanding, plaintiffs fail to address the D.C. Circuit's holding that "an organization's diversion of resources to litigation" cannot support standing. (ECF No. 31 at 27 (citing *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011).) Ignoring this precedent, plaintiffs seek support in caselaw that is inapposite. Neither case on which they rely, *Fair Emp't Council of Greater Wash.,*

*Inc. v. BMC Marketing Corp.* or *People for the Ethical Treatment of Animals v. United States Dep't of Agric.* (*PETA*), supports plaintiff's argument. And even if *BMC Marketing* and *PETA* provided appropriate standards, Bread has barriers to standing that plaintiffs have not and cannot overcome.

*BMC Marketing* dealt with alleged racial discrimination, and the D.C. Circuit found the organizational plaintiff had a cause of action solely under Title VII and not 42 U.S.C. § 1981, so it is readily distinguishable from this case. 28 F.3d 1268, 1277 (D.C. Cir. 1994). The D.C. Circuit found in *BMC Marketing*, that "[o]ne can hardly say that BMC has injured the [Fair Employment Council of Greater Washington] merely because the Council has decided that its money would be better spent by testing BMC than by counseling or researching." 28 F.3d at 1277. Similarly, "deflection of the agency's time and money from counseling to legal efforts" would not support standing. *Id.* The D.C. Circuit flatly refuted the idea—as it would almost two decades later in *ASPCA*—that diverting resources could constitute an injury sufficient for standing purposes. *Id.*

*PETA* concerned the "denial of access to bird-related [Animal Welfare Act] information," something "concrete and specific to the work in which they are engaged…." 797 F.3d 1087, 1095 (D.C. Cir. 2015). There it was "conceded" that the organization's preferred remedy would bring the desired change. *Id.* Here, plaintiffs have not even proposed a proper remedy—*see* ECF No. 32 at 17-19—making it "entirely speculative whether the challenged practice will actually impair the organization's activities." *PETA*, 797 F.3d at 1095 (quotation omitted).

Plaintiffs' argument in support of Bread's organizational standing is even weaker when it comes to establishing traceability. First, plaintiffs summarize the alleged injury requiring class certification and injunctive relief by claiming the District "failed to provide SNAP benefits to District residents." (ECF No. 45 at 25.) However, the vast majority of District residents are not *eligible* for SNAP benefits, and it is the District's obligation under federal law to determine whether an applicant is eligible before providing the appropriate assistance. *See* SNAP Eligibility, Dep't Of Human Svcs., *available at* https://dhs.dc.gov/service/snap-eligibility (last accessed Nov. 15, 2017). Plaintiffs have not even established that the majority of the individuals named in support of plaintiffs' request for relief failed to receive benefits *for which they were eligible* and, for those who may have, that this was the fault of the District. (ECF No. 31 at 7-10; *see also* Section I.B above.)

In fact, plaintiffs have only argued the *possibility* that some eligible people may not have received benefits. On the final page of their reply, plaintiffs concede this point, stating that "a temporary decline in SNAP participation *could* increase Bread's food demand" and the decline in SNAP participation between August 2016 and September 2017 "*likely* contribut[ed] to Bread's increase in food demand…." (ECF No. 45 at 25 (emphasis added).) Plaintiffs' reliance on such possibilities is fatal to their claims, and to Bread's claims in particular. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Plaintiffs bear the burden of proof on standing and their proof of concrete injury must extend beyond the "merely possible." *See, e.g., BEG Invs., LLC v. Alberti*, 85 F. Supp. 3d 13, 33 (D.D.C. 2015); *Campbell v. Nat'l Union Fire Ins. Co.*,

130 F. Supp. 3d 236, 268 (D.D.C. 2015) ("the Court is unable to discern from the factual allegations … anything that would nudge her assertion … from the merely possible"); *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 39 (D.D.C. 2010) ("a court must conclude that it is not merely possible"); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (merely "conjectural or hypothetical" injury will not suffice).

