Exhibit C

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - - - - -

SHONICE G. GARNETT, ET AL.,

            Plaintiffs,      Civil Action No.:
                           17-cv-1757 (CRC)

          v.

LAURA ZEILINGER,

            Defendant

- - - - - - - - - - - - - - - - x



DEPOSITION OF LAURA ZEILINGER


FRIDAY, JANUARY 12, 2018

WASHINGTON, D.C.

1:09 p.m.






REPORTED BY:

MISTY KLAPPER, RPR, CRR, CMR

Job no: 20487

Exhibit C

1        expedited assistance?

2        A.     Could --

3               MS. MCGRAW:  Objection, outside the scope.

4        Don't answer the question.

5               MR. COHAN:  Sorry, what was that?  I didn't

6        hear you.

7               MS. MCGRAW:  Do not answer the question.

8               MR. COHAN:  We actually disagree with that

9        characterization because we think that the purpose

10       of -- the process of compiling the FNS-B reports,

11       we're entitled to understand what the difference

12       is between an expedited and a regular application.

13              MS. MCGRAW:  The witness can testify as to

14       what is the difference between a regular

15       application and an expedited application.

16              You can go ahead and testify as to that.

17              THE WITNESS:  Sure.  So a regular

18       application is a full application for SNAP

19       benefits.  And that application -- and an

20       expedited application for benefits is one where

21       it's an application for, basically, emergency food

22       stamps that is a -- which is -- does not require

23       the full application at -- when the resident comes

24       into the Agency.

25              BY MR. COHAN:

Exhibit C

1       Q.   So if the -- so you -- so let me jump ahead

2       a little bit, if you would, to line six.  And

3       we're talking about expedited or emergency

4       benefits and it says expedited service.

5            Is that what you're referring to when you

6       speak in terms of expedited food stamps or

7       expedited SNAP benefits?

8       A.   Yes.

9       Q.   So expedited service would be this -- would

10      be the non-30 day applications, non-regular

11      applications; is that correct?

12      A.   That is correct.

13      Q.   Okay.  So I'd ask you, if you would, under

14      approvals, for example, there's listed as 5,602

15      applications that -- on this form -- that are

16      approvals of expedited service; is that correct?

17      A.   Yes.

18      Q.   So how would the worker know that to have an

19      application placed as one that's entitled to be

20      denominated as expedited service as opposed to a

21      regular application?

22            MS. MCGRAW:  Objection, outside the scope.

23            Don't answer the question.

24            MR. COHAN:  Okay.  I think we're going to

25      call the magistrate judge or judge assigned to

Exhibit C

1      Q.     -- and available in the form it is.

2      A.     Great.

3      Q.     Thanks.

4      A.     So this answer is in reference to the --

5      just to be very clear --

6      Q.     Yes.

7      A.     -- to the report that -- the December 11th

8      report that we have in front of us.

9      Q.     Yes, ma'am.

10     A.     Okay.  Once the District was -- understood

11     that the initial submissions and the way that the

12     data that was required in order to complete the

13     366B was incorrect, there was a process by which

14     ESA worked with the DCAS reports team to fix the

15     DCAS report that would generate accurate data that

16     pertains to the certifications section of the

17     report.

18          That entailed an iterative process and --

19     and a sampling of cases to ensure that the

20     report generated was accurate and correct, and

21     to identify where there were errors prior that

22     led to data that was originally submitted being

23     incorrect.

24          Once there was confidence and surety,

25     through a great degree of sampling by both the

Exhibit C

1          DCAS team and the data analysts in managing

2          this process, and the revised DCAS report was

3          complete, the data was then compiled and

4          provided to the OCFO to re-submit to FNS.

5          Q.    Thank you very much.  That was very

6          comprehensive.  I want to go to the last thing you

7          said.  You said the data was then compiled.

8                And the -- so can you tell me the process

9          for compiling that data?

10         A.    So that data would then be generated and the

11         report that we talked about from the reports team

12         and provided to Won-Ok Kim.  Won-Ok would provide

13         that information, possibly through OPRMI, again,

14         to the OCFO, and the OCFO would contact FNS, who

15         was aware that we were working on correcting our

16         366B.

17               FNS rejects the prior report because it

18         was erroneous, which opens up the opportunity

19         for the OCFO to submit the accurate -- the

20         revised data.  And that is how that data was

21         submitted.

22         Q.    So as part of the process for compiling the

23         FNS-366B reports, am I correct that somebody would

24         query DCAS to determine the number that was used

25         to populate, for example, cell 3-A?

