```
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2
         - - - - - - - - - - - - - - - x
 3       SHONICE G. GARNETT, et al.,
                                        CA No:  1:17-cv-01757-CRC
 4              Plaintiffs,
                                        Washington, D.C.
 5       vs.                            Monday, March 19, 2018
                                        10:06 a.m.
 6
         LAURA ZEILINGER,
 7
                Defendant.
 8       - - - - - - - - - - - - - - - x

 9       _____

10                    TRANSCRIPT OF MOTION HEARING
            HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                    UNITED STATES DISTRICT JUDGE
         _____
12       APPEARANCES:

13       For the Plaintiffs:     MARC COHAN, ESQ.
                                 NATIONAL CENTER FOR LAW AND
14                               ECONOMIC JUSTICE
                                 275 Seventh Avenue, Suite 1506
15                               New York, NY 10001-6860
                                 (212) 633-6967
16
                                 LANCE MURASHIGE, ESQ.
17                               KAITLIN WELBORN, ESQ.
                                 HOGAN LOVELLS US LLP
18                               555 Thirteenth Street, NW
                                 Washington, DC 20004
19                               (202) 637-5457

20                               JENNIFER MEZEY, ESQ.
                                 CHINH Q. LE, ESQ.
21                               LEGAL AID SOCIETY OF D.C.
                                 1331 H Street, NW, Suite 350
22                               Washington, DC 20005
                                 (202) 661-5947
23
         (CONTINUED ON NEXT PAGE)
24
         Proceedings recorded by mechanical stenography; transcript
25       produced by computer-aided transcription
```

```
 1    APPEARANCES (CONTINUED):

 2    For the Defendant:       ESTHER YONG McGRAW, ESQ.
                               FERNANDO AMARILLAS, ESQ.
 3                             CONRAD Z. RISHER, ESQ.
                               OFFICE OF THE ATTORNEY GENERAL FOR
 4                             THE DISTRICT OF COLUMBIA
                               441 4th Street, NW, Suite 630 South
 5                             Washington, DC 20001
                               (202) 442-9887
 6

 7    Court Reporter:                  Lisa A. Moreira, RDR, CRR
                                       Official Court Reporter
 8                                     U.S. Courthouse, Room 6718
                                       333 Constitution Avenue, NW
 9                                     Washington, DC  20001
                                       202-354-3187
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  Your Honor, we're on the
 3      record for Civil Case 17-1757, Shonice Garnett, et al. vs.
 4      Laura Zeilinger, et al.
 5              Counsel, if you could please approach the lectern
 6      and identify yourselves for the record.
 7              THE COURT:  Don't be shy.
 8              MR. COHAN:  Yes.  Thank you.
 9              Good morning, Your Honor.  My name is Marc Cohan.
10      I'm with the National Center for Law and Economic Justice.
11      I'm one of the attorneys representing plaintiffs in this
12      matter.
13              THE COURT:  Mr. Cohan, how are you?
14              MR. COHAN:  I'm very good.  Thank you, Your Honor.
15              MS. MEZEY:  Good morning, Your Honor; Jennifer
16      Mezey from the Legal Aid Society of the District of
17      Columbia, also co-counsel for the plaintiffs.
18              THE COURT:  Ms. Mezey.
19              MS. MEZEY:  Thank you.
20              MR. MURASHIGE:  Good morning, Your Honor; Lance
21      Murashige from Hogan Lovells on behalf of the plaintiffs as
22      well.
23              THE COURT:  I'm trying to keep you all straight.
24      I don't usually get this many introductions.
25              MS. WELBORN:  Good morning; Kaitlin Welborn, Hogan
```

1   Lovells, for the plaintiffs.

2          MR. LE:  Good morning, Your Honor; Chinh Le from

3   the Legal Aid Society of the District of Columbia on behalf

4   of the plaintiffs.

5          THE COURT:  Mr. Le.

6          MS. YONG McGRAW:  Good morning, Your Honor; Esther

7   Yong McGraw on behalf of the defendant, Laura Zeilinger and

8   the District of Columbia, and with me at counsel table is

9   Fernando Amarillas and Conrad Risher.

10          THE COURT:  Okay.  Good morning, everyone.  I hope

11   you all didn't have too much trouble getting in the

12   courthouse today.  We're very busy.

13          Before we get started -- I know we have a good

14   deal of material to get through -- let me just try to frame

15   the issues from my perspective a little bit.

16          As I indicated in the minute order, I'd like to

17   spend the bulk of the time this morning discussing the

18   preliminary injunction motion, and I am mostly interested in

19   what standard I should apply in deciding both whether the

20   plaintiffs have shown a likelihood of success on the merits

21   with respect to whether there was a violation of the statute

22   or not and, B, in deciding whether an injunction should

23   issue on one or more of the plaintiffs' claims.

24          On the first question, whether there's been a

25   statutory violation, it seems fairly clear to me from the

1    case law that the statute requires strict compliance with

2    the applicable time limits, and no one has suggested here

3    that the District has achieved 100 percent compliance with

4    any of the relevant time limits; but on the second question,

5    whether an injunction should issue, I don't think even the

6    plaintiffs would suggest that if the defendants had a 99

7    percent compliance rate with all of the deadlines that it

8    would be in the public interest to issue an injunction in

9    this case.

10          So, you know, the question I have is where the bar

11   should be set and, relatedly, what evidence I should rely on

12   in deciding whether that standard has been met.

13          Now, on that point, it strikes me that the most

14   current data in the record -- and the data that the

15   discovery period in this case was designed to bring

16   forward -- are the FY 2017/Q1 2018 quarterly reports to FNS,

17   and what I read that data as showing, facially at least, is

18   that the District's processing of initial applications, both

19   the standard applications and the expedited applications, is

20   not only improving but is currently at the 95 percent level

21   that FNS deems to be acceptable nationally.  So my

22   overarching question to the plaintiffs would be why placing

23   DHS under a court injunction with the possible sanction of

24   contempt for noncompliance is necessary and in the public

25   interest at this juncture.

1          But on the other hand, that same data seems to

2     suggest that DHS is lagging in the processing of

3     recertification applications by a fairly substantial amount

4     below FNS's 90 percent threshold for corrective action

5     plans, and so the overarching question I would ask the

6     District is, why wouldn't an injunction be appropriate to

7     remedy what appears to be continuing deficiencies in that

8     particular area.  Okay?

9          Why don't we start with the plaintiffs.

10          MR. COHAN:  Thank you, Your Honor.

11          THE COURT:  You're welcome.

12          MR. COHAN:  With the Court's indulgence, the way

13     plaintiffs have divided the argument is I will speak to the

14     questions you've identified as part of the preliminary

15     injunction issue.  As to those questions the Court may have

16     as to either individual named plaintiffs or as to the notice

17     claims, Jennifer Mezey, with the Legal Aid Society, would

18     speak to those.

19          Your Honor indicated that you don't anticipate

20     necessarily having many in the way of questions as to class

21     certification, but in the event that you do, Mr. Murashige

22     with Hogan & Lovells would be the person who would be in the

23     best place to answer those questions.

24          THE COURT:  Great.

25          MR. COHAN:  Turning to the questions and the

1    framing that the Court set forth, we agree, of course, with

2    the Court that the standard for ascertaining whether or not

3    the defendants have met the requirements of 7 USC 2020(e)(3)

4    and (e)(9) is one of absolute compliance, and we also agree

5    with the Court that if defendant were at this point

6    appearing before this Court at 99 percent or 98 percent, we

7    would certainly not be here.

8              We're here because we believe that the evidence

9    demonstrates that as to both initial applications and as to

10   recerts the defendant is considerably below the standard of

11   what the Court requires.

12             So let me turn, if I may, first --

13             THE COURT:  The standard of what the statute --

14             MR. COHAN:  What the law requires.  What the law

15   requires.  I apologize.

16             As to -- let me turn, if I may, though, to the

17   initial applications first.

18             We would suggest that the FNS-366B is not the

19   correct tool to use to measure defendant's compliance with

20   the timely processing of initial applications.  As set forth

21   in the reply to defendant's response to our motion for

22   preliminary injunctive relief, the FNS-366B was filled out

23   incorrectly the first time around and is still filled out

24   incorrectly.  But before I go into the question -- into

25   explaining why the 366B is an unreliable measure, even if we

1    were not able to demonstrate that, the defendant actually

2    acknowledges that it's not meeting the timely processing

3    requirements for initial applications, and we should take

4    the defendant at their word.

5           Basically the defendant seems to have two stories

6    they want to tell.  They have one story they want to tell

7    plaintiffs and this Court in which they allege that they are

8    meeting a certain performance level.  They have a different

9    story they tell to FNS, and that story is best demonstrated

10   by a document that we sought to ask this Court to have

11   admitted as a supplemental exhibit in support of the motion

12   for preliminary injunctive relief.

13          And I refer this Court, Your Honor, to document

14   ECF 50-4.  This is a document generated by defendant dated

15   December 14, 2017.  It's in response to FNS's finding that

16   the defendant is failing to meet the processing requirements

17   for initial applications.

18          FNS found that defendant was at the upper bound of

19   the -- based on FNS's sampling protocol, at the upper bound

20   of 88.45 percent.  It actually found that defendant was

21   closer to 79 percent in terms of timely processing of

22   initial applications, but because FNS has a -- acknowledges

23   that there is a sampling interval --

24          THE COURT:  Okay.  Let's --

25          MR. COHAN:  Please.

1          THE COURT:  -- pin that.  That 79 percent number

2     was based on a sampling of 80-some-odd cases.  What evidence

3     is there that that sample was limited to initial

4     applications as opposed to also including recertifications?

5          MR. COHAN:  Yes, Your Honor.  The evidence of that

6     is that when -- is the FNS sampling protocol, which is set

7     forth in federal regulation.  Under the terms of the

8     sampling protocol that FNS engages in, they are looking at

9     two things to determine the sampling frame, if you will.

10    The first thing they look at is applications that were

11    approved, and then they look at initial applications.  They

12    do not look at recertifications.  They do not look at denied

13    applications.  They only look at initial approved

14    applications.

15         THE COURT:  Okay.  And just so that I'm following

16    this --

17         MR. COHAN:  Yes, please.

18         THE COURT:  -- where in the record does it

19    establish that?

20         MR. COHAN:  I am not positive it's in the record

21    itself.  It's actually in the federal regulations, which we

22    can easily provide to the Court --

23         THE COURT:  Okay.

24         MR. COHAN:  -- and the subregulatory material FNS

25    generates in terms of its QC protocols.

1          THE COURT:  Why would they exclude recertification

2     applications?

3          MR. COHAN:  Because under the -- two reasons, Your

4     Honor.  First, under the purpose of the sampling, they're

5     looking to determine initial applications going into the

6     population of data because they have, as part of their

7     federal QC requirements, to look at a single data element,

8     and that single data element is initial applications, and

9     that's what they use to measure two things.

10         Number one, whether the states and the districts

11    must, in fact, improve; also whether or not the states and

12    the districts are entitled to a performance bonus, and

13    certain states, in fact, perform so well that they're

14    entitled to a performance bonus.  As a chart that one of the

15    exhibits in this record indicates, some states were in fact

16    at 100 percent or 101 percent because of the use of the

17    upper bounds.

