UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SHONICE G. GARNETT, *et al.*, | ) <br> ) |
| *Plaintiffs*, | ) <br> ) |
| v. | ) Civil Action No. 17-1757 (CRC) <br> ) |
| LAURA ZEILINGER, | ) <br> ) |
| *Defendant*. | ) <br> ) |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPPLEMENTAL BRIEF
ADDRESSING THE COURT'S APRIL 10, 2018 MINUTE ORDER**

**INTRODUCTION**

In support of their Motion for Preliminary Injunction, Plaintiffs submit this Response to Defendant's Supplemental Brief addressing three questions posed by the Court's April 10, 2018 Minute Order: (a) whether FNS has released more current data on the District's APT rate or, if more current data is unavailable, the expected release date of new data; (b) how the District's timeliness rates for processing recertification applications compare to other States' rate or to national averages; and (c) the status of the District's Corrective Action Plan concerning timely processing rates.

Defendant's supplemental submission strengthens Plaintiffs' already strong showing that they are likely to succeed on the merits of their claims that Defendant fails to timely process initial and recertification SNAP applications, thereby entitling them to a preliminary injunction. Indeed, Defendant's supplemental evidence demonstrates her ongoing failure to absolutely comply with SNAP application processing requirements as well as the failure of FNS's involvement to bring about compliance. Absent an injunction, individuals and families in the

District will continue to go hungry while they wait for Defendant to cure these ongoing failures. *See e.g.*, ECF No. 24-33, ¶ 17 (unable to find sufficient food); ECF No.24-47, ¶ 15 (unable to feed minor children); ECF No. 45-50, ¶¶ 2–3, 13 (78-year-old with severe disabilities without enough food); ECF No. 45-53, ¶¶ 2–3, 16 (72-year-old woman without sufficient food).

## ARGUMENT

### A. Defendant's FNS-Determined APT Rate for April to September 2017 Is Well Below Absolute Compliance.

The FNS-determined APT rate for April to October 2017 shows that Defendant continues to violate SNAP timeliness requirements.[1] Although Defendant's "upper bound" APT rate is just above the point at which FNS requires a Corrective Action Plan (CAP),[2] Defendant still falls far short of the absolute compliance required by law. FNS requires *all* applications to be timely processed. *See* ECF No. 45-30 at 2. Moreover, Defendant's *actual* APT rate is 87.10%—nearly 4% lower than the 91.03% upper bound rate on which Defendant relies. Indeed, statistically Defendant's APT rate is equally likely to be at the *upper* bound rate it cites as it is to be at the *lower* bound of 83.17%. In other words, there is a 95% chance that Defendant's APT rate is somewhere between 91.03% and 83.17%.[3]

---

[1] FNS's policy of requiring a CAP only when a jurisdiction's performance falls below 90% (the upper bound) reflects FNS's management of its limited oversight resources. *See Briggs v. Bremby*, 792 F.3d 239, 246 (2d Cir. 2015). That is, the 90% metric is a management tool, not an indication that FNS finds the jurisdiction's APT rate to be legally compliant or satisfactory.

[2] Notably, that Defendant's upper bound is above 90% for April 2017–September 2017 is irrelevant even for FNS oversight purposes, since her prior performance led to FNS requiring corrective action, and DHS's performance has not improved sufficiently to exempt it from further corrective action. *See* ECF No. 58-1, ¶ 5.

[3] Defendant's performance may be even lower than indicated by the APT rate. The APT rate only measures the timeliness of an agency's *approved* applications. U.S.D.A., *Clarification on the three ways initial SNAP application processing timeliness is measured* 2 (June 2, 2017), https://fns-prod.azureedge.net/sites/default/files/snap/Triple%20Timeliness%20Memo%2023 May2017.pdf. The law requires all applications, whether approved or denied, be processed within statutory deadlines. *See Briggs v. Bremby*, No. 3:12-cv-00324, 2014 WL 1246696, at *12

