# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **SHONICE G. GARNETT** *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 17-cv-1757 (CRC) |
| **LAURA ZEILINGER**, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

States that participate in the federal Supplemental Nutrition Assistance Program ("SNAP") must comply with strict statutory deadlines for processing benefit applications and periodically recertifying benefit eligibility. Plaintiffs, three classes of District of Columbia residents, have sued the director of the agency that administers the District's SNAP program for alleged noncompliance with these deadlines and now move for a preliminary injunction. The injunction sought would compel the District to: (1) adhere to the statutory timelines for processing both initial and periodic recertification applications; (2) timely notify eligible households that their benefits will expire absent recertification; and (3) notify households of any delay in the processing of their applications and of their right to a hearing to contest adverse or delayed eligibility determinations.

The Court will grant the plaintiffs' motion in part. It will issue an injunction requiring the District to process SNAP recertification applications within the statutory deadlines, which it has fallen well short of doing in the recent past. The Court declines, however, to extend that injunction to the processing of initial applications. The evidence before the Court suggests that the District is making progress towards full compliance with that particular deadline, with the active assistance and supervision of the Department of Agriculture's Food and Nutrition Service,

the federal agency that oversees SNAP. Additional judicial intervention is therefore unnecessary at this juncture and would be contrary to the public interest. The Court will instead continue to monitor the District's performance as the litigation progresses and consider extending the injunction to initial applications as warranted. Finally, the Court will also decline to issue injunctions ordering the District to provide the requested notifications, finding that the plaintiffs have not adduced sufficient evidence at this stage of the litigation to establish a likelihood of success on the merits of those claims.

## I.     Factual Background

### A.    The Supplemental Nutrition Assistance Program ("SNAP")

Congress originally enacted the Supplemental Nutrition Assistance Program ("SNAP") in 1964 in an effort to combat hunger and malnutrition by providing assistance to low-income households for purchasing food. See Food Stamp Act of 1964, Pub. L. No. 88-525, 78 Stat. 703 (codified at 7 U.S.C. §§ 2011 *et seq.*).[1]  States can elect to participate in SNAP and, if they do, are responsible for certifying household eligibility for benefits, issuing benefits, and otherwise administering the program on the state level. Id. §§ 2013(a), 2020(a)(1); 7 C.F.R. § 271.4. The federal government, in turn, provides the funding for benefits and covers 50 percent of the administrative costs borne by the States. 7 U.S.C. §§ 2013(a), 2025. If a State elects to participate, it must administer its SNAP program in accordance with the SNAP Act and the Secretary of Agriculture's implementing regulations. See 7 U.S.C. § 2020(e); 7 C.F.R. § 273.2.

_____

[1] The program's name was changed from its original name, the "Food Stamp Program," to SNAP in 2008. See Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-234, § 4001, 122 Stat. 923, 1092.

One of the responsibilities that participating States have is verifying a household's eligibility to receive benefits. 7 U.S.C. § 2020(a)(1). A household is eligible for SNAP benefits if its net income is below the federal poverty line and its assets generally do not exceed $2,000. Id. § 2014(c), (g). The statute and pertinent regulations also detail how States must process applications for benefits. First, States must allow a household to apply for SNAP benefits the same day that it contacts a SNAP program office in person during office hours. Id. § 2020(e)(2)(B)(iii). Once a State receives an application for benefits, it must "promptly" certify a household's eligibility. Id. § 2020(e)(3). This certification process must be completed and benefits provided no later than thirty days after the application's filing. Id. For certain households with extremely low income—less than $150 per month or liquid assets less than $100—the State must provide benefits no later than seven days after an application is filed. Id. § 2020(e)(9)(A). These are known as "expedited" applications. States must also notify the household when it acts on the household's application, by sending an approval, denial or "pending status" notification within the statutory time period. 7 C.F.R. § 273.10(g).

Eligible households are certified to receive benefits for a specific period of time, known as the "certification period." See 7 U.S.C. § 2020(e)(4). States are required to ensure that households receive a notice at the start of the last month of their certification period, warning them of the expiration of the certification period and of the need to recertify eligibility to continue receiving benefits. Id. For any household that submits a recertification application no later than fifteen days prior to the expiration of its certification period, the State must provide benefits—if the household remains eligible—without a break in service. Id. Finally, States must provide households the opportunity for a hearing if the household is aggrieved by the State's action. Id. § 2020(e)(10).

Within the federal government, the Secretary of Agriculture has delegated most of the administration of SNAP to the Food and Nutrition Service ("FNS" or "the Service"), a component agency of the Department of Agriculture. 7 C.F.R. § 271.3. The Service engages in detailed oversight of the States' administration of their SNAP programs. For instance, State agencies are required to submit a variety of plans to the Service for approval, such as plans for the computerization of benefit program administration, id. § 272.10, annual budget plans, id. § 272.2(c)(1)(i), and plans for quality control sampling, id. § 275.11(a). See also id. § 272.2(d) (listing other plans requiring Service approval). In addition, States must submit a quarterly summary of their operations to the Service. Id. § 272.2(c)(1)(ii).

Another way in which the Service oversees the administration of State benefit programs is through an annual "quality control review" process. As part of their performance reports to the Service, State agencies are required to perform a quality control review on a sample of households that either received SNAP benefits ("active" cases) or had benefits suspended, denied, or terminated ("negative" cases). Id. § 275.10(a). Each case in the sample is then reviewed to check, among other things, whether the household received the correct amount of benefits or whether the State accurately terminated or denied benefits. Id. State agencies submit the results of this quality control review to the Service, which further analyzes the results to determine whether the State is in compliance with its obligations and to determine error rates for the State's grants and denials of benefits. Id.; see also id. § 275.3(c) (discussing the Service's verification of State-reported error rates); id. § 275.23(b)(2) (same). Based on the information reported through the quality control review, the Service also awards bonuses to States that show "high or improved performance" on a variety of measures, including error rates for payment

determinations, accuracy of benefit determinations, and timeliness of processing applications. Id. § 275.24.

