## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SHONICE G. GARNETT, *et al.*, | ) )  ) |
| *Plaintiffs*, | ) )  Civil Action No. 17-1757 (CRC) |
| v. | ) )  |
| LAURA ZEILINGER, | ) )  |
| *Defendant*. | ) )  |

## JOINT STATUS REPORT

The Parties respectfully submit this joint status report in response to the Court's June 15, 2018 Minute Order, in which the Court directed the Parties to meet and confer in a good faith effort to arrive at a monitoring and reporting proposal as required by the Court's May 31, 2018 preliminary injunction opinion [ECF No. 60]. In accordance with the Court's Minute Order, the Parties met and conferred by conference call on June 26, 2018, and subsequently continued their conferral by email. The Parties have reached agreement concerning language for certain aspects of monitoring and reporting.

During the meet-and-confer, Plaintiffs asked numerous questions about how the District of Columbia (the District) calculates timeliness for SNAP applications and what kinds of data the District propose reporting. The District explained that it follows and will continue to follow the laws, regulations, and other guidance provided by the Food and Nutrition Service (FNS) as to how to calculate timeliness and what data to report. Plaintiffs asked Defendant to provide additional clarification regarding what she understands FNS to require, but she declined to do so. The District proposed reporting to the Court information similar to that found in the FNS-366B,

supplemented with the Application Processing Timeliness (APT) rate, to apprise the Court of the two primary sources on which FNS relies when calculating the timely processing of both initial applications and recertifications.  The District also reported that, as discussed in its most recent filing, in response to the Court's Memorandum Opinion and Order it was developing a new method for measuring the timeliness of recertification application processing separate from initial applications.  *See*, *e.g.*, ECF No. 67 at 18.  The District also invited Plaintiffs to propose any additional or different methods of reporting.

Following the meet-and-confer, Plaintiffs' counsel summarized their understanding of Defendant's responses and offered a list of their proposals.  *See* Ex. A (June 28, 2018 e-mail from C. Le to C. Risher).  The District confirmed that its reporting would follow the guidance issued by FNS and commented on each of the specific proposals.  *See* Ex. B (July 2, 2018 email from C. Risher to C. Le).  Plaintiffs' counsel responded with additional explanation as to two of its proposals.  *See* Ex. C (July 2, 2018 email from J. Mezey to C. Risher).

## PLAINTIFFS' POSITION

Defendant also requested that Plaintiffs provide Defendant specific proposed requests as to the form and substance of data reports to be issued pursuant to the Court's preliminary injunction.  In response, Plaintiffs' counsel sent additional specific data monitoring and reporting elements necessary for determining Defendant's current and ongoing compliance with SNAP application timeliness.  Plaintiffs believe that these monitoring and reporting requirements ought to be readily generated with Defendant's existing database and reporting capacity and are the types of requirements routinely set forth in other jurisdictions where preliminary and permanent relief have been entered.  They fall into five categories:

2

1. As to decisions on initial applications subject to 30-day processing:

    a. the total number of decisions made in the month, broken out by application approvals and denials;
    b. the total number of "timely denials" and the total number of "timely application approvals" (as defined in our proposed order);
    c. as to untimely application approvals, the number of days by which such decisions were untimely, broken out in 10-day intervals (e.g., 1-20 days late; 11-20 days late, etc.);
    d. as to untimely application denials, the number of days by which such decisions were untimely, broken out in 10-day intervals (e.g., 1-20 days late; 11-20 days late, etc.); and
    e. the percentage of timely decisions (total timely application approvals plus total timely denials divided by the total number of application approvals and denials), rounded to the first decimal point (e.g., 90.26% is rounded to 90.3%).

2. As to initial application decisions on applications eligible for expedited processing ("7-day approvals"):

    a. the total number of timely 7-day approvals and the total number of untimely 7-day approvals;
    b. as to untimely 7-day approvals, the number of days by which such decisions were untimely, broken out in 10-day intervals (e.g., 1-10 days late, 11-20 days late, etc.); and
    c. the percentage of timely 7-day approvals (total number of timely 7-day approvals divided by total number of 7-day approvals), rounded to the first decimal point (e.g., 90.26% is rounded to 90.3%).

