```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
2     - - - - - - - - - - - - - - - x
      SHONICE G. GARNETT, et al.,
3                                      CA No:  1:17-cv-01757-CRC
                    Plaintiffs,
4                                      Washington, D.C.
                                       Tuesday, September 24, 2019
5     vs.                              10:12 a.m.

6     LAURA ZEILINGER,

7                    Defendant.
      - - - - - - - - - - - - - - - x
8     _____

9         TRANSCRIPT OF POST DISCOVERY STATUS CONFERENCE
         HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
10                UNITED STATES DISTRICT JUDGE
      _____
11    APPEARANCES:
      For the Plaintiffs:        MARC COHAN, ESQ.
12                               NATIONAL CENTER FOR LAW AND
                                 ECONOMIC JUSTICE
13                               275 7th Avenue, Suite 1506
                                 New York, NY 10001
14                               212-633-6967

15                               CHELSEA C. SHARON, ESQ.
                                 LEGAL AID SOCIETY OF D.C.
16                               1331 H Street, NW, Suite 350
                                 Washington, DC 20005
17                               (202) 661-5947

18    For the Defendant:         CONRAD Z. RISHER, ESQ.
                                 FERNANDO AMARILLAS, ESQ.
19                               MATEYA KELLEY, ESQ.
                                 OFFICE OF THE ATTORNEY GENERAL FOR
20                               THE DISTRICT OF COLUMBIA
                                 441 4th Street, NW, Suite 630 South
21                               Washington, DC 20001
                                 (202) 442-9887
22
      Court Reporter:            Lisa A. Moreira, RDR, CRR
23                               Official Court Reporter
                                 U.S. Courthouse, Room 6718
24                               333 Constitution Avenue, NW
                                 Washington, DC  20001
25                               202-354-3187
```

1                      P R O C E E D I N G S

2            THE COURTROOM DEPUTY:  Your Honor, we're on the

3     record for Civil Case 17-1757, *Shonice Garnett, et al. vs.*

4     *Laura Zeilinger*.

5            Counsel, if you can please approach the lectern

6     and identify yourselves for the record.

7            MR. COHAN:  Yes.  Good morning, Your Honor.  My

8     name is Marc Cohan.  I'm one of the attorneys for the

9     plaintiffs.  Also with me today is Ms. Chelsea Sharon with

10    the Legal Aid Society who will also be speaking to

11    plaintiffs' application.

12           THE COURT:  Okay.  Good to see you, folks.

13           MR. RISHER:  Good morning, Your Honor; Conrad

14    Risher on behalf of the District of Columbia.  I'm joined at

15    table by Mateya Kelley and Fernando Amarillas.

16           THE COURT:  All right.  Good morning, Mr. Risher,

17    and everyone else.

18           All right.  So this is our post-discovery status

19    conference in the case.  It has been awhile since I have

20    torn into the issues in the case so you will forgive me if

21    my memory fails and if I ask you to refresh my memory as to

22    what some of the issues are.

23           I guess, before we get into the discovery

24    disputes, where does the case go from here?

25           Mr. Risher?

1          MR. RISHER:  Thank you, Your Honor.

2          THE COURT:  I mean, as we move to the merits

3    phase, is this a summary judgment case, or is this a bench

4    trial; or what's the posture going forward?

5          MR. RISHER:  The District's position is that

6    summary judgment is certainly the appropriate next stage,

7    and the District expects resolution at summary judgment.

8          THE COURT:  Okay.  So at the PI stage, the Court

9    held that the deadlines in the statute were pretty absolute

10   or that the statute required essentially strict compliance.

11   Now, we declined to enter an injunction with respect to the

12   initial deadlines because if the District's at 95 percent

13   compliance, that was good enough, and I didn't think it

14   would be in the public interest to impose injunctive relief,

15   or at least preliminary injunctive relief, on that basis.

16   We reached an opposite conclusion, obviously, on the

17   recertification applications.

18          But if the statute requires strict compliance, and

19   even by the District's most recent report you're still at

20   95, 96, 97 percent, technically doesn't that still violate

21   the statute; and so why wouldn't the plaintiffs be entitled

22   to summary judgment at least on liability?  Do you follow

23   me?

24          MR. RISHER:  I think I follow Your Honor's

25   question.

1          The issue that the District would raise is that

2     although the statute may say -- excuse me.  I'll try that

3     again.

4               THE COURT:  Yes.

5               MR. RISHER:  The statutory language

6     notwithstanding, these regulations that have been propounded

7     by the Food and Nutrition Service, the federal agency that

8     is responsible for the SNAP program, have set standards of

9     95 percent compliance -- this may have been the source of

10    the Court's number -- being the level above which no

11    corrective action plan is generally expected.  The

12    indication being that --

13              THE COURT:  But the plaintiffs have alleged a

14    violation of the statute.  They have not alleged a violation

15    of FNS regs, right?  The statute provides the cause of

16    action.

17              MR. RISHER:  The statute does provide cause of

18    action, but the correct interpretation of the statute can be

19    informed by the regulations, the questions of deference that

20    are due.  Part of the Court's ruling earlier was based on

21    the question of whether there was in place sufficient

22    oversight of the SNAP program and its administration in the

23    District of Columbia without the requirement of additional

24    oversight from the Court.  And so part of what would, we

25    expect, make up the summary judgment arguments are the level

1     of involvement that FNS has with the District and the

2     oversight that is being provided by the federal government.

3              THE COURT:  How have these lawsuits in other

4     jurisdictions been resolved on the merits; or have there

5     been consent decrees before the summary judgment stage or

6     the trial stage in all of them?

7              MR. RISHER:  I will not attempt to be

8     comprehensive, but the tendency that I have seen is for

9     there to be resolution before the merits by consent decree

10    or some form of settlement.

11             THE COURT:  Okay.

12             MR. RISHER:  I believe that that's what happened

13    in New York City and Hawaii, although I confess I'm not

14    certain on the specific jurisdictions.

15             THE COURT:  And I'm just thinking out loud here.

16    If I'm correct, or if my initial inclination is correct that

17    the statute requires strict performance or strict

18    compliance, then, you know, the plaintiffs are entitled to a

19    declaration to that effect; but the question really is what

20    the remedy to that should be.  Should there be permanent

21    injunctive relief?  That strikes me -- is that a summary

22    judgment question, or is that a bench trial question?

23             I mean, there's going to be a dispute of facts as

24    to how substantial the District has complied, how accurate

25    these monthly reports are.  In the face of that

1    disagreement, if there's no settlement, how do we resolve

2    that?

3            MR. RISHER:  It is certainly possible that a trial

4    will be appropriate; and if so, the District will certainly

5    be prepared to go forward.

6            THE COURT:  Okay.

7            MR. RISHER:  It remains hopeful that that --

8            THE COURT:  It seems to me that there may be a

9    threshold legal ruling that, you know, the plaintiffs'

10   claims are based on a statute that requires strict

11   compliance, and if that's the case, we could avoid a lot of

12   costly summary judgment briefing on all of these other

13   prudential factors as to whether the District has complied

14   or not and then just jump straight to remedy.

15           MR. RISHER:  It is possible.  The Court's earlier

16   ruling was obviously based on a smaller record than would be

17   possible at this time.  The extent to which the Court might

18   be interested in dividing up summary judgment is an issue

19   the District is prepared to discuss.  It certainly has not

20   reached any conclusions on it.

21           THE COURT:  Okay.  Putting aside these discovery

22   disputes, I may get you folks to get together and propose a

23   schedule for -- you know, the timing and schedule for

24   further proceedings.

25           MR. RISHER:  Certainly, Your Honor.  The District

1    has given thought to that.

2              THE COURT:  The other issue is that this is --

3    there are three classes, I guess.

4              Mr. Amarillas, we encountered this in the *Hoyte*

5    case.  How do the notice provisions of Rule 23 relate to any

6    summary judgment proceedings?  Is there a requirement that

7    potential class members be given notice before any final

8    judgment either at summary judgment or after trial?

9              And that's something I'm going to ask you folks to

10   think about and let me know how we should fold into the

11   schedule going forward, okay?

12             MR. RISHER:  Yes, Your Honor.

13             THE COURT:  Plaintiffs, do you want to be heard on

14   both those questions?

15             MR. COHAN:  Yes.  Thank you very much, Your Honor.

16             THE COURT:  Yes.

17             MR. COHAN:  Turning first to the question of

18   possible resolution of this matter, we, too, believe, as

19   does defendant, that, at least as to the question of

20   liability, summary judgment is appropriate.  We don't

21   believe, however, that defendant's performance is presently

22   in the mid-90s.  We believe that --

23             THE COURT:  Well, I know that.  Let's put that

24   aside.

25             MR. COHAN:  Yes.

```
 1              THE COURT:  That's a given, okay.
 2              MR. COHAN:  But assuming that defendant's
 3    performance --
 4              THE COURT:  But let's assume for the moment that
 5    it's 95 percent and that the statute requires strict
 6    compliance.  You're entitled to summary judgment?
 7              MR. COHAN:  We believe we are.  We believe, for
 8    example --
 9              THE COURT:  On also a declaration that the
10    District has not adhered to the statutory deadlines?
11              MR. COHAN:  Yes.
12              THE COURT:  Okay.  Now, then, how do you propose a
13    remedy would follow?
14              MR. COHAN:  We believe the remedy would be as
15    follows, Your Honor:  that we should proceed either through
16    divisive summary judgment or through a hearing before Your
17    Honor whereby defendant would have to demonstrate those
18    steps that would be necessary to bring itself into
19    compliance with an absolute compliance standard.
20              The Ninth Circuit in a case called *Withrow vs.*
21    *Concannon* spoke about absolute compliance being all but an
22    individual handful of cases that are inevitable in any large
23    bureaucracy.  We believe there are a number of steps the
24    defendant has not done that other states do do that would
25    allow it to be better able to fine-tune its performance even
```

1     assuming it were at 95 percent.

2              For example, most recently in the state of

3     Nebraska they began to do individual sampling of application

4     delays to identify the reason for the individual application

5     delays to pull together a comprehensive scheme of

6     remediation to identify root causes and to ensure those root

7     causes do not occur again.  They have weekly meetings that

8     go over -- sort of equivalent to hospital mortality panels

9     to figure out what went wrong and what steps are necessary

10    to remedy those steps.  They have incorporated ensuring

11    timeliness as part of the DNA of the entire way the agency

12    operates from the director down to the lowest worker.

13             We're still looking, for example, at a July 2019

14    corrective action plan that the District has submitted to

15    FNS where they've identified a number of steps that they

16    plan to take to bring themselves into compliance but have

17    still not taken even though this issue now has been pending

18    both before FNS and this Court now for more than two years.

19             So there are a number of steps we believe

20    defendant can take and that would be appropriate to take.

21    And whether or not that would be appropriate through -- for

22    submission of papers or a hearing, we're agnostic.

23             THE COURT:  So, in other words, the remedy would

24    be within the equity discretion of the Court based on

25    evidence presented by the parties as adduced during

1    discovery and perhaps even a live hearing.

2         MR. COHAN:  Yes.  We're not certain that we need

3    the live hearing because we do believe there has been, as

4    Mr. Risher correctly points out, fairly extensive discovery,

5    and, once it is supplemented -- we hope at the conclusion of

6    today's appearance before Your Honor -- we believe we would

7    have enough evidence to go forward at least as to

8    propounding a remedy issue.

9         We do believe that one issue that is critical that

10   has not yet been addressed is to do a root cause

11   investigation of why the cases that are delayed are, in

12   fact, being delayed.  That could be done through some sort

13   of systematic or random sampling where they actually open

14   case files and do a root cause analysis, but that has yet to

15   have been done by defendant.