## II.   <u>Plaintiffs Fail to Establish Irreparable Harm.</u>

As explained above, and in the District's opposition to plaintiffs' motion for preliminary injunction, the difficulties encountered by the named plaintiffs and declarants have been rectified. (ECF No. 31 at 18-19, 21-23; *see also* Zeilinger Suppl. Decl. ¶¶ 18-27.) As a result, plaintiffs cannot show—as they must—that "[t]he injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm," or that any injury is "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citation omitted). In fact, most of the delays and difficulties encountered by plaintiffs and other declarants were caused by their own (or Legal Aid's) failure to comply with well-known District procedures. *See* Section I.B above. This includes the submission of SNAP applications by email, a method not authorized by the SNAP application form instructions that are well-known to Legal Aid. *Id.* However, when problems were brought to the District's attention, the District took prompt action to remedy those issues. *Id.*

Plaintiffs do not dispute that the District has improved its business process and that the mechanisms described in the District's opposition help to ensure timely processing and notice to beneficiaries, and to resolve issues as they are uncovered by

DHS staff or reported by beneficiaries and advocates. (ECF No. 31 at 29-36.) Although plaintiffs may believe that those mechanisms are "insufficient," that does not suffice to warrant injunctive relief, especially given plaintiffs' failure to present concrete evidence of widespread issues that currently affect the District's ability to administrate SNAP benefits. The evidence presented by the District, and the revised FNS-366B reports, tell a different story. (ECF No. 44-2; Ex. B.)

Indeed, "failure to demonstrate irreparable harm is 'grounds for refusing to issue a preliminary injunction, even if the other three factors entering the [preliminary injunction] calculus merit such relief.'" *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (observing that there is "a high standard for irreparable injury")). Because plaintiffs have failed to establish irreparable harm and are unlikely to succeed on the merits, their request for injunctive relief should be denied.

### III.   The Balance of Equities Favors the District of Columbia and a Preliminary Injunction Is Not in the Public Interest.

Plaintiffs state, without support, that a preliminary injunction would not divert critical resources already dedicated to ensuring eligible District residents receive SNAP benefits in a timely manner. (ECF No. 45 at 23-24.) Plaintiffs cannot presume to know this, nor can they be sure that an injunction would not interfere with the protective measures mandated by the federal government. (*Id.*; *see* ECF No. 31 at 36-38.) As stated in the District's opposition, the District must review all SNAP applications and recertifications to ensure eligibility and avoid fraud, waste, and abuse. (ECF No. 31 at 36-38.) If the District were ordered to alter the protective

mechanisms that are currently in place, it could lose federal funding and put local funds and SNAP benefits at risk. To grant an injunction with those consequences is not in the public interest. *See, e.g.*, *Washington v. District of Columbia*, 530 F. Supp. 2d 163, 173 (D.D.C. 2008) ("[I]t is indisputably in the public's interest for government costs to be minimized.") (citations omitted).

Here, simply put, plaintiffs *have not* established that the District fails to comply with federal law, or that it deprives SNAP beneficiaries of due process. But even if the Court determines that the balance of hardships or public interest tips in favor of plaintiffs, plaintiffs cannot overcome their failure to demonstrate a likelihood of success on the merits or irreparable harm. *Nat'l Tobacco Co., L.P. v. District of Columbia*, 2011 WL 4442771, at *9 (D.D.C. Sept. 14, 2011).

## CONCLUSION

For the foregoing reasons, and the reasons in defendant's opposition, plaintiffs' Motion for Preliminary Injunction should be denied.

Dated:  February 21, 2018.          Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

CHAD COPELAND
Acting Deputy Attorney General
Public Interest Division

/s/ Toni Michelle Jackson
TONI MICHELLE JACKSON (Bar No. 453765)
Chief, Equity Section

/s/ Fernando Amarillas
FERNANDO AMARILLAS (Bar No. 974858)
ESTHER YONG MCGRAW (Bar No. 988479)
CONRAD Z. RISHER (Bar No. 1044678)

Assistant Attorneys General
441 Fourth Street, N.W., Suite 630 South
Washington, D.C. 20001
Telephone: (202) 442-9887
Facsimile: (202) 730-0646
Email: fernando.amarillas@dc.gov

***Counsel for Defendant Laura Zeilinger***