Exhibit C

1           difference in how these two reports were compiled

2           that results in the different numbers, if any?

3           A.    Yes.  So for -- are you asking -- you're

4           asking about -- I'm sorry, could you repeat?

5           Q.    Yes.  Sure.

6           A.    Are you asking about that cell?  Does your

7           question pertain only to cell 3-A?

8           Q.    It does not.  It pertains to all of the

9           information contained in the certification section

10          of the two reports.

11          A.    So could you, please, restate your question

12          in full?

13          Q.    Yes.

14                Can you, please, explain what

15          differences, if any, resulted from the process

16          of compiling these two different FNS-366B

17          reports that led to the numbers that are

18          reflected here being different?

19          A.    Yes.  So the -- in -- in the earlier report,

20          in Exhibit 3, the District was -- there were

21          several errors in the way the District was

22          calculating -- that the numbers were imported in

23          the certification section.  Those were corrected

24          and the accurate data was then updated and -- the

25          form was updated to include the accurate data in

Exhibit C

1          Exhibit 2.

2          Q.    And what were those errors?

3          A.    One related to the -- what is reflected in

4          what would -- the column that reads approved

5          overdue applications, that's column D for 1 to 30

6          days; column E, 31 to 60 days, approved overdue

7          applications -- E, 31 to 60 days, just to repeat;

8          column F, which is approved overdue applications

9          between 61 and 90 days; and column G, approved

10         overdue applications 91 plus days.

11              In the District's initial submission, the

12         report was calculated to include all

13         applications processed within 30 days of

14         filing, as opposed to starting on day 31.

15         That's the first area.  That's one.

16              Also, in initial applications, that would

17         be the cell that would be in the third row,

18         column A, instead of it being, as we talked

19         about, a combination of expedited and regular

20         applications, the initial submission in Exhibit

21         3 only included what was understood what DCAS

22         was pulling at the time as regular

23         applications.

24              In addition, there -- okay.  I'll keep

25         going.  So that -- so that's -- well, in

Exhibit C

1        addition, in the certification section,

2        initially some data was pulled from ACEDS for

3        the first ten days, which is the legacy

4        system -- it would be capital A-C-E-D-S, the

5        legacy system -- in an effort to reflect the

6        full quarter.  That was because the data was

7        not comparable and all the calculations could

8        not be completed with the ACEDS data that was

9        removed in the final submission.

10             In addition, there was an error in the

11        field that related to expedited applications.

12        So the initial report was not accurately

13        identifying which applications were regular and

14        which were expedited.  It was pulling from an

15        incorrect data field.

16             And finally, under recertifications, the

17        initial report excluded recertifications that

18        were performed during the 30 day grace period,

19        which is the 30 days after the recertification

20        is due.

21        Q.    Sorry, could you please repeat that last

22        statement?

23        A.    Sure.  In column D, line 4 under

24        recertifications, the initial report excluded SNAP

25        recipients who were certified within the 30 day

Exhibit C

1      Q.    Okay.

2      A.    -- that was -- that was -- that included

3      information that my staff provided to counsel

4      that -- and -- and -- but the final eyes on it

5      before it came to me were from counsel.

6      Q.    So in the information that staff provided to

7      counsel, to the best of your knowledge, did that

8      information exist within the Agency prior to being

9      provided to counsel?

10     A.    It did not.

11     Q.    So it was prepared specifically for counsel,

12     you believe?

13     A.    Yes, that is my understanding.

14     Q.    Okay.  So if we may return, you also

15     indicated that one of the reasons for the error in

16     Zeilinger 3 was that the system was not accurately

17     identifying which applications were regular and

18     which ones were expedited.

19          Can you, please, explain what that means?

20     A.    Yes.  So the report queries -- data fields

21     in DCAS, it was querying fields that were not

22     correctly distinguishing which cases were

23     expedited and which cases were regular in -- in

24     the initial -- in Exhibit 3.

25     Q.    Which fields should it have been querying?

Exhibit C

1    A.    I can't tell you that.

2    Q.    Do you know who would have greater knowledge

3    as to that than yourself?

4    A.    Yeah, the programmers.

5    Q.    Do you know why it was not querying the

6    correct fields?

7    A.    Because it was incorrectly -- the report had

8    an error in the way it was built.

9    Q.    And how do you know that it is correctly

10   querying the fields now?

11   A.    Because our team pulled sample cases to

12   ensure that it was correct in the corrected

13   report.