18         The other reason is that, as a practical matter,

19    the recertification question, as defendant correctly notes,

20    is one that involves different moving parts that FNS has

21    not -- has made a decision for administrative ease to not

22    look at.

23         So FNS wanted to get at the recertification data,

24    and that's why it uses the 366B in order to be able to get

25    at that data.  This is an administrative choice made by the

1      agency, and it's one that's incorporated both in their

2      regulation and in the quality control measure.

3                  THE COURT:  Okay.

4                  MR. COHAN:  FNS was aware --

5                  THE COURT:  So what's your point with respect to

6      the December 14th letter?

7                  MR. COHAN:  So the point in regard to the December

8      14th letter, Your Honor, is if you take a look at the last

9      paragraph.  The District acknowledges that based on FNS's

10     October 23, 2017, letter, which requires a corrective action

11     plan, the -- because the District, based on the August

12     reporting of the data for the period from September 1st

13     through March 30th, was not meeting its timely performance

14     requirements, that the District had to submit a corrective

15     action plan.  FNS found that corrective action plan to be

16     insufficient and has -- and the District agreed to do

17     additional improvement.

18                  So in the last paragraph the District informs FNS

19     that "Our plan includes reports to demonstrate progress as

20     we work towards 95 percent ATP" --

21                  THE COURT:  Okay.

22                  MR. COHAN:  This is in December.

23                  -- "and with these initiatives and the careful

24     monitoring of effectiveness of DCAS, we can reach our goal

25     of 95 percent one year from the date of the CAP approval."

1        So this assumes that even if the CAP was approved

2   the next day, December 15th, which we have no evidence it's

3   been approved yet, that the earliest that the District is

4   promising to reach 95 percent is one year from that date.

5   That would be December 15, 2018.

6        THE COURT:  Okay.  And same question, what

7   evidence in the present record is there that when the

8   District sets a goal at 95 percent, that does not include

9   the recertifications as well?

10        MR. COHAN:  Because this is in response to the

11   finding by the -- by FNS that they have failed to meet.

12        THE COURT:  The 89 percent finding?

13        MR. COHAN:  That's correct.

14        THE COURT:  Okay.  So they would have -- the

15   District would have to know that that finding was limited

16   to -- would have to appreciate that that finding was limited

17   to --

18        MR. COHAN:  Yes; that is correct, Your Honor.

19        THE COURT:  -- initial applications, okay.

20        MR. COHAN:  And, you know, the District -- what's

21   interesting about this is the District had two choices.  The

22   District could have -- so -- I'm sorry, if I may, then

23   turning your attention to Document 50-5, and at that point

24   the FNS response to the District is basically saying, "We

25   are writing a response to the draft Corrective Action Plan

1   submitted designed to improve," and it says, "We have

2   reviewed the material and cannot accept the plan at this

3   time as is.  We find that it contains insufficient detail to

4   be approved."

5          And it basically says, at a minimum, the

6   corrective action plan should include an analysis of the

7   root causes of the timeliness issue and the steps we'll take

8   to address these root causes, and milestones for achieving a

9   95 percent application process timeliness rate one year from

10  the date of the CAP approval should also be included in the

11  CAP.  And then it speaks in terms of monitoring application

12  timeliness is critical.

13         So this is all relating to the FNS's relationship

14  with the District in terms of the requirement of the

15  District to process initial applications timely.  And,

16  again, the -- all of this is set forth in great detail in

17  federal regulations that defines, number one, what the

18  quality control process is and, number two, what the

19  District must do in the event that the quality control

20  process is not met.

21         Because we were submitting these records to --

22  these documents to supplement the record, we did not brief

23  extensively what those QC requirements are, but we'll be

24  glad to submit a short letter to the Court after this

25  argument, if the Court wishes.

1          THE COURT:  Okay.  These documents were produced

2     in response to a FOIA request.  Is that --

3          MR. COHAN:  Yes, that is correct, Your Honor.

4          THE COURT:  And were they just recently received?

5     It's January 30, 2018.

6          MR. COHAN:  That is correct, Your Honor.

7          THE COURT:  And that's why they're not in the

8     record?

9          MR. COHAN:  Yes, that is correct.

10          THE COURT:  Okay.

11          MR. COHAN:  And what is also interesting about the

12     January 30, 2018, letter is that the -- FNS goes on to say

13     to the District that monthly reporting is required, and

14     what's significant about that is the District, in our

15     experience across the country, is the only food stamp

16     program that does not have monthly reporting to be able to

17     determine the timely processing of applications.  That's

18     critical both as a way of being able to demonstrate

19     compliance with the law, but it's also critical --

20          THE COURT:  Haven't -- aren't there scores of

21     biweekly reports in the --

22          MR. COHAN:  The biweekly reports that they produce

23     are reports that go -- that look at individual cases,

24     handfuls of cases, to be able to engage -- understand where

25     some issues may have gone wrong as they're rolling out the

1    DCAS.

2              This is sort of --

3              THE COURT:  But they're tracking backlogs and

4    failed applications.  I mean, they seem to be plenary in

5    some senses, correct?

6              MR. COHAN:  Some sense, but as they assert, for

7    example, as to the failed submissions, that those failed

8    submissions don't give them information, according to

9    defendant, as to whether or not those applications are

10   timely or not because they assert that's only tracking the

11   effectiveness of the DCAS system.  They assert that workers

12   will then manually enter those failed applications into the

13   system.

14             Our point is that openly what they need is whole

15   population data that tracks an application from the date of

16   submission to the date of either approval or denial to see

17   whether or not it meets the 30-day standard.  FNS has

18   amended its own regulations that require that very monthly

19   monitoring reporting at 7 CFR 272.15(b), and defendants are

20   not meeting that monthly reporting requirement --

21             THE COURT:  Okay.

22             MR. COHAN:  -- which is why the letter requests --

23             THE COURT:  That's a little too far into the

24   weeds, and maybe I --

25             MR. COHAN:  Fair enough, Your Honor.

1          THE COURT:  But let's back up.  Your point

2     regarding the 90 to 95 percent compliance rates that are

3     reflected in the quarterly reports to FNS is that they are

4     not -- for initial applications and expedited applications

5     is that they are not to be believed because the District is

6     telling the FNS in response to the corrective action plan

7     mandate that it won't be able to get to 95 percent for

8     another year.  Is that the point?

9          MR. COHAN:  That's one part of the point, Your

10    Honor.

11         The second part of the point is that -- and that

12    circles back to the problem we have with the 366Bs, the

13    366Bs being submitted to the Court, both the revised ones

14    and the most recent one.  The revised ones would indicate

15    the defendant is performing far above the findings of FNS.

16    The most recent report submitted, the most recent quarterly

17    also indicates that as to initial applications they are

18    performing far above the rate found by FNS.

19         As to the initial --

20         THE COURT:  But the last -- as you say, the most

21    recent data from FNS, that audit report that's a sample,

22    covers activity back in 2016.  So the quarterly reports that

23    are being submitted, there's a mismatch between the time

24    periods covered and the latest FNS audit.  Is that fair?

25         MR. COHAN:  Well, yes and no, Your Honor.

1          THE COURT:  So how can you compare those two

2     things?

3          MR. COHAN:  You can compare it very simply for two

4     reasons.  First off, the defendant, as part of its

5     submission in this case, submitted its revised 366Bs that

6     cover the exact same time period.  So if one were to compare

7     their revised 366Bs for the same quarters, their performance

8     is not --

9          THE COURT:  So that would be Q1 of '17 and Q2 of

10    '17.

11         MR. COHAN:  That is correct.

12         THE COURT:  Okay.

13         MR. COHAN:  So you can compare, and they're very

14    different.  That's number one.

15         Number two is -- again, what is most telling is

16    that defendant did not say to FNS -- when FNS said your

17    performance is below what it should be and you have to

18    submit a CAP, which is an extremely onerous activity,

19    defendant didn't write back and say, "Actually, we disagree.

20    We have whole population data in the 366B, which you wanted

21    us to submit, that shows at a very different performance

22    level."

23         You know, in this case, what would be the normal

24    conduct of somebody confronted with evidence that they're

25    not meeting their legal requirements, normally what somebody

1  would do, if they believed in their heart of hearts that

2  they were, is to say, "We think you're wrong.  You've got a

3  sample.  We've got full population data.  Here's our whole

4  population data.  Give us another chance to convince you

5  that we're actually meeting our legal performance

6  requirements, and we should not be subject to FNS sanctions

7  and possible withholding of administrative reimbursement

8  money."

9           They didn't do that.  They didn't -- they didn't

10  push back at all.  They immediately said, "You're right.

11  We're wrong.  We'll do a corrective action plan.  We need a

12  year."

13          You know, it's a very telling communication to FNS

14  that's wholly at odds with the defense that they're putting

15  forward in this lawsuit.  And I'm not surprised because, as

16  we pointed out in our reply to defendant's response,

17  defendant still did not complete the 366Bs correctly.  The

18  first time around they admitted they put in the wrong data

19  in the wrong columns.  They misunderstood what they were

20  supposed to do.  During the course of the deposition the

21  director basically said thank you to plaintiffs for pointing

22  out that the 366Bs were in error.  They went back.  They

23  took a look.

24          And so one of the questions that I asked the

25  director during the course of the deposition was what data

1    got entered into the various squares as to initial and

2    expedited and 30-day applications, and she says, "We listed

3    the applications based on filing date."  So from her point

4    of view -- for example, if you look at the most recent

5    exhibit that is submitted at ECF 48-2, which is dated

6    January 31, 2018, defendant says the numbers that are in

7    these columns under initial application --

8            THE COURT:  Hold on.  This is one of the reports?

9            MR. COHAN:  Yes, Your Honor.

10           THE COURT:  Let me get on the same page.

11           Okay.

12           MR. COHAN:  Okay.  So during the course of the

13   deposition, Your Honor, defendant testifies -- and they

14   produced the director as their 30(b)(6) witness, and she

15   testifies that what the District did is it entered into the

16   columns for initial applications and for expedited

17   applications, applications based on date of filing.  So from

18   her testimony what the District did is that represented in

19   this quarter, from October 2017 through December 2017, are

20   applications filed during that quarter.  What FNS requires

21   is this to be applications processed during the quarter.

22           Why does that -- why that distinction?  Because if

23   it's applications that are processed during this quarter,

24   you have the results of all application determinations in

25   the period from October 1, 2017, through December 31st.  On

1    the other hand, if you only list applications that were

2    filed in the quarter, those applications that were filed in

3    the latter part of the quarter -- for example, applications

4    filed in December -- if they're late, they're not going to

5    be picked up in this document at all.

6            So this is not an accurate way of being able to

7    collect data.

8            THE COURT:  But if you look at multiple quarters,

9    isn't that all going to come out in the wash?  Because

10   you're capturing some and leaving out the others, and if you

11   take a longer-term view, at some point they're all going to

12   get captured.

13           MR. COHAN:  It would, except that would assume

14   that you were picking up in the later quarters the

15   determinations.  If all you're ever doing is tracking

16   applications filed in the quarter, you would -- if that

17   application was not filed in a subsequent quarter, it would

18   never be picked up again.  It's completely off the

19   District's radar screen for reporting on the 366B because

20   this is reporting only on applications filed in the quarter,

21   according to the director's testimony.  A very critical

22   distinction.