This data confirms Defendant's ongoing and significant non-compliance with the federal SNAP statute.  The law requires absolute compliance with application processing deadlines.  In this context, absolute compliance generally translates to 100% compliance, with only a very small margin of error.  *See Robidoux v. Kitchel*, 876 F.Supp 575, 580 (D. Vt. 1995) (ordering Vermont "to process *all* applications for benefits within the thirty day deadline specified by law" with a 3% margin of error upon a finding of a "consistent 8–10% failure rate" in meeting SNAP application timeliness requirements); *Robertson v. Jackson*, 766 F. Supp. 470, 479 (E.D. Va. 1991) (requiring 100% compliance with only a 3% margin of error), *aff'd* 972 F.2d 529 (4th Cir. 1992); *Hess v. Hughes*, 500 F. Supp. 1054, 1066 (D. Md. 1980) (requiring that all SNAP applications be processed within statutory mandates, and allowing a 3% error rate and the exclusion of cases in which delay was due to client error); *see also Withrow v. Concannon*, 942 F.2d 1385, 1389 (9th Cir. 1991) ("Plaintiffs are entitled under the regulations to [full] compliance, not substantial compliance").

### B. Defendant Misstates the Facts and FNS Policy Concerning Recertification Applications.

FNS does not publish state SNAP recertification timeliness rates or national averages.  In response to the Court's question, Defendant incorrectly states that the FNS APT rate measures the timeliness of initial applications and recertifications in one combined metric.  In support, Defendant cites to FNS instructions regarding completion of the FNS 336-B. ECF No. 58 at 3.  Defendant is clearly confused.  These instructions have *nothing* to do with the calculation of the FNS-determined APT rate, which is derived from the completely separate FNS SNAP Quality

---

(D. Conn. Mar. 24, 2014).  The APT rate cannot show the District's timeliness rate for denied applications.

Control review process and measures the timeliness of *initial* SNAP applications. *See* U.S.D.A., *supra* n.3 at 1–3.

In discussing low recertification rates, Defendant further muddies the waters by confusing the rate at which those required to recertify actually successfully recertify with the rate at which Defendant timely processes recertification applications actually submitted. ECF No. 58 at 2–3. The former is irrelevant to the issue in this case—whether Defendant timely processes recertification applications.

The fundamental point remains that, as with initial SNAP applications, Defendant must absolutely comply with the requirement to timely process recertification applications. 7 U.S.C. § 2020(e)(4); 7 C.F.R. § 273.14. Defendant's own data indicates that she fails to do so. ECF No. 49-2. Moreover, other states, including Colorado, Hawaii, and Nebraska include whole population monthly monitoring of SNAP recertification timeliness, and have reported a compliance rate close to 100%. *See* Attach. 1, Decl. of Travis England in Supp. of Pls.' Resp., Ex. C; Ex. E; Ex. G; Ex. H; Ex. J. Given the overwhelming evidence that Defendant fails to timely process recertifications, this Court can and should hold her similarly accountable.

### C. Defendant Still Has No Approved Corrective Action Plan and Continues to Violate Federal Law.

Defendant's failure to identify and correct its SNAP application delay failures is further demonstrated by DHS's ongoing inability to formulate and execute a CAP. FNS requested a CAP from Defendant on October 23, 2017. ECF No. 58-1, ¶ 5.[4] Now, six months later, Defendant still has no approved CAP, despite one extension, three rejected submissions, and one

---

[4] Contrary to Defendant's assertions, the District has been under a CAP that addresses "untimely processing of Food Stamp recertification[s]," which cause high error rates. *See, e.g.*, ECF No. 24-27 at 14 (Nov. 2014); ECF No. 24-28 at 22 (May 2015); ECF No. 24-29 at 19 (Nov. 2015); ECF No. 24-30 at 20 (May 2016); ECF No. 24-13 at 20 (Nov. 2016); ECF No 24-14 at 21 (Apr. 2017).

CAP training conducted by FNS. *Id.*, ¶¶ 6–15. Defendant offers no assurances as to when she will finally get it right, and if anything, her agency's track record since implementing the new DCAS system suggests that it will not happen any time soon.