Along with this reporting and approval oversight, the Service can levy punitive sanctions if State agencies do not comply with their statutory and regulatory obligations. For instance, the Service may temporarily suspend all or a portion of the federal funds a State receives to cover administrative costs. Id. § 276.4(b). This suspension "shall remain in effect until [the Service] determines that a State agency has taken adequate corrective action to correct the problem causing the suspension." Id. The Service can also disallow all or part of the administrative funds the State agency receives. Id. § 276.4(c). Prior to suspending or disallowing funds, the Service must provide a warning to the State agency. Id. § 276.4(d). To avoid the proposed sanction, the State agency typically must submit a corrective action plan that "determine[s] appropriate actions to reduce substantially or eliminate deficiencies in program operations." Id. § 275.16(a); see also id. § 276.4(d)(ii) (requiring submission of a corrective action plan). The State agency can administratively appeal any suspension or disallowance of federal funds. Id. § 276.4(f); see also id. § 276.7 (describing the administrative appeal process). Finally, the Service can also elect to seek injunctive relief against the State in federal court to ensure compliance. Id. § 276.5.

B. The District's administration of SNAP

In the District of Columbia, SNAP is administered by the Economic Security Administration, an agency within the District's Department of Human Services. Def.'s Opp'n Pls.' Mot. Prelim. Inj. ("Def.'s Opp'n") Ex. A ("First Zeilinger Decl."), ¶ 6. The Administration also oversees the District's other assistance programs, such as Temporary Assistance for Needy Families ("TANF"). Id. ¶ 7. The District operates five service centers spread throughout the city

to provide in-person assistance to those seeking benefits.  Id. ¶ 13.  These service centers are operated Monday through Friday and handle applications for SNAP and other benefits, including interviewing applicants and processing applications.  Id. ¶¶ 13–14.  In addition to running the five service centers, the District also operates a call center that residents can contact by telephone for assistance with benefits-related issues.  Id. ¶ 17.  As with the service centers, the call center operates Monday through Friday, though it also has an automated self-service interactive hotline available 24 hours a day, seven days a week.  Id. ¶¶ 18–19.

On October 23, 2017, the District received a letter from the Service indicating it would need to submit a corrective action plan aimed at raising the District's rate of timely processed applications for SNAP benefits.  Pls.' Reply Def.'s Opp'n ("Pls.' Reply") Ex. 1, Ex. O ("October 23, 2017 FNS Letter").[2]  The District submitted a draft corrective action plan on December 14, 2017, which the Service could not approve due to a lack of sufficient detail.  Def.'s Suppl. Br. Supp. Opp'n ("Def.'s Suppl. Br.") Ex. 1 ("Fourth Zeilinger Declaration"), ¶¶ 8–9.  A revised plan was submitted on February 9, 2018, which the Service again declined to approve because of insufficient detail.  Id. ¶¶ 10–11.  The Service arranged a training on March 14, 2018 to assist the District in creating an appropriate plan.  Id. ¶ 12.  The District submitted a new working draft to the Service on March 28, 2018, and the Service indicated that the draft was "what [it's] looking for."  Id. ¶¶ 13–14.  The second revised plan was submitted to the Service on April 11, 2018.  Id. ¶ 15.  The Court is unaware of its acceptance status at this time.

_____

[2] The plaintiffs note that the District has previously been required to submit corrective action plans, which they contend shows the ineffectiveness of that process.  But these prior plans dealt with error rates, not timeliness rates.  See, e.g., Mem. Law Supp. Pls.' Mot. Prelim. Inj. ("Pls.' Mot. Prelim. Inj.") Ex. 1, Ex. W (Nov. 2014 corrective action plan); id. Ex. Z (May 2016 corrective action plan).  As a result, they are of limited value here.

C. Procedural history

In August 2017, a group of D.C. residents filed suit against Laura Zeilinger, the Director of the District's Department of Human Services, alleging that the District's administration of SNAP was deficient in several respects.[3]  Specifically, the plaintiffs alleged that the District was: (1) failing to process initial applications for benefits and to provide benefits to eligible households within the applicable statutory time limits, in violation of the SNAP Act, Am. Compl. ¶ 171; (2) failing to implement the SNAP recertification process so as to allow eligible households to continue to receive benefits without a break in service, also in violation of the SNAP Act, id. ¶ 172; and (3) failing to provide notice of delays in processing applications and of the opportunity for a hearing, in violation of the SNAP Act and the Due Process Clause of the Fifth and Fourteenth Amendments, id. ¶ 173.  The plaintiffs sought declaratory and injunctive relief correcting these violations.  In conjunction with their complaint, the plaintiffs filed a motion for class certification, which the Court granted on March 28, 2018, certifying three classes.  See Garnett v. Zeilinger, 2018 WL 1524748 (D.D.C. March 28, 2018).

The plaintiffs then filed this motion for a preliminary injunction seeking an order requiring the District to (1) process SNAP benefit applications in accordance with the statutory timelines, (2) provide the opportunity for recipients to complete the recertification process and have SNAP benefits issued for the new certification period in a timely manner, and (3) send written notice of processing delays and of the opportunity for an administrative hearing to households whose applications were delayed in processing.   Mem. Law Supp. Pls.' Mot. Prelim. Inj. ("Pls.' Mot. Prelim. Inj.") at 1.

---

[3] While Director Zeilinger is technically the sole defendant in this case, the Court will refer to the defendant as "the District."

After the District filed its opposition to the motion for a preliminary injunction, the plaintiffs moved to stay briefing to allow them to conduct limited, expedited discovery on several factual issues raised by the District's opposition, including a dispute over the accuracy of several reports submitted by the District to the Food and Nutrition Service. At a December 1, 2017 status conference, the Court directed the parties to meet and consider whether the case should be stayed to allow for further discussion of settlement or the narrowing of disputed issues. See Minute Order (Dec. 1, 2017). When the parties reported that they were unable to reach any agreement, the Court granted in part the plaintiffs' motion for expedited discovery. See Order (Dec. 15, 2017). It permitted the plaintiffs to conduct a limited, four-hour corporate representative deposition on four specific topics and ordered the District to make more recent versions of the relevant timeliness reports available to the plaintiffs. Id. at 6.

Following this discovery, the parties completed briefing on the preliminary injunction motion. The Court held a hearing on the motion (along with the then-pending motion for class certification) on March 19, 2018. It then ordered a further round of briefing addressing some additional issues, which was completed on April 24, 2018. The motion is now ripe for resolution.

**II.    Legal Standard**

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). The party seeking a preliminary injunction thus bears the burden of making a "clear showing that [he] is entitled to such relief." Id. at 22. To make such a showing, the party must establish: "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3)

that the balance of equities tips in his favor, and (4) that an injunction is in the public interest."

Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting Winter, 555 U.S. at 20).