3. As to decisions on recertification applications:

    a. the total number of decisions, broken out by recertification application approvals and "recertification application denials" (as defined in our proposed order);
    b. the total number of "timely recertification application approvals" and the total number of "timely recertification application denials";
    c. as to untimely recertification application approvals, the number of days by which such decisions were untimely, broken out in 10-day intervals (e.g., 1-10 days late; 11-20 days late, etc.);
    d. as to untimely recertification application denials, the number of days by which such decisions were untimely, broken out in 10-day intervals (e.g., 1-10 days late; 11-20 days late, etc.); and
    e. the percentage of timely recertification decisions (total number of timely recertification application approvals plus timely recertification application denials divided by the total number of recertification application approvals and denials), rounded to the first decimal point (e.g., 90.26% is rounded to 90.3%).

4. As to initial applications subject to 30-day processing pending at the end of the month:

    a. the total number of applications pending at the end of the month, broken out by number of applications pending 30 days or under and the number pending more than 30 days (in 10-day increments); and
    b. as to initial applications eligible for expedited processing pending at the end of the month, the total number of pending applications at the end of the month, broken out by the number of applications pending 7 days or under and the number pending more than 7 days.

5. As to recertification applications pending at the end of the month:

    a. the total number of pending recertification applications at the end of the month, broken out by number of recertification applications pending 30 days or under and the number pending more than 30 days (in 10-day increments).

The Parties agree as to certain aspects of Plaintiffs' proposed language. *See* Ex. B (July 2, 2018 email from C. Risher to C. Le) (District's responses to Plaintiffs' proposed language). Defendant agrees to provide reporting on: (1) the number of initial (30-day and expedited) and recertification applications approved and denied (**1a, 2a, 3a**), (2) the number of initial (30-day and expedited) and recertification applications that are approved (but not those denied) timely (**1b, 2a, 3b**); and (3) the number of untimely initial (30-day and expedited) application approvals in 30-day intervals (**1c, 2b, 3c**). *See id.* But the parties remain in disagreement about other aspects of these reporting requirements.

## PLAINTIFFS' ARGUMENT

### A. Monthly Reporting

Plaintiffs have proposed language that would require Defendant to report performance on a monthly basis. Monthly reporting enables the Parties to have a complete, current, and mutual understanding of compliance improvements over the course of the Court's injunction. Quarterly production means that the parties and the Court would not have access to critical information

until more than 75 days have lapsed from the last day of the first month of the quarter.[1] Defendant has objected to providing the reporting monthly and has proposed quarterly reporting, arguing that she does not want to burden the Court with a monthly report.  Plaintiffs have proposed making monthly reporting available to Plaintiffs, with a quarterly report to be submitted by Defendant to the Court if the Court so desires.  Thereby, if monthly data indicates a serious failure by Defendant in timely processing applications, Plaintiffs will be able to move for appropriate relief in a timely manner.  Similar reporting obligations have been included in other orders for preliminary relief regarding SNAP timeliness.  *See, e.g.*, ECF No. 59-2, Ex. A (Hawaii Preliminary Injunction Order).  And recent reporting by the District to FNS indicates that the District is capable of providing both monthly and weekly reporting.  *See, e.g.*, Ex. D. (*FNS Weekly Report from DC 2018-06-15.xlsx - I. Monthly Measures (M&W)*) (obtained through FOIA).

Neither Defendant nor the Court will be prejudiced by the provision of monthly data. Assessing performance of Defendant's agency on a monthly basis will not increase the burden on Defendant as it has the capacity to generate the information at that periodicity already.  The Court will not be prejudiced as the Court can readily assess trends demonstrated by the data. Defendant's view that providing the data quarterly is less likely to present a misleading picture is premised on a misreading of a discussion of volatility in market performance and not data that tracks an agency's performance in as close to real time as practicable.