16         THE COURT:  Okay.

17         All right.  We'll issue an order, but I think what

18   I want you all to do is to get together and see if you can

19   agree to a schedule for further proceedings, including this

20   notice issue under Rule 23.

21         MR. COHAN:  As to -- I'm sorry, Your Honor.  As to

22   that issue --

23         THE COURT:  Yes.

24         MR. COHAN:  -- just to be clear, it's plaintiffs'

25   view that since this is a 23(b)(2) class action and not

1    (b)(3), that no notice would be required under these

2    circumstances.  If there were a settlement, we do believe

3    notice would be required; but prior to entering a judgment,

4    we don't believe it would be required.

5            THE COURT:  So unless I'm reading this wrong,

6    23(c)(2)(A) says, "For (b)(1) or (b)(2) Classes.  For any

7    class certified under 23(b)(1) or (b)(2), the Court may

8    direct appropriate notice to the class."  So that's

9    discretionary?  Notice is not required?

10           MR. COHAN:  That's our view, Your Honor.

11           THE COURT:  Okay.

12           MR. COHAN:  We believe it's required in a

13   (b)(3) --

14           THE COURT:  But for 23 --

15           MR. COHAN:  -- if there are monetary issues at

16   stake.

17           THE COURT:  Got it.

18           MR. COHAN:  But where the Court is simply ordering

19   defendant to comply with it's preexisting obligation --

20           THE COURT:  Got it.

21           MR. COHAN:  -- it's discretionary.

22           THE COURT:  Got it.  That solves that.

23           MR. COHAN:  Thank you, Your Honor.

24           THE COURT:  All right.

25           So I have read the submission that the parties

1   have made.  I have not read all of the exhibits.  What I

2   would propose is that we just work through these issues.

3           And, Mr. Risher, why don't you come up, if you're

4   going to be addressing them for the government, to keep you

5   from having to stand up and sit down.

6           MR. COHAN:  And if I may, Your Honor?

7           THE COURT:  Sure.

8           MR. COHAN:  What we are proposing is that I would

9   address issues concerning the timely processing of

10  applications, and Ms. Sharon will cover the issues

11  concerning the notice of expiration.

12          THE COURT:  That's fine.

13          MR. COHAN:  I assume Mr. Risher will handle it all

14  on behalf of his client, and, if I may, Your Honor, I'm

15  prepared to --

16          THE COURT:  Before we get there.  Any settlement

17  discussions at all?

18          MR. COHAN:  They have not occurred yet.  We would

19  certainly be amenable to that.

20          THE COURT:  Okay.  And would you suggest just

21  doing it yourselves, or would a mediator or special master

22  of some kind aid that process?

23          MR. COHAN:  I think right now it would be

24  premature to think that we need the services of a mediator

25  or special master.  We have certainly settled cases in other

 1   jurisdictions that have gone in either direction.  But I

 2   think we'd know fairly quickly whether or not those services

 3   would be helpful.

 4            THE COURT:  Do you have a view?

 5            MR. RISHER:  Plaintiffs' position as to whether or

 6   not a mediator or special master would be helpful seems

 7   appropriate --

 8            THE COURT:  Okay.

 9            MR. RISHER:  -- at this time, although I cannot

10   bind the District myself.

11            THE COURT:  All right.  The first issue is the

12   alleged exclusion of data from the monthly reports that have

13   been submitted to the Court.

14            Mr. Cohan, do you want to start off?

15            MR. COHAN:  Yes, Your Honor.  Thank you very much.

16            The Court set forth, in its preliminary injunction

17   order, the contents of court-required monitoring to

18   demonstrate timely process of application.  The Court

19   requested the District to provide data from the date of the

20   filing of the application to the date that the decision has

21   been made and to report whether or not the approval was

22   timely and, if untimely, the number of days that it was

23   untimely broken down into tranches.

24            The District, midway through the process, decided

25   to change the manner in which the data was being reported

1    without either consulting plaintiffs in advance or seeking

2    Court permission by excluding from the court reporting those

3    cases that the District determined were client-caused

4    delays; in other words, cases where the District believed

5    for whatever reason that the client was responsible for the

6    application not being processed timely.

7            We have been attempting, as part of the discovery

8    in this case, to identify two bits of information, Your

9    Honor, that are critical to the Court's determination of

10   timeliness.  The first bit of information is how the

11   defendant, in fact, constructs the reports that the Court

12   has ordered.  The second bit of information is how the

13   defendant determines if the applicant themselves is somehow

14   responsible for delay.

15           Why this matters is, as indicated in my prior

16   statement to the Court, we're either talking about

17   performance in the mid-80s or we're talking about

18   performance in the mid-90s.  These are very different --

19           THE COURT:  All right.  Let's take an example.

20           MR. COHAN:  Yes.

21           THE COURT:  Do you have the August 2019 report,

22   the latest one?

23           MR. RISHER:  Yes, Your Honor.

24           THE COURT:  Why don't we take that out, okay?

25   Initial applications, eSNAP, total approved 1,889, approved

1    timely 1,799, 95.24 percent, and then it says 187 were

2    excluded.

3              MR. COHAN:  Yes, Your Honor.

4              THE COURT:  That's what you're talking about?

5              MR. COHAN:  Yes, Your Honor.

6              THE COURT:  And there's an asterisk, and the

7    asterisk refers to a footnote saying, "In accordance with

8    USDA FNS APT rate methodology, applications for which a

9    clients fails to submit required information timely are

10   excluded from timeliness calculations."

11             Okay.  So you know how many are excluded.  So if

12   you add that number, you can come up with a different

13   percentage.

14             MR. COHAN:  That is correct, Your Honor.

15             THE COURT:  And in this case, if you take all of

16   the initial applications -- I don't have a calculator in

17   front of me, but it doesn't look like it gets you to mid-

18   80s.

19             MR. COHAN:  For that particular month and that

20   particular cell it will get you to, if memory serves, about

21   88.3.

22             THE COURT:  Okay.  Now, do you agree that there

23   are FNS methodologies that apply to whether an application

24   should be countered or not?

25             MR. COHAN:  We do, Your Honor.

1         THE COURT:  Okay.  And so what's the dispute here?

2    That these 187 and the 36 do not fall into the applications

3    that FNS permits to be excluded?

4         MR. COHAN:  The difficulty is, Your Honor, we have

5    no way of knowing, and that's where the discovery question

6    goes in this case.  The FNS regulations in terms of

7    determining applicant fault are complicated and strict.

8    They set forth very specific things that the District must

9    have done in order to be able to determine whether or not

10   the applicant is at fault or the District is at fault for

11   the delay in the processing of the application.

12        We have been seeking, through deposition and

13   through documentary evidence, to determine whether or not,

14   in counting a case as an applicant-caused delay, the

15   District is, in fact, complying with the FNS requirements,

16   what constitutes applicant-caused delay as opposed to

17   District-caused delay.

18        The District tells us that it does it, but it has

19   not provided the underlying reporting logic; in other words,

20   the instructions that are issued, Your Honor, from the

21   District supervisory staff to the report-writer that would

22   permit us to know how the reports have been generated.  So

23   we're being asked to basically rely on the good will and

24   good faith of an agency that has had several years of

25   difficulty constructing reports.  If Your Honor will

1    remember, the District had to go back and reconstruct the

2    366B reports because it wasn't able to do that correctly.

3                THE COURT:  That's the quarterly FNS report.

4                MR. COHAN:  That is correct, Your Honor.

5                So we're being asked to rely on this.  We are in a

6    place where we can neither trust nor verify the correctness

7    of the information being provided because we're not being

8    permitted to look under the hood, to look at the reporting

9    logic or the reporting instructions that go to the report-

10   writer.

11               The reason this is critical, Your Honor, is we've

12   received contradictory information in depositions from

13   District witnesses as to how they, in fact, count the

14   categories of delayed applications.  We've had one witness

15   who testifies that it includes both missed verifications as

16   well as missed appointments.  We've had another witness that

17   says it's only missed verification.

18               THE COURT:  What are missed verifications?

19   Verification -- you have to verify your income.

20               MR. COHAN:  Residency, whatever it may be, Your

21   Honor.

22               THE COURT:  And if an applicant doesn't submit a

23   verification that she's a D.C. resident and that she's below

24   an certain income amount --

25               MR. COHAN:  Correct.

```
1              THE COURT:  -- household --

2              MR. COHAN:  The agency could deny.

3              THE COURT:  Could deny, okay.  So you don't doubt

4    that there are at least some of those in there.  You just

5    don't know how many there are.

6              MR. COHAN:  That is precisely correct.  We also

7    don't know why they're in there because, if the client has

8    failed to submit the verifications, the correct response

9    under FNS regs ought to be to deny the application, and this

10   report is only supposed to be a report of approvals.

11             Additionally --

12             THE COURT:  So let me stop you.

13             MR. COHAN:  Yes.

14             THE COURT:  This is not a new issue.  They've been

15   producing these reports since the PI ruling.

16             MR. COHAN:  Yes.

17             THE COURT:  You've deposed the folks who have

18   produced -- who make these reports, who create the reports.

19             MR. COHAN:  Yes.

20             THE COURT:  You're unhappy with their answers --

21             MR. COHAN:  Not --

22             THE COURT:  -- but you've had access to them.

23             MR. COHAN:  We have not had access to the

24   underlying instructions that inform --

25             THE COURT:  Let's start with the people who --
```

```
1              MR. COHAN:  Yes.

2              THE COURT:  You can ask them, you know:  These

3    187, what goes into that?

4              MR. COHAN:  And we did.  And we got contradictory

5    answers from the two different witnesses we deposed on that

6    question, Judge.

7              THE COURT:  So that doesn't entitle you to

8    additional discovery, just because you get two different

9    answers from two different people.

10             MR. COHAN:  But what we're asking for here, Your

11   Honor, because, again, the complexity of the issue involved

12   is we're asking for the underlying instructions that the

13   District provided to the report-writer so that --

14             THE COURT:  Okay.  Have you asked for those in a

15   request for production?

16             MR. COHAN:  We have.

17             THE COURT:  Do those exist, Mr. Risher?

18             MR. RISHER:  Yes, Your Honor.

19             THE COURT:  Why would they not be relevant and

20   responsive to the request?

21             MR. RISHER:  The documents in question are

22   generated as attorney work product and, therefore,

23   protected from production by privilege.  However, the

24   District made an offer to plaintiffs on July 30th to produce

25   the documents specifically used and referenced in her
```

1    deposition by Ms. Won-ok Kim, who is the person who creates

2    these reports each month.  When plaintiffs agreed on August

3    30th, the District produced these documents.

4            THE COURT:  Okay.

5            MR. RISHER:  Plaintiffs then subsequently deposed

6    the technician who translated Ms. Kim's directions into

7    computer code on the specifics of the report.  It's unclear

8    to the District what more plaintiffs expect.

9            THE COURT:  Mr. Cohan.

10           MR. COHAN:  Yes, Your Honor.  That is incorrect in

11    two very significant ways.

12           First, Your Honor, we have not been provided,

13    despite what Mr. Risher may believe, with the written

14    instructions that would be either in the form -- as the

15    report-writer testified, either in the form of an electronic

16    mail or what's commonly known as a JIRA, J-I-R-A, ticket

17    that would have issued from Ms. Kim, who is the data manager

18    for the agency, to Mr. Tripurneni, who is the report-writer

19    for the agency.  We have received neither of those.  What

20    we have received is a one-page, in essence, set of notes

21    from -- Ms. Kim generated.