14   Q.    When was the sample pulled?

15   A.    It was pulled during the time in which

16   the -- that we referenced earlier, that the ESA

17   data analysts were working with the DCAS team to

18   correct the report.

19   Q.    Do you know which months -- which month or

20   months?

21   A.    That was then timed between when the

22   litigation was filed and our understanding of what

23   was incorrect and -- and when the report was filed

24   on December 11th.  I can't tell you the date they

25   fixed each problem though.

Exhibit C

1         Q.    I'm not asking you for the day they fixed

2         the problem.  I'm asking you for the date that the

3         sampling process took place.

4         A.    During the final -- that was -- during the

5         final phases of -- of that exercise.

6         Q.    Do you know if that was October?  November?

7         A.    No.

8         Q.    July?

9         A.    No.  But it would be more recent because

10        that's the -- because that was what they did to

11        check it to make sure it was right at the end.

12        Q.    Do you know how many cases were in the

13        sample that were pulled?

14        A.    I don't, but it was -- I do know that it was

15        considered --

16             MS. MCGRAW:  Objection, outside the scope.

17             But you can answer, if you know.

18             THE WITNESS:  Okay.  I don't know the exact

19        number.

20             BY MR. COHAN:

21        Q.    I believe you testified a little bit earlier

22        today that there was a great degree of sampling,

23        quote/unquote.

24        A.    It was statistically relevant.

25        Q.    I don't know what statistically -- I

Exhibit C

1          apologize, I don't know what statistically

2          relevant means, so could you explain?

3                    MS. MCGRAW:  Objection, outside the scope.

4                    You can answer, if you know.

5                    THE WITNESS:  So the -- no, I don't -- I'm

6          not going to speculate.  I think it's -- there's a

7          clear standard around what makes a significant

8          sample size and -- and the analysts working on

9          this ensured they had a statistically relevant

10         sample size.

11                   BY MR. COHAN:

12         Q.    But you don't know the size?

13         A.    But I don't know what that number is because

14         I'm -- I'm -- not being a statistician or -- and I

15         did not ask them to provide that to me.

16         Q.    So what information, if you know, is used to

17         determine whether the application should be

18         treated as an initial application or as an

19         expedited service application?

20         A.    It -- it would be reflected in DCAS what

21         type of application the resident was making and it

22         would -- they would rely on DCAS.  They would rely

23         on DCAS to -- that information that would be in

24         the DCAS system to distinguish what's regular and

25         what's expedited.

Exhibit C

1      Q.    And does that also apply to expedited

2      applications?

3      A.    Yes.

4      Q.    Would that also apply to the totals line on

5      the certification section of the 366B?

6      A.    Yes.

7      Q.    Can you identify for me where in your

8      Declaration you also explain the other errors that

9      you spoke about that led to the revision of

10     incorrect information in the earlier versions of

11     the 366B?

12          MS. MCGRAW:  Objection, outside the scope.

13          Don't answer the question.

14          BY MR. COHAN:

15     Q.    Do you recall testifying previously that one

16     of the reasons that the earlier version of the

17     366B contained errors is that it did not include

18     those instances where somebody was re-certifying

19     their eligibility and filed their application

20     during the 30 day grace period?

21     A.    Yes.

22     Q.    And is that issue reflected in your

23     Declaration?

24          MS. MCGRAW:  Objection, outside the scope.

25          Don't answer the question.

Exhibit C

1          BY MR. COHAN:

2          Q.    Is there anyplace in writing that that is

3     explained that I would be able to better

4     understand the explanation you've given?

5          MS. MCGRAW:  Objection, outside the scope.

6          You can answer, if you know.

7          THE WITNESS:  Yes.

8          BY MR. COHAN:

9          Q.    Where would that be?

10         A.    It was in partially what I reviewed in

11    preparation; and there's reference, general

12    reference, to that issue in the -- in my

13    Declaration.

14         Q.    In which paragraph?

15         MS. MCGRAW:  Objection, outside the scope.

16         Don't answer the question.

17         MR. COHAN:  Counsel, just to be clear, your

18    witness -- I'm trying to get further clarification

19    on an explanation of one of the bases for the

20    revision.  Your witness has identified, at least

21    in part, it being reflected in the Declaration.

22    I'm simply asking her to identify which paragraph

23    so that I can fully understand the basis of the

24    revision in what she's already identified as a

25    very technical form.

Exhibit C

1      Q.    Well, Ms. Zeilinger, what notices were

2      affected by the vendor error referred to in topic

3      four?