23           The determinations, which is why FNS requires it

24   to be done based on determinations, would address Your

25   Honor's observation, because if an application should have

1   been filed -- I'm sorry, should have been processed in

2   October, but it wasn't, it didn't get processed until

3   January, then it would get picked up on the January report

4   because it's a report on decisions made, determinations,

5   timely determinations.  This is only tracking applications

6   filed.  It also -- therefore, we don't know anything about

7   applications that were pending at the time that this report

8   was prepared.

9          So given a choice between weighing the veracity of

10  a 366B where defendant admits using a faulty methodology or

11  weighing the fact that FNS found a failure to timely comply

12  and defendant, given a choice, did not push back against

13  that finding but basically allocuted to the finding, to use

14  sort of a criminal analogy, and said, you know, "Tell me the

15  penalty we have to suffer in order to be able to get out

16  from under a worse penalty," that's a very telling statement

17  against interest by the part of the government or the

18  defendant, in this context, and we think it's one that this

19  Court is entitled to give great weight to.  And it also

20  makes sense because it sort of strains credibility --

21          THE COURT:  Is there another FNS audit scheduled

22  any time soon?

23          MR. COHAN:  Pardon?

24          THE COURT:  Is there another FNS audit scheduled

25  any time soon?

1          MR. COHAN:  We don't know -- there will probably

2     be another FNS audit that would result as part of their

3     review of the corrective action after the corrective action

4     plan has been approved and in place, but we don't know the

5     timing on that, and, since defendant has said they need

6     until December of 2018 to be able to improve their

7     performance, we just don't know.

8          THE COURT:  Let's take a step back.  Assume I

9     agree with everything that you just said and that the most

10    relevant statistic is the 89 percent compliance rate as

11    found in the last FNS audit.  Why isn't that -- why wouldn't

12    that be good enough given that they are under supervision by

13    FNS; there's a corrective action plan; they're working

14    towards getting better?  Even if you don't take the absolute

15    statistics in the quarterly report, there seems to at least

16    be an upward trend regardless of what methodology is used.

17         Why would the public interest be served in

18    imposing an injunction, or why would an injunction be

19    necessary to get them from 89 percent up to 95 percent?

20         MR. COHAN:  Well, two things, Your Honor.  We

21    don't agree that 95 percent is, in fact, the standard to

22    which they should be held accountable.  Under, for example,

23    the case law in *Withrow v. Concannon* out of the Ninth

24    Circuit and out of *Haskins v. Stanton*, Seventh Circuit, and

25    other cases, that basically defendants should be required to

1     process applications absolutely except for those individual

2     isolated failures that are inevitable in any large

3     bureaucracy, but what they should be doing is focusing on --

4            THE COURT:  Even if the federal agency that

5     oversees compliance has -- would deem that level of

6     compliance to be acceptable nationally?

7            MR. COHAN:  Yes.  And that's both because FNS --

8     FNS has a very different role in this entire process than do

9     plaintiffs.  FNS has a responsibility, as an administrative

10    agency, to ensure that the federal food stamp program

11    dollars are being spent appropriately.  They want -- they

12    set certain benchmarks.  They set certain parameters.

13           THE COURT:  And they can withdraw dollars.

14           MR. COHAN:  Pardon?

15           THE COURT:  They can withdraw dollars.

16           MR. COHAN:  They can.

17           THE COURT:  Why isn't that an effective hammer or

18    incentive for compliance?

19           MR. COHAN:  As the Court pointed out in *Withrow v.*

20    *Concannon* and as the Court also pointed out in *Briggs v.*

21    *Bremby*, it's basically the death knell of an agency.  If

22    they withdraw money from an agency, it's administrative

23    dollars.

24           The federal food stamp dollars are 100 percent

25    federal money.  So the only money that goes directly to

1    defendant is the administrative dollars.  If FNS takes that

2    away, the agency, for all intents and purposes, cannot keep

3    staff going in order to -- so FNS views it, quite correctly,

4    as a draconian remedy.

5            Instead, as the Court has found in *Withrow* and in

6    *Briggs*, plaintiffs have a very different interest at stake.

7    Their interest -- you know, we're talking numbers.  We're

8    talking percentages.  What this case is openly about is low-

9    income families that cannot put food on the table, and the

10   Court has recognized that that stake gives plaintiffs an

11   interest in a more vigorous, more robust remedy than FNS

12   might impose.  It gives defendant -- I'm sorry, it gives

13   plaintiffs a strong interest in holding the feet to the

14   fire.

15           So that's why, for example, in *Briggs v. Bremby* in

16   the District Court of Connecticut, even though FNS was

17   involved in corrective action, the Court issued a

18   preliminary injunction requiring defendant to submit its own

19   corrective action plan to the Court demonstrating how it

20   would get above 95 percent.  That was affirmed by the Second

21   Circuit.  FNS submitted an amicus to the Second Circuit

22   indicating that FNS is fully comfortable and appreciates the

23   sort of role that plaintiffs can play in a case like this --

24   food stamp applicants and recipients -- to hold a state's

25   feet to the fire.

1          This sort of parallel tracks, if you will, Your

2     Honor, and that's why we believe here, to mitigate the

3     harm -- I mean, the harm we're talking about --

4     notwithstanding defendant suggesting there is no harm

5     because they basically want to somehow shift the blame to

6     plaintiffs' counsel or plaintiffs themselves or a vendor or

7     a third party, the bottom line is the harm has been

8     recognized by every court to look at this as being profound,

9     serious, and irreparable.  It's people going hungry because

10    they don't get food.

11          This is -- FNS has its own regulations.  Congress

12    has said something very unique in the context of the food

13    stamp program.  Congress has said in a statute that you have

14    to feed certain hungry people within seven days of

15    application.  So that, to us, is a very strong, very

16    particularized mandate.  The rest of the population may be

17    able to wait 30 days, but certain folk must be fed within

18    the seven days.

19          One of the issues that is embedded in the FNS

20    quality control process is they don't even drill down into

21    the difference between expedited and regular.  So we would

22    certainly want -- as part of the corrective action plan, we

23    would ask this Court to direct defendant to submit how it's

24    meeting the requirement for expedited households as well.

25          So what we would be asking this Court to do, and

1      we believe it's appropriate under the circumstances, is to

2      submit a corrective action plan within 30 days giving

3      plaintiffs an opportunity to comment that demonstrates how

4      they will meet absolute compliance within 90 days of the

5      date that this Court issues its injunction and to

6      demonstrate, either through statistically significant random

7      sampling or whole population data, how it is meeting the

8      requirements of the court order.  That is relief that has

9      been routinely granted by other courts in one form or

10     another around this country addressing these kinds of

11     systemic failures.

12                 And it's not -- you know, the notion of the

13     monthly monitoring -- again, this is the only district that

14     does not produce monthly monitoring in the entire country,

15     that we're aware of, so they should certainly be doing that.

16                 THE COURT:  And you're requesting that relief in

17     the form of a preliminary injunction?

18                 MR. COHAN:  Yes, Your Honor.

19                 THE COURT:  Not just a permanent injunction.

20                 MR. COHAN:  That is correct, because we believe

21     there's urgency here that -- again, because the

22     irreparability of harm, the hungry families that are at

23     stake, that we believe this Court should act.

24                 We believe there may be additional or appropriate

25     relief that would come out in the course of a permanent

1   injunction, but at this point we believe we've established a

2   likelihood of success on the merits.  Certainly there is

3   irreparability of harm.  We believe both of those together

4   weigh in favor of the public interest.

5          As the Court observed in *Haskins v. Stanton*, the

6   requirement to comply with the food stamp program is not

7   imposed by the Court.  The requirement to comply is imposed

8   by the statute.  We're asking the Court to impose -- to

9   enforce that requirement, not to impose it.  And we believe,

10  again, because of the urgency involved, that this Court

11  should act expeditiously, and we would -- again, we briefed

12  this extensively and can certainly supplement with any

13  questions the Court has, but every court that has addressed

14  this where there has not been a settlement has issued a

15  preliminary injunction when it has made a finding of

16  liability, and we believe here there is that finding of

17  liability.

18         THE COURT:  Okay.  Let's just -- I want to go back

19  to these numbers for a minute --

20         MR. COHAN:  Please.

21         THE COURT:  -- because I think it's pretty

22  critical.  I mean, while, you know, I've read the

23  declarations that your individual clients have submitted, I

24  sympathize with them.  I think that they are troublesome in

25  some respects, particularly having to stand in line -- you

1    know, show up at 3:00 in the morning and stand in line and

2    the like, but I don't see any other way in deciding this

3    question than to do it in gross based on, you know,

4    statistical compliance, and so the numbers, I think, are

5    important.

6         And if I'm hearing you correctly, your two

7    arguments as to why the reported 95 percent recent

8    compliance rates cannot be believed and your argument that

9    you will be able to prevail on the merits in showing that

10   those numbers are not to be believed are, one, the

11   inconsistencies with what the District has told FNS and,

12   two, the fact that they don't include or they only include

13   applications that were processed in that quarter, not

14   applications that were filed in that quarter.  Is that fair?

15        MR. COHAN:  If I may correct that just a little

16   bit, Your Honor.  As to the second part, it's -- they

17   include only applications filed in the quarter.

18        THE COURT:  Filed in the quarter.

19        MR. COHAN:  Not determinations made in the

20   quarter, which we think is critical.

21        The other thing is --

22        THE COURT:  And is there any basis for estimating

23   how the numbers would change if they considered filed

24   applications as opposed to simply determinations?

25        MR. COHAN:  We do not know, if by doing it wrong,

1    how much they've skewed the data.  However, we do have a

2    data point.

3              THE COURT:  And is it 1 percent?  Is it 5 percent?

4    Is it 10 percent?

5              MR. COHAN:  It's impossible to know, Your Honor,

6    because what we would need to capture are those applications

7    that were filed and were still pending at the end of the

8    quarter, particularly those applications that were pending

9    that were untimely.  That's largely an unknowable.

10             The reason it's an unknowable is because the

11   District, unlike every other district in the country, does

12   not keep that kind of granular data.  It doesn't keep it as

13   a management tool.  It doesn't keep it to report to FNS.  It

14   doesn't keep it to inform itself in terms of how it's

15   performing.

16             What we do know is that if we -- the only reliable

17   data source that we have is one that is by an external

18   validator, FNS, that comes in and conducts its own review of

19   defendant's files, and defendant at that point doesn't

20   simply say, you know, "We disagree."  It makes basically a

21   statement against its own material interest by saying,

22   "We're going to take your results, and we're going to submit

23   a corrective action plan, and we're going to comply with

24   that corrective action plan."

25             When FNS comes back and says that corrective

1    action plan is not enough, we don't -- defendant has not

2    submitted anything to the Court saying to FNS, "Well, good

3    news, we're actually performing very nicely.  Thank you very

4    much.  Here's the corrected 366Bs that cover the same time

5    period."  Defendant is completely silent.

6              So I don't think that we should be putting a lot

7    of credit in 366B results the defendant is not even willing

8    to put forth before FNS, the oversight agency, and stand

9    behind.  I think that's a very critical thing to note here.

10             The only place they're using this data is in a

11   defensive crouch in litigation, which is --

12             THE COURT:  Okay.  I saw in the record some FNS

13   guidance as to how the numbers should be reported.  Does

14   that -- is there any guidance that speaks to how that -- how

15   those fields should be populated?  Whether they should

16   include just applications filed in the quarter or

17   applications processed in the quarter?