Even with active FNS oversight and assistance, Defendant has been unable to meet this basic requirement to develop a plan to cure her noncompliance, much less cure the noncompliance itself. Court intervention is required to assure that Defendant immediately and absolutely complies with federal law. Defendant's assertion that ameliorative actions are in progress "does not render injunctive relief moot, nor does it deprive the Court of its authority to grant injunctive relief." *Briggs v. Bremby*, No. 3:12-cv-00324, 2012 WL 6026167, at *19 (D. Conn. Dec. 4, 2012). Courts have rejected a "wait-and-see" approach even when the Defendant has taken extensive remedial efforts, clearly not the situation here. *Booth v. McManaman*, 830 F. Supp. 2d 1037, 1042 (D. Haw. 2011).

An injunction ordering compliance now is both appropriate and necessary. Court orders mandating timely processing of applications and monthly monitoring to track actual compliance have brought several agencies into full compliance. *See* Attach. 1, Ex. A at NCLEJ 000022–000024; Ex. B at NCLEJ 000033–000036, Ex. D at NCLEJ 000051–000053; Ex. F at NCLEJ 000098–000101; Ex. I at NCLEJ 000125–000127. Colorado and Hawaii conduct monthly monitoring of application processing timeliness, and have achieved compliance. *See id.*, Ex. C; Ex. G; Ex. H. In these states, a court order led the agency to develop the strategies needed to comply with the law and assist vulnerable families. Families in the District deserve the same.

## CONCLUSION

For all the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction should be granted.

Dated: April 24, 2018				Respectfully submitted,

/s Chinh Q. Le
Chinh Q. Le (DC Bar No. 1007037)
Jennifer Mezey (DC Bar No. 462724)[*]
Chelsea Sharon (DC Bar No. 1016006)[*]
LEGAL AID SOCIETY OF THE
	DISTRICT OF COLUMBIA
1331 H Street NW, Suite 350
Washington, DC 20005
202-628-1161 (Phone)
202-727-2132 (Fax)
cle@legalaiddc.org
jmezey@legalaiddc.org
csharon@legalaiddc.org

Marc Cohan[††]
Mary R. Mannix[†]
Travis W. England[††]
Katharine Deabler-Meadows[†]
NATIONAL CENTER FOR LAW
	AND ECONOMIC JUSTICE
275 7th Avenue, Suite 1506
New York, NY 10001
212-633-6967 (Phone)
212-633-6371 (Fax)
cohan@nclej.org

Peter R. Bisio (DC Bar No. 459256)
Lance Y. Murashige (DC Bar No. 1021562)
Emily Goldman (DC Bar No. 1032032)
Kaitlin Welborn (DC Bar No. 88187724)
Susan A. Musser[††]
HOGAN LOVELLS US LLP
555 13th Street NW
Washington, DC 20004
202-637-5600 (Phone)
202-637-5910 (Fax)
peter.bisio@hoganlovells.com

*Attorneys for Plaintiffs*

---

[*]	Practicing pursuant to LCvR 83.2(g).
[†]	Application for admission *pro hac vice* to be submitted.
[††]	Admitted to appear *pro hac vice*.

**CERTIFICATE OF SERVICE**

    I certify that, on April 24, 2018, I caused a copy of this Plaintiffs' Response to Defendant's Supplemental Brief Addressing the Court's April 10, 2018 Minute Order and accompanying materials to be served on the following via ECF:

Fernando Amarillas
Esther Yong McGraw
Conrad Z. Risher
Office of the Attorney General for the District of Columbia
441 4th Street, NW
Washington, DC 20001
202-442-9887
fernando.amarillas@dc.gov
esther.mcgraw@dc.gov
conrad.risher@dc.gov

Date:   April 24, 2018                  /s/ Chinh Q. Le
                                                Chinh Q. Le (DC Bar No. 1007037)
                                                LEGAL AID SOCIETY OF THE
                                                        DISTRICT OF COLUMBIA
                                                1331 H Street NW, Suite 350
                                                Washington, DC 20005
                                                202-628-1161 (Phone)
                                                202-727-2132 (Fax)
                                                cle@legalaiddc.org

                                                *Attorney for Plaintiffs*