## III. Analysis

The plaintiffs move for a three-fold injunction that would require the District to: (1) adhere to the statutory timelines for the processing of all SNAP benefit applications, (2) send out recertification notices on time as required by the statute, and (3) provide recipients notice of any delays in processing their applications and of their right to a hearing. The Court will grant the plaintiffs' first request in part but will deny the other two.

A. Plaintiffs' motion for an injunction requiring the District to process initial and recertification SNAP applications in a timely manner.

First, the plaintiffs request an injunction requiring the District to process initial and recertification applications in accordance with the statutory timelines. Looking to the four factors for injunctive relief, the Court will grant this part of the plaintiffs' request as to the processing of recertification applications and will impose monitoring and reporting requirements as to the processing of initial applications.

### 1. Likelihood of success on the merits

In order to obtain a preliminary injunction, the plaintiffs must first demonstrate a likelihood of success on the merits. Sherley, 644 F.3d at 392. Whether the plaintiffs have met this requirement depends in part on whether the SNAP Act requires absolute or substantial compliance with the timelines for processing applications. The District argued at the hearing that the Court should follow the approach taken by the Third Circuit in Shands v. Tull, 602 F.2d 1156 (3d Cir. 1979), which only required substantial compliance with the statute. But Shands is not the proper analog here. For one, Shands is of limited value because it involved a different statutory provision and scheme, namely a requirement under the Aid to Families with Dependent

Children program (now the TANF program) to provide hearings upon request. Id. at 1160.

Moreover, the approach taken in Shands has since been rejected by multiple courts, which have instead required absolute compliance with statutory requirements for the administration of welfare programs. See, e.g., Withrow v. Concannon, 942 F.2d 1385, 1387–88 (9th Cir. 1991); Alexander v. Hill, 707 F.2d 780, 784 (4th Cir. 1983); Reynolds v. Giuliani, 2005 WL 342106, at *17 (S.D.N.Y. Feb. 14, 2005). This includes multiple decisions involving the SNAP Act processing timelines at issue here. See Haskins v. Stanton, 794 F.2d 1273, 1274 (7th Cir. 1986); Briggs v. Brembly, 2012 WL 6026167, at *17–18 (D. Conn. Dec. 4, 2012), aff'd, 792 F.3d 239 (2d Cir. 2015); Robidoux v. Kitchel, 876 F. Supp. 575, 579 (D. Vt. 1995); Robertson v. Jackson, 766 F. Supp. 470, 476 (E.D. Va. 1991), aff'd, 972 F.2d 529 (4th Cir. 1992).

As the Court discussed in more detail in its opinion on class certification, the requirement for absolute compliance with the timelines for processing applications flows directly from the statutory text itself. This text "literally requires strict compliance with its provisions." Haskins, 794 F.2d at 1277; cf. Withrow, 942 F.2d at 1387 (describing similar language in regulations implementing other aspects of the SNAP Act as "unequivocal"). It provides that States *shall* process applications within a specific number of days, without limitations or caveats. See 7 U.S.C. § 2020(e)(3), (9). In light of this statutory text, the Court joins the weight of authorities rejecting the approach in Shands and concludes that the SNAP Act requires absolute compliance.

The Court further concludes that the plaintiffs have demonstrated a substantial likelihood of showing the District has failed to meet this standard. For one, the District conceded at the hearing that it was processing less than 95% of applications on time. Hr'g Tr. 52:19 (March 19, 2018). This concession is confirmed by the evidence in the record that the plaintiffs have

presented, namely recent data on two metrics of timeliness used by the Food and Nutrition Services.

The first such metric is known as the "Application Processing Timeliness" or "APT" rate. See U.S. Dep't of Agriculture, Food & Nutrition Serv., "Clarification on the three ways initial SNAP application processing timeliness is measured," at 1 (June 2, 2017).[4]  This statistic exclusively covers the timely processing of *initial* applications, not recertification applications, and is calculated based on the sample of cases used in the State quality control process.  Id.  To calculate the APT rate, the Food and Nutrition Service divides the total number of sample applications timely disposed of by the total number of approved sample applications.  Id. at 1–2. The Service then calculates a 95% confidence interval for the APT rate.  Id.  When determining whether a State is eligible for a performance bonus or needs to submit a corrective action plan, the Service uses the upper bound of this confidence interval.  Id.

The second timeliness metric involved here is the overdue application rate, calculated from data contained in quarterly reports submitted by States.  Id. at 4.  Since the beginning of fiscal year 2017, the Service has required States to submit reports each quarter of the fiscal year (known as "FNS-366B reports") that detail the total number of applications—broken down further into the number of recertification, initial, and expedited applications—approved or denied that quarter as well as how many applications were approved "overdue."  Id.  According to the

---

[4] While this memorandum is not in the record, the Court may take judicial notice of an official agency memoranda posted on that agency's website.  See, e.g., Pharm. Research & Mfrs. of Am. v. U.S. Dep't of Health & Human Servs., 43 F. Supp. 3d 28, 33 (D.D.C. 2014) ("Courts in this district have frequently taken judicial notice of information posed on official public websites of government agencies.").  This memo can be found online at https://www.fns.usda.gov/snap/clarification-three-ways-initial-snap-application-processing-timeliness-measured.

Service, an application is approved "overdue" if it was approved after the requisite statutory time limit (*i.e.*, 7 days after submission of an expedited application or 30 days after submission of a standard application). Id. at 5; see also U.S. Dep't of Agriculture, Food & Nutrition Serv., "Clarifications for Reporting on the Certification Section of the FNS-366B," at 3 (Jan. 11, 2017).[5] Using the data in these reports, a rate of applications approved overdue—and thus not within the statutory time limit—can be calculated.

The most recent data under both of these metrics indicates that the District is not in full compliance with the statutory timelines. With respect to the APT rate, the most recent data covers the FNS quality control audit for April to September 2017. Based on a sample of 279 cases, the District approved only 87.10% of these cases on time, with an upper limit of the confidence interval of 91.03%. Def.'s Suppl. Br. Ex. 1, Ex. A, at 3. Both of these numbers are obviously below full compliance. Similarly, according to the most recent FNS-366B report—for the first quarter of fiscal year 2018—the District approved a total of 74.54% of applications on time, which includes 94.97% of initial applications, 59.28% of recertification applications, and 94.81% of expedited applications. Def.'s Surreply Supp. Opp'n ("Def.'s Surreply") Ex. B.[6] These numbers, too, indicate that the District is not in full compliance with the statutory

_____

[5] The Court takes judicial notice of this January 11, 2017 FNS memorandum as well. See, e.g., Pharm. Research, 43 F. Supp. 3d at 33. The memo can be found online at https://www.fns.usda.gov/snap/fns-366b-certification-section-question-and-answer-memo.