---

[1] For example, Defendant would not provide data for the quarter beginning July 1, 2018, until approximately October 15th, 2018.  Therefore, neither Plaintiffs nor the Court would have data concerning August timeliness until almost 75 days after the end of July 2018 (or 15 days after the end of the quarter).

**B. Reporting Regarding Timeliness of Denials**

Plaintiffs have proposed language that would require Defendant to provide reporting regarding the timeliness of Defendant's processing of SNAP initial and recertification applications that have been denied. Defendant disputes the existence of a requirement to timely process applications that are denied, but such requirements are clearly set forth in FNS's implementing regulations. *See* 7 CFR § 273.2 (g)(3) (requiring agency to provide denial notice no later than 30 days from filing date); 7 C.F.R. § 732 (a)(2) (requiring agency "to 'act promptly' in processing all applications); *Briggs v. Bremby*, No. 12-cv-00324, 2014 U.S. Dist. LEXIS 38204, *18-22 (discussing SNAP application processing requirements regarding applications that are denied and rejecting agency's request to modify preliminary injunction). Reporting on the timeliness of Defendant's approval and denial of applications is necessary for a complete picture of the timeliness of application processing overall.

**C. Reporting Percentage of Timely Decisions Based on Defendant's Data**

Plaintiffs have proposed language that would require Defendant to include in her reporting the percentage of timely decisions for initial (30-day and expedited) and recertification applications, defined as the total timely application approvals plus total timely denials, divided by the number of application approvals and denials, rounded to the first decimal point. Defendant objects to this metric as unnecessary. Including this summary data point in Defendant's reporting will best enable the Court and the Parties to understand Defendant's timeliness compliance over time, and its calculation will add no significant burden to Defendant's reporting obligations because they are already reporting these components separately.

### D. Reporting of Untimely Application Determinations on 10-day Intervals

Plaintiffs have proposed language that would require Defendant to break out untimely application determinations for initial and recertification applications by 10-day intervals (i.e., applications that are 10 days beyond the statutory deadline, 20 days, 30 days, etc.). The provision of information concerning the length of delays for late applications enables the Court and the parties to know not only the extent of the untimeliness, but whether those late applications are very late. Thus, knowing whether the majority of late applications are late by 1-10 days as opposed to 21-30 days can provide critical information in enabling the parties and the Court to design and require corrective action.

Defendant is only willing to provide reporting broken out at 30-day intervals, as she currently provides to FNS. She has pointed to no system limitations that would prevent the generation of information regarding late applications in a more granular fashion. Indeed, if (as she claims) she is improving her timeliness, such reporting ought not be a burden as there ought to be far fewer late applications.

### E. Reporting of Pending Applications

Plaintiffs have proposed language that would require Defendant to include in her reporting data concerning the timeliness of pending applications at the end of a given reporting period (whether that period is a month or a quarter). The provision of information concerning pending applications at the end of each reporting period enables the Court and the parties to assess Defendant's timely processing of SNAP applications. Defendant's proposed monitoring format captures only those applications actually processed in the reporting period, making it possible for the data reported to show high percentages of timely processing since the data would reflect only those applications that the Defendant process expeditiously, while other applications remain pending at the end of the reporting period. If these pending applications are not

processed for months or never processed at all, the reporting would not pick up the length of delay or the fact that some applications were never processed.  Data excluding pending applications at the end of each reporting period will not provide the Court and the parties with a complete understanding of the District's performance.

The District's position remains that it does not see the need for such information or authorization for it in the Court's Memorandum Opinion and Order.