22           In terms of the -- and second, as to the privilege

23    issue --

24           THE COURT:  Well, let's just --

25           MR. COHAN:  All right.

1          THE COURT:  -- figure out what you have.

2          MR. COHAN:  All right.

3          THE COURT:  The notes that you have --

4          MR. COHAN:  Yes.

5          THE COURT:  -- do they have instructions or

6     criteria or guidelines or instructions that say these are

7     excluded and these are included?

8          MR. COHAN:  They do not, Your Honor.

9          THE COURT:  Mr. Risher, do you have a copy of what

10    it is you gave them?

11         MR. RISHER:  I don't know if I have a copy, Your

12    Honor.  I didn't realize that that would be desired.  I

13    would characterize it differently than plaintiff.

14         THE COURT:  All right.  Clearly what they're

15    looking for -- let's put aside the privilege issue; and if

16    we have to litigate privilege issues, you're going to have

17    to submit something in writing.  But what they want is the

18    guidelines that the report-writer used to exclude the 187

19    and the 36 for August, for example.

20         MR. RISHER:  Yes, Your Honor.

21         THE COURT:  What criteria did they use?

22         MR. RISHER:  And those were -- I beg your pardon,

23    Your Honor.

24         THE COURT:  Go ahead.  Those were given?

25         MR. RISHER:  Those were provided.

1                THE COURT:  Okay.

2                MR. COHAN:  Respectfully, they were not, Your

3        Honor.  Again, we -- he testified in the deposition that was

4        just this month that they would have been provided to him

5        either in an email or in what's commonly called, again, a

6        JIRA ticket, which is a way in which these data wonks

7        communicate with each other.  Neither of those documents

8        were communicated.

9                All that was provided to us was a one-page summary

10       of some notes from Ms. Won-ok Kim, who is the data manager,

11       but that's not an instruction that was issued from Ms. Kim

12       to Mr. Tripurneni that basically said:  This is the process

13       by which I want you to do it.  This is what I want you to

14       count.  This is what I want you to exclude.  This is the

15       logic behind how to develop the report.

16               As Your Honor can well imagine, if you're

17       instructing a data person to pull certain cases, that person

18       needs to have very detailed and specific instructions as to

19       which cases to include and which cases to exclude so they

20       can write a report that's appropriate.

21               He testified further that he would then submit

22       the report to the data manager, who would review the report

23       and ask for modifications of the report that had been

24       generated. We've been provided with none of that.  It is

25       comparable to a decision being made by the District to want

1   to add a house -- add a room to their house.  It would be a

2   very specific set of instructions that the architect would

3   prepare for the contractor.  What we're seeking are those

4   specific instructions to make sure that it was correctly

5   formatted to capture what FNS requires because, again, it's

6   complicated.

7           For example, the witness would be able to clarify

8   whether or not the client is being given enough time to

9   submit the verifications from the date of request.  The FNS

10  regulations are incredibly specific.

11          THE COURT:  Let me stop you.

12          MR. COHAN:  Yes.

13          THE COURT:  Did you lodge an interrogatory?

14          MR. COHAN:  Pardon?

15          THE COURT:  Did you lodge an interrogatory to the

16  District asking what criteria are used to exclude initial

17  SNAP applications?

18          MR. COHAN:  This information was requested, and

19  a -- it was requested in a follow-up request for documents

20  and a letter and during the deposition of Ms. Kim; so it's

21  been requested at least three times.

22          THE COURT:  It seems like you're requesting

23  documents --

24          MR. COHAN:  Yes.

25          THE COURT:  -- as opposed to just asking the

1    District --

2         MR. COHAN:  Very specifically requesting

3    documents, Your Honor.  For example, Ms. Kim testified the

4    documents existed.  We asked for them to be produced.  In a

5    notice of deficiency letter sent to the District, we, again,

6    referenced we haven't received the documents.  So the

7    District has been on notice as to these -- as to the desire

8    for the documents, and it's unclear to us what prejudice

9    there is.

10        From the Court's point of view -- one of the

11   questions the Court is going to have to be asked to resolve

12   by plaintiffs is whether or not the reports are accurate.

13   Presumably part of plaintiffs' proof to the Court on that

14   will be looking at the underlying reporting.

15        You know, assuming that we agree with the District

16   that they, in fact, generated the client delay column

17   accurately and are populating it accurately, then we're

18   looking at performance rate somewhere in the mid-90s.  If we

19   disagree, and the Court agrees with us, we're looking at a

20   performance rate in the 80s.

21        It makes a difference to remedy.  It makes a

22   difference to liability.  This is a pivot-point question for

23   this case, and it's unclear to me, leaving aside the

24   privilege question for a moment, why it would not be simple

25   enough for the defendant to have the -- the witness

1      testified he retains every single instruction he's ever

2      received in terms of report-writing.  That was -- you know,

3      I asked him -- I personally took the deposition.  I asked

4      him several times, "Do you keep that information?"

5                    Mr. Conrad objected, "Asked and answered."

6                    He each time said yes.

7                    So we know he keeps it.  It's just a question of

8      producing it.

9                    THE COURT:  Mr. Risher.

10                    MR. RISHER:  So plaintiffs have made several

11      representations --

12                    THE COURT:  So if the plaintiffs request a

13      particular document that's mentioned by a deponent, they're

14      entitled to ask for the document unless it's privileged.

15      And so, you know, do these documents exist, instructions

16      from someone to the report-writer telling him what -- or her

17      what applications to include or exclude?

18                    MR. RISHER:  Yes, Your Honor.  Those documents are

19      the documents that plaintiffs have insisted are

20      insufficient.  The documents are not a single page, but

21      we'll leave that aside.

22                    The documents that Ms. Kim discussed at her

23      deposition, plaintiffs asked for those documents.  Although

24      the District believes that the documents are protected by

25      privilege, the District still offered to make them available

1    to plaintiffs.

2              Plaintiffs at last agreed to accept the documents.

3    The District produced them.

4              Plaintiffs are now asking for the internal

5    instructions and debates that the technical DCAS team needs,

6    but as Your Honor discussed almost a year ago, on the first

7    conference call that plaintiffs requested, this is a case

8    about SNAP.  It's not a case about the District's

9    information technology.  In spite of that, the District has

10   produced hundreds of documents that go to the information

11   technology questions that plaintiffs have insisted on asking

12   despite their lack of relevance to any claim here.

13             I'd also like to point out, leaving aside several

14   other representations, it's unclear to me what plaintiffs

15   mean when they say the District made a change midway.  If

16   you look at the very first report that was filed, the

17   excluded applications column is there.  The footnote is, if

18   not identical, certainly fairly close.  This would be 85-1

19   filed October 16, 2018.

20             MR. COHAN:  And if I may address that last point

21   and then a couple of others, Your Honor?

22             MR. RISHER:  I don't know that --

23             MR. COHAN:  First off, in terms of the change that

24   was made midway through, Ms. Kim testified during her

25   deposition that in the spring of this year defendant began

1    to add -- in addition to missed verifications, add missed

2    appointments to the data of the excluded applications.  So

3    that's a change that's midway through that we had not been

4    advised of in advance, and the Court had not been advised of

5    in advance.

6             So yes, they had an included and excluded

7    application column, but what went into the excluded

8    application column changed midway through, according to

9    Ms. Kim.

10             Interestingly enough, Mr. Tripurneni, who is the

11   person --

12             THE COURT:  Well, let me ask this question.

13             MR. COHAN:  Yes.

14             THE COURT:  Other than lack of verification and

15   failure to appear for an interview, do you have any reason

16   to believe that there are other categories of excluded

17   applications for other reasons that are not proper?

18             MR. COHAN:  No, but we don't know that the ones

19   that they are excluding are being properly excluded.  That's

20   the critical question here.

21             And, again, Mr. Risher points --

22             THE COURT:  So you think that there are some

23   people who did show up for their interview and still got

24   excluded potentially?

25             MR. COHAN:  We think either one of three things,

1    Your Honor.  Either, yes, there are some people who

2    submitted the verifications but were improperly treated as

3    client-

4    caused delays because we do know, for example, based on

5    other documents in the District's system, that there are

6    delays in entering verifications into the system so that

7    they may later be -- they may have been properly provided,

8    but there would be delay in scanning.

9         We know, number two, that under the FNS rules,

10   defendant would have to document that they gave the

11   applicant sufficient time to provide the verification.

12        And, number three, without looking at what the

13   instructions are, we do not know whether or not the

14   verifications being requested are the appropriate

15   verifications.  We've had witnesses testify as to different

16   verifications that are being required for purposes of

17   establishing eligibility, some of which are not necessary

18   verifications for purposes of establishing eligibility.

19        We would know, for example, if we had the

20   underlying instructions that told the report-writer which

21   verifications the District is looking at to determine

22   whether or not the client failed to submit the verifications

23   timely.  We would know whether or not the District is

24   counting correctly the number of days that the applicant is

25   being provided in order to submit those verifications, which

1    is tightly controlled by FNS regulations.  We would also

2    understand the question of why an application is considered

3    to be delayed rather than denied when the applicant fails to

4    meet the required time frame for the submitting of the

5    required verifications allegedly.

6         The difficulty we have here is we're being asked

7    to take defendant at its word that it is correctly excluding

8    applications, and we are not being provided with the

9    specific instructions that were issued by email or by JIRA

10   ticket from one part of the agency to the other, Your Honor.

11        THE COURT:  Okay.  What is a JIRA ticket?

12        MR. COHAN:  A JIRA ticket is a way that data nerds

13   communicate over managing of data.  There is a JIRA system,

14   which I don't fully -- which I don't purport to fully

15   understand, but it basically allows a report-generator or a

16   data person to communicate with somebody else about data

17   issues through the exchange of the equivalent of almost

18   texts or system emails, and the witness -- the report-writer

19   testified that he would either get an instruction through

20   the JIRA system, which is a closed system that the District

21   uses to communicate amongst itself, or in the form of an

22   email.  He could then report back to the data manager about

23   the work that he did, and the data manager would either sign

24   off or provide corrections, as the case may be.  That's the

25   underlying stuff.

1          We're not asking for the debate, as Mr. Risher

2     suggests.  We don't want to probe behind their decision as

3     to why they wanted to do it.  This is a question of whether

4     they're doing it correctly at all.

5          As to the question why to do it, why they would

6     think it's appropriate to change a Court-ordered monitoring

7     report without consulting with the Court, that's between

8     defendant and the Court.

9          As to whether or not they've done it correctly, we

10    do believe that's a critical question, and we have a right

11    to get at that underlying reporting that would allow us to

12    understand the programming, Your Honor.

13         THE COURT:  All right.  Mr. Risher, if the request

14    is for all guidance and instructions given to the report-

15    creator regarding excluded applications, I think they're

16    entitled to that unless there's a burdensomeness objection

17    or privilege objection or some other recognized objection.

18         All right.  So you say you've given them

19    everything you have.  What I'd like for the District to do

20    is to produce all information that falls into one of those

21    categories unless there's a reason that it should be

22    withheld.  And if you want to raise a privilege issue,

23    that's fine.

24         I don't know how difficult it is to access these

25    JIRA tickets.  Do you have any insight as to whether that's

1    something that's even accessible to the District?

2              MR. RISHER:  I can say, Your Honor, that at one of

3    the depositions plaintiffs' counsel noted that they had

4    looked at a lot of JIRA tickets.

5              THE COURT:  Okay.

6              MR. RISHER:  Certainly the District has produced

7    many.

8              THE COURT:  So you filed a FOIA request for these

9    things?

10             MR. COHAN:  No.  Defendant has produced JIRA

11   tickets as to other issues, Your Honor, just not as to this

12   issue.

13             THE COURT:  I see.  Okay.

14             MR. RISHER:  The characterizations that plaintiffs

15   have made are inaccurate as well as, in some cases, simply

16   derogatory.  JIRA is a commercial, off-the-shelf program

17   that's used by companies and government agencies around the

18   world.