4            MS. MCGRAW:  Go ahead and answer.

5            THE WITNESS:  The 60 day recertification

6      notice for June of 2017 was that -- or that it

7      should have been mailed in June of 2017 is the

8      topic.

9            BY MS. MEZEY:

10     Q.    And if this notice said June 30th 2017

11     instead of July 31st 2017, would this notice

12     represent one of the notices that was affected by

13     this vendor error?

14           MS. MCGRAW:  Objection, outside the scope.

15           You can answer, if you know.

16           THE WITNESS:  I can speculate that it would.

17           BY MS. MEZEY:

18     Q.    So this is the -- this is the type of

19     notice, but for the dates -- but for the specific

20     dates that was impacted by this vendor error?

21           MS. MCGRAW:  Objection, outside the scope.

22           Don't answer the question.

23           MS. MEZEY:  Okay.

24           BY MS. MEZEY:

25     Q.    Could you tell me the process for producing

Exhibit C

1          with.

2                  Had any of those people, aside from your

3          counsel, spoken with the vendor about why this

4          error occurred?

5                  MS. MCGRAW:  Objection, outside the scope.

6                  You can answer, if you know.

7                  THE WITNESS:  Could you, please, restate the

8          question?

9                  BY MS. MEZEY:

10         Q.   Sure.  Did someone -- did someone in the

11         Agency who works under you speak to the vendor

12         about why this error occurred?

13                 MS. MCGRAW:  Objection, outside the scope.

14                 You can answer, if you know.

15                 THE WITNESS:  Someone in District Government

16         spoke with the vendor about the error.

17                 BY MS. MEZEY:

18         Q.   But you don't know if that person was in the

19         Department of Human Services or another agency?

20                 MS. MCGRAW:  Objection, outside the scope.

21                 You can answer, if you know.

22                 THE WITNESS:  This is a DCAS contract, so it

23         would pertain to -- and it was a failure to

24         fulfill the obligations in the contract.  So

25         certain functions are shared and, therefore, it --

Exhibit C

1          occurred as opposed to, for example, populating

2          the notice and then failing to press a button to

3          print them out or --

4                    MS. MCGRAW:  Objection, outside the scope.

5                    You can answer, if you know.

6                    THE WITNESS:  The vendor failed to act on

7          the information when it was provided to them.

8                    BY MS. MEZEY:

9          Q.    Do you know how many households were

10         affected by this error?

11         A.    Yes.  Approximately -- approximately 4500.

12         Q.    When did -- how did the Department learn

13         that this error had occurred?

14         A.    We learned when -- the very beginning of

15         September when our staff were seeing clients who

16         were coming into the center who had not received

17         notice and our systems were showing that that

18         notice went.

19         Q.    How many -- how many clients were -- how

20         many clients were coming in saying that they had

21         not received notice?

22                   MS. MCGRAW:  Objection, outside the scope.

23                   You can answer, if you know.

24                   THE WITNESS:  I don't know.

25                   BY MS. MEZEY:

Exhibit C

1        tried to determine who had not received -- well --

2        A.     Yeah.

3        Q.     -- why don't we ask it this way:

4               So you testified earlier that

5        approximately 4500 people did not receive the

6        notice, correct?

7        A.     Correct.

8        Q.     Okay.  And then is that the same number of

9        people who received the robocalls and mailings?

10       A.     No.

11       Q.     Okay.  So how many people received the

12       robocalls and mailings?

13       A.     That would be the balance of the people who

14       did not recertify, had not recertified by the --

15       at the point in which we began those robocalls.

16       So there were -- I think what you're getting at is

17       there were approximately 1000 people out of that

18       4500 who were certified on their own.  And the --

19       these are, you know, clearly not precise.  They're

20       approximations.

21       Q.     Sure.

22       A.     The balance of those people received

23       robocalls and the mailing.

24       Q.     Okay.  And so you said that -- so the 1000

25       people who recertified on their own, were these

Exhibit C

1        A.    Yes.

2        Q.    Okay.  And could you please read the -- the

3        lines that starts with print vendor at the bottom.

4        A.    Print vendor file processing issue.  A file

5        for recertification was not processed.  Impacting

6        3,049 SNAP recipients.

7        Q.    So does the 3,049 recipients reflect the

8        number of people -- of -- well, let me ask this:

9              Is this recipients or households?

10             MS. MCGRAW:  Objection, outside the scope.

11             You can answer, if you know.

12             THE WITNESS:  I don't know.

13             BY MS. MEZEY:

14       Q.    Okay.  Does this 3,049 figure represent the

15       people -- the -- the number of people who were

16       affected who didn't receive notice or just the

17       number of people who didn't recertify on their

18       own?