18             MR. COHAN:  Yes, Your Honor.  There is in the

19   record -- we do include as part of the record the FNS

20   guidance to the District and to the states about how to

21   properly fill out --

22             THE COURT:  Okay.

23             MR. COHAN:  -- the 366Bs, and if you can give me a

24   moment, one of my colleagues, I'm sure, will be able to give

25   us the ECF citation to that.

1           THE COURT:  That would be great.

2           MR. COHAN:  If I may turn, though, to something

3      else, where the Court asked about whether or not -- should

4      the injunction issue, and I would submit here, Your Honor,

5      that the injunction should issue for another reason in

6      addition to the irreparable harm in terms of the balancing

7      of interests, and that's that there is very little harm to

8      the defendant for the injunction issuing, but there is very

9      strong public interest in knowing that the government

10     agencies that are funded from tax dollars are, in fact,

11     meeting the requirements they're supposed to.

12          What we're asking the defendant to do is not to

13     divert resources, not to hire additional staff.  If they

14     choose to do that, that's their choice.  We're not asking

15     the defendant to do a new project or a new program.

16          What we're asking them to do is that which they

17     are already legally mandated to do under federal statute,

18     and how -- and we're perfectly prepared to even say to this

19     Court that if the Court orders them to submit a corrective

20     action plan demonstrating how they're going to do it, that

21     leaves to the defendant the opportunity to come forward and

22     figure out what its best tools are to be able to accomplish

23     that.  But we believe that a federal court order vests in a

24     person receiving it a far greater degree of seriousness or

25     an awareness of sort of the burdens that they're under.

```
 1              If you will, the old expression that a hangman's

 2    noose has the ability to focus somebody, the remedies that

 3    are available to report are far more surgical, far more

 4    nuanced, and frankly, for a defendant who refuses to comply

 5    with the Court order, far more concerning than the

 6    possibility that FNS might, years down the road, choose to

 7    withhold some percentage of administrative funding to which

 8    defendant could then appeal through a laborious and lengthy

 9    administrative process.  That process would take years,

10    Judge, where a court order would force them to address their

11    failure, which has been a persistent failure -- this is not

12    something new -- fairly quickly.  And it does not make sense

13    for this Court to issue an injunction only as to the

14    recertifications where defendant could somehow shift

15    resources away from the processing of initial applications

16    focused on recerts.  By covering the entire waterfront of

17    applications, we're ensuring that both initial applications,

18    expedited and 30-day, as was recertifications, are being

19    timely processed.

20              THE COURT:  I think this would be an easy case if

21    the numbers showed that they were in the 75/80 percent

22    range, as is the case in many of the cases that you've cited

23    and that I've read where injunctions have issued.  You know,

24    what I'm struggling with is what happens if you're in the 88

25    to 93 percent range, and I'm not sure we still have a real
```

1    stationary target as to what the rate actually is.

2              MR. COHAN:  I would say even if they were at 93

3    percent, 94 percent, this Court should issue an injunction

4    as the Second Circuit observed in *Robidoux v. Celani* where

5    the defendant was within basically 2 to 3 percent of

6    absolute compliance, that that --

7              THE COURT:  Give me that one again.

8              MR. COHAN:  Yes, *Robidoux* -- R-O-B-I-D-O-U-X --

9              THE COURT:  Yes.

10             MR. COHAN:  -- *v. Celani*, C-E-L-A-N-I.

11             And in *Fortin* -- F-O-R-T-I-N -- *v. The*

12   *Commissioner* out of the First Circuit, the Court addressed

13   the question of, you know, what -- the Court addressed the

14   question of absolute versus substantial compliance, and the

15   Court said it really didn't matter because, as a practical

16   matter, the defendant wasn't even meeting a substantial

17   compliance standard, and at that point the Court observed

18   that there was 3 to 4 percent noncompliance, well above a 95

19   percent threshold.

20             In *Briggs v. Bremby*, the Court imposed a 95

21   percent compliance -- that's Connecticut, also in the Second

22   Circuit -- and *Robertson v. Jackson* out of the Fourth

23   Circuit and *Hess v. Hughes* also of the Fourth Circuit.  The

24   Courts have imposed compliance standards where, again,

25   absolute compliance with a margin of error of somewhere in

 1    the neighborhood of about 3 to 4 percent to recognize those

 2    sort of inevitable failures to comply.

 3             So I think, Your Honor, that we would argue that

 4    the test really is not a hard numerical test.  The test at

 5    the end of the day is whether or not defendant is doing all,

 6    as *Withrow* points out, humanly possible to absolutely

 7    comply; however, for purposes of convenience at a

 8    preliminary injunction stage, we would argue that at a

 9    minimum we should be meeting the kinds of standards in cases

10    like *Fortin*, *Robidoux*, *Robertson v. Jackson*, and at a

11    minimum looking at a 3 to 4 percent margin of error.

12             So we would submit that even at 88 percent you're

13    talking about more than one out of your ten families that

14    are doing without critical food stamps.  We would argue that

15    that is just completely and totally an unsustainable

16    position for defendant to be in in terms of meeting its

17    obligations to needy households under the Federal Food Stamp

18    Act.  The benefit that's at -- you know, if this were a case

19    about whether or not people were getting homes painted, you

20    know, and deadlines were being passed over and somehow a

21    federal agency has an obligation to come in post-hurricanes

22    and do some, you know, revitalization of homes, and they

23    missed some deadlines -- you know, but food is food is food,

24    and, you know, that's part of why Congress has acted to

25    impose such a sharp seven- and 30-day requirement.

1            THE COURT:  Address the recertifications.

2            MR. COHAN:  Yes.

3            THE COURT:  What does the evidence show with

4    respect to the current status of the backlog of

5    recertification notifications?  I know there's this issue of

6    the vendor error, but sitting here today what can I draw on

7    to establish the District's compliance with the notice

8    provision of the recert standard?

9            MR. COHAN:  Well, as to the notice provision

10   question, if I may, I'd like to let Ms. Mezey speak to that.

11           THE COURT:  Sure.

12           MR. COHAN:  What I would like to, though, ask the

13   Court to also recall is at the outset the Court did observe

14   that the evidence in the record certainly indicates that the

15   defendant is not timely processing recertifications.  The

16   notice issue, in some respects, is separate and apart from

17   that because, if people don't receive notice of the

18   obligation to recertify, they often walk in the door as a

19   new applicant because all of a sudden their food stamps

20   stopped.

21           THE COURT:  I assume you're willing to rely on the

22   quarterly reports for the recert figures, huh?

23           MR. COHAN:  At this point, Your Honor, we're sort

24   of at a place where you are, that we don't know what other

25   data to rely upon because defendant does not produce

1    reliable data.

2          Defendant makes an argument that some degree of

3    those cases are cases where individuals may be at fault or

4    that they may, in fact, be ones where the defendant is being

5    very nice and allowing them to process late, but they have

6    no numbers they come up with.  They speculate.  And so even

7    as we point out in our reply, that if you give defendant the

8    benefit of the doubt that 50 percent of the delayed cases

9    were somehow the fault of the recipient or the fault of

10   somebody else, what you're stuck with is still 20 percent of

11   all the recertifications, according to defendant's own data,

12   are late.

13         One reason it doesn't matter whether or not the

14   defendant records the data in recerts but it does matter in

15   terms of applications is because you can have false

16   positives, but it's very hard to have false negatives in

17   this context.  So the fact that the defendant is reporting

18   such a high degree of nonperformance, I think they have to

19   live with the data that they're submitting to the Court as

20   proof of their own performance.

21         I would also suspect -- argue that it's highly

22   incredible that defendant could somehow be performing so

23   poorly in terms of recertifications and somehow so well in

24   terms of initial applications when they have a unified

25   system.  It's not as if they have one office over here

1    that's entirely dedicated to initial applications with its

2    own staff.

3            THE COURT:  Well, unless this vendor error

4    resulted in a huge number of backlogs that they've been

5    trying to work down since last summer.

6            MR. COHAN:  Right.  But the difficulty with that

7    is the testimony of the director that this represents

8    applications filed during the quarter.  If this were, you

9    know, determinations during the quarter, we would be

10   inclined to think there's that possibility because they're

11   finally getting to determinations that have been sitting out

12   there for months.  But the director's own testimony is these

13   are applications filed in the court of recertifications --

14           THE COURT:  But we went from 3,400 filed in Q1 '17

15   in 9,600 filed in Q2 '17.

16           MR. COHAN:  Right, absolutely.  That's because for

17   whatever reason they were not accepting applications for

18   filing.

19           THE COURT:  Right.  So now all of a sudden you

20   have the same number of people trying to process three times

21   as many applications, recertification applications.

22           MR. COHAN:  Right.  That may well be true, and by

23   this point --

24           THE COURT:  So naturally your rate might be

25   expected to go down.

1          MR. COHAN:  It might be expected to; it might not.

2     We just don't know.  That's the difficulty here.

3          This is a certain degree of speculation, but,

4     again, if it's an agency that's being overwhelmed by the

5     numbers, it cries for the need for an injunction under a

6     corrective action plan, and it also says to me there's no

7     reason to believe that the numbers as to initial

8     applications are trusted because, as a practical matter,

9     there is no way to know that the agency is operating two

10    separate shops.  It's just not credible.

11         And, Your Honor, I said we would supplement the

12    record as we went forward.  If Your Honor draws your

13    attention, if you would, to Paragraph 123 of Docket No.

14    31-1.

15         THE COURT:  You're testing my command of the

16    record --

17         MR. COHAN:  No, I'm not.

18         THE COURT:  -- or my ready access to it.

19         MR. COHAN:  I'm just hoping that one of --

20    somebody will make a notation in the record for you for

21    later, Your Honor --

22         THE COURT:  Yes.

23         MR. COHAN:  -- that Paragraph 123 of the

24    director's declaration in opposition to the preliminary

25    injunction sets forth the Web link to the instructions for

1    how to report the 366B data and then acknowledges in the

2    same paragraph that there were additional clarifications

3    offered six months after that.

4           So the defendant certainly is aware the 366B FNS

5    guidance informs the defendant of the requirement to report

6    applications determined, not applications filed.

7           THE COURT:  Hold on one second.

8           Okay.

9           MR. COHAN:  And if I may at this time, Your Honor,

10   ask Ms. Mezey to answer Your Honor's questions regarding the

11   recertification notices.

12          THE COURT:  Great.  Thank you very much.

13          MR. COHAN:  Thank you very much, Judge.

14          THE COURT:  Ms. Mezey, step right up.  How are

15   you?

16          MS. MEZEY:  I'm fine.  How are you?

17          THE COURT:  Okay.

18          MS. MEZEY:  I would also just like to note that we

19   have several of our plaintiffs and declarants in the

20   audience today.

21          THE COURT:  Okay.  Welcome, ladies and gentlemen.

22          MS. MEZEY:  So did Your Honor have specific

23   questions or --

24          THE COURT:  Well, I want to get a handle on what

25   the notice backlog is, and I wondered -- there are

1    references in the biweekly reports to a fairly limited

2    number -- I think 90 -- of current notice backlogs.