[6] To calculate this rate, the Court first found the total number of applications approved overdue by adding together the applications approved overdue 1-30 days (Column D in the form), approved overdue 31-60 days (Column E), approved overdue 61-90 days (Column F) and approved overdue 91+ days (Column G) for each category of applications ("total" applications, which encompasses all types; initial; recertification; or expedited). The Court then divided this sum by the total number of approved applications (Column A) for each category of applications and multiplied the result by 100 to arrive at a percent.

requirements. In light of this evidence and the statute's requirement for full compliance, the Court concludes that the plaintiffs have shown a substantial likelihood of succeeding on the merits.

### 2. Irreparable injury

Next, the plaintiffs must demonstrate that they "would suffer irreparable injury if the injunction were not granted." Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006). With respect to irreparable injury, the D.C. Circuit has "set a high standard"—the injury alleged must be "certain and great," "actual and not theoretical," and "beyond remediation." Id. (citations omitted). In addition, the injury must be "of such imminence that there is a 'clear and present need for equitable relief to prevent irreparable harm.'" Id. (citation and emphasis omitted).

Declarations from class representatives and members establish that, without benefits, class members are unable to obtain enough food for themselves and their families, requiring them to skip meals and go hungry. See, e.g., Pls.' Mot. Prelim Inj. Ex. 2, ¶ 13 (Decl. of Shonice G. Garnett ("I skip meals all the time."); Pls.' Reply Ex. 4, ¶ 9 (Decl. of Nelson Bostic) ("I would just have days where I didn't get enough to eat."). This is particularly true for recipients with dietary restrictions, for whom finding food can be particularly burdensome. See, e.g., Pls.' Mot. Prelim. Inj. Ex. 8, ¶ 25 (Decl. of Elizabeth Telson) (describing difficulty finding substitute meals due to lactose intolerance); Decl. of Kathryn Harris [ECF No. 27-6] ¶ 7 (describing difficulty finding substitute meals due to irritable bowel syndrome). Even for those recipients who are able to obtain food, doing so can come at the cost of paying for other necessary survival expenses, such as rent, electric bills, or phone bills. See, e.g., Pls.' Mot. Prelim. Inj. Ex. 6, ¶ 16 (Decl. of Diamond Moore) ("I couldn't keep up with the rent because I needed the money for

food . . . I also got behind on my electric bill."); id. Ex. 7, ¶ 10 (Decl. of Sandra Bonilla de Leonzo) ("I had to pay my rent late.").

The harms described in these affidavits—forgoing food or other necessities— are clearly irreparable in nature. "[T]he deprivation of food 'is extremely serious and is quite likely to impose lingering, if not irreversible, hardships upon recipients.'" Haskins, 794 F.2d at 1276–77 (citation omitted); see also, e.g., Kildare v. Saenz, 325 F.3d 1078, 1083 (9th Cir. 2003) ("[B]ack payments cannot 'erase either the experience or the entire effect of several months without food, shelter or other necessities.'" (citation omitted)).

The District does not disagree. Instead, it argues that the plaintiffs have failed to show that their injury is sufficiently *imminent* to sustain injunctive relief. Def.'s Opp'n at 30; Def.'s Surreply at 21. This is so, it says, because the plaintiffs have not shown that the issues leading to individual declarants' specific delays in receiving benefits are likely to occur again. Def.'s Opp'n at 30; Def.'s Surreply at 21. But the District has conceded that it is processing less than 95% of applications on time. Hr'g Tr. 52:19 (March 19, 2018). Given that it approves roughly 10,000 to 20,000 applications each quarter, see Pls.' Reply Ex. 1, Ex. P (fiscal year 2017 FNS-366B reports), that means that at least 500 to 1,000 households per quarter (or roughly 2,000 to 4,000 households annually) are not receiving benefits on time. While the specific declarants here may not be among those unserved households, the harms they suffer are indicative of the harms suffered by such households, which are members of the plaintiff class. These harms, as discussed, are irreparable and will continue to occur to class members until the District is in full compliance.

That said, the plaintiffs must show that the injury is of such imminence that there is a "'clear and present' need for equitable relief to *prevent* irreparable harm." Chaplaincy of Full

Gospel Churches, 454 F.3d at 297 (emphasis added).  Put another way, the plaintiffs must show that the District will continue to remain below absolute compliance without this Court's intervention.  As to initial applications, there are reasons to doubt that a full injunction is necessary to prevent the irreparable harms the plaintiffs have identified.  For one, the District is close to full compliance and has shown a trend of rising timeliness rates.  Compare Pls.' Reply Ex. 1, Ex. P, at 1 (FNS-366B report for first quarter, fiscal year 2017 showing a timeliness rate of 90.59%) and id. Ex. 2, Ex. B (data for October 2016 to March 2017 showing an APT rate of 79.49% with an upper bound of 88.45%) with Def.'s Surreply Ex. B (FNS-366B report for first quarter, fiscal year 2018 showing a timeliness rate of 94.97%) and Def.'s Suppl. Br. Ex. 1, Ex. A, at 3 (data for April to September 2017 showing an APT rate of 87.10% with an upper bound of 91.03%).

Moreover, as discussed above, the District is under an obligation to prepare a corrective action plan for the Food and Nutrition Service addressing its low processing rate for initial applications.  See October 23, 2017 FNS Letter.  The Service requires the District to bring its APT rate up to 95% within a year of any plan's approval and has the power to impose sanctions if the District fails to submit an acceptable corrective action plan or comply with any plan the Service ultimately accepts.  See id.  The Service has indicated its willingness to reject the District's plan and to carry out its oversight duties in the formulation of that plan.  See Fourth Zeilinger Decl. ¶¶ 9–14.  Given the District's relatively high and rising timeliness rate and the Service's active regulation here, there are reasons to believe that the District will reach a de minimis level of non-compliance, or even full compliance, as to initial applications in the absence of a court order.  As such, injunctive relief may not be necessary to prevent irreparable harm.

However, these reasons why injunctive relief may not be necessary to prevent irreparable harm do not apply to recertification applications. For one, the District has a much lower timeliness rate: 59.28% according to the most recent FNS-366B report. See Def.'s Surreply Ex. B. In addition, since the Service monitors the APT rate—which as noted only covers initial applications—there is no parallel corrective action plan process triggered by low timely processing rates for recertification applications.