### DEFENDANT'S POSITION

The District's position was set forth in its latest filing with the Court and its July 2, 2018 response to Plaintiffs' proposal.  *See* ECF No. 67 and Ex. B.  Briefly, the District believes the Court would be best served by receiving quarterly reporting showing timeliness as required by and overseen by FNS.  Such reporting would provide the Court with the relevant information from the FNS-366B and the official APT rate for initial applications and recertifications, the two FNS-approved methods for reviewing the processing of SNAP applications, without overburdening the Court. The District does not "dispute[ ] the existence of a requirement to timely process applications that are denied," *see* at 6 above, but disputes that it has ever made a denial untimely. *See* Ex. B.

Plaintiffs' inclusion of the weekly report the District provides FNS showing weekly and monthly data, Ex. D, buttresses the District's position.  The report underscores FNS's oversight capabilities.  FNS is constantly monitoring the most recent data, and the District believes that it would be unnecessary for the Court to duplicate that effort.  Formal filings, such as the FNS-366B, are made quarterly because they present a higher "signal-to-noise" ratio—that is, the numbers are less likely to present a misleading picture.  *See*, *e.g.*, *Smoothing Data with Moving Averages*, FED. RESERVE BANK OF DALLAS, available at https://www.dallasfed.org/research/basics/moving.aspx (last accessed July 3, 2018) (looking at longer periods of time can "reduce or

8

eliminate short-term volatility in data" and "capture changes in the direction of the [data] better than the unadjusted series does."). It also shows that FNS is providing oversight of pending applications, making creation of the new reports in Plaintiffs' Requests 4 and 5 unnecessary and unduly burdensome, as well as beyond the scope of the Court's Memorandum Opinion and Order. *See, e.g.*, Ex. D at 10, 16.

In addition to providing the data described in the first paragraph, the District intends to develop a method for reporting to the Court the timeliness of recertification application processing. *See id.* Plaintiffs seek additional reporting that would require the creation of new reports to provide information that would be confusing or based on a misunderstanding of the application and recertification procedures and, in either case, would be unnecessary and contrary to the Court's Memorandum Opinion and Order.

Dated: July 3, 2018

   /s Chinh Q. Le
Chinh Q. Le (DC Bar No. 1007037)
Jennifer Mezey (DC Bar No. 462724)[*]
Chelsea Sharon (DC Bar No. 1016006)[*]
LEGAL AID SOCIETY OF THE
   DISTRICT OF COLUMBIA
1331 H Street NW, Suite 350
Washington, DC 20005
202-628-1161 (Phone)
202-727-2132 (Fax)
cle@legalaiddc.org
jmezey@legalaiddc.org
csharon@legalaiddc.org

Marc Cohan[††]
Mary R. Mannix[†]

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

/s/ Fernando Amarillas
FERNANDO AMARILLAS (Bar No. 974858)
Chief, Equity Section

/s/ Conrad Z. Risher
CONRAD Z. RISHER (Bar No. 1044678)
AMANDA J. MONTEE (Bar No. 1018326)
JESSICA KRUPKE (Bar No. 1019967)
Assistant Attorneys General

---

[*]    Practicing pursuant to LCvR 83.2(g).
[†]    Application for admission *pro hac vice* to be sought.
[††]   Admitted to appear *pro hac vice*.

Travis W. England[††]
Katharine Deabler-Meadows[†]
NATIONAL CENTER FOR LAW
    AND ECONOMIC JUSTICE
275 7th Avenue, Suite 1506
New York, NY 10001
212-633-6967 (Phone)
212-633-6371 (Fax)
cohan@nclej.org

Peter R. Bisio (DC Bar No. 459256)
Lance Y. Murashige (DC Bar No. 1021562)
Emily Goldman (DC Bar No. 1032032)
Kaitlin Welborn (DC Bar No. 8187724)
Susan A. Musser[††]
HOGAN LOVELLS US LLP
555 13th Street NW
Washington, DC 20004
202-637-5600 (Phone)
202-637-5910 (Fax)
peter.bisio@hoganlovells.com

*Attorneys for Plaintiffs*

441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
(202) 442-5868
(202) 741-0557 (fax)
conrad.risher@dc.gov

*Counsel for Defendant Laura Zeilinger*

10