19             THE COURT:  Okay.

20             MR. RISHER:  The District can certainly look into

21   them and see if there are additional tickets; and I won't

22   burden the Court with other inaccuracies in plaintiffs'

23   description.

24             THE COURT:  All right.  And, look, I'm not into

25   the "Who shot John?" okay?  I just want to get to the right

1    answer here.

2              So any instructions, guidance, directives to the

3    report-writer regarding how to classify applications for

4    purposes of the reports that the Court is relying on to

5    determine the District's performance I think are relevant,

6    okay?  So within 30 days go back and either confirm that

7    everything has been produced or produce documents that are

8    relevant to the request; or raise a privilege objection or

9    burdensomeness objection, and I'll take that up.  Okay?

10             MR. RISHER:  Yes, Your Honor.

11             THE COURT:  Okay.

12             Backlogs.

13             MR. COHAN:  Your Honor, before we turn to the

14   question of backlogs, there has been an issue --

15             THE COURT:  And let me also just -- I should have

16   said this at the outset.  You know, the purpose of the

17   Court's order regarding resolution of discovery disputes

18   without need for a formal motion and calling the Court is to

19   take these things up on an informal basis as they arise.

20   It's not to save them all until the end of discovery for an

21   omnibus hearing like this, okay?

22             I'm happy to resolve the disputes, but, you know,

23   this is not the way that it is designed to work, okay?

24             MR. COHAN:  Yes, Your Honor.

25             MR. RISHER:  Yes, Your Honor.

```
1                    MR. COHAN:  If I may --

2              If I may, Mr. Risher?  Let plaintiffs speak to

3    this.

4                    THE COURT:  And I -- go ahead.

5                    MR. COHAN:  Thank you.

6              As to the omnibus aspect of the motion, we

7    certainly apologize.  Some of this is because we have

8    just been able to access certain critical deponents within

9    the last couple of weeks because of just the timing of

10   document --

11                   THE COURT:  I get that, but you're also

12   complaining about 30(b)(6) witnesses who weren't prepared or

13   the scope of 30(b)(6) witness testimony, which I assume

14   could have been raised months ago, correct?

15                   MR. COHAN:  Yes, Your Honor.  As to that -- and

16   Ms. Sharon will speak to that in more detail -- we actually

17   were hoping that, based on her deposition, there would be

18   further information revealed from people she identified who

19   might have greater knowledge as to herself.

20                   THE COURT:  Okay.  Backlogs.

21                   MR. COHAN:  But as -- if I may, Your Honor, before

22   the backlogs, there had been a question raised in the

23   footnote about the verification notices to initial

24   applicants, and this is tied to the question of the accuracy

25   of the excluded application data.
```

1          THE COURT:  I'm sorry, footnote to your

2     submission?

3          MR. COHAN:  Yes, Your Honor.  I would direct the

4     Court's attention, if I might, to Footnote No. 1.

5          THE COURT:  Okay.

6          MR. COHAN:  One -- as I indicated, one of the

7     requirements under FNS regulation before an application can

8     be counted as excluded is the applicant has to be provided

9     with a notice that informs the applicant specifically those

10    verification items or documents, if you will, that the

11    applicant needs to provide in order for an application to be

12    processed to completion.  So one of the things we've been

13    asking for is to see whether -- to see the final

14    verification notice to determine whether or not the

15    verification notice, in fact, complies with FNS requirements

16    or not.  It's a simple yes-or-no question.

17         Defendant has represented to us that it has

18    either -- that it has already produced verification

19    documents and has represented that to the Court.

20         We are seeking a very simple request at this

21    point, which is for the defendant to identify which of the

22    various verification forms it has provided, many of which

23    have "Draft" or still have notes on them it believes are, in

24    fact, the final verification, in which case we will rely on

25    that representation, or if it searches its records and

1    believes there is one that is, in fact, truly final, to

2    provide that to us.  It is -- we view it as a simple binary

3    issue.  If it can identify which one it believes to be

4    final, we will be satisfied.

5           THE COURT:  Mr. Risher?

6           MR. RISHER:  As the District said in its filing,

7    it has repeatedly told plaintiffs that it has produced all

8    of the notice templates in its possession.  Plaintiffs have

9    raised their concern that these templates have comments on

10    them.  The District has assured plaintiffs that the comments

11    are there appropriately and are the notice templates, the

12    final version.

13           THE COURT:  Okay.  Very well.  Some say "Draft";

14    some don't say "Draft"?

15           MR. COHAN:  Correct, Your Honor.  But all of them

16    have balloon comments, and typically you would not expect

17    the please-fix-this type comment that is in the margin to be

18    consistent with a final document.  You would presume that

19    there would be a document that the defendant at some point

20    would have fixed.  Somebody would say:  That's it.  This is

21    final.  We're good to go.

22           That's what we were seeking, Your Honor.

23           THE COURT:  I will accept counsel's representation

24    that all have been produced.

25           MR. COHAN:  We would ask if you can point just to

1    the Bates-stamp number that constitutes the final

2    verification notice because we've received multiple, Your

3    Honor.

4              THE COURT:  I'm not going to do that.

5              Okay.  Backlogs.

6              MR. COHAN:  Backlog.

7              Just to be entirely clear here, defendant may have

8    misapprehended plaintiffs' position as to this.  The backlog

9    issue does not simply go, as defendant argues, to the

10   question of documents that have not been processed through

11   the system timely and still wait to be scanned or otherwise

12   handled, although that is certainly an important issue, but

13   it also goes to the question of backlogged applications.

14   And we know, for example, that as to --

15             THE COURT:  What is a -- remind me what a

16   backlog --

17             MR. COHAN:  A backlog application, Your Honor, is

18   any application that is pending beyond the timely processing

19   date.  So, for example, if an application was filed on

20   September 1st and had not been processed by the end of

21   September, by the time we roll into October that application

22   would be considered to be a backlogged application.

23             THE COURT:  So does that correspond to the "Late

24   Over 30 Days" column?

25             MR. COHAN:  It does, Your Honor.

1          THE COURT:  Okay.

2          MR. COHAN:  And there are some applications that

3   have been identified either in other documents or in

4   deposition testimony as being very backlogged.  And part of

5   the reason this is a concern is that we do know that as to

6   some of those applications defendant's witnesses have

7   identified that they have, in fact, been purged from the

8   system completely.

9          So, for example, in an October 1, 2018, email --

10          THE COURT:  Okay.  Where is that in your --

11          MR. COHAN:  That would be Exhibit 2, Your Honor.

12          THE COURT:  Okay.

13          MR. COHAN:  And that would be Bates-stamp

14   No. 0031066.

15          There's a report from a Ms. Berry to Ms. Kim, who

16   is the data manager, and in the second paragraph, for

17   example, they identify 87 cases in which the applicant is

18   not receiving benefits and did not receive notification

19   regarding pending verification needed.  And then she says:

20   Due to the age of the applications and policy, we didn't

21   register the application so a new notice can be generated.

22          So that, to us, means these are applications that

23   never got registered into the system.  The client was not

24   provided with benefits.  We do not know whether or not this

25   is an -- we don't know what policy she's referring to, so we

 1    had a number of questions concerning the backlogged issue

 2    that have been propounded as set forth in our letter.

 3            And this is more than just documents.  It's about

 4    what is happening to backlogged applications.

 5            THE COURT:  Okay.  When did you receive this email

 6    in discovery?

 7            MR. COHAN:  I don't know the exact date that we

 8    received the email, Your Honor.  It was in one of the

 9    earlier productions from defendant.  I believe it was, if

10    memory serves, April of this year.

11            MS. SHARON:  July.

12            MR. COHAN:  July of this year, but it is

13    consistent --

14            THE COURT:  Did you depose Ms. Berry?

15            MR. COHAN:  We have not, Judge.

16            THE COURT:  Why not?  You could have asked her

17    about it.

18            MR. COHAN:  Because we had reached the agreed-upon

19    limit of the number of depositions.  We were running up

20    against the Court's scheduled deadline to conduct the

21    completion of discovery, Your Honor, because this was

22    produced to us in July.

23            There was also the notion, for example, that they

24    identified 256 cases that had been withdrawn due to the

25    applicant, quote-unquote, receiving SNAP benefits in another

1    case or receiving proper notification.  However, under FNS

2    regulations, only an applicant can withdraw their

3    application.  An agency may not withdraw the application for

4    the client.

5            So, again, this seems to be a policy that the

6    agency has.  We asked to reopen the deposition of Ms. Kim

7    because Ms. Kim's deposition predated the production of

8    the documents, and Ms. Kim is the one who was the -- if

9    you'll notice, is listed on the email itself in October.

10   She would be the appropriate person to testify.  She would

11   be over Ms. Berry.

12           THE COURT:  Did Ms. Kim reply to this email?

13           MR. COHAN:  Pardon?

14           THE COURT:  Did Ms. Kim reply to this email?

15           MR. COHAN:  We have -- other than acknowledging --

16   it says:  Thanks a lot.  Good news is that three out of four

17   are duplicates of those that can be withdrawn, but we have

18   these apps to be denied, but we didn't send any

19   notifications.  What should we do?  Et cetera.

20           So you'll see, Your Honor, that she, in fact,

21   is the one -- that's from her responding to an email from

22   Ms. Berry.

23           THE COURT:  Okay.  Mr. Risher?

24           MR. RISHER:  It seems, Your Honor, that a lot of

25   the issue here is that plaintiffs presume how the District

1   works, and the District does not work in the way that

2   plaintiffs presume.  The documents that plaintiffs cite are

3   documents the District produced and documents plaintiffs

4   deposed multiple witnesses on.

5          Plaintiffs' argument about what the documents say

6   or do not say will come in their merits briefing but is not

7   grounds for reopening discovery now.

8          THE COURT:  Okay.  The Court agrees with that.  It

9   will deny your motion to reopen discovery --

10         MR. COHAN:  If I could --

11         THE COURT:  Let me rule first.

12         MR. COHAN:  I apologize, Your Honor.

13         THE COURT:  I'll let you react, but let me rule.

14         MR. COHAN:  I apologize.

15         THE COURT:  And I agree with Mr. Risher that the

16   interpretation of this document can be argued based on the

17   document itself and any other evidence that's in the record

18   as part of the merits determination.

19         There have been a lot of depositions in the case.

20   We've had discovery now for 11 months.  You all have been

21   very diligent in taking discovery.  I get that.  But, you

22   know, I've never seen a discovery process where every single

23   witness is questioned on every single issue that arises in a

24   document, and, frankly, I don't see the need to burden the

25   District with another deposition of someone who has already

1     been deposed once, particularly given that the author of

2     this email was not deposed to ask her about what she meant,

3     okay?

4              Go ahead.

5              MR. COHAN:  But, if I may, Your Honor, just very

6     quickly?

7              THE COURT:  Yes.

8              MR. COHAN:  The reason this is -- continues to be

9     a concern is the document was provided fewer than two months

10    ago subsequent to the deposition of Ms. Kim.  Ms. Kim is the

11    person who would have been responsible for taking action on

12    behalf of the District in response to the information

13    provided, including representations of policy.

14             So we seek to reopen the deposition of Ms. Kim for

15    the limited purpose -- we are proposing no more than an hour

16    or two deposition -- for the limited purpose of

17    understanding specifically how frequently this problem of

18    withdrawn or cancelled applications occurs and what the

19    agency's actions are taken in response to that because this

20    is not, plaintiffs believe -- and defendant has provided us

21    with no evidence to counter -- an isolated incident.