19       A.    I don't know.

20             MS. MCGRAW:  Objection, outside the scope.

21             You can answer, if you know.

22             THE WITNESS:  I'm sorry.

23             MS. MCGRAW:  It's okay.

24             THE WITNESS:  I don't know.

25             BY MS. MEZEY:

Exhibit C

1        within -- within -- within a week.

2        Q.    Within a week, okay.

3              And, again, just directing your attention

4        to the people who did not receive notice and

5        did not recertify on their own, did those

6        individuals lose their SNAP benefits?

7        A.    Not necessarily.

8        Q.    Did they lose them for some period of time?

9              MS. MCGRAW:  Objection, outside the scope.

10             You can answer, if you know.

11             THE WITNESS:  Likely.

12             BY MS. MEZEY:

13       Q.    Okay.

14       A.    But they would have been reinstated if they

15       came in within the grace period.

16       Q.    Okay.  I want to come back to the grace

17       period in a minute.

18             You said that the Agency was producing

19       regular reports.  Were those internal reports?

20             MS. MCGRAW:  Objection, mischaracterizes

21       prior testimony.

22             You can answer.

23             MS. MEZEY:  Could you -- let me rephrase.

24             BY MS. MEZEY:

25       Q.    What did you mean when you said that the

Exhibit C

1       A.   It is my understanding that the staff at the

2      Department was in -- monitoring the degree to

3      which people we were reaching were coming in to do

4      their recertifications.  They were relying on data

5      to know that those -- from DCAS -- to know at what

6      pace and what number of people we had reached do

7      that with throughout the month.  And I don't know

8      exactly who or how precisely that took place, only

9      that there was a process by which they were

10     understanding that.

11     Q.   And who at DHS was in charge of that

12     process?

13     A.   It --

14        MS. MCGRAW:  Objection, outside the scope.

15        You can go ahead and answer, if you know.

16        THE WITNESS:  It would have been under the

17     supervision of Anthea Seymour.

18        BY MS. MEZEY:

19     Q.   So someone within ESA?

20     A.   Yeah.

21     Q.   Okay.  And what was the -- what was the

22     final number?  How many people -- how many people

23     did -- who you had contacted -- did come in and

24     recertify by the end of the month?

25     A.   So 63 percent of the people who we contacted

Exhibit C

1       completed their recertification during the grace

2       period.  Inclusive of the people who had done

3       that who we didn't contact, 72 percent of the

4       recipients who needed to recertify were certified

5       all together by the end of the grace period, which

6       I'll just add is higher than in normal months.

7       Q.    What is -- what is the --

8       A.    I don't have the precise average.  We

9       know -- we are -- but we know, looking generally

10      at patterns of recertification, that -- that there

11      is -- that that -- that that was high for us.

12      Q.    Okay.  Although generally, normally do you

13      do any sort of outreach to people to tell them to

14      re -- that they can recertify during the grace

15      period?

16              MS. MCGRAW:  Objection, outside the scope.

17              You can answer, if you know.

18              MS. MEZEY:  She testified that it's higher

19      than normal, so I'm allowed to explore.

20              MS. MCGRAW:  Objection, outside the scope.

21              You can answer, if you know.

22              BY MS. MEZEY:

23      Q.    Go ahead.

24      A.    Normally we send -- the way that we are --

25      the way that we are obligated to notify is through

Exhibit C

1      notices.  And we do that.  We -- this is not the

2      only instance that we have done reminders by

3      robocalls.

4      Q.    Okay.  What other instance is there that

5      you've done reminders by robocall?

6           MS. MCGRAW:  Objection, outside the scope.

7           Do not answer the question.

8           BY MS. MEZEY:

9      Q.    Ms. Zeilinger, you testified that this was

10     not the only time that you've done reminders by

11     robocall.

12          What -- what did you mean when you --

13     when you said that?

14          MS. MCGRAW:  Objection, outside the scope.

15          Do not answer the question.

16          BY MS. MEZEY:

17     Q.    Are the other 27 percent of individuals who

18     didn't recertify before the end of the grace

19     period, are they still without benefits?

20     A.    I -- I don't know.  It is possible that they

21     would have come in and made a new application and

22     I don't know how many may have done that.

23     Q.    Okay.  All right.  So let me -- so normally

24     during the grace period when you were -- you were

25     explaining to my colleague, Mr. Cohan, that during