3              MS. MEZEY:  Uh-huh.

4              THE COURT:  And it is not entirely clear to me

5    whether all of those relate to notice of recertification

6    applications being due or whether there are some other

7    notices that may be included in that backlog.

8              MS. MEZEY:  Well, I think that in line with the

9    question --

10             THE COURT:  And even if it's the case that there

11   are 90 recert -- a backlog of 90 recert applications,

12   doesn't that show that there is improvement or has been

13   improvement recently in DHS's processing of recertification

14   applications?

15             MS. MEZEY:  Well, what we would submit, Your

16   Honor, is that the backlog is only a piece of the problem

17   with the sending out of notices of expiration as discussed

18   in our Claim 2, and with the Court's indulgence, I could

19   walk you through the various parts of the record where we

20   have evidence of systemic notice failures that also align

21   with our individual plaintiffs and declarants.

22             THE COURT:  That would be helpful.

23             MS. MEZEY:  So for people who were due to

24   recertify in July, this notice failure affected declarants

25   Christina Duncan, Ebony Coe, and Grant Lester, and at ECF

1    24-18, Page 31, the District reports to FNS, we had a job

2    failure to recertification notices which caused the notices

3    on 4/11 to fail.  So the notices are mailed out 60 days in

4    advance, so it stands to reason that that -- that part of

5    that notice failure included the recertification notices

6    that those three declarants did not get.

7         You mentioned the September error.  In a way, I

8    think the District is being misleading in referring to that

9    as a vendor error because the vendor, of course, is the

10   agent of the District, and if that particular error was due

11   to the vendor, it was made clear during the deposition of

12   Director Zeilinger that prior to that error occurring there

13   was very little oversight or monitoring to ensure that the

14   vendor actually sent out the notices, and that the District

15   didn't even learn of this vendor error until September,

16   after people had already lost their -- had already lost

17   their benefits.

18         THE COURT:  And the District has continued to

19   employ the vendor.

20         MS. MEZEY:  Correct.

21         THE COURT:  Okay.

22         MS. MEZEY:  Then, in October, when plaintiff

23   Kathryn Harris and declarant Diane Yancey and Bruce

24   Meraviglia lost their benefits, there was an outgoing

25   message on the customer service line, which is at ECF 33,

1    Pages 2 and 3, a declaration by my colleague, Chelsea

2    Sharon, that there was an outgoing message that said

3    something to the effect of, "If you lost your benefits for

4    failing to recertify by October, this was due to a technical

5    error.  We apologize."

6           At the same time, with Declarant Diane Yancey, who

7    is an elderly woman with multiple disabilities who went

8    without food because of this error, originally, when we

9    called the customer service line, we were told that her

10   notice had been mailed out, but then, when we went through

11   the administrative review conference, it was found that she

12   should not have had her benefits terminated because, and I

13   quote, SNAP notices were not mailed out to customers that

14   month.

15          And then to underscore the District's inability to

16   know that these failures had occurred, Mr. Amarillas, in the

17   December 2nd status conference before Your Honor, said that

18   the District didn't even know about this notice problem

19   until we had raised it in our motion for expedited

20   discovery.

21          Then we have Declarant Joseph Carver, who lost his

22   benefits -- well, was supposed to have lost his benefits in

23   December.  He got his benefits for December but then was

24   terminated in January, and at that point we had an admission

25   by a customer service representative that a lot of people

1    didn't get their notices that month, and at ECF 45-24, Page

2    5, the report to FNS, the District says, "We had a large

3    notice failure affecting benefit delivery for December 1st."

4         And then finally, Declarant Diamond Moore, a

5    single mother with five children, one of whom is a baby,

6    lost her benefits in January and at ECF 45-24, Page 5, there

7    was a notice -- there was a note of issues that had been

8    raised with October notices SNAP batches, and at 45-22-33

9    there was an October 31st failure of critical batch jobs

10   affecting notices.

11        So now that I've gone through all that, let me

12   back up a minute and tell you why we think that this is

13   all -- that this is all significant and to go back to your

14   question why the backlog is only a small piece of this.

15        What we discovered through the experiences of our

16   individual plaintiffs and declarants and the admissions and

17   other evidence of systemic error is that, first of all, the

18   District has a systemic problem with sending out notices.

19   Whether it's due to some error that the vendor committed,

20   whether it's due to some problem with DCAS, we don't know

21   because the agency is so untransparent.  But we know that

22   there is a problem, and it doesn't just affect our

23   individual people because we wouldn't have those admissions

24   and evidence of widespread notice failures.

25        The second thing which we learned in the

1    deposition from Director Zeilinger is that the DCAS system

2    only shows the date that a notice was sent to the vendor.

3              THE COURT:  And just let me stop you.

4              MS. MEZEY:  Sure.

5              THE COURT:  So you would agree, then, that the

6    standard I'm to apply is whether you have shown the

7    likelihood of success of proving that those recertification

8    notice issues are due to some systemic pervasive issue as

9    opposed to one or two isolated areas that are not likely to

10   recur?

11             MS. MEZEY:  Correct.  In my practice, we see

12   people all the time who have moved and they've either not

13   reported it to the agency or they've reported it and the

14   agency hasn't updated their address, all sorts -- or

15   problems with the mail, all sorts of problems like that.

16             THE COURT:  The District has responded to several

17   of the narratives that you've placed in the record with

18   reasons why particular individuals were not --

19             MS. MEZEY:  Correct, but one interesting thing,

20   which relates to what I had said before, is that in almost

21   all of these situations of the declarants and plaintiffs

22   we've read we have mentioned the District's response is that

23   they were sent a notice.

24             So Ms. Moore was sent a notice.  Mr. Carver was

25   sent a notice.  Ms. Yancey was sent a notice despite this

1    evidence of widespread failure.  And the reason for that, we

2    believe, is that their system does not show when the notice

3    actually gets mailed to the person.  It just shows that it

4    went to the vendor or that a notice was scanned into the

5    system.

6           But there's no evidence that the District has put

7    forward that that notice actually goes to the individual;

8    therefore, the District has no way of rebutting our evidence

9    that there were these widespread failures to send notices.

10          THE COURT:  Okay.

11          MS. MEZEY:  So in relation to -- so for Claim 2,

12   following on Mr. Cohan's presentation, we would similarly

13   say that Claim 2 would lend itself to this type of absolute

14   compliance that would be part of the PI motion -- excuse me,

15   the preliminary injunction order.

16          And one last thing that I just wanted to point out

17   to Your Honor, you mentioned that the District is improving

18   and that the notice backlog is being -- is reduced.  If you

19   look at --

20          THE COURT:  I suggested that that's what the

21   biweekly reports indicate.

22          MS. MEZEY:  Correct.  That was not your

23   assessment.

24          If you look at the District's opposition to the

25   preliminary injunction motion at ECF 31, Page 21, the

1    District states, "Fewer notices are failing each week.  As

2    reported to FNS, the system notice failure was approximately

3    10 to 13 percent on a weekly basis during June and July

4    2017, the rate dropped to 6 to 10 percent as of August 2017,

5    and it averaged 5 percent in the most recent report to FNS,"

6    which seems to be a good trajectory.  However, in December,

7    in one of its December reports to FNS, they reported a

8    higher-than-14-percent error rate in December with over

9    2,000 notices failing in one day alone, December 6th.

10                THE COURT:  Where is that in the record?

11                MS. MEZEY:  That's at ECF 45-25, Page 25.

12                So clearly, even if the District has made progress

13   with the backlog, there obviously are still systemic

14   problems that are affecting the delivery of notice.  And in

15   this case, the delivery of notice is essential because

16   otherwise people don't know when to recertify, and so people

17   who are -- as Ms. Moore said to me, "If I had gotten the

18   notice telling me to recertify, I would have gone in to

19   recertify."

20                It's not just an -- it's not just an academic

21   issue.  It's a direct relation to whether or not people get

22   food.

23                THE COURT:  And are those all recert notices or --

24                MS. MEZEY:  Yes, these are --

25                THE COURT:  -- are some -- I mean, DHS sends out

1     lots of notices.

2              MS. MEZEY:  Correct, Your Honor.  And in the

3     reports to FNS, sometimes recert notices are distinguished,

4     and sometimes they're not.  The notices that we're referring

5     to in Claim 2 are notices of expiration, which are detailed

6     in the implementing regulation of 7 CFR 273.14(b)(1).

7              It's really part -- the thing that starts the

8     recertification process.  You notify the person that it's

9     time to recertify --

10             THE COURT:  The NOEs.

11             MS. MEZEY:  Exactly.

12             -- you set an appointment for them, and that's

13    what gets the process started.

14             THE COURT:  Okay.

15             MS. MEZEY:  Thank you, Your Honor.

16             THE COURT:  Thank you very much.

17             MR. COHAN:  Your Honor, may I just supplement very

18    quickly on one point?

19             THE COURT:  Sure.

20             MR. COHAN:  Your Honor had asked during my

21    argument where the Court might be able to find discussion as

22    to how the ATP rate is calculated, and that's in the record,

23    Your Honor, at Docket No. 45-30, which is a memorandum from

24    FNS to the local districts, the states and the districts,

25    explaining --

```
 1              THE COURT:  January 11, 2017?

 2              MR. COHAN:  There is that memo, yes, Your Honor.

 3              THE COURT:  Okay.

 4              All right.  Ms. Yong.

 5              (To the gallery) Folks, feel free to take a

 6      stretch, if you'd like.  I know it's a little technical.

 7              MS. YONG McGRAW:  Good morning, Your Honor.

 8              THE COURT:  Good morning.  How are you?

 9              MS. YONG McGRAW:  Good.

10              So a few points I want to -- I hope I don't jump

11      around too much.

12              THE COURT:  Okay.  I want you to focus at some

13      point on the plaintiffs' arguments that the most recent

14      quarterly report figures, that I shouldn't rely on them for

15      the reasons that they've said.

16              MS. YONG McGRAW:  All right.  So I want to take a

17      step back and talk about -- provide the Court some

18      background on the 366Bs and how FNS oversight works.  So one

19      of the things that FNS does is there's actually a memo which

20      is cited in the District's opposition to motion for

21      preliminary injunction at -- I forget; I'll find the cite in

22      a bit -- that talks about how the -- how FNS uses --

23      calculates timeliness in three different ways.  So one of

24      those ways is using the 366B, and the District acknowledges

25      that that's not the only method that FNS uses to conduct
```

 1    oversight of the states.

 2            So the 366B is one method, and that covers all of

 3    the applications and recerts for a particular quarter, but

 4    there's also, as Your Honor mentioned, in the -- the 88.45

 5    percent is based on a sampling method, which is another

 6    method that FNS uses, and FNS in that case goes in and pulls

 7    its own sample.  And so there's very little information that

 8    the District can have in terms of, like, what FNS is doing

 9    to come up with that number.

10            THE COURT:  So you do not agree with the

11    plaintiffs that those samples only reflect initial

12    applications and not recertification applications?

13            MS. YONG McGRAW:  No, we agree that they only

14    include initial applications --

15            THE COURT:  Okay.

16            MS. YONG McGRAW:  -- but it includes initial

17    applications and -- which is defined to include both the

18    regular 30-day as well as the expedited seven-day.  So they

19    include both of that.

20            So there's kind of two parallel things that we're

21    talking about.  One is applications, and one is

22    recertifications.