To conclude, as to recertification applications—for which no direct regulatory oversight process exists and for which the District has much lower current timeliness rates—the plaintiffs have shown irreparable harm that will occur in the absence of injunctive relief. As to initial applications, the ongoing FNS corrective action plan process may mean that a full injunction is not necessary to prevent the irreparable harms identified by the plaintiffs.

### 3. Balance of equities

The third requirement that the plaintiffs must meet is to demonstrate that the balance of equities or hardship tilts in their favor. See, e.g., Chaplaincy of Full Gospel Churches, 454 F.3d at 297. In deciding how the balance tips, the Court must weigh "the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter, 555 U.S. at 24 (citation omitted). The Court must be particularly cognizant of "the public consequences in employing the extraordinary remedy of injunction." Id. (citation omitted).

The Court has already discussed the serious and irreparable harm to class members in the absence of an injunction: chiefly, going without food for themselves and their families. In contrast, the additional burden imposed on the District by any injunction would be minimal. As the Seventh Circuit explained in a case involving a SNAP Act injunction, "[t]he Act itself

imposes the burden; [an] injunction merely seeks to prevent the defendant[] from shirking [its] responsibilities under it." Haskins, 794 F.2d at 1277; see also Withrow, 942 F.2d at 1388 ("An injunction requiring adherence to [the SNAP Act] regulations . . . imposes no inappropriate obligations on the state."); Briggs, 2012 WL 6026167, at *19 (same). Because any obligation to comply with the timelines arises under the statute and pertinent regulations, an injunction requiring such compliance creates no significant *new* burdens on the District.

The District nevertheless contends that if an injunction issues, it will be forced to divert resources and would face "additional administrative burdens" in order to comply. Def.'s Opp'n at 37. If it does divert resources, the District says, it may be unable to properly administer other benefit programs or other aspects of the SNAP program, and could face sanctions from federal regulatory agencies as a result. Id.; Def.'s Surreply at 22–23. But while an injunction might in practical terms demand a diversion of resources, the legal obligation to divert those resources is rooted in the statute; the injunction simply enforces the statute's requirement that the District find the resources needed to meet all of its obligations. An injunction thus imposes no burden on the District beyond what the statute already requires. Consequently, the balance of equities tilts in favor of granting injunctive relief, both as to initial applications and recertification applications.

### 4. Public interest

Finally, the plaintiffs must demonstrate that issuance of an injunction is in the public interest. See, e.g., Chaplaincy of Full Gospel Churches, 454 F.3d at 297. As the plaintiffs contend, there is a public interest in enforcing compliance with the law. See, e.g., Fund for Animals, Inc. v. Espy, 814 F. Supp. 142, 152 (D.D.C. 1993). That said, the mere fact that an agency is not in compliance with the law is insufficient, by itself, to justify an injunction. "[A]

federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." Weinberger v. Romer-Barcelo, 456 U.S. 305, 313 (1982).

The Court is also particularly cognizant that with respect to the statutory timelines, "absolutely perfect compliance is unattainable." Withrow, 942 F.2d at 1388; see also Haskins, 794 F.2d at 1277; Briggs, 2012 WL 6026167, at *17; Reynolds, 2005 WL 342106, at *17. As the Ninth Circuit has explained, "[t]here is . . . doubtless a point at which any failure of total compliance is truly *de minimis*, where the state has come to comply 'as strictly as is humanly possible.'" Withrow, 942 F.2d at 1388; see also Haskins, 794 F.2d at 1277 ("As with any program of this size, a few inadvertent errors are inevitable, and we are confident that the district court will not exercise its equitable powers to hold the state in contempt for every minor, inadvertent infraction of the Act if the court is satisfied that the officials are complying with the Act as strictly as is humanly possible."). If a State is complying with the timelines for the approval of applications "as strictly as is humanly possible," then the public interest would not favor an injunction forcing the diversion of resources from other important government programs to chase a small and likely unattainable improvement.

In addition, the Court must take account of the role that the Food and Nutrition Service plays in administering this statute and in ensuring the District is complying with its obligations. The Service has demonstrated its willingness and ability to actively regulate the District's compliance, as illustrated by the ongoing corrective action plan process: the Service has rejected inadequate plans and is working closely with District personnel to resolve its timeliness problems. Fourth Zeilinger Decl. ¶¶ 9–14. And the Service has tools in its arsenal to enforce the District's adherence to its corrective action plan, namely the ability to suspend or disallow all or part of the District's administrative funds or to itself seek injunctive relief from a federal court.

See 7 C.F.R. § 276.4. As the regulatory agency with responsibility for administering the SNAP program, the Service has an expertise in the statutory requirements that this Court lacks, and it better understands how States can practically achieve them.

In light of the Service's expertise and role, in particular with respect to the ongoing corrective action plan process, the public interest would disfavor the Court's interference in the regulatory scheme through the issuance of injunctive relief. In other words, this "is not a situation where only an injunction can vindicate the purpose of the statute in question, nor one where the statute 'compel[s]' such an extraordinary remedy." Allina Health Servs. v. Sebelius, 756 F. Supp. 2d 61, 70 (D.D.C. 2010) (quoting Weinberger, 456 U.S. at 314). And where the Court has a less intrusive means of furthering the statutory purpose and ensuring compliance with the District's statutory obligations, the public interest would weigh towards choosing such options, especially where, as here, the plaintiffs seek a mandatory ("do this") rather than prohibitory ("don't do this") injunction. See, e.g., Dorfmann v. Boozer, 414 F.2d 1168, 1173 ("The power to issue a preliminary injunction, *especially a mandatory one*, should be 'sparingly exercised.'" (emphasis added) (citation omitted)).

With these considerations in mind, the Court concludes that the public interest favors an injunction as to the recertification applications but favors a more limited oversight role for the initial applications. First, the District's noncompliance as to recertification applications is far beyond de minimis. The most recent FNS-366B reports—the only data that directly measures recertification application timeliness—shows a timeliness rate of 59.28%. See Def.'s Surreply Ex. B. While the District contends that it is typical for states to have a lower rate of timely processing for recertification applications as opposed to initial applications, the District's rate is well below what other states have reported: Colorado reports monthly rates of 94.71% to 97.91%

for January 2017 to February 2018, New Mexico reports monthly rates of 90.4% to 98.4% for

November 2017 through March 2018, and Texas reports monthly rates of 96.65% to 99.10% for

October 2017 to April 2018.[7]  The plaintiffs have also presented data indicating that states have

achieved much higher rates; Nebraska, for instance, processed 99% of recertification

applications on time in February 2018.  Pls.' Response Def.'s Suppl. Br. ("Pls.' Response) Ex. E.