22             We're trying to get at the extent to which

23    applications are disappearing.  It's a critical question to

24    the Court's understanding of whether or not they're

25    processing applications timely.  If they exclude delayed

1      applications from the Court reporting, then it conceals the

2      actual true nature of their performance, and that is what we

3      wanted to try to get at --

4                    THE COURT:  Okay.

5                    MR. COHAN:  -- by a quick reopening of that

6      deposition, Your Honor.

7                    THE COURT:  I understand, and I'll stand by my

8      ruling.

9                    MR. COHAN:  Thank you, Your Honor.

10                   THE COURT:  Accuracy of app filing date.

11                   MR. COHAN:  Yes, Your Honor.  This has been

12     an ongoing issue back and forth with the -- in the

13     discovery, and we've received some conflicting information.

14     And what -- as indicated in the letter, what we are seeking

15     here is to have a complete, full understanding of the

16     ability of the District to protect the application filing

17     date.

18                   The District has represented that this is an issue

19     that, in fact, has been resolved and been put to bed;

20     however, as recently as the July 2019 submission from the

21     District to FNS as part of its CAP and reporting, the FNS

22     indicates that it still believes that the District was

23     failing to protect the household filing date.  The reason

24     that is important is because it measures the start date from

25     determining whether or not an application has been processed

1    timely.

2              To use the example I gave before, the applicant

3    submits an application on September 1st, but the agency

4    records that application as being submitted on September

5    5th.  That's not protecting the application filing date.

6              This is an issue that FNS has gone back and forth

7    to the District on a number of times.  As recently as,

8    again, the July 2019 corrective action plan submitted from

9    the District to FNS, it says -- and I quote -- The District

10   will provide FNS documentation surrounding the additional

11   training of when to reopen, reactivate, or reapply on cases

12   where the filing date has not been protected.  Currently

13   this training is in development and is slated to be

14   finalized and delivered by the end of September, meaning

15   this month.

16             So what we are seeking is information concerning

17   that process to try to understand whether or not the

18   District, in fact, has addressed its problems in protecting

19   the application filing date or whether or not it, in fact,

20   has failed to satisfy the requirement to protect the

21   application filing date.  That is what is being sought in

22   that portion of the letter, Your Honor.

23             THE COURT:  Okay.  So let me just make sure I

24   understand this.

25             MR. COHAN:  Yes.

1          THE COURT:  If someone files an application on the

2   1st, but a data entry clerk doesn't get around to entering

3   it until the 7th, the system would block the application

4   from being entered because of this five-day lag?

5          MR. COHAN:  That seems to be the issue, Your

6   Honor, that is at play.

7          THE COURT:  So what happens is it gets entered on

8   the 7th, but that's a week later than it was actually

9   entered.

10          MR. COHAN:  Correct, Your Honor.  And the District

11   has made representations that they have done some data fixes

12   to attempt to address the problem, which we certainly

13   appreciate.

14          THE COURT:  Okay.

15          MR. COHAN:  They also acknowledge, though, that

16   there are still work-arounds that individual workers may

17   have to engage in.

18          FNS found it had failed to properly train and

19   oversee the workers to do that.  As a consequence, the

20   District promised in July to FNS by the end of this month

21   they would engage in various corrective action to attempt to

22   solve the problem.  We're seeking information as to whether

23   or not they, in fact, engaged in it, how successful it was,

24   and whether or not it solved the problem.

25          THE COURT:  Did you depose anyone on those

1    questions?

2              MR. COHAN:  We did not receive this information

3    concerning the CAP to be submitted until after the

4    depositions of the relevant witnesses were completed, Your

5    Honor.

6              THE COURT:  Okay.  Mr. Risher?

7              MR. RISHER:  Once again, plaintiffs complain that

8    documents produced by the District reveal liability of the

9    District, and that is an issue for their merits briefing.

10             The description that plaintiffs have made is

11   inaccurate.  The question of dating was an information

12   technology issue such that in the early days -- and

13   plaintiffs admit that this is something which happened in

14   2018 -- the system would not allow back-dating of an

15   application from the 7th to the 1st, and so the District had

16   a policy of writing in a note in the applicant's case that

17   that had happened and making an underpayment so that there

18   was -- if necessary, so that the plaintiff -- pardon me --

19   the SNAP applicant received all of the benefits the

20   applicant was entitled to receive.

21             THE COURT:  Okay.

22             MR. RISHER:  The only issue was that the system

23   required someone to go in and read that note to fully

24   understand.

25             Plaintiffs concede, again, that that is no longer

1    a problem for the system; but it was never a problem for the

2    applicant, and this case is about whether applicants are

3    receiving their benefits timely.

4         Plaintiffs received documentation.  They did not

5    receive a July submission until after it had been completed

6    and submitted, but they received earlier corrective action

7    plans which addressed this issue.

8         THE COURT:  Okay.  Are there any written reports

9    or analyses or recommendations in the District's files

10   related to this application date issue?

11        MR. RISHER:  Yes, Your Honor.

12        THE COURT:  Okay.

13        MR. RISHER:  The District would --

14        THE COURT:  Have those been produced?

15        MR. RISHER:  Yes, Your Honor.

16        THE COURT:  Okay.

17        MR. RISHER:  Exhibit 6 being but one example of

18   many.  Exhibit 6 saying different things than plaintiffs

19   interpret it to say.

20        THE COURT:  Okay.  Is there any analysis that's in

21   the works that is scheduled to be completed this month, as I

22   hear plaintiffs to suggest?

23        MR. RISHER:  The District is always training and

24   retraining its staff, providing refreshers, providing new

25   training to newly hired staff.  It is constantly updating

1    its procedures.

2            I cannot speak to whether there is some specific

3    change of some significance that is coming.  I can only say

4    that the District has produced dozens of documents about

5    training, and plaintiffs have asked multiple witnesses about

6    training at their depositions.

7            THE COURT:  Okay.  Since we're going to keep the

8    discovery period open for 30 days to capture these

9    instructions to the report-creator regarding criteria for

10   excluding applications, while you all look to see whether

11   there are any additional documents, the District will be

12   under a continuing obligation to produce any written

13   documents, any written materials regarding this issue as

14   well, okay?  And I'll take your representation that it has

15   produced any currently existing written materials regarding

16   the filing date application.  Is that clear?

17           MR. RISHER:  Yes, Your Honor.

18           THE COURT:  All right.  NOEs, which are notices of

19   expiration, correct?

20           MR. COHAN:  And with the Court's permission, I'd

21   like to turn this over to Ms. Sharon.

22           THE COURT:  Permission granted.

23           MR. COHAN:  Thank you, Your Honor.

24           MS. SHARON:  Good morning, Your Honor.

25           THE COURT:  Good morning.  How are you?

1      MS. SHARON:  I'm well.  How are you doing?

2      THE COURT:  Good.  This is all coming back to me

3  now.

4      MS. SHARON:  Happy to assist in any way that I

5  can.

6      If I could just, Your Honor, with your indulgence,

7  point out one last issue related to the filing date --

8      THE COURT:  Sure.

9      MS. SHARON:  -- that Mr. Cohan was discussing.  In

10  Exhibit 6 there's reference made to a specific sample review

11  and analysis that the agency is undertaking to conduct.

12  Back in July 2018 Ms. Kim states that Ms. Rollins is going

13  to conduct a sample review and analysis.  This specific

14  document has been requested several times, both in

15  depositions and in follow-up exchanges with counsel, and if

16  counsel could specifically search to see whether such

17  analysis has been done along with other efforts counsel will

18  be conducting, we would appreciate that.

19      THE COURT:  Okay.  Mr. Risher, do you know if that

20  document was created or not?

21      MR. RISHER:  We return to confusion on plaintiffs'

22  part.  The email refers to a sample review.  The email makes

23  no reference to a document.  The District has told

24  plaintiffs that as far as it knows it has not been able to

25  find any such documents.

1          THE COURT:  Okay.  Very well.  We'll leave it at

2     that.

3          MS. SHARON:  Thank you, Your Honor.

4          Would you like to start with the mailing addresses

5     issue that's raised?

6          THE COURT:  Okay.  Hold on one second.

7          MS. SHARON:  Sure.

8          THE COURT:  Let me just read my notes.

9          Okay.  Go ahead.

10          MS. SHARON:  Yes, Your Honor.

11          Defendant acknowledges an error in the DCAS system

12     that prevents all notices, including notices of expiration,

13     from being sent to households' designated mailing addresses.

14     A household in the DCAS system can have both a primary

15     address and a mailing address.  The mailing address would be

16     if you prefer to receive mail at a different location than

17     your primary address.  And our understanding is this error

18     impacts most greatly the District's homeless population, and

19     this is because defendant's policy, as we understand it, is

20     to set households' primary address when they're homeless to

21     a location where they cannot receive mail, and that would be

22     the H Street Service Center.

23          THE COURT:  Okay.

24          MS. SHARON:  And unfortunately we did not receive

25     information regarding this issue, and it's apparently

1    ongoing until the September 9th document production the

2    defendant made, so we've been under -- although we did

3    promptly follow up to request more detailed information,

4    we've been unable to determine the precise nature or timing

5    of any fix to address the issue.

6          THE COURT:  So this goes to the second class folks

7    who allegedly did not receive a notification of expiration

8    in time to apply for continuation of the benefits, and the

9    benefits ceased as a result.

10         MS. SHARON:  Precisely, Your Honor.

11         THE COURT:  Okay.  And so if they're not mailing

12   the NOEs to the right address, that would be relevant to

13   that class claim.

14         MS. SHARON:  Exactly, Your Honor.  And Legal Aid

15   has seen several individuals who have been impacted by this

16   issue in recent months, so we have cause for concern

17   regarding that.

18         THE COURT:  Okay.  So what have you requested?

19   What do you believe has not been disclosed; and why do you

20   believe you're entitled to it?

21         MS. SHARON:  Yes, Your Honor.

22         Following the September 9th production we sent a

23   follow-up email to defendant requesting any documents

24   concerning the nature or the fix -- the nature or the timing

25   of the fix that has allegedly been undertaken to address

1    this issue.  We did ask questions of the notices lead about

2    this issue in September during his deposition, but he --

3    while he was familiar with the error and confirmed its

4    impact, he was not certain about the timing of any proposed

5    fix of that issue.

6              THE COURT:  I'm sorry, who was?

7              MS. SHARON:  I'm sorry.  That's Mr. Krishnan,

8    Saravanan Krishnan, who is the lead of the DCAS notices

9    team.

10             THE COURT:  Okay.

11             MS. SHARON:  And so what we're requesting, Your

12   Honor, is any documentation of the nature or timing of the

13   proposed fix to address this issue as well as perhaps to --

14   the opportunity to propound just a very specific, narrow

15   interrogatory on this issue to confirm our understanding of

16   how it impacts homeless individuals and to confirm the

17   District's position as to when it will be addressed and how.

18             THE COURT:  Okay.  Mr. Risher?

19             Let's, I guess, start with the document issue.

20   Has the District analyzed this issue?  Has there been a fix?

21   Has there been any written work product developed around

22   this issue?

23             MR. RISHER:  Yes, Your Honor.  If you look at Page

24   4 of Plaintiffs' Exhibit 8 --

25             THE COURT:  Hold on.

 1             All right.  What is this document?

 2             MR. RISHER:  Excuse me, Your Honor.

 3             This is one of the many documents the District has

 4    produced that deal with changes to the information

 5    technology system known as DCAS.  They're not SNAP related.

 6    But, again, plaintiffs asked for, and the District provided,

 7    these rollouts of changes that were made to the programming

 8    and code such that the system could do things that otherwise

 9    would have to be done by SNAP workers.

10             On Page 4 --

11             THE COURT:  And is this a public document or an

12    internal D.C. government document?