23            So for applications, there's regular applications,

24    which is the District has 30 days to approve process.

25            THE COURT:  I understand.  So let's just stop

1    there.  If you agree that the audit is -- we're comparing

2    apples to apples --

3            MS. YONG McGRAW:  Correct.

4            THE COURT:  -- with the 366Bs.

5            MS. YONG McGRAW:  Correct.

6            THE COURT:  At least for the initial applications.

7            MS. YONG McGRAW:  Correct.

8            THE COURT:  And so respond to the question that if

9    your compliance rate in that FNS audit is only 88 percent,

10   and that's giving you the benefit of the upper bounds of the

11   confidence interval, whereas your revised 366 reports are

12   showing a higher compliance rate than that, why should we

13   trust the 366 reports?

14           MS. YONG McGRAW:  Well, the reason why the

15   District used the 366 calculation number is because we're

16   responding to the calculation methods that were in the

17   plaintiffs' motion for preliminary injunction.

18           The plaintiffs' motion set forth this calculation

19   by using the 366Bs, so in the District's response it

20   responded by looking at -- using that exact same

21   calculation method from plaintiffs' motion for preliminary

22   injunction and using the revised 366Bs and the most recent

23   2018 Quarter 1 366B.

24           THE COURT:  And so that must be a different method

25   than what FNS uses.

1              MS. YONG McGRAW:  Well, FNS actually uses three

2      methods, and it's actually in the opposition to preliminary

3      injunction -- oh, sorry, it's in Director Zeilinger's

4      declaration at ECF 32-1, Page 14, Paragraph 51.  And there's

5      a cite that says in the middle of that paragraph, "FNS" --

6              THE COURT:  I'm sorry, one more time.

7              MS. YONG McGRAW:  "Clarification on the Three Ways

8      Initial SNAP Application Processing Timeliness is Measured."

9      It's an FNS guidance dated June 2, 2017.

10             THE COURT:  Okay.

11             MS. YONG McGRAW:  And the -- I apologize.  The

12     hyperlink for that particular June 2, 2017, is at Paragraph

13     47 of the same declaration, Page 12.

14             So but one thing that I wanted to point the

15     Court's attention to is that the 88.45 percent is based on

16     the numbers from March 2017, and Your Honor asked when the

17     most -- when the next --

18             THE COURT:  For a six-month period.

19             MS. YONG McGRAW:  Right, from October 2016, which

20     is the first time when DCAS was implemented, to March 2017.

21     And we know from the 366Bs that Quarter 1 and Quarter 2 of

22     2017 cover that same time period, and we know that on the

23     366Bs the District's numbers from Q1/Q2 have improved since

24     then, so Q3/Q4 and finally in 2018 Q1 have improved since

25     the Quarter 1 and Quarter 2 from 2017.

```
1              I think that, you know, as Your Honor noted and is

2       noted throughout the record, FNS is in very frequent contact

3       with DHS.  They have biweekly -- every two weeks they meet

4       with them extensively, and there are these slide decks that

5       are created, and so FNS is monitoring it.  I don't know when

6       the next audit is either, but I assume that the trajectory

7       of the 366Bs is going to be similar to the trajectory that

8       would be shown by the sampling method used by -- or whatever

9       other compilation method used by FNS to come up with this

10      88.45 percent.

11             And I would note that -- and Your Honor's

12      questions --

13             THE COURT:  So then, I mean, I understand that

14      your position is that there is improvement.

15             MS. YONG McGRAW:  Yes.

16             THE COURT:  But are you conceding that you're not

17      really at 95 percent as measured by FNS even though you're

18      getting there?

19             MS. YONG McGRAW:  Yes.  We admit that we're not at

20      95 percent, which is why the District -- DHS recently

21      submitted a CAP.

22             THE COURT:  Okay.

23             MS. YONG McGRAW:  So -- and I think one thing, to

24      respond to the Court's questions about what percentage

25      is -- a preliminary injunction should be issued, you know,
```

1    the plaintiffs cited to *Withrow v. Concannon*.  There's

2    another case, *Shands vs. Tull*, and it's from the Third

3    Circuit.  It's 602 F. 2d 1156.  And in that case, it also --

4    both *Shands* and *Withrow*, first of all, dealt with should it

5    be substantial compliance or full compliance that the agency

6    be held to.

7         But one thing to note is that the factual pattern

8    in both of those cases dealt with whether the agency was

9    complying with the 90-day or 60-day deadline to hold a fair

10   hearing.  So -- which is very different because the number

11   of fair hearings that DHS handles per quarter is

12   approximately -- I think on the last 366B report it's a

13   handful -- a couple of hundred, whereas, by contrast, the

14   number of applications and either initial -- regular initial

15   applications, expedited or recertifications, is on the order

16   of 8,000 to 9,000 per month, which is 24,000 to 27,000 per

17   quarter.

18        So the numbers that we're talking about are very

19   different.  And so in both *Withrow* and *Shands*, those cases

20   are when the agency has failed to comply with the deadline

21   of providing a hearing and a decision within 60 days from

22   when a fair hearing request was filed.

23        But to the -- more specifically, in *Shands vs.*

24   *Tull*, the Court -- the Third Circuit actually talked --

25             THE COURT:  Well, the large number point can cut

1    in both directions, right?

2              MS. YONG McGRAW:  True.

3              THE COURT:  If you're talking about 20,000

4    applications, 1 percent is 200 people without food stamps.

5              MS. YONG McGRAW:  It's 200 people that may not

6    have been -- that may not have had their application done

7    timely.

8              THE COURT:  Exactly.

9              MS. YONG McGRAW:  But, again -- and I'll get to

10   this later -- the FNS clarification on how to -- there's an

11   FNS guidance, which I believe plaintiffs' counsel cited to,

12   talking about how to fill out this new 366B form, and in

13   that Q-and-Answer section of the guidance it specifically

14   says that what's counted as overdue -- you have to count it

15   as overdue, even if it's related to the client's error --

16             THE COURT:  I understand.

17             MS. YONG McGRAW:  -- or agency error.

18             So contrary to what plaintiffs' counsel

19   represented, it's not that we don't know.  It's that FNS

20   actually dictates that we have to include it as overdue.

21             THE COURT:  And FNS builds that into its 90 and 95

22   percent threshold.

23             MS. YONG McGRAW:  Correct, correct.

24             Now, one thing about *Shands vs. Tull* is it

25   actually looked at -- it looked at the language in the

1   statute, so Congress's language as well as the agency's

2   language in the regulations, and it says -- it states that,

3   "Both provisions show that" -- "show an implied intent to

4   hold the states to a standard of substantial compliance, and

5   thus to make some allowance for the difficulties of

6   administering an extensive bureaucracy."

7          Now, in -- one of the -- in the -- so we talked

8   about -- and in the Court it also says, "We believe the

9   scheme reveals a congressional intent to require only

10   substantial compliance from the states."

11          So I think there is case law to both sides, and I

12   think that, you know, we agree that the statute requires 100

13   percent, and we agree -- and there is evidence in the

14   record -- that FNS considers 95 percent to be acceptable,

15   but even as to 90 percent, it's only if you're below 90

16   percent that FNS requires a CAP, and there's many states

17   that are on CAPs, and the District is only 1.55 --

18          THE COURT:  And some of those states have been

19   under injunctions as well, correct?

20          MS. YONG McGRAW:  And the District is only 1.55

21   percent below that 95 percent, and that's based on the

22   March -- October 2016 to March 2017 date, so I think

23   that's -- and I think, in the context that a preliminary

24   injunction is an extraordinary remedy, that should be taken

25   into account.

1             On the -- there was some discussion about whether

2     the 366B was done correctly based on some testimony from

3     Director Zeilinger, and I will say that the District has

4     followed the -- after having to revise the 366B reports has

5     gone through with a fine-toothed comb the instructions and

6     is processing the 366Bs based on the processing date, not

7     the filing date, and that -- and Director Zeilinger misspoke

8     at her deposition.  And we've addressed this in our sur-

9     reply at Page -- which is ECF 48, Page 13, that there's

10    evidence in the record showing that what plaintiffs

11    speculate that the 366Bs are based on the date of filing,

12    not the date of processing, cannot be true because at the

13    bottom of Page 13 every 366B submitted in Fiscal Years 2017

14    and 2018 lists at least one application --

15            THE COURT:  So wait.  Hold on.  So you're saying

16    that the forms were actually filled out in the way that

17    plaintiffs suggest that they should have been?

18            MS. YONG McGRAW:  Yes.

19            THE COURT:  And that Ms. Zeilinger misspoke in her

20    deposition when she said that they were not filled out in

21    that fashion.

22            MS. YONG McGRAW:  Yes.

23            THE COURT:  Okay.  And do we have a supplemental

24    declaration from Ms. Zeilinger, or this is just a statement

25    in your sur-reply?

1          MS. YONG McGRAW:  This is a statement in our

2     sur-reply.

3          THE COURT:  Okay.

4          MS. YONG McGRAW:  But we certainly can supplement

5     the record with an additional declaration.

6          THE COURT:  I think I'd like that.

7          MS. YONG McGRAW:  Very well.

8          THE COURT:  Within seven days, okay?

9          MS. YONG McGRAW:  Yes.

10          THE COURT:  Actually --

11          MS. YONG McGRAW:  We can provide it to the Court

12     by the end of the week.

13          THE COURT:  By close of business Thursday, okay?

14          MS. YONG McGRAW:  Sounds good.

15          THE COURT:  And we'll give the plaintiffs an

16     opportunity to respond within two business days.

17          MS. YONG McGRAW:  Now, Your Honor's questions

18     on --

19          THE COURT:  What about this backlog issue, and

20     what is the backlog, what's the backlog trend, and how is

21     it relevant to the plaintiffs' claims that the District is

22     not -- has failed to send notice in a systemic way?

23          MS. YONG McGRAW:  Well, so first of all, the

24     backload -- the backlog, rather, is trending in the same

25     direction.  It's trending downward, as we reported in our

1    sur-reply and in the declaration, and we're continuously

2    working on it.  And, you know, I would note that when we're

3    talking about notices, there's many types of notices that

4    are issued by DCAS because DCAS handles Medicaid

5    applications, TANF, which is cash assistance, as well as

6    SNAP; and even within SNAP there are multiple types of

7    notices.

8            And in specific, Ms. Mezey cited to ECF 45-25 at

9    Page 25 as citing to one of the slide -- biweekly slide

10   decks and stated that it showed a SNAP recert notice, and

11   that's not correct.  I just took a look at it, and it was

12   for a benefit change notice.

13           THE COURT:  Right.

14           So that was the source of a question that I had.

15   So in several of these slide decks there's a slide entitled

16   "Food Notices Backlog Status."  And the one I have in front

17   of me is October 4th, FNS FOIA Bates No. 001442, but there

18   are several like it.  It says the total backlog is 90, but

19   all of them have to do with change in benefits.

20           MS. YONG McGRAW:  Right.

21           THE COURT:  So the question is, what is a change

22   in benefits notice, and is that the same thing as a

23   recertification notice?

24           MS. YONG McGRAW:  It's not the same thing as a

25   recertification notice.

1          So the recertification notice is formally called a

2     "Notice of Expiration."