Although some states may not have rates this high, this data shows that it is possible for states to

achieve timeliness rates far higher than the District's.  Since the District's non-compliance well

exceeds a de minimis level, and because the Food and Nutrition Service does not directly oversee

state compliance on timely processing of recertification applications, the Court concludes that

the public interest would favor the full injunctive relief that plaintiffs seek.

But initial applications again present a slightly different story.  For one, the District's

compliance rates are much closer to a de minimis level of non-compliance: statistics suggest the

District is likely processing somewhere around 90–95% of applications in a timely fashion

currently.[8]  Moreover, the District has shown a definite upward trend in its timeliness rate,

---

[7] While none of this data is in the record, the Court may take judicial notice of data
publicly released on the relevant state agency's website.  See, e.g., Pharm. Research, 43 F. Supp.
3d at 33.  Data for Colorado can be found in the "Statewide timeliness data by app type"
spreadsheet available at https://www.colorado.gov/pacific/cdhs/data-economic-security.  Data
for New Mexico can be found in the "monthly statistical reports" available at
http://www.hsd.state.nm.us/monthly-statistical-reports.aspx.  (The Court here cites the New
Mexico data only for applications received by the 15th day of the month before benefits expire,
the deadline to ensure no break in benefits.)  Data for Texas can be found in the "SNAP
Timeliness" monthly reports available at https://hhs.texas.gov/about-hhs/records-statistics/data-
statistics/supplemental-nutritional-assistance-program-snap-statistics.

[8] The Court infers this given that the most recent APT rate data has the District's upper
bound of the confidence interval at 91.03% and the most recent FNS-366B form shows a
timeliness rate of 94.97%.  See Def.'s Surreply Ex. B (FNS-366B report for first quarter, fiscal
year 2018); Def.'s Suppl. Br. Ex. 1, Ex. A (APT rate data for April to September 2017).

improving from 90.59% of applications processed on time in the first quarter of 2017 to 94.97% of applications processed on time in the first quarter of 2018. Compare Pls.' Reply Ex. 1, Ex. P, at 1 (FNS-366B report for first quarter, fiscal year 2017) with Def.'s Surreply Ex. B (FNS-366B report for first quarter, fiscal year 2018). Finally, the District is currently subject to a corrective action plan aimed at ensuring that it achieves a 95% APT, bringing it near rates that other courts have found to be de minimis non-compliance.[9] This regulatory process offers an alternative means of ensuring statutory compliance without the burden of an injunction. Thus, in light of the relatively high level of compliance that the District has already obtained and the ongoing corrective action plan process with the Service, the Court concludes the public interest favors a less intrusive oversight role with respect to initial application rather than the full injunction that will apply to recertification applications.

### 5. Conclusion

The Court concludes that the plaintiffs have carried their burden as to an injunction requiring the District to process *recertification* applications in accordance with the statutory timelines: they have shown a substantial likelihood of success on the merits, that irreparable harm would occur without an injunction, that the balancing of equities tilts in favor of injunctive relief, and that the public interest favors an injunction. The Court will therefore grant this aspect of the plaintiffs' motion.

_____

Combining these two figures with the overall upward trend of the timeliness rates suggests an actual current rate somewhere between 90% and 95%.

[9] See, e.g., Robertson, 766 F. Supp. at 480 (final injunction in a SNAP application processing timeline case allowing a 97% timeliness rate); Pls.' Response Ex. A, at 4 ¶ 2 (D. Hawaii preliminary injunction in a SNAP application processing timelines case allowing a 95% timeliness rate); id. Ex. D, at 8 ¶ 10 (settlement in a SNAP application processing timelines case allowing a 96% timeliness rate).

On the other hand, the Court concludes that it will exercise its equitable discretion to more narrowly tailor relief as to *initial* applications. While the plaintiffs have shown a likelihood of success on the merits and that the balancing of equities tips in their favor, the other two factors point towards a more limited judicial role in light of the ongoing federal corrective action plan process. That process makes it likely that the District will continue to improve its timely processing of applications until it achieves a 95% APT rate, bringing it close to a level of de minimis noncompliance and eliminating the need for a full injunction. Moreover, the Court is hesitant to take upon itself the role that the Food and Nutrition Service is currently and actively playing in the regulatory scheme given the Service's greater expertise and experience. That said, there is still a role for the Court to play in monitoring the ongoing regulatory process. Thus, the Court will require the District to file periodic reports regarding the status of the corrective action plan and updating the Court on its current timeliness rates. Should the District show a large or consistent decline in its initial application timeliness rates, or should it fall out of compliance with or fail to progress in the corrective action plan process, the Court will consider instituting more fulsome injunctive relief covering initial applications as well.

B.  <u>Plaintiffs' motion for an injunction requiring the District to provide an opportunity for SNAP benefit recipients to complete the recertification process without a break in benefits.</u>

In addition to injunctive relief concerning the timely processing of benefits applications, the plaintiffs seek an injunction requiring the District to "provide an opportunity for SNAP recipients to complete the recertification process and have SNAP benefits for the new certification period issued in a timely manner." Pls.' Mot. Prelim. Inj. at 1. Under the SNAP Act, the District must "insure that each participating household receive[s] a notice of expiration of its certification prior to the start of the last month of its certification period advising the

household that it must submit a new application in order to renew its eligibility for a new certification period." 7 U.S.C. § 2020(e)(4). The plaintiffs argue that the District systemically fails to comply with this requirement, which leads to households being unable to complete the recertification process without a break in benefits. Pls.' Mot. Prelim. Inj. at 34. The District responds that the plaintiffs have merely shown isolated failures to meet the statutory requirements—rather than a systemic and ongoing problem—and thus have not demonstrated a substantial likelihood of success on the merits. Opp'n at 21; Surreply at 5.

Unlike with the processing of applications, the plaintiffs have not offered complete statistics on the District's processing of recertification notices to demonstrate any systemic failure to comply with the statutory requirement. Instead, they rely primarily on (1) bi-weekly reports submitted by the District to the Food and Nutrition Service, (2) testimony from Director Zeilinger regarding a "vendor's error" resulting in the failure to send 4,500 recertification notices in June 2017, and (3) declarations from individuals stating that they did not receive recertification notices when they were due. The Court concludes that, on the current factual record, the plaintiffs have not carried their burden of showing a likelihood of success on the merits.