13             MR. RISHER:  This is an internal document.

14             THE COURT:  Okay.  So these are release notes; so

15    whenever there's a patch or a fix of some kind, it gets

16    documented in a report like this?

17             MR. RISHER:  That's correct.  They are constantly

18    happening, and so they're not released as they happen but, I

19    believe, as often as weekly.  Some releases are larger than

20    others.

21             THE COURT:  Okay.  Page 4.

22             MR. RISHER:  On Page 4 it indicates that, to the

23    extent there was a problem with the system for homeless

24    individuals, that problem was addressed in April.

25             THE COURT:  Where does it say that?

```
 1              MR. RISHER:  The last row says "JIRA ONM190."  It

 2      says their mail will now be mailed to the mailing address

 3      provided.

 4              THE COURT:  Okay.  Are there any other documents

 5      that show the District's response to this --

 6              MR. RISHER:  There are --

 7              THE COURT:  -- problem?

 8              MR. RISHER:  -- many, Your Honor, and they have

 9      been produced.

10              THE COURT:  All right.

11              MR. RISHER:  Exhibit --

12              MS. SHARON:  May I be heard in response?

13              THE COURT:  You may.  He says he's given you

14      everything.

15              MS. SHARON:  Yes.  Counsel is correct that there

16      was a past issue, but he is mistaken because this error has

17      actually reoccurred.

18              So Exhibit 8 is referring to a past issue that was

19      corrected in April 2018.  Plaintiffs also believed that this

20      error had been corrected and did not have any reason to

21      believe it had recurred until it received Exhibit 7, and

22      this is a document from late August 2019.  It's a PowerPoint

23      presentation that defendant's DCAS team creates for weekly

24      meetings that it holds, and this refers to an issue.  It

25      says on Page 5, "System is not sending notices to the
```

1    reported mailing address," and it indicates that that issue

2    remains ongoing.  It says "Go Live September 2019" at the

3    top.  And, indeed, defendant's own lead of the notices team

4    testified that his understanding was that this issue was --

5    had been presently ongoing in 2019.

6            So I believe defendant's counsel is mistaken in

7    representing that the issue was corrected and has not

8    recurred since April of 2018.  That document was provided by

9    plaintiffs for context about the impact in the past.

10            Our understanding is that if defendant is, indeed,

11    undertaking to do a code fix to the system to correct this

12    issue, there would have to be email exchanges, JIRA tickets,

13    as Mr. Cohan testified to, or some documents describing what

14    steps the programmers are going to take to fix this error.

15    It is implausible to think that they've diagnosed the issue

16    and investigated without creating a single document on that

17    point, Your Honor.

18            THE COURT:  Okay.  Here's what we're going to do.

19    In the next 30 days, Mr. Risher, go back to your client and

20    see if there are any additional documents other than those

21    that you've already produced regarding the mailing of recert

22    applications or recert notices to designated mailing

23    addresses.

24            MR. RISHER:  I can actually represent to Your

25    Honor that Page 7 -- or pardon me, Page 5 of Exhibit 7

1    refers not to an issue of mailing to homeless individuals.

2              THE COURT:  It's not just homeless individuals.

3              MR. RISHER:  Understood, Your Honor.

4              THE COURT:  It's the system mailing to mailing

5    addresses as opposed to designated addresses whether the

6    recipient is homeless or not, as I understand it.

7              Correct --

8              MS. SHARON:  Yes, Your Honor.

9              THE COURT:  -- Ms. Sharon?

10             MR. RISHER:  Yes, Your Honor.

11             MS. SHARON:  That's correct.

12             MR. RISHER:  And Page 5 confirms that it has been

13   fixed, was fixed last month.  And, again, this is a question

14   that goes to what the DCAS system does rather than to what

15   the District does.

16             THE COURT:  But the District administers DCAS,

17   correct?

18             MR. RISHER:  Yes, Your Honor.  And as with many

19   issues, the District has said from the beginning of this

20   case that there have been difficulties with the rollout of

21   the DCAS system, and in response to those, the Department of

22   Human Services, whose director plaintiffs named as the

23   defendant, takes steps outside of the DCAS system.  It does

24   not rely on DCAS doing something correctly to provide the

25   benefits that are due under SNAP.

1          This example was discussed with the back-dating

2     issue.  When DCAS could not properly handle back-dating of

3     applications --

4          THE COURT:  I understand.  There may be work-

5     arounds to technical, you know, deficiencies in DCAS, and

6     your client may have successfully worked around them, but if

7     there's a problem with DCAS that is preventing notices of

8     expiration from getting to the right people, then that's

9     obviously relevant to the plaintiffs' claim.  There may be a

10    defense that there was a work-around or it didn't affect,

11    you know, the benefits or whatnot, and we'll hear that, but

12    that's not a discovery issue, okay?

13         So what I'd like for you to do is just to confirm

14    if there are any other documents related to this issue,

15    namely the system sending out notices to the mailing address

16    when, in fact, it should be sending it out to the designated

17    address, okay?

18         MR. RISHER:  Okay, Your Honor.  Thank you.

19         THE COURT:  And if you've produced everything,

20    we're done.

21         MR. RISHER:  Thank you, Your Honor.

22         THE COURT:  All right.  Next one, Ms. Sharon.

23         MS. SHARON:  Yes, Your Honor.  Regarding this

24    topic, defendant has acknowledged, in its interrogatory

25    responses and in its documents, four failures to send

1    notices of expiration to SNAP households.  Despite the fact

2    that they have acknowledged these issues, their document

3    production on these topics has been nearly nonexistent.  For

4    three of the four notice failures they've either produced no

5    documents or a single document apiece.

6          THE COURT:  So these are four examples out of

7    thousands of NOEs that go out?

8          MS. SHARON:  Yes, Your Honor, but each of these

9    was -- our understanding, based on defendant's responses, is

10    that they were each widespread in nature.  So, for example,

11    on Page 14 of Exhibit 9, which is their interrogatory

12    responses, they discuss a programming error that was

13    preventing DCAS from triggering an NOE for many households,

14    so it wasn't selecting all the cases that were due to

15    recertify.

16          THE COURT:  I recall at the very beginning of this

17    case, at the first hearing, the issue was framed:  Yes, Your

18    Honor, there have been some problems with the, you know,

19    recertification processing timeliness because we had this

20    technical glitch.  I remember it was a vendor not sending

21    out the notices.

22          This is not a new issue, right?  This has been an

23    issue since the beginning of the case.

24          MS. SHARON:  That is correct, Your Honor.  And

25    what we are seeking is sufficient document production or

1    knowledgeable witnesses who could testify -- I'm sorry, that

2    would allow us to test the claim that these issues that have

3    been occurring way back since you mentioned, since the

4    beginning, have, in fact, been corrected, whether steps have

5    been taken to compensate impacted households and, in fact,

6    whether our named plaintiffs and declarants were impacted by

7    these errors.

8         THE COURT:  But you've had 11 months to depose

9    people, including 30(b)(6) witnesses, on these technical

10   issues that we've known about since the beginning of the

11   case.  Why isn't that sufficient?

12        MS. SHARON:  Well, Your Honor, we have done our

13   very best to obtain information, but we have -- as I said,

14   we have received not a single document about certain notice

15   failures that defendant expressly acknowledges in its

16   interrogatories.

17        For example, defendant describes a May 2018 NOE

18   failure, and they purport in their interrogatories to

19   identify the precise number of households impacted.  They

20   talk about how it was discovered.  They've produced no

21   documents about how it was discovered, about how they

22   determined who was impacted.  And while we have -- we asked

23   defendant to identify, in its supplemental interrogatories,

24   who investigated these notice failures so that we could

25   depose them.

1          We deposed five of the individuals they

2     identified.  None of them could testify with any

3     specificity.

4          THE COURT:  Let me stop you.

5          MS. SHARON:  I'm sorry.

6          THE COURT:  So you're not objecting to the

7     interrogatory responses?

8          MS. SHARON:  That's correct.

9          THE COURT:  They've identified these technical

10    issues.  But your argument is given the existence of the

11    issues you expect there to be documents.  We asked for the

12    documents, and we didn't get them, so where does that leave

13    us?

14          So, Mr. Risher, why isn't it reasonable to believe

15    that there would not be documents related to those four

16    technical issues?

17          MR. RISHER:  There are certain to be fewer

18    documents than plaintiffs presume because most of these

19    issues are -- excuse me -- many such issues are dealt with

20    via telephone call, face-to-face meeting.

21          Many of the documents that do exist -- I don't

22    know that I would say all, although some documents have been

23    produced -- were created specifically in reference to this

24    action which had been filed the year before; and, therefore,

25    they are privileged communications often had directly with

1   the Office of General Counsel at the Department of Human

2   Services.

3            THE COURT:  Okay.  Did you produce --

4            MR. RISHER:  And --

5            THE COURT:  Did you produce a privilege log so

6   that the plaintiffs could have a basis for challenging your

7   invocation of privilege?

8            MR. RISHER:  Yes, Your Honor.  The District has

9   produced three privilege logs.  Its first, I believe, was in

10  May of this year; its second in July; its third in

11  September.

12           THE COURT:  Okay.  And is it your representation

13  that the District has searched for all documents related to

14  these four technical problems?

15           MR. RISHER:  Yes, Your Honor.

16           THE COURT:  Okay.

17           MS. SHARON:  Your Honor, may I be heard in

18  response?

19           I personally examined the privilege logs other

20  than one that was produced at 6:00 p.m. last night, and I

21  can find nothing on them that appears in any way to relate

22  to these four notice failures.  This is the first that I'm

23  hearing of any claim of privilege.

24           And, Your Honor, it's simply implausible to think

25  that there would be no documents regarding an acknowledged

1    notice failure.  They had to have diagnosed, discovered,

2    taken steps to correct that problem in some respect, and

3    there would have to be some communications or documents on

4    that point.  Unless defendant's position is that no one

5    conducted such investigation or took any corrective measures

6    for households, there would have to be some documents on

7    that point.

8              THE COURT:  All right.  Any documents referred to

9    by deponents or referred to in other documents that you

10   have?

11             You have no leads as to any particular document.

12   You're just arguing that it cannot be the case that there is

13   an absence of documents.

14             MS. SHARON:  Well, for example, Your Honor,

15   defendant presented to FNS a report detailing certain

16   failures that had occurred in the past, and in that report

17   it undertook to explain exactly what had happened, how it

18   was diagnosed, who was impacted, providing specific numbers

19   of households.  So -- but none of those underlying documents

20   have been produced to plaintiffs showing how they determined

21   what the cause was, how they got the information that they

22   provided to FNS.

23             In addition, third parties like FNS and the print

24   vendor have provided us with the District's own documents

25   that the District has not produced to us, which raises

1     concerns about whether there are other documents out there.

2     If third parties are producing District documents to us that

3     the District has not produced about these topics, that's

4     cause for concern.

5          We've even gone back and said:  We have these

6     documents.  They're redacted, or they're in partial form.

7     Please produce them to us.

8          We received them from third parties and defendant

9     has not done so, so that's of significant concern to

10    plaintiffs about the completeness of defendant's search for

11    documents.

12         THE COURT:  Okay.

13         MS. SHARON:  We believe part of the problem may be

14    that the person charged with investigating notice failures

15    at that time, he was not identified as a custodian that the

16    defendant searched his emails or documents, so we believe

17    many of the responsive documents may, in fact, be in his

18    possession.

19         THE COURT:  Who is that person?

20         MS. SHARON:  Mr. Adnan Khan, K-H-A-N.  Multiple

21    witnesses testified that he would have been charged with

22    investigating those failures.  We understand he's -- I

23    believe he's no longer employed by the agency.  He certainly

24    doesn't hold a role pertaining to these notice issues now.