3          THE COURT:  Okay.

4          MS. YONG McGRAW:  And it is required to be sent 60

5     days before a beneficiary's certification period ends, and

6     it tells them your certification period is going to end two

7     months from now, you need to come in and recertify, and

8     there's an interview date for them to come in.

9          The other types of --

10         THE COURT:  Now, this chart does not have an entry

11    for an NOE.  It has an entry for SNAP recert approvals.  Is

12    that the -- is that what that is designed --

13         MS. YONG McGRAW:  So that is notice saying that

14    you've successfully recertified, and here's your new -- the

15    new end of your certification period.

16         THE COURT:  Okay.  So this chart does not cover a

17    backlog in the NOEs.

18         MS. YONG McGRAW:  No.  I don't believe it does,

19    but I -- which ECF number is that?

20         THE COURT:  I'm not sure I have an --

21         MS. YONG McGRAW:  Or which exhibit number?

22         THE COURT:  FNS FOIA 001442, Page 34 from the

23    October 4th -- or the biweekly report that covers October

24    4th, and there are several charts like that.

25         MS. YONG McGRAW:  Do you have the exhibit letter?

 1    I don't believe any of these reflect the notice of

 2    expiration, looking at the -- looking at the --

 3              THE COURT:  Okay.

 4              MS. YONG McGRAW:  -- the categories, but one

 5    thing --

 6              THE COURT:  Okay.  Where in the record or

 7    generally what types of documents in the record contain the

 8    status of the NOE backlog?

 9              MS. YONG McGRAW:  So let me -- I believe that we

10    cited to it in -- when we cited the downward trend --

11              THE COURT:  Okay.

12              MS. YONG McGRAW:  -- in the recerts.

13              If I can come back to that, Your Honor, and we'll

14    have an opportunity to --

15              THE COURT:  Okay.  All right.  Anything else on

16    the recerts?

17              MS. YONG McGRAW:  Yes.

18              THE COURT:  Your own numbers show that over the

19    last five reporting quarters the rate has ranged from 75.4

20    percent timely down to 41 percent timely, and the most

21    recent one is 59.2 percent timely.  Isn't that substantially

22    under what not only the law but FNS requires?

23              MS. YONG McGRAW:  Well, so FNS -- the 95 percent

24    only applies to applications, not recertifications.

25              THE COURT:  Okay.  Is there a standard for

1    recerts?

2              MS. YONG McGRAW:  As far as I know, I don't know

3    of one.  I don't know that there's one in the record.  I

4    don't know what percentage FNS requires, but what I will say

5    is that on Page 16 of our sur-reply, which is ECF 31, we

6    address that -- sorry, of our sur-reply, which is ECF 48,

7    ECF 48 at the bottom of Page 15 to the top of Page 16, that

8    first of all, there's two pieces of evidence in the record.

9    One is the testimony of Dr. -- of Director Zeilinger saying

10   that, you know, with respect to the vendor error, 63 percent

11   of the people that we contacted via robocalls or subsequent

12   notices completed their recertification during the grace

13   period, and then a total of 72 percent actually recertified,

14   and that's higher than in normal months, at the top of Page

15   16.

16             And then there's a citation to a study by the

17   Urban Institute showing that they wanted to understand the

18   rates, causes, and costs of churning, of the turnover, in

19   the SNAP population, and in their report in Fiscal Year 2011

20   only 32 to 41 percent of SNAP recipients in certain states

21   received SNAP benefits for the full year by recertifying

22   when required.

23             So this is something that the District has -- you

24   know, the recertification rate is always lower than the

25   application rate for a variety of reasons.  It could be that

1   people miss the grace period deadline even after they've

2   received notice, as evidenced by some of the named

3   plaintiffs in the record, or they have -- as one of the

4   declarants of the benefit, they become over income.

5          THE COURT:  I'm sorry, isn't the deadline

6   triggered -- there's a notice deadline.  Let's put that

7   aside.

8          Once notice is sent out, the recipient applies for

9   recertification, and the District has 30 days to act on that

10  application.

11         MS. YONG McGRAW:  Yes.

12         THE COURT:  Correct?

13         MS. YONG McGRAW:  For the most part.  It depends

14  on when it comes in, if it's before the 15th or after the

15  15th of the month.

16         THE COURT:  But what does that -- what does

17  meeting that deadline have to do with how many people churn

18  out of the system and decide not to submit an application or

19  don't submit an application within the grace period?

20         These numbers are based on applications that are

21  sitting there, and you have a certain number of days to

22  process them, right?

23         MS. YONG McGRAW:  Correct, but the way that the

24  366Bs, remember, are -- the instructions say that it's

25  overdue even if it's due to the client error, so in this --

1    so one of the things for recertifications is they get the

2    notice 60 days before their deadline.  They can recertify

3    any time in those 60 days, and then to not -- to continue

4    getting SNAP benefits after their cert period ends.

5           But if they come in the 30-day period after that

6    60 days, so they've already -- their SNAP benefits have

7    already expired, they still get a 30-day grace period to

8    come in and recertify, and so long as they do that, they get

9    the prorated for that month and they get the new

10   certification period.

11          So anybody that comes in in that 30 days is

12   considered overdue, whether it's their fault or the agency's

13   fault.  So both of them are included in the 366Bs as overdue

14   recertifications.

15          THE COURT:  Okay.

16          MS. YONG McGRAW:  Just a couple of things I

17   wanted to correct on what plaintiffs' counsel said is that

18   I'm not -- the first I've heard of D.C. is the only state

19   without monthly reports in citation to CFR 272-15, we have

20   not looked at that.  It is not part of the case.  It's not

21   been briefed, and the District is not prepared at this time

22   to address any claims from plaintiffs.

23          The second is that plaintiffs essentially want to

24   replace FNS's role as oversight, which is due -- and FNS is

25   aggressively and consistently conducting oversight of the

1    District, as evidenced by the multiple biweekly reports in

2    the record.  And plaintiffs say that they want a CAP to

3    address expedited SNAP applications as well because FNS

4    doesn't oversee that part.  The District would object to

5    that and correct the record to say that initial

6    applications, which is Row 3 of the 366B report, is defined

7    in the FNS instructions for how to fill out the 366B report

8    as including both regular 30-day applications as well as

9    expedited applications, and that the APT rate includes both

10   as well.

11            Now, and then plaintiffs also --

12            THE COURT:  Respond to the argument that there

13   would be little harm from the entry of an injunction since

14   you all are already, you know, complying and are under a

15   CAP, but that the added incentive of a federal court

16   injunction is necessary to draw the attention to the

17   seriousness of the matter?  That's basically the plaintiffs'

18   equity argument for why an injunction ought to issue here.

19            MS. YONG McGRAW:  Right.  I don't think that

20   there's any evidence in the record showing that DHS is not

21   taking the issue seriously.  In fact, it has evidence of the

22   complete opposite, which is the District is working very

23   hard and working hand in hand with FNS ever since the DCAS

24   implementation, which was monitored and approved, got

25   concurrence from FNS to proceed with the go-live.  And so

1    FNS has been a partner the entire time, and so additional

2    court oversight, which is through a preliminary injunction,

3    is an extraordinary remedy, and the plaintiffs -- the

4    evidence that the plaintiffs submit is simply not enough.

5              THE COURT:  In this context it strikes me as not

6    terribly extraordinary.  It seems to have happened quite a

7    bit.

8              MS. YONG McGRAW:  I don't think that having --

9              THE COURT:  I mean, we've cited, you know, at

10   least ten cases here today where courts have imposed

11   injunctions on states to meet whatever level of compliance

12   they deem is necessary.

13             MS. YONG McGRAW:  It's -- I think the evidence

14   doesn't show that the same -- the evidence in this record is

15   not the evidence of those records, and as we've seen, based

16   on the plaintiffs' own calculation that they proffered in

17   their motion for preliminary injunction, the District's

18   initial and expedited application processing rates are at 95

19   percent.

20             And, yes, that may not be -- that may be only one

21   of the measures by which FNS conducts compliance over the --

22   monitors compliance of the District, but it's -- even the

23   old stale data from March 2017 is 88.45 percent.  And, as

24   Your Honor noted, in many of those cases cited by the

25   plaintiffs the state agency was very far out from

1    substantial compliance, and here the District is very close

2    to -- at least based on the March 2017, very close to 90

3    percent, which is the threshold for even doing a CAP.

4              THE COURT:  Okay.

5              MS. YONG McGRAW:  And on the recertifications,

6    there's nothing in the record stating what the level of

7    oversight is, but I will note to Pages 15 and 16 of the

8    District's sur-reply and the evidence in the record that the

9    rate of certification -- recertification is lower not only

10   because of various causes but also the 366Bs include overdue

11   as of -- due to client error as well as agency error.

12             THE COURT:  Just on class cert briefly, I read the

13   *DL* case, and this case --

14             MS. YONG McGRAW:  I'm sorry, which case?

15             THE COURT:  The *DL* case, the D.C. Circuit case

16   regarding enrollment of students, disabled students under

17   the IDEA, and this case seems to be quite similar.

18             You all challenge the commonality and typicality

19   requirements on the grounds that there might be different --

20   there probably are different reasons why the deadlines

21   aren't being met for particular clients, but the question

22   is, under the reasoning of the *DL* case, why does that

23   matter?  The statutory violation here is missing the

24   deadlines.  The statute doesn't speak of why the deadlines

25   are missed.

1          So why can't that claim be -- why isn't that claim

2     amenable to class-wide resolution?

3          MS. YONG McGRAW:  Well, because I think the way

4     that plaintiffs have defined their definitions is just is

5     there a violation of the SNAP act of this provision, and

6     that's simply too broad.

7          You know, the District cited in its briefs many

8     cases from the D.C. Circuit saying that at some level of

9     abstraction there's always going to be commonality.  And

10    here, if we look back at the line of cases from *Wal-Mart vs.*

11    *Dukes*, you know, there they're alleging there's a violation,

12    there's gender discrimination --

13         THE COURT:  But there are lots of different

14    reasons why there can be gender discrimination under Title

15    VII.  Just one theory as to why the District has violated

16    SNAP in this case is that they've either missed the initial

17    deadline or the recertification deadline.

18         MS. YONG McGRAW:  But the reasons for why they

19    missed that -- for example, you know, we look at Stanley and

20    Gaines.  They were -- they claim that they did not get the

21    notice of expiration for the recertification, and that was

22    due to the vendor error that was an isolated error, and

23    these are the only two named representatives for that class

24    that's being defined.

25         And so, you know, what is the common error or

1    misconduct or defendant's conduct that led to the violation?

2    I think that's where we don't have commonality among the

3    class members and among the named plaintiffs.

4             THE COURT:  Okay.  Thank you.

5             Mr. Cohan, the last bite of the apple.

6             MR. COHAN:  Thank you very much, Your Honor.

7             THE COURT:  Briefly.

8             Okay.  So if I credit this anticipated declaration

9    from Ms. Zeilinger that the numbers were calculated

10   correctly based on processing and not just filings, do you

11   still -- are you still entitled to an injunction?

12            MR. COHAN:  Absolutely, Your Honor, for two

13   reasons.  First off, we would actually ask this Court to not

14   permit a supplemental declaration to be submitted.

15   Defendant -- this is the first time defendant raised a

16   concern about hearing something for the first time.  This is

17   the first time we're hearing about something.  Defendant

18   submitted a sur-reply, had already received our argument

19   concerning the filing date, and does not mention the

20   commissioner -- the director misspoke once in the sur-reply

21   that was submitted.