The bi-weekly reports are the closest thing to statistical evidence that the plaintiffs present. These are a series of reports (in the form of a slide deck) that the District presents to the Service every two weeks. See, e.g., Pls.' Reply Ex. 1, Ex. R (Oct. 11, 2017 slide deck). The plaintiffs point primarily to two pieces of information contained in these reports: the "backlogs" of notices and the "error rate" for notice generation. Pls.' Mot. Prelim. Inj. at 34–35; Pls.' Reply at 12–13. But the significance of these two pieces of information is not readily apparent to the Court. Assuming for the moment that a "backlog" notice is one sent late, the number of such

notices reported in the most recent reports is small compared to the total number of notices that the District generates. The December 20, 2017 bi-weekly report—the most recent one in the record—indicates a total of 200 "backlog" notices. Pls.' Reply Ex. 1, Ex. W, at 26. Without minimizing the importance of every household receiving the notices due to it, 200 notices represents a scant fraction of 1% of the 55,000 notices the District sends monthly. First Zeilinger Decl. ¶ 133. Of those 55,000, an average of 4,500 are recertification notices, id. ¶ 143, making the 200 backlog notices no more than 4.5% of recertification notices—assuming all 200 "backlog" notices are *recertification* notices.

This brings the Court to a second limitation in the "backlog" notice statistics: it is not self-evident from the record that the "backlog" notices listed are recertification notices in particular. Indeed, record evidence indicates they might not be. In the most recent bi-weekly reports, the "backlog" notices are all categorized as "Change in Benefit" notices. See, e.g., Pls.' Reply Ex. 1, Ex. W, at 26 (Dec. 20, 2017 slide deck). The District's counsel represented at the hearing that a "Change in Benefit" notice is not the same thing as a recertification notice. Hr'g Tr. 58:24–25 (March 19, 2018). Thus, it is not clear to the Court that the backlog listed in the most recent reports reflects a backlog in sending out recertification notices. In light of these gaps and the general lack of clarity regarding what the bi-weekly reports show, the backlog figures in the bi-weekly reports provide only limited indication of a systemic failure to print and send recertification notices on time.

The same is true with the "error rates" that the plaintiffs point to. See, e.g. Pls.' Reply Ex. 1, Ex. W, at 24 (Dec. 20, 2017 slide deck). In her declaration, Director Zeilinger explains that this "error rate" refers to notices that do not automatically generate, likely due to an issue such as an incorrect address or missing information. First Zeilinger Decl. ¶ 136. These notices

are instead manually generated and then sent to a third-party vendor for printing and mailing. Id. Director Zeilinger further attests that the District's IT personnel monitor notice generation and can quickly re-run notices that fail to automatically generate to ensure they are processed and sent. Id. ¶ 137. In light of this process, the fact that a notice is not properly generated "does not mean the notice is untimely sent." Id. ¶ 138. The plaintiffs offer no evidence to rebut Director Zeilinger's representations or to establish that the "error rates" refer to notices that are ultimately not sent on time. Thus, without more evidence, these figures, too, provide little indication of an ongoing systemic failure to send recertification notices on time.

Aside from the bi-weekly reports, the plaintiffs primarily rely on the deposition testimony of Director Zeilinger and a set of individual declarations. Many of those declarations are from class members attesting to their failure to receive a recertification notice and the consequent termination of their benefits. See, e.g., Decl. of James Stanley [ECF No. 27-2] ¶ 5; Decl. of Roderick Gaines [ECF No. 27-4] ¶ 7. While these declarations certainly suggest that some households are not receiving the notices owed them, they cannot on their own demonstrate a *systemic* failure.

In an attempt to bridge that gap, the plaintiffs point to other evidence that they argue shows the District has had repeated, large-scale failures to send out notices. The most persuasive piece of evidence they present involves a "vendor's error" from June 2017, which was one of the key topics in the limited discovery the Court permitted. See Order at 6 (Dec. 15, 2017) (allowing the plaintiffs to conduct a corporate representative deposition regarding the vendor's error). According to Director Zeilinger, in June 2017 a vendor's error resulted in the failure to send out any of the recertification notices due to recipients that month (whose recertification applications would have been due in September 2017). See Pls.' Reply Ex. 3 ("Zeilinger Dep.") 124:4–11.

Director Zeilinger testified that the District prepared a file with the necessary information for printing and mailing and successfully transferred that file to the third-party vendor the District uses to print and mail notices.  Id. 124:4–11, 126:17–21, 127:9–12.  The vendor, in turn, failed to print and send the notices.  Id. 126:17–21.  Approximately 4,500 households did not receive a recertification notice as a result of this error.  Id. 130:11.

The failure to provide notice to 4,500 households is obviously disconcerting.  But the error is again equally consistent with a systemic problem as it is with an isolated failure.  The District, after all, provided the necessary information to the printer on time.  Id. 126:17–18.  The printer simply failed to print the notices.  Id. 126:19–21.  Even a conscientious and well-run system might experience this sort of unexpected human error.  Without additional indications that this vendor's error was more than an isolated mistake, it does not bridge the gap left by the other evidence.

Moreover, after this error occurred the District took steps to prevent similar ones in the future: it adopted procedures to "confirm that when files were transmitted for notices, they actually resulted in notices printed and mailed."  Id. 153:12–15; see also id. 154:19–24.  The bi-weekly reports that the District submits to the Service also indicate that it is verifying the transfer of files to the printer, confirming the files are being processed, and monitoring the printing process for notices sent with return envelopes.  See, e.g., Pls.' Reply Ex. 1, Ex. W, at 27 (Dec. 20, 2017 slide deck).  Given the processes that the District has put in place to avoid another

mailing error, the June 2017 snafu is not particularly powerful evidence of a *systemic* and

*ongoing* failure to prepare and send recertification notices.[10]

Nor is there enough evidence of further failures akin to this vendor's error to establish a

likelihood that it is part of a trend of problems as opposed to an isolated error.[11]  The plaintiffs

point to a declaration submitted by their counsel, who states that she called the District's call

center on October 23, 2017 and heard a message that stated: "If you failed to receive timely

notification to renew your SNAP benefits, which have now terminated for October 2017, this is

due to a technical issue."  Decl. of Chelsea Sharon [ECF No. 33-3] ¶ 3.  While this message

might suggest an additional issue in the production of notices, it gives no sense of the nature of

the error, the scope of the error, whether it relates to the same vendor error discussed above, or

the number of households impacted.  Similarly, a class member attests that he spoke to someone

with the District's call center who indicated "a lot of people did not get a notice telling them they

needed to recertify."  Pls.' Reply Ex. 10, ¶ 11 (Decl. of Joseph Carver).  Again, however, there is

---

[10] To the extent that plaintiffs cannot show an *ongoing* systemic failure, the Court would have concerns regarding their standing to seek injunctive relief.  Cf. City of Los Angeles v. Lyons, 461 U.S. 95, 105 (1983).