25         And I'll just emphasize that the current lead of

1      the DCAS notices team was asked about all four of these

2      failures.  He had no knowledge of any of them, and he

3      specifically denied having investigated them in connection

4      with the defendant's interrogatories despite what defendant

5      represented.

6              THE COURT:  All right.  As I said, some of these

7      technical issues are over two years ago now.  How are they

8      relevant to the District's current compliance and, you know,

9      timeliness numbers?

10             MS. SHARON:  Yes, Your Honor.  Even from the

11     minimal deposition testimony and documents we have received,

12     we have reason to believe that several of these failures are

13     indeed ongoing.  For example, Jeremy Platt, who is the

14     former lead of the DCAS notices team, testified that, when

15     he transitioned out of his role in October of last year, the

16     system was failing to trigger several hundred notices of

17     expiration per month, and he believed that this was due to

18     the programming error the defendant acknowledges in their

19     interrogatory responses.

20             In addition, defendant's own interrogatory

21     responses don't claim to have resolved the underlying cause

22     of the May 2018 notice failure.  They say that it's

23     monitored, that there's reporting to address it, but it

24     appears that that issue is still ongoing.  At least they've

25     made no representation to the contrary.  But, again, for

1    that error we have not a single document and no deposition

2    testimony.

3            But more fundamentally, Your Honor, we believe

4    that we should be entitled to test the claim that these

5    errors have been, in fact, corrected.  There has not been

6    one witness who has been able to speak to the corrective

7    measures the defendant allegedly undertook, and we don't

8    have any documents concerning these corrective measures.

9    So, again, defendant is just asking us to take them at their

10   word that we have fixed it and that there's no ongoing

11   ramifications from these issues.

12           THE COURT:  And you've not endeavored to depose

13   Mr. Khan or Mr. Platt?

14           MS. SHARON:  I'm sorry?

15           THE COURT:  Neither Mr. Khan nor Mr. Platt was

16   deposed?

17           MS. SHARON:  Mr. Platt was deposed, Your Honor,

18   and our understanding is that Mr. Khan is no longer employed

19   by the agency, or at least has transitioned out of that

20   position.

21           THE COURT:  Okay.  That doesn't preclude you from

22   subpoenaing him.

23           MS. SHARON:  No.  Of course, Your Honor.

24           THE COURT:  All right.  Mr. Risher, it strikes me

25   that these technical issues are important.  I don't like to

1    question representations of counsel about what their clients

2    searched for and did not search for and found and did not

3    find, but it does strike me as unlikely that there are no

4    documents related to, for instance, a vendor failing to send

5    out 20,000 notices of expiration given that it's a key issue

6    in the case and that your client is facing, you know,

7    injunctive relief from a federal court, that no one is

8    talking about fixing this issue in documents.

9            MR. RISHER:  Your Honor, plaintiffs questioned

10   Director Zeilinger in May, as the District's 30(b)(6)

11   witness, about this allegation.  Director Zeilinger informed

12   plaintiffs, as the District did in its interrogatory, that

13   the 20,000 did not deal with notices of expiration.  It was

14   not even related to SNAP.

15           When questioned at his deposition, Mr. Khan did

16   not say that he knew that nothing happened.  He said that --

17           THE COURT:  Correct me if I'm wrong, but I thought

18   that this -- the District maintained that part of its low

19   recertification compliance statistics were due, in part, to

20   this vendor issue.  Am I misremembering that?

21           MR. RISHER:  Somewhat, Your Honor.

22           THE COURT:  Okay.

23           MR. RISHER:  The District had the vendor problem

24   that in June of 2017 notices of expiration were not timely

25   sent out.  As a result, on September 1st of 2017 several

1    thousand individuals showed up and said:  Our benefits were

2    cancelled, and we didn't receive notice.

3                    THE COURT:  Okay.

4                    MR. RISHER:  That was the issue.

5                    THE COURT:  So let's talk about that vendor issue.

6                    MR. RISHER:  Yes, Your Honor.

7                    THE COURT:  How can there not be any documents

8    internal to the agency on that issue?

9                    MR. RISHER:  There are documents, Your Honor.  The

10   District has produced some documents.

11                   THE COURT:  Okay.

12                   MR. RISHER:  However, that issue arose after

13   plaintiffs had commenced this action and so, again, most of

14   that communication would have been made in reference to this

15   case precisely because it is so directly relevant.  However,

16   in deposition testimony from multiple witnesses, including

17   the first 30(b)(6) deposition done at the preliminary

18   injunction stage, the District testified and later produced

19   documents about the new procedures that it was putting into

20   place to prevent a recurrence of that issue.

21                   Multiple witnesses, including Mr. Platt and

22   Mr. Krishnan, were deposed on that procedure.  The District

23   has produced the documents that these different witnesses

24   referenced -- a mitigation report, a reconciliation report,

25   email between the District and its print vendor -- to

1    protect against a recurrence of that problem.

2          The issue in May of 2018, the District represented

3    in its interrogatory response that approximately 120

4    households might have been affected.  That's 120 notices of

5    expiration in a month out of the several thousand that are

6    sent.  The District figured out what the problem was and

7    explained that in its interrogatory, and what documents

8    exist that dealt with the question of whether these

9    approximately 120 households had received a notice of

10   expiration or not have been produced.

11         THE COURT:  Okay.  Why wasn't Mr. Khan identified

12   as an appropriate custodian in response to this request?

13         MR. RISHER:  Mr. Khan is the information

14   technology person.  He works on the programming or worked on

15   the programming of the DCAS system.

16         Similarly, Mr. Krishnan, Mr. Tripurneni, people

17   who were deposed by plaintiffs, any communications that they

18   had on this issue would have been with people at the

19   Department of Human Services about we have a problem, and

20   those individuals at the Department of Human Services were

21   very -- their email boxes were queried.

22         The way that email is stored in the District's

23   system is, if an email is sent by one person to three

24   others, only one copy of it is kept.  It is merely tagged as

25   being connected to those people.  And so by searching

1     relevant members of the Department of Human Services and of

2     the DCAS team, the District is able to pull all of the

3     relevant communications.

4             THE COURT:  So your position would be that it

5     would not reveal any additional documents to search his

6     inbox or outbox?

7             MR. RISHER:  Our position is that we made a

8     reasonable search.  I cannot obviously assert with certainty

9     that checking him there would not have been some others, but

10    it is unlikely, and the District was very thoughtful in

11    choosing which custodians to search -- or, excuse me,

12    "custodians" is not quite the right word -- to check which

13    individuals' email to search.

14            THE COURT:  Okay.

15            MS. SHARON:  Your Honor, if I could be heard on

16    the specific custodians point?  Exhibit 13 that we've

17    attached is one of the emails we've received from the third-

18    party print vendor that has not been produced by defendant,

19    and it is an email exchange involving Mr. Khan and the print

20    vendor.  It does not contain -- it was not sent to any of

21    the District's identified custodians, and we believe that's

22    why this and similar correspondence with the print vendor,

23    between Mr. Khan and the print vendor, may not have been

24    produced, because none of the other D.C. employees who are

25    cc'd on that email were custodians.

1        THE COURT:  And, again, this print vendor issue is

2   the one that affected the notices of expiration or a

3   different issue?

4        MS. SHARON:  It's confusing, Your Honor.

5        THE COURT:  Yes.

6        MS. SHARON:  The June 2017 vendor error is the one

7   that you heard about way back during the conference you held

8   before.

9        THE COURT:  Yes.

10        MS. SHARON:  Subsequently, defendant produced

11   documents indicating that there was, in April and May of

12   2017, another vendor error that impacted 20,000 notices.

13   That document does not describe the notice types that were

14   impacted, and other witnesses have been unable to testify

15   specifically about what notice types were impacted, and

16   that's why we seek additional discovery on that issue in

17   order to test defendant's claim that these did not, in fact,

18   involve notices of expiration.

19        I will note that we have several declarants who

20   were due to receive an NOE that would have been mailed in

21   April or May of 2017 who did not receive those notices,

22   and we are concerned that that may have been due to the

23   same -- to this April/May 2017 vendor error that's

24   acknowledged in --

25        THE COURT:  And explain to me again, if that

1      recipient didn't get a notice in April of 2017, how that's

2      relevant to whether the District is complying substantially

3      now, almost two and a half years later.

4              MS. SHARON:  Yes, Your Honor.  It goes to the

5      question of the procedures that are in place to detect the

6      vendor's failure to print notices and whether steps have

7      been taken to compensate those households who are impacted

8      by those failures.  Defendant, you know --

9              THE COURT:  Your lawsuit is not asking for

10     compensation to people whose --

11             MS. SHARON:  I understand that, Your Honor, but

12     the question of how defendant reacts when it uncovers a

13     notice failure and what steps it takes to investigate who

14     was impacted and how it should be resolved is relevant to

15     the claims in the litigation, Your Honor.

16             THE COURT:  Any suggestion of any vendor errors in

17     the last 18 months?

18             MS. SHARON:  Your Honor, we do -- we were produced

19     documents indicating several failures to transfer documents

20     to the print vendor or several issues where the print vendor

21     missed a file, so there do appear to be some ongoing issues

22     with the vendor's performance.  Not of the magnitude that

23     have occurred in the past, but, perhaps, Your Honor, the

24     more fundamental concern is the technical errors with the

25     DCAS system that Mr. Platt testified caused notices to

1    continue to not be triggered for certain households who are

2    due to recertify.  He said several hundred per month at the

3    time he left the agency --

4              THE COURT:  Okay.

5              MS. SHARON:  -- which would be separate from a

6    print vendor malfunction, Your Honor.

7              THE COURT:  When did Mr. Khan leave the agency?

8              MS. SHARON:  I do not know, Your Honor.

9              THE COURT:  Mr. Risher, do you know that?  How

10   long has he been gone?

11             MR. RISHER:  I do not know that, Your Honor.  I

12   know that Mr. Platt had left DCAS before plaintiffs even

13   suggested they wished to depose him.  The District worked to

14   make him available.  He came and was deposed for seven hours

15   on his own time.

16             He also said several hundred notices of all type

17   were not sent.  He said one hundred or fewer notices of

18   expiration were not generated by the DCAS system and,

19   therefore, were sent out by mail merge.

20             THE COURT:  Okay.

21             MR. RISHER:  Mr. Platt testified about the system

22   in place to catch when a file is not successfully

23   transferred that Ms. Sharon just referenced and the steps

24   that the District takes to catch that and to provide the

25   file the next day.  The documents to which plaintiff has

1    just referred are documents showing that there has not been

2    a repetition of the problem from 2017, and multiple

3    witnesses have been deposed along those lines.

4            THE COURT:  Okay.  Given how dated the 2017

5    glitches were or are, I'm not going to order you to go back

6    and search Mr. Khan's file, but, Mr. Risher, I'd like for

7    you to do the same thing with respect to this set of

8    requests, which is to go back to your client and confirm

9    that all documents related to these glitches were either

10   produced, or if they weren't -- if they were withheld on

11   privilege grounds, to indicate to the plaintiffs where those

12   documents are on your privilege log.

13           And if you want to lodge a -- if you want to

14   challenge their privilege assertion, feel free.  Okay?

15           MR. RISHER:  Yes, Your Honor.

16           THE COURT:  All right.

17           All right.  Last but not least, mitigation and

18   reconciliation reports.

19           MS. SHARON:  Yes, Your Honor.  As you just heard

20   defendant's counsel testify, one of their key defenses in

21   this claim is that any ongoing errors with the DCAS system

22   are caught by these reports that they run both to monitor

23   the DCAS system's performance and to monitor the print

24   vendor's performance.