22            The only evidence they submit or the only point

23   they make is that somehow there's an application that was

24   delayed more than 91 days as the sole indication that that

25   means that they had to have filled it out correctly.  But

1     it's quite easy an application could have been late by more

2     than 91 days if the application was filed at the beginning

3     of the reporting period and they didn't process it within

4     the four months that they basically had because from October

5     1st to January 31st, that's not 90 days.  That's actually

6     120 days.  So they would pick up a late 91-plus day

7     application if it was filed in the beginning of the quarter.

8              So the sole thing that they're pinning somehow the

9     director misspoke but --

10             THE COURT:  I don't want to argue this now.  I'm

11    going to allow the supplemental declaration to be filed,

12    and I'm going to give you an opportunity to respond to it.

13    This is obviously technical stuff.  Let's try to get to the

14    right --

15             MR. COHAN:  I will turn to the other point I

16    wanted to make regarding that, Your Honor, is that

17    defendant's counsel stood up before you and answered what

18    was the most critical question as to initial applications,

19    30- and seven-day applications.  You asked directly are they

20    at 95 percent.  She said no.  So whatever the director

21    submits in terms of how the 366B may or may not have been

22    filled out, they're telling you that the statement they made

23    to FNS is, in fact, a correct one, that they are not there.

24             And equally critically, they make the point that

25    they have been doing everything necessary to bring

1    themselves into compliance with federal statute.  They don't

2    say that they have brought themselves into compliance with

3    federal statute, which is a very interesting distinction,

4    but they haven't.  The reason we know they haven't is they

5    submitted a faulty corrective action plan.  FNS comes back

6    and says, "Your corrective action plan is deficient in five

7    ways."  This is on December 14, 2017.  They submit their

8    faulty corrective action plan January of 2018, FNS comes

9    back, they say to FNS not that "We're doing everything

10   possible because we recognize the critical interest at

11   stake, and we're going to get food stamps to people timely

12   within 30 days, 60 days, 90 days."  They say, "We need 12

13   months from the date that FNS approves the CAP to even get

14   to 95 percent."

15          So this is not an agency that has its hair on

16   fire, that is acting with all deliberate speed, so to speak.

17   This is an agency that is in a deliberate slow, careful

18   negotiation with the federal oversight agency.  Their own

19   statements to FNS highlight the importance of the issuance

20   of the preliminary injunction in this context to basically

21   speed them up, to give them a sense of the urgency that they

22   need to treat this with because they've acknowledged they're

23   not at 95 percent, and they -- they also conflated something

24   I want to also correct.

25          Client error is not built into the 90 percent for

 1    initial applications, 30- and seven-day.  Client error may

 2    be built into recertifications, but not as to initial

 3    applications as FNS counts that.

 4             THE COURT:  Is there an FNS-acceptable standard

 5    for recertification?

 6             MR. COHAN:  There is not, Your Honor.  FNS --

 7             THE COURT:  There is not.

 8             MR. COHAN:  There is, and there is not.  There is

 9    not an FNS sampling standard because FNS does not sample

10    recerts.  What FNS has said to the districts is that for

11    purpose of complying with the federal statute it expects

12    full compliance, and, of course, unless it's acting ultra

13    vires the authority of the Congress it has to do that, but

14    it has not --

15             THE COURT:  Right.  That's a different question.

16             MR. COHAN:  But it has not set forth a sampling

17    consistent because it doesn't sample recerts.  It has not

18    had the capacity to do so, which is why it --

19             THE COURT:  So it doesn't place districts under

20    CAPs for deficiencies in recert applications?

21             MR. COHAN:  It will if it finds those deficiencies

22    as part of its review, but it doesn't do it in a numerically

23    tracked way.

24             Part of what FNS does is they go in and they do

25    what are known as program access reviews, and they will pull

1    a certain number of cases, they will review those cases,

2    they will seek to identify deficiencies, and they will

3    instruct the districts or the states to do better.  They do

4    that as to notices.  They do that as to overpayments,

5    underpayments, but there are not, as there is with timely

6    processing, set performance standards.

7         THE COURT:  So it may be that 65/70 percent would

8    be acceptable --

9         MR. COHAN:  It would be possibly acceptable to

10   FNS, but it should not be acceptable to this Court because,

11   as a practical matter, again, households that are not able

12   to eat, the standard we would argue under the case law would

13   be one of absolute compliance.  And other jurisdictions that

14   have addressed failures to timely comply with

15   recertification requirements have not hesitated to impose

16   that kind of standard.

17        THE COURT:  Well, I assume that FNS has those same

18   goals in mind.

19        MR. COHAN:  I would assume they do as well, Your

20   Honor.  But what they do in terms of their percentages, we

21   just -- they just haven't done it yet because they don't

22   have the technology yet in place.

23        But it does not include -- interestingly enough,

24   Counsel raised the *Shands v. Tull* decision, which is a case

25   out of the Third Circuit, correctly dealing with -- she's

1    correct; it deals with fair hearing decisions.  As the Court

2    points out, fair hearing decisions are, of course, a much

3    smaller scale of operation, but the District would devote

4    less resources to it than it would to applications, both

5    initial and recerts.

6          What defendant does not make as part of her

7    argument is that the Court in *Shands v. Tull* found that

8    there was substantial compliance because the district was at

9    96 percent, and that's -- if the District were at 96 percent

10   here today, Your Honor would be presumably hearing a

11   different case than the one that it's presently hearing.  So

12   I do think that that's an important distinction that gets

13   left out here.

14         The other thing -- and there is ample evidence

15   that we have submitted in the record in terms of defendant's

16   own acknowledgements, that sometimes part of the problem

17   also is that not all the applications that get submitted are

18   necessarily known to the defendant.  They might be --

19   defendant has admitted it's had issues with applications

20   being made known to the system.  If they're not made known

21   to the system within five days, they're not timely recorded.

22         So defendant's own ability to keep track of its

23   data is extraordinarily suspect, so what should we look to

24   in terms of taking defendant at its word?  And that's its

25   admission that it's not at 95 percent.  It's an admission

1   now that's been made in two fora.  It's been made to FNS.

2   It's been made to the Court.  And so we would submit, Your

3   Honor, that it doesn't take its obligation with enough

4   seriousness to evade the imposition of a preliminary

5   injunction, and that a preliminary injunction here would

6   serve a very vital purpose of ensuring that needy people

7   are, in fact, having their food stamps processed as required

8   by law.

9            THE COURT:  Okay.  Thank you very much.

10           MR. COHAN:  Thank you, Your Honor.

11           THE COURT:  Ms. Yong, just one more question, and

12   I'm not sure it's determinative of anything, but why are the

13   lines so long?

14           MS. YONG McGRAW:  Why the what?

15           THE COURT:  Why do people have to show up at 3:30

16   in the morning at one of these service centers to get in

17   line and wait until 5:00 to submit their applications or

18   have their questions answered?  That struck me as being very

19   disturbing.

20           MS. YONG McGRAW:  From what I understand is that

21   that has been a long-time practice in the District, and that

22   part of the goals of installing the business process re-

23   engineering and the one-and-done and the reducing handoffs

24   and going to electronic scanning of paperwork that comes in

25   so you can give it directly back to people is to streamline

1   it so that people don't have to wait in line for as long.

2   But I think that there's --

3           THE COURT:  And, I mean, I'm not holding you

4   responsible for this obviously --

5           MS. YONG McGRAW:  Yes.

6           THE COURT:  -- but is that something that's being

7   monitored?  Are there -- I didn't see anything in the

8   biweekly reports about, you know, wait time in line, which

9   seems to be pretty critical.

10          MS. YONG McGRAW:  Yes, and so that I think in the

11  first Zeilinger declaration perhaps there's a paragraph that

12  talks about the -- we do monitor the wait times --

13          THE COURT:  Okay.

14          MS. YONG McGRAW:  -- and, you know, kind of the

15  average wait times at each service center and how that

16  changes over the weeks, over the months.  And we are

17  monitoring.

18          (To Mr. Amarillas) Thank you.

19          It's ECF 31, Page 32.  And this is based on

20  Director Zeilinger's declaration, Paragraph 78, that most

21  service centers reach full customer processing capacity

22  anywhere between 11:00 a.m. and 4:00 p.m., although busy

23  times will vary depending on customer needs.

24          But part of the reason of doing the business

25  process re-engineering is so that people can come in.  We

1   now have scanners at every station so that we can get

2   documents in.  We can -- and we try to do a one-and-done,

3   and we're at -- I believe our last percentage that we

4   reported in the court filings is 83 percent one-and-done,

5   which means that somebody comes in, and let's say they want

6   to apply for SNAP.  They can apply -- 83 percent of the time

7   somebody coming in is one-and-done in that one visit so that

8   we don't have to have them come back again.

9          One thing to recognize about SNAP is that they do

10  have to recertify.  You do have to come in for an interview,

11  although the department has alternative pathways to do a

12  telephone interview if people are elderly or disabled and

13  can't come in to complete an interview.

14         I just want to correct the record on one thing

15  that plaintiffs' counsel just said about -- he cited the

16  District's CAP as saying that the District says that they

17  need 12 months to get to 95 percent, implying that the

18  District is not acting with any sort of urgency, and I would

19  point to the FNS guidance dated March 18, 2016, which is --

20  I believe it's cited as one of the exhibits in plaintiffs'

21  exhibits as well as perhaps a hyperlink in the District's

22  opposition to the preliminary injunction motion.  And in

23  that it says, "States with a new timeliness problem that in

24  the CAP the milestones for achieving the 95 percent APT rate

25  one year from the date of a CAP should" -- "approval should

1    also be included in the CAP."

2              So the FNS guidance about timeliness and CAPs

3    actually says that it's one year from the date of the CAP.

4              THE COURT:  Okay.  Very well.

5              I will probably get -- (To Ms. Mezey) I think...

6              MS. MEZEY:  Okay.

7              THE COURT:  As much as I like hearing from you

8    folks.

9              I will probably get something out on class cert

10   sooner rather than later, and the PI issue may take a little

11   more time.  I'd like the supplemental declaration and the

12   response to iron out that issue.

13             We've heard a lot today.  I'd like to have an

14   opportunity to digest it and go to the record and do a

15   little bit more reading.  And there's a chance that we may

16   ask for supplemental materials on some particular points so

17   be on the lookout for that.

18             Have a good spring break in the meantime, okay?

19   Thank you very much.

20             MR. COHAN:  Thank you very much, Your Honor.

21             MS. YONG McGRAW:  Thank you, Your Honor.

22                    (Whereupon the hearing was

23                     concluded at 11:53 a.m.)

24

25

1        **<u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>**

2

3             I, LISA A. MOREIRA, RDR, CRR, do hereby

4    certify that the above and foregoing constitutes a true and

5    accurate transcript of my stenographic notes and is a full,

6    true and complete transcript of the proceedings to the best

7    of my ability.

8        Dated this 22nd day of March, 2018.

9

10                              /s/Lisa A. Moreira, RDR, CRR
                               Official Court Reporter
11                              United States Courthouse
                               Room 6718
12                              333 Constitution Avenue, NW
                               Washington, DC 20001

13

14

15

16

17

18

19

20

21

22

23

24

25