[11] During their deposition of Director Zeilinger, the plaintiffs attempted to ask questions regarding other possible errors.  See, e.g., Zeilinger Dep. 143:6–15, 166:11–16.  The District's counsel instructed Director Zeilinger not to answer such questions, over opposing counsel's objections.  Id.  The Court agrees with the District that such questions were beyond the scope of the limited discovery order.  That order specified that the deposition would cover "the 'vendor error' referenced on pages 9 and 22 of Defendant's opposition."  Order at 6 (Dec. 15, 2017).  That error was the June 2017 error.  The District's opposition made reference to no other vendor's errors, and the Court's discovery order was specifically tailored to resolve only the factual questions created by the District's opposition and the original motion for preliminary injunction.  See id. at 4–5.  Other errors that might have occurred were not teed up by the District's opposition or the plaintiffs' initial motion and thus fall outside the scope of the narrowly-tailored discovery order.  The plaintiffs are, of course, free to inquire about other possible vendor's errors in merits discovery.

no sense of the nature or scope of the error or even that this is a separate error from the one referenced in counsel's declaration.  While these two declarations ultimately provide some suggestion of continued problems in the generation and delivery of notices, they are still insufficient to establish that the plaintiffs have shown a substantial likelihood of demonstrating an ongoing and systemic failure to produce recertification notices.

Ultimately, most of the plaintiffs' evidence—particularly the bi-weekly reports and the June 2017 vendor's error—is equally consistent with the District's argument that any notice failures were isolated instances.  At this juncture, with too many factual questions remaining, that is insufficient for the plaintiffs to carry their burden of demonstrating a substantial likelihood of success on the merits.  See Obama v. Klayman, 800 F.3d 559, 564 (D.C. Cir. 2015) (opinion of Brown, J.) (affirming denial of injunction since "[a]lthough one could reasonably infer from the evidence" that plaintiffs would prevail in showing standing "one could also conclude the opposite").  Of course, this does not mean that the plaintiffs cannot prevail on the merits.  Discovery and further development of the factual record may well demonstrate that the plaintiffs have the better understanding of the evidence they submit.  The Court simply concludes that right now the plaintiffs have not provided evidence sufficient to demonstrate a substantial likelihood of success on the merits.  Consequently, the Court will deny their request for a preliminary injunction regarding the sending of recertification notices.

C.  Plaintiffs' motion for an injunction requiring the District to send written notice of processing delays and of the opportunity for an administrative hearing.

Finally, the plaintiffs seek an injunction requiring the District to send written notices of processing delays and of the opportunity to request an administrative hearing to households whose applications are delayed beyond the statutory timelines.  The Court again concludes that

the plaintiffs have not demonstrated a likelihood of success on the current record and will thus deny this aspect of their motion.

The plaintiffs' argument here is predicated on the statutory and regulatory requirements for notice and fair hearings, namely States' obligations to: (1) send written notice within 30 days informing households of the acceptance, denial, or pending status of their application, 7 C.F.R. § 273.10(g); (2) provide households notice of their right to request a hearing following adverse determinations, id. § 273.15(f); and (3) provide such fair hearings upon request, id. § 273.15(i); see also 7 U.S.C. § 2020(e)(10). The plaintiffs contend that the District is systemically failing to meet these obligations, particularly by not informing households about any delays in processing their applications and of their right to a hearing to challenge such delays. Pls.' Mot. Prelim. Inj. at 37.

As to the first contention, the plaintiffs present only declarations from several class members indicating that they failed to receive notification as to any delays in processing their applications—indeed, that they failed to receive *any* notice concerning their application in contravention of the regulatory requirements in 7 C.F.R. § 273.10(g). See, e.g., Pls.' Mot. Prelim. Inj. Ex. 6, ¶ 15 (Decl. of Diamond Moore); id. Ex. 7, ¶ 9 (Decl. of Sandra Bonilla de Leonzo). But as with the failure to send out recertification notices, in light of the sheer volume of SNAP recipients, declarations from a dozen or so households do not suffice to show a *systemic* failure. And the plaintiffs provide no indication that the class members involved are a representative statistical sampling of the larger population of households. Without more, the submitted declarations cannot carry the plaintiffs' burden to demonstrate a substantial likelihood of success on the merits.

Turning to the alleged failure to provide households with notice of their appeal rights, again the plaintiffs provide insufficient evidence to show a systemic failure. For one, Director Zeilinger, in her first declaration, states that the District routinely includes a notice of appeal and of hearing rights in adverse determination notices. First Zeilinger Decl. ¶ 144. None of the individual class member declarations contradict this by, for example, stating that the class member received a notice without information regarding her appeal rights. Again, on the current evidentiary record, the plaintiffs have not shown a likelihood of success on the merits related to this aspect of their requested injunction.

In sum, the plaintiffs rely exclusively on individual declarations to establish a likelihood of success on this aspect of their case. Such declarations, without more, do not establish a substantial likelihood of demonstrating a systemic error of the type necessary to support an injunction. As such, the Court will deny this portion of the plaintiffs' preliminary injunction motion.[12]

* * *

For the foregoing reasons, the Court will grant in part and deny in part the plaintiffs' Motion for a Preliminary Injunction. It is hereby

**ORDERED** that the plaintiffs file proposed language for an injunction covering recertification applications and for the reporting requirements for initial applications, consistent

---

[12] The District also raises a challenge to plaintiff Bread for the City's standing. However, there only needs to be one plaintiff with standing for a case to proceed. See, e.g., In re Navy Chaplaincy, 697 F.3d 1171, 1178 (D.C. Cir. 2012). No party contests that the plaintiff class has standing to seek injunctive relief given their allegations of harm flowing from an ongoing, systemic violation of their statutory rights. As a result, the Court need not at this juncture resolve any arguments as to Bread for the City's standing.

with this opinion, by June 7, 2018.  The District shall file any response to the plaintiffs' proposed

injunction and reporting requirement language by June 14, 2018.  If is further

      **ORDERED** that the District is to respond to the complaint by July 2, 2018.

      **SO ORDERED**.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  May 31, 2018