25           Their witness, who is the current lead of the DCAS

1    notices team, testified with great specificity about the

2    specific reports that are allegedly run, and they fall into

3    two categories.  One is called mitigation reports.  Those

4    are used to identify households who -- for whom the system

5    did not create a notice of expiration.  The other is

6    reconciliation reports, which are used to uncover instances

7    where the print vendor failed to mail a specific notice or

8    file of notices that was transferred.

9            We have looked very carefully, myself in

10   particular, through the discovery that defendant has

11   provided and cannot find samples of either the mitigation

12   reports or the reconciliation reports in the form that the

13   witness testified they existed, and in order to be able to

14   test the accuracy of this reporting, to test the claim that

15   it is, in fact, regularly conducted, we believe it's

16   essential that we be able to see a sample of those reports,

17   Your Honor.

18           THE COURT:  Okay.  Mr. Risher, do these reports

19   exist in the form that Ms. Sharon just described?

20           MR. RISHER:  I would hesitate to presume to know

21   the form to which Ms. Sharon described, but the District has

22   produced mitigation reports, reconciliation reports, reports

23   related to those such as the verification reports.  It's not

24   generally the District's practice to help plaintiffs to

25   interpret what has been produced, but I have brought some

1    samples to court today and can provide them to the Court or

2    to plaintiffs.

3            THE COURT:  This is clearly an issue that you guys

4    can talk about and work out, okay?  I don't want a summary

5    judgment brief where you're disputing what Exhibit A is,

6    okay?  It's a report.  Let's agree that it's the report that

7    both sides are going to argue from at summary judgment.

8            MS. SHARON:  Your Honor, if I could just be heard

9    briefly in response?

10           THE COURT:  Yes.

11           MS. SHARON:  We have attempted to identify those

12   documents through several very specific deficiency letters.

13   We've pointed to the Bates stamps that they have provided.

14   We said, "This is not our understanding of the form in which

15   these are kept," and we've received no response from

16   counsel.  This was raised as early as our May 8th deficiency

17   letter --

18           THE COURT:  Okay.  Bring them up.  Let me see the

19   reports.

20           Okay.  Mr. Risher, what have you given me?

21           MR. RISHER:  Counsel spoke of mitigation reports.

22           THE COURT:  Yes.

23           MR. RISHER:  One was provided with Bates No.

24   38712.

25           THE COURT:  Hold on.  So is the report the

1    spreadsheet at the end?

2              MR. RISHER:  Yes, Your Honor.

3              THE COURT:  And that's the mitigation report that

4    you understand to be generated to investigate instances in

5    which notices are not generated by DCAS.

6              MR. RISHER:  I would not characterize it that way,

7    Your Honor.

8              THE COURT:  Okay.

9              MR. RISHER:  There are known problems with the

10   DCAS system where it does not properly trigger and create

11   notices of expiration --

12             THE COURT:  Okay.

13             MR. RISHER:  -- for SNAP benefits, and so the

14   mitigation report is created to pull the specific SNAP

15   applicants whose NOE was not generated.  They are then

16   generated by the DCAS team and sent as a separate file to

17   the print vendor.

18             THE COURT:  And so when people within the agency,

19   including the deponents that Ms. Sharon referred to, refer

20   to mitigation reports, to your understanding this is what

21   they're talking about?

22             MR. RISHER:  Yes, Your Honor.

23             MS. SHARON:  And, Your Honor, this is inconsistent

24   with what Mr. Krishnan, the notices lead, testified is

25   provided to him.  This simply is not what he described

1      having received as a mitigation report.

2             The same is true of the alleged reconciliation

3      report, which I'll note does not contain -- is not keyed to

4      the dates on which a notice of expiration would be

5      transferred to the print vendor, so it does not help us to

6      determine the accuracy of those reports as concerns NOEs,

7      which is why we've requested a larger sample of these

8      documents.

9             I'll just mention, just because it's confusing and

10     technical, that the NOE only goes out once a month, and

11     that's on -- our understanding is that it's transferred to

12     the print vendor on the 28th of each month, so any report

13     that would concern the print vendor's performance would have

14     to be from the 29th of the month or the 30th to be able to

15     pick up any NOEs that were not printed by the vendor.

16            And, again, because we know it's technical, we

17     have had a lot of back-and-forth with the District about

18     precisely what we're looking for.  We've tried to identify

19     very specifically the reports and the date ranges that we

20     were hoping to retrieve a sample of, and we've just received

21     these, I believe, in the production on the 13th of

22     September.  They do not correspond to the testimony of their

23     lead personnel, and they appear to be an inadequate sample

24     that would allow us to actually learn anything about notices

25     of expiration.

```
 1              THE COURT:  All right.  What about the

 2    reconciliation report?  Is this Garnett 37885?

 3              MS. SHARON:  Your Honor, I am not -- it is hard

 4    for me to interpret, but my understanding is that this is

 5    the report -- the print vendor provides to the District a

 6    report of what they've processed, but the District -- again,

 7    their lead personnel testified that he creates a separate

 8    spreadsheet where he compares his list of notices that were

 9    transferred with the vendor's report of what they mailed,

10    and he creates a separate document illustrating any gap

11    between those numbers.  I don't understand this to be that

12    document based on his testimony, and so I don't believe this

13    is a reconciliation report based on his testimony, Your

14    Honor.

15              THE COURT:  Okay.  I don't want to order the

16    District to produce every single mitigation report and

17    reconciliation report in their files, all right?  I want you

18    to get together and figure out what it is the deponent was

19    referring to and link it to samples or precise documents

20    that the District has.

21              MS. SHARON:  Yes, Your Honor.

22              THE COURT:  Okay?  Just work that out, okay?

23              MS. SHARON:  Yes, Your Honor.

24              THE COURT:  All right.

25              All right.  I think that's it.
```

1          MS. SHARON:  Your Honor, I'm sorry.  There's two

2     just subsidiary issues in the last point of District -- of

3     plaintiffs' filing on this point.  They're not the

4     monitoring reports, but the -- if you turn to Exhibit 16,

5     Your Honor.

6          THE COURT:  Okay.

7          MS. SHARON:  The District's head of their data

8     analytics department -- that's Ms. Kim, who you've heard

9     testimony about -- in that email she, on Page -- I believe

10    that's on Page 3, she cuts and pastes into the email an

11    underlying data set, and that data set is what the District

12    uses in order to populate reports to FNS about the rate at

13    which they're timely sending notices of expiration.  We

14    have -- this is an excerpt of such a report.  We've compared

15    it to the monthly reports that they provide to FNS and noted

16    several discrepancies and areas of concern, and we are

17    simply asking that this underlying data set be produced from

18    November 2017 -- I'm sorry, November 2018, where it cuts

19    off, to the present.

20          It's clear that it's in a form that could be

21    produced given that it was cut and pasted into this email,

22    and it would enable us to test the accuracy and assumptions

23    that are built into the data that's provided on a monthly

24    basis to FNS.

25          THE COURT:  And have you previously requested

1        this, or is this a new request?

2              MS. SHARON:  No, Your Honor, we had -- yes, we had

3        previously requested it.  No, it is not a new request.  We,

4        first, requested underlying data in one of our very first

5        deficiency letters in May, and after Ms. Kim's deposition we

6        followed up with an email asking for any underlying data

7        used to populate the various reports that are provided by

8        the District.

9              THE COURT:  I saw that in your report, and the

10       question is what is -- I mean, are you asking for access to

11       the entire DCAS database and every single underlying

12       application that's been filed?

13             MS. SHARON:  No, Your Honor.  With respect to the

14       NOE issue, we're literally just seeking this data set right

15       here that's cut and pasted into the email, just from

16       November 2018 to the present.

17             THE COURT:  All right.  So is it your position

18       you're not asking the District to create any custom reports,

19       but simply to produce to you a report that is already in

20       existence?

21             MS. SHARON:  That's precisely correct, Your Honor.

22             THE COURT:  All right.

23             Mr. Risher, what's wrong with that?

24             MR. RISHER:  I don't know that that is an accurate

25       description of the facts.  Counsel has insisted that the

1     exhibit shows something that was cut and pasted.  I don't

2     know that that is true.

3                    THE COURT:  Let's back up, okay?  Someone prepares

4     the quarterly FNS report.  Is that accurate?

5                    MR. RISHER:  I don't know -- is Your Honor

6     referring to the 366B report?

7                    THE COURT:  Yes.  Someone prepares the 366.

8                    MR. RISHER:  Yes, Your Honor.

9                    THE COURT:  And they use -- do they use a report

10    extracted from DCAS to populate the 366?

11                   MR. RISHER:  So, yes, Your Honor, but it doesn't

12    create a file.  What happens is, just as if you do a search

13    on your computer, results show up on your screen.

14                   THE COURT:  Yes.

15                   MR. RISHER:  But there's not a document where the

16    results can then be copied from one screen to another.

17                   THE COURT:  That was my question.  Is it something

18    that exists presently in the agency's file?

19                   MR. RISHER:  And I am saying to Your Honor that --

20                   THE COURT:  So, in other words, if I were to send

21    you a request for production for all data sets used to

22    populate the second quarter 2017 366, would the agency be

23    able to go to a file and retrieve those data sets --

24                   MR. RISHER:  My understanding, Your Honor --

25                   THE COURT:  -- without requerying the entire

1    database?

2              MR. RISHER:  My understanding, Your Honor, is that

3    if that request were made of the agency, if I made that

4    request to the agency, they would query the system.

5              There may be a file somewhere, but they would not

6    know where to look for it, and they would not look for it.

7    They would query the system because that's how their

8    operations are designed.

9              THE COURT:  Okay.  So, Ms. Sharon, you know, if

10   there's a relevant document in their files, and you request

11   it, and it's not overly burdensome for them to produce it,

12   you're entitled to it.  But you're not entitled to customize

13   queries from the entire database, and I don't think you're

14   entitled to the entire database itself.

15             MS. SHARON:  Yes, Your Honor, and we're not

16   requesting that.  If defendant's counsel's position is that

17   this document with this underlying data does not exist, we

18   understand that, but I'm not clear that that is the case, or

19   if that's what defendant's counsel is representing, or if it

20   would be possible for him to check the witness's files.

21             THE COURT:  Counsel, go back to your client and

22   see if this particular document from which this may or may

23   not be a cut and pasted excerpt exists, okay?

24             MR. RISHER:  Yes, Your Honor.

25             THE COURT:  Okay.

1          MS. SHARON:  Thank you.

2          THE COURT:  Now we're done.

3          MS. SHARON:  Thank you.

4          THE COURT:  All right.  So we'll leave discovery

5     open for another 30 days to allow for the follow-up

6     discussed today.  We'll issue a summary minute order just

7     memorializing the Court's rulings.

8              In the meantime, let's get together and think

9     about how the case will proceed forward to the merits.  To

10    the extent there are disagreements as to what the path

11    forward should be, lay those out, and we'll have you back,

12    and we can talk about those.

13             Also think about the best way to potentially

14    resolve the case.  And if you would like a referral of some

15    sort from me, I would be happy to do that, okay?

16         MS. SHARON:  Thank you, Your Honor.

17         MR. COHAN:  Thank you very much, Your Honor.

18         MR. RISHER:  Thank you, Your Honor.

19         THE COURT:  All right.  Have a good day.

20                 (Whereupon the hearing was

21                  concluded at 11:59 a.m.)

22

23

24

25

1                    <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3               I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8          Dated this 26th day of September, 2019.

9

10                                   <u>/s/Lisa A. Moreira, RDR, CRR</u>
                                     Official Court Reporter
11                                   United States Courthouse
                                     Room 6718
12                                   333 Constitution Avenue, NW
13                                   Washington, DC 20001

14

15

16

17

18

19

20

21

22

23

24

25