UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SHONICE G. GARNETT**, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**LAURA ZEILINGER**,<br><br>Defendant. | Case No. 17-cv-1757 (CRC) |

## OPINION AND ORDER

Claiming clear error and manifest injustice, plaintiffs have moved under Federal Rule of Civil Procedure 59 for reconsideration of the Court's September 9, 2021 entry of summary judgment for the defendant. Because plaintiffs failed to raise most of their arguments for reconsideration prior to the Court's entry of judgment, and demonstrate no error in any case, the Court will deny the motion.

### I.    Background

In August 2017, a group of District of Columbia residents and a non-profit organization brought this class action against Laura Zeilinger in her official capacity as Director of the District's Department of Human Services ("DHS"), which administers the city's participation in the federal Supplemental Nutrition Assistance Program ("SNAP"). See Pls.'s Compl., ECF Doc. No. 1; Pls.'s Am. Compl, ECF Doc. No. 26. Plaintiffs alleged that the District was violating their due process rights by failing to process food stamp applications within the SNAP Act's

mandatory timelines.  Pls.'s Compl. at ¶ 173.[1]  The complaint sought injunctive and declaratory relief under 42 U.S.C. § 1983.  Id. at 31–32.

Plaintiffs filed a motion for class certification along with their complaint and sought a preliminary injunction soon thereafter.  See Pls.'s Mot. for Class Cert., ECF Doc. No. 2.  In March 2018, the Court certified three classes of D.C. residents who claimed violations of three distinct SNAP Act deadlines.  See Garnett v. Zeilinger, 301 F. Supp. 3d 199 (D.D.C. 2018) ("Garnett I").  The time period of each class covered conduct by the District beginning on June 1, 2016.  Id. at 212–13.

Two months later, the Court partially granted plaintiffs' preliminary injunction motion. Garnett v. Zeilinger, 313 F. Supp. 3d 147 (D.D.C. 2018) ("Garnett II"), vacated by Garnett v. Zeilinger, 485 F. Supp. 3d 206 (D.D.C. 2020) ("Garnett IV").  Notably, in their briefing on the likelihood-of-success-on-the-merits prong of the preliminary injunction inquiry, neither side suggested that plaintiffs had to establish that the city's failure to meet the SNAP Act's statutory deadlines was the result of some policy or practice as required for § 1983 municipal liability under Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978).  Both sides appeared to assume, rather, that liability hinged simply on whether the city had met the statutory deadlines, although they differed on how strictly compliance should be measured.  Plaintiffs argued that absolute compliance with the SNAP Act's timeliness requirements was required. The District countered that substantial compliance was sufficient to avoid liability.  Citing prior SNAP litigation against various States, the Court sided with the plaintiffs, holding that the plain language of the Act requires strict compliance with its application processing timetables.  Garnett

---

[1] While Director Zeilinger is currently the sole defendant in this case, consistent with its prior opinions the Court will refer to the defendant here as "the District."

II, 313 F. Supp 3d at 155.  Moving to the balance-of-equities and public-interest prongs of the preliminary injunction inquiry, the Court found that the District's relatively better and improving performance in timely processing initial SNAP applications——coupled with ongoing oversight of the District's timeliness performance by the Federal Nutrition Service ("FNS"), the federal agency that supervises States' participation in SNAP——did not warrant imposition of an injunction with respect to initial applications.  Id. at 157–61.  By contrast, the Court found it in the public interest to issue an injunction requiring improvements in the District's timely processing of applications by existing SNAP recipients to recertify their eligibility, which had been particularly deficient.  Id. The Court directed the parties to propose language for an appropriate preliminary injunction.  Id. at 162.

The District followed with a motion to dismiss, which the Court largely denied on August 23, 2018.  Garnett v. Zeilinger, 323 F. Supp. 3d 58, 74–75 (D.D.C. 2018) (finding that § 1983 provided plaintiffs with a cause of action and allowing two claims to proceed to discovery) ("Garnett III").  As an alternative to dismissing the case, the District requested that it be substituted as a defendant for Director Zeilinger.  The court reserved judgment on that request because it was unclear to the Court how, if at all, the substitution would affect the governing legal standard, which the Court assumed to be Monell's "policy or practice" standard.  Id. at 75. The Court therefore invited the parties to clarify "the proper standard that applies to this case . . . in more detail in future briefing."  Id.

The same day, after having received the requested input from the parties on the appropriate scope and language of a preliminary injunction, the Court issued an order requiring the District to implement all necessary changes to its policies, procedures, and employee training programs to ensure "full compliance" (pegged at a 95% timeliness rate) with the statutory

timetable for processing applications by existing SNAP recipients to recertify their eligibility. Preliminary Injunction Order at 2, ECF Doc. No. 74. And while the order did not mandate improvements in the timely processing of initial applications, it required the District to file monthly reports with the Court documenting its timeliness in handling those applications. Id. at 2–3. It also made the city report on the status of a corrective action plan that had been imposed by FNS. Id. at 5. The District proceeded to file the Court-ordered reports up until the outbreak of the COVID-19 pandemic, when the Court suspended the required submissions with the plaintiffs' consent. See Minute Order of 4/16/2020.

Following extensive discovery, the parties filed cross motions for summary judgment. Despite the Court's invitation in its motion-to-dismiss ruling to address application of the Monell standard, the first mention of Monell in the summary judgment briefing came on page three of the District's reply brief. See Def.'s Reply in Support of Cross-Motion for Summary Judgment at 3. As a result, the Court included the following advisory in a Minute Order issued in advance of the oral argument on the motions:

> In addition to the points raised in their briefs, the parties should be prepared to address the following question[]: (1) Whether Monell's "policy or practice" standard applies to Plaintiffs' claims and, if so, how it impacts the level of noncompliance with the SNAP Act that is actionable under § 1983, see, e.g., Salazar v. District of Columbia, 954 F. Supp. 278, 324 (D.D.C. 1996) (applying the Monell standard to District's compliance with Medicaid processing requirements even though the statute defines D.C. as a "state" and finding that plaintiffs had to show a "persistent, pervasive practice, attributable to a course of conduct deliberately pursued by official policymakers, which caused a deprivation of plaintiffs rights . . .")

> Minute Order of 7/16/2020 (cleaned up).

The Court commenced the oral argument by observing that the case had not been squarely framed as a Monell claim at the preliminary injunction stage and that the outcome may well have differed had it been so presented. Hearing Tr. at 5–6. The Court then asked plaintiffs'

4

counsel if she now agreed that the <u>Monell</u> standard applied.  <u>Id.</u>  She responded: "Plaintiffs agree with the defendant that the <u>Monell</u> standard does apply in this case even though Your Honor is correct that the District is defined as a State for purposes of the SNAP Act."  <u>Id.</u> at 7.

On September 9, 2020, the Court issued a 39-page Memorandum Opinion with an accompanying Order granting summary judgment in favor of the District.  <u>See</u> <u>Garnett IV</u>, 485 F. Supp. 3d at 232.  As relevant here, the Court first reiterated its holding at the motion-to-dismiss stage that § 1983 provides a cause of action for plaintiffs to enforce the District's compliance with the SNAP Act's timeliness requirements.  <u>Id.</u> at 219.  It then found, as plaintiffs' counsel had acknowledged at oral argument, that the standard for assessing the District's liability under § 1983 for failing to meet the statutory timeliness requirements was the "policy or practice" standard for municipal liability set forth in <u>Monell</u>.  <u>Id.</u>  In so finding, the Court observed that while "the SNAP Act defines the District of Columbia as a 'State,'" binding D.C. Circuit authority establishes that "the District is considered a municipality under § 1983."  <u>Id.</u> (citing 7 U.S.C. § 2012(r), <u>Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of Columbia</u>, 846 F.3d 391, 413 (D.C. Cir. 2017), and <u>Salazar v. District of Columbia</u>, 954 F. Supp. 278, 324 (D.D.C. 1996)).  The Court went on to explain that courts assess municipal liability under <u>Monell</u> in two steps.  <u>Id.</u> at 219–20.  First, they "must determine whether the plaintiffs have established a predicate federal or constitutional or statutory violation."  <u>Id.</u> at 220.  "If so, they must decide whether custom or policy of the municipality caused the violation."  <u>Id.</u> (citing <u>Baker v. District Columbia</u>, 326 F.3d 1302, 1306–07 (D.C. Cir. 2003)).

Beginning with step one of the inquiry, the Court found that while the record evidence established that the District had improved its application processing rates, plaintiffs had raised

genuine questions of fact as to whether the District had been fully compliant with statutory timeliness requirements for both initial SNAP applications and recertification applications.  See id. at 226–27.  As noted above, the question of what constituted "full compliance" with the SNAP Act deadlines had been hotly contested at the preliminary injunction stage.

At step two, however, the Court sided with the District, concluding that the "record as a whole" did not support a finding that the District's failure to reach full compliance was caused by a municipal policy or practice.  See id. at 227–32.  Plaintiffs' theory of municipal liability——as confirmed by counsel at oral argument——was that city officials had been "deliberately indifferent" to identified problems in meeting the applicable timeliness requirements.  Id. at 220 (citing Hearting Tr. at 7:17–23).  Disagreeing, the Court cited record evidence documenting a host of initiatives undertaken by the District to improve processing rates after it had been made aware of deficiencies in application processing following the roll out of its new computer system.  See id. at 227–28.  By contrast, plaintiffs had presented "little evidence to rebut the District's extensive testimonial and documentary evidence of its efforts to improve timeliness, which is entitled to a presumption of good faith."  Id. at 228 (citations omitted).  Based on this evidentiary disparity and "[i]n light of the record as a whole," the Court concluded that "the District's approach [was] reasonably designed to achieve full compliance with the SNAP Act's timeliness requirements."  Id. at 229.

The Court buttressed its finding that the District had not acted with deliberate indifference with record evidence showing that its recent timeliness performance compared favorably to that of municipalities that have been found to be deliberately indifferent to meeting processing timelines in analogous government benefit programs, as well as to States that have been subject to federal court injunctions for untimely SNAP application processing.  Id. at 230.

The Court also noted that the District's timeliness rates were within the heartland of those reported by the fifty States.  Id.

Because plaintiffs failed to raise a genuine question of fact as to deliberate indifference under the second prong of the Monell analysis, the Court granted summary judgment to the District.  Plaintiffs now ask the Court to reconsider its ruling under Federal Rule of Civil Procedure 59(e).

## II. Legal Standards

Federal Rule of Civil Procedure 59(e) provides that a "motion to alter or amend a judgment must be filed no later than 28 days after the entry of judgment."  "A Rule 59(e) motion is discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (internal quotation marks omitted).  Reconsideration of an order or amendment of a judgment "is an extraordinary measure" that a court does not undertake casually.  Fresh Kist Produce, LLC v. Choi Corp., 251 F. Supp. 2d 138, 140 (D.D.C. 2003).  As such, "mere disagreement does not support a Rule 59(e) motion," Smith v. Lynch, 115 F. Supp. 3d 5, 12 (D.D.C. 2015) (quoting United States ex rel. Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 290 (4th Cir. 2002)), and Rule 59(e) motions are "not simply an opportunity to reargue facts and theories upon which a court has already ruled."  Fresh Kist Produce, 251 F. Supp. 2d at 140 (internal quotations removed); see also Patton Boggs LLP v. Chevron Corp., 683 F.3d 397, 403 (D.C. Cir. 2012) (stating Rule 59 motions are "not a vehicle to present a new legal theory that was available prior to judgment.").

Plaintiffs seek reconsideration of the Court's summary judgment ruling on four grounds: *first*, that the Court clearly erred by considering evidence of the District's efforts to improve its timeliness compliance after the filing of the complaint in August 2017; *second*, that the Court clearly erred by purportedly drawing certain evidentiary inferences in the District's favor in finding a lack of deliberate indifference; *third*, that the Court clearly erred by not considering an alternative potential pathway to <u>Monell</u> liability besides deliberate indifference; and *fourth*, that the Court visited "manifest injustice" on plaintiffs, and, by extension, all D.C. residents, by applying the <u>Monell</u> liability framework to their claims.  The Court takes each argument in turn.

### III.  Discussion

#### A.  Post-complaint evidence

As part of its analysis of <u>Monell</u> liability, the Court considered the record evidence "as a whole" to assess whether the District had been deliberately indifferent to known deficiencies in its SNAP Act compliance.  <u>Garnett IV</u>, 485 F. Supp. 3d at 229.  That evidence included, but was not limited to, the District's timeliness statistics for periods after plaintiffs filed suit and after the Court issued the preliminary injunction.  <u>See</u> <u>id.</u> at 228–31 (discussing the District's performance during the periods pre- and  post-injunction).  Plaintiffs contend that the Court committed clear error by giving any consideration *at all* to this post-complaint evidence in reaching its liability finding.  Pls.'s Mot. to Alter at 5 ("Defendant's post-filing conduct is relevant only to the relief this Court may still order, not to liability.").

Yet, this is the first time the plaintiffs have made this argument.  In fact, their present position runs counter to their own reliance on the District's post-complaint timeliness performance to support both liability and injunctive relief.  In their summary judgment briefing, plaintiffs maintained that they were entitled to judgment on the merits based on the District's

continuing failure, as reflected by the District's court-ordered reports through December 2019, to comply with the SNAP Act's processing timelines.  See, e.g., Pls.'s MSJ at 15 (arguing that "[t]he Court should grant Plaintiffs' summary judgment motion because . . . [of] Defendant's ongoing failure to process SNAP application timely" and referencing a table listing data from the court-ordered reports).  And at oral argument, plaintiffs advanced their interpretation of the same reports, along with other post-complaint evidence, in arguing that the District officials were deliberately indifferent to the delays.  Hearing Tr. at 18:6–15 (plaintiffs' counsel arguing that the fact that the "District has reported to this Court and to FNS [a] number that doesn't comply with FNS requirements" established "Monell liability").  Because Rule 59 cannot be used to raise new arguments that were previously available to the moving party, see, e.g., Fresh Kist Produce, 251 F. Supp. 2d at 140, the plaintiffs are not entitled to reconsideration on the asserted ground that the Court improperly considered the District's post-complaint actions.

The Court would reject plaintiffs' argument in any event.  The complaint was filed in August 2017.  Its central factual allegation was that the District's implementation of a new computer system beginning in October 2016 had caused widespread delays in processing SNAP applications.  See Pls.'s Complaint at ¶¶ 67–77.  FNS had monitored the implementation of the new system and conducted a review of the District's subsequent timeliness performance.  That review resulted in an October 2017 letter to the District finding that its overall timeliness rate for processing initial applications—88.45%—warranted imposition of a corrective action plan.  Garnett IV, 485 F. Supp. 3d at 213. [2]

---

[2] As the Court explained in its opinion, "[t]his figure is based on a calculation of the upper bound of a 95% confidence interval (an estimated range of values of which FNS is 95% confident includes the true value) surrounding the FNS APT rate point estimate. The upper

The complaint does not squarely allege that the District's lackluster timeliness performance was caused by a city "policy or practice," let alone specify what the offending policy or practice may have been. And, as noted above, the plaintiffs' briefing throughout the case---at the preliminary injunction stage, the motion to dismiss stage, and the summary judgement stage---ignored the Monell standard. See supra at § I. As a result, at oral argument, the Court asked plaintiffs' counsel to explain plaintiffs' theory of Monell liability. She responded:

> The Plaintiffs have established Monell liability against the District because . . . [Director Zeilinger] had a custom and practice of being deliberately indifferent to her agency's failure to timely process SNAP . . . applications . . . [A] custom or practice can be established by proving knowledge and acquiescence, and we have established both here. The Defendant has known of her agency's failures because she has been under a corrective action plan from the [FNS] since October 2017[.] . . . Additionally, even under her flawed data analysis, the defendant has known that every month her agency was failing to process hundreds of applications in a timely manner.

> Hearing Tr. at 7:18–8:21 (noting as an example the District's February 2020 performance report).

In other words, plaintiffs contended that FNS's October 2017 letter placed the District on notice of its untimely processing and that the District responded with deliberate indifference to the deficiencies that FNS documented, as reflected by its continuing poor timeliness performance up to the point of the oral argument.

The Court thus framed the deliberate indifference inquiry in its ruling precisely as plaintiffs' counsel presented it at oral argument. Garnett IV, 485 F. Supp. 3d at 227. And it proceeded to find, contrary to plaintiffs' stated theory, ample record evidence showing "that the

---

bound of the interval, rather than the point estimate, is used to identify and monitor poor timeliness." Garnett IV, 485 F. Supp. 3d at 213 n.3.

District took numerous steps to improve its SNAP application processing timeliness once it was made aware of the system's deficiencies." Id. Plaintiffs might disagree with that conclusion, but they can hardly fault the Court for framing the inquiry based on their express theory of liability.

What's more, as the Court noted in its ruling, plaintiffs offered scant evidence—*from any time period*—showing that the District was deliberately indifferent to application processing delays. Id. at 228. And the Court squarely addressed what little evidence plaintiffs did offer, which included statistics and e-mail correspondence during the same post-complaint time period that they now urge the Court to ignore. Id. at 228–29. The plaintiffs are free to differ with the weight that the Court lent to their evidence, but mere disagreement cannot be the basis for clear-error reconsideration under Rule 59. See, e.g., Smith, 115 F. Supp. 3d at 12.

B. Purported evidentiary inferences

Plaintiffs next fault the Court for purportedly making unwarranted assumptions and drawing adverse evidentiary inferences concerning the District's timeliness statistics in finding a lack of deliberate indifference.

As the Court detailed in its summary judgment ruling, measuring a State's (or the District's) timeliness in processing SNAP applications is no simple task. See Garnett IV, 485 F. Supp. 3d at 221–223 (discussing the various approaches to measuring compliance). There were four separate timeliness reports in the record. See id. Which was the most appropriate one to use to assess whether the District had improved its processing performance—and thus whether it was in substantial compliance with the statutory time tables—hinged on whether the measure counted "overdue applications whose processing has been delayed beyond the applicable deadline due to the fault of the applicant." Id. at 221. That is so because under FNS regulations, a State is not responsible for the late processing of applications if the applicant (or "client")

11

caused the delay.  Id.  But that rule has a caveat:  "[T]he State agency may attribute overdue applications to client fault only after taking certain mitigation actions, such as offering assistance with completing the application and obtaining the required verifications [to support the application]."  Id. (citing 7 C.F.R. § 273.2(h)(1)).  Not surprisingly, plaintiffs urged the Court to rely on the two measures that included *all* overdue applications, regardless of fault, which showed lower timeliness rates.  See id.  The District favored the two measures that excluded overdue applications that are attributed to client fault.  See id.  The District's preferred metrics would be consistent with the applicable FNS regulations regarding client fault (as well as the method the FNS applied when placing the District under a corrective plan), but only if there was solid evidence in the record that the District had taken proper mitigation measures before excluding applications attributed to client fault.  See id. at 221–22.  The Court thus reviewed the competing metrics through that lens.  Id. at 221–24.

There was no dispute that plaintiffs' preferred metrics included all overdue applications regardless of the role the applicant played in the delay.  Id. at 221.  Thus, these metrics obviously do not reflect the most accurate measure of assessing the District's timeliness performance, again assuming that the other measures properly accounted for client fault.  The first of the District's favored measures—the QC APT—was derived from a sample of active cases reviewed by an independent DHS quality-control team.  Id. at 221–22.  As the Court explained, this team was required by FNS regulations to "accurately determine if an application was properly pended due to a client's delay in providing verification."  Id. at 222.  The Court found that the District presented ample unrebutted evidence that the review team adhered to FNS protocols in determining whether the client failed to provide required verifications.  Id.  As a result, the Court used the District's QC APT as its primary benchmark for assessing the District's timeliness

performance.  Id. at 224.  And that benchmark placed the District's timeliness rate at approximately 95%, a substantial apples-to-apples improvement based on the same rate that FNS had used two years earlier in deciding to impose a corrective action plan on the District.  See id. at 225.

The Court did not stop there.  It also considered the District's other favored metric—the Adjusted State APT Rate—and found ample evidence that DHS employees regularly performed the required FNS mitigation measures when processing SNAP applications through standard business procedures.  Id. at 223–25.

Plaintiffs nevertheless argue that he Court clearly erred by (1) eschewing their preferred metrics in favor of the District's and (2) drawing improper evidentiary inferences from the District's favored statistics to support the Court's estimation that the District's true timeliness rate was "in the ballpark of 90% to 95%."  Id. at 226.  The Court responds with several points.

To begin, plaintiffs argue that the Court's improper selection and treatment of the various performance metrics led it to erroneously find a lack of deliberate indifference on the part of the District.  Mot. to Alter at 6–10.  That is an overstatement.  The bulk of the Court's discussion of the timeliness measures came in its analysis of the *first* prong of the Monell analysis—whether there had been predicate violation of the SNAP Act—which the Court decided in *plaintiffs'* favor.  See Garnett IV, 485 F. Supp. 3d at 220–27.  The Court's analysis of Monell's second prong—deliberate indifference—focused instead on the District's improvement efforts and the relative lack of evidence of deliberate indifference offered by plaintiffs.  See id. at 227–32. While the Court did note that "the efficacy of the District's improvement efforts is borne out it its recent timeliness results," id. at 230, those results did not ground the Court's findings on deliberate indifference.

Second, the Court did not simply cherry pick the District's favored performance metrics over the plaintiffs'. The question at hand was which statistic most accurately accounted for applicant-cause delays consistent with FNS regulations. See id. at 221. Indeed, that was the main factual issue that the parties briefed at summary judgment. Performance measures that included all applications, regardless of fault, were simply irrelevant to the inquiry. Plaintiffs' position is thus like saying that the Washington Nationals should not advance to the playoffs over the second-place Mets because, even though the Nats had a better win-loss record, the Mets had a higher batting average. While the Nats' deficient batting average might well be useful in judging their overall performance, the only measure that counts for playoff consideration is winning percentage. Same with the District's SNAP performance. The relevant legal yardstick is how quickly the District processed applications that were not delayed by the applicant within the statutory timeframe. The Court therefore examined whether there was evidentiary support for the District's position that its statistics properly excluded "client fault" applications per FNS guidance. See id. at 221. Finding no genuine factual dispute on that issue, the Court based its performance statistics on the District's favored metrics. Id. at 222–24. The Court sees no errors in that decision.

Relatedly, plaintiffs are mistaken in asserting that there was no summary judgment evidence to support the Court's finding that a majority of overdue applications were caused by client delay. Pls.'s Mot. to Alter at 7. There was plenty evidence. As the Court found, the District "presented ample evidence that [DHS] arrived at its internal QC APT numbers in line with th[e] FNS protocol" on excluding applications that were "properly pended due to client's delay in providing verification." Garnett IV, 485 F. Supp. 3d at 222. The District also offered evidence that 85% of SNAP applications are processed through the "one and done" intake

system and that DHS staff regularly took the required mitigation steps as part of that system.  Id. at 223–24.  Plaintiffs did not offer any proof to rebut this evidence, nor did they put forth a single applicant whose application had been erroneously characterized as overdue because of client delay.  Id.  On that record, the Court was hard pressed to locate any dispute of material fact.

Finally, as the District points out, any inferences the Court drew with respect to the District's preferred timeliness statistics actually ran in plaintiffs' favor.  As noted above, the record evidence showed that DHS's independent quality-control review of sample applications complied with FNS guidance on excluding applications due to lack of verification from the client, and that the District's standard intake procedures, which were applied in 85% of cases, incorporated required FNS mitigation measures.  Id. at 223.  Yet, the Court did not simply adopt the District's most recent reports showing timely processing of over 95% of applications. Rather, recognizing the impossibility of ascertaining precisely how many applications were properly excluded based on client fault, and giving plaintiffs the benefit of the doubt, the Court arrived at a reasoned, conservative estimate of the District's timeliness rate: somewhere between 90% and 95%.  Id. at 226.  That estimate was low enough to support a finding of a predicate SNAP Act violation, but the improvement in the rate (particularly the "apples to apples" QC APT rate) was in line with the Court's finding of no deliberate indifference on the part of the District.  Id.  The Court finds no error in its estimate or the conclusions it supported.

C.  Alternative Path to *Monell* liability

Plaintiffs next assert that the Court clearly erred by not considering whether the District could be subject to Monell liability based on Ms. Zeilinger's "actions as a policy making official, independent of deliberate indifference."  Pls.'s Reply at 4.  But like their post-complaint evidence argument, plaintiffs raise this alternative theory of Monell liability for the first time in

15

their motion for reconsideration.  As noted, Rule 59 motions are "not a vehicle to present a new legal theory that was available prior to judgment."  Patton Boggs LLP, 683 F.3d at 403.

Plaintiffs contend that their failure to raise this argument at summary judgment does not constitute a waiver.  They rely on Swanigan v. City of Chicago, 775 F.3d 953, 955 (7th Cir. 2015) for the proposition that "articulation of one [path to liability under Monell] is not waiver of all others."  Pls.'s Reply at 4.  However, Swanigan did not discuss or consider whether failing to raise a particular basis for Monell liability constituted waiver.  775 F.3d at 955.  The question there, rather, was whether all of the plaintiff's Monell claims were mooted by a damages verdict in a separate suit against individual officers employed by the municipality.  See id. at 955–59, 962–64.  The Seventh Circuit held that the district court's decision to *sua sponte* dismiss the plaintiff's two remaining "policy or practice" claims against the municipality was error because the claims sought prospective injunctive relief not available in the individual officer suits, and because the municipal defendant's indemnification of the individual officers and payment of $1 in nominal damages for any Monell violation did not resolve these equitable claims.  See id. at 962.  In other words, Swanigan was focused on the existence of further *remedies* under § 1983, and whether the claims against the municipality were resolved by the prior verdict against the individual officers.  See id.  Finding that the verdict against the officers did not entirely resolve the Monell claim against the municipality, the Seventh Circuit reversed the district court's decision to dismiss the claims as moot.  Id. at 962–64.  That is a far cry from the situation here, where plaintiffs failed to even mention the alternative basis on which they now seek to ground their Rule 59 motion.

As noted above, the Court specifically flagged Monell's "policy or practice" standard at the motion-to-dismiss stage, see Garnett III, 323 F. Supp. 3d at 75, in its order for argument on

the cross motions for summary judgment, see Minute Order of 7/16/2020, and at the argument

itself, see Hearing Tr. at 5-6.  And yet plaintiffs' counsel affirmed that they intended to show

liability solely under the "*deliberately indifferent*" standard.  See Hearing Tr. at 7 (emphasis

added).  Because "Rule 59(e) motions are aimed at reconsideration, not initial consideration,"

arguments raised for the first time on a Rule 59(e) motion may be deemed "waived."  GSS Grp.

Ltd. v. Nat'l Port Auth., 680 F.3d 805, 812 (D.C. Cir. 2012) (quoting District of Columbia v.

Doe, 611 F.3d 888, 896 (D.C. Cir. 20210)).  As such, plaintiffs waived their present argument

that the Court should have considered an additional basis for Monell liability.

Even if the Court were to consider plaintiffs' new argument, it would reject it.  It is true

that "the action of a government decisionmaker" is one of several potential bases for municipal

liability under Monell.  Baker, 326 F.3d at 1306-07.  And Director Zeilinger would seem to be a

final policymaker under D.C. law.   Nevertheless, "[i]n order for a municipality to be held liable

for the single decision of a final policymaker, that official must have demonstrated 'deliberate

indifference to the risk that a violation of a particular constitutional or statutory right [would]

follow the decision.'"  Blue v. District of Columbia, 811 F.3d 14, 19 (D.C. Cir. 2015) (quoting

Board of County Commissioners v. Brown, 520 U.S. 39, 411 (1997).  Plaintiffs are therefore

mistaken that simply establishing that a final policymaker made the decision or the action at

issue is *ipso facto* sufficient to establish Monell liability.  They still would need to show that the

official was deliberately indifferent to the constitutional or statutory violation.  Id.  As discussed

above, the plaintiffs adduced little to no evidence supporting that required showing.[3]

---

[3] It is not even clear to the Court what specific decision or action plaintiffs believe Ms. Zeilinger took that caused the alleged statutory violations.  Neither their summary judgment briefing (which, as discussed, did not present this theory of liability) nor their motion for reconsideration pinpoints any such conduct.

D.  Manifest Injustice

Finally, plaintiffs complain that applying the Monell standard for municipal liability in this case would work manifest injustice on citizens of the District by subjecting their challenge to the city's SNAP Act compliance to a more rigorous standard of proof than similar challenges brought against States.  See Pls.'s Mot. to Alter at 16.  However, "manifest injustice does not exist where . . . a party could have easily avoided the outcome, but instead elected not to act until after a final order had been entered."  Mohammadi v. Islamic Republic of Iran, 947 F. Supp. 2d 48, 78 (D.D.C. 2013), aff'd, 782 F.3d 9 (D.C. Cir. 2015) (quoting Ciralsky v. CIA, 355 F.3d 661, 665 (D.C. Cir. 2004)).  Instead, "manifest injustice" must entail a result that is "fundamentally unfair in light of governing law," and not "just a clear and certain prejudice to the moving party."  Slate v. Am. Broad. Companies, Inc., 12 F. Supp. 3d 30, 35–36 (D.D.C. 2013).

Here, the Court applied the Monell standard based on prior authority in this Circuit for treating the District as a municipality for purposes of § 1983.  See Garnett IV, 485 F. Supp. 3d at 219 (citing Act Now to Stop War, 846 F.3d at 413, Salazar, 954 F. Supp at 324).  The fact that the SNAP Act defines the District as a State, id., is beside the point; the cause of action for the plaintiffs' suit comes not from the SNAP Act, but § 1983.  The Medicaid statute at issue in Salazar also defined the District as a State, yet the court still applied the Monell standard to plaintiffs' claim because it arose under § 1983.  Salazar, 954 F. Supp at 324.  The Court sees no basis in the case law for plaintiffs' assertion that whether the District should be treated as a State or municipality under § 1983 varies based on the role of the official being sued or the law being challenged.  Nor is there a textual basis in § 1983 for drawing such distinction.  See 42 U.S.C. § 1983.  Fair or not, the Court is not free to disregard the governing statute in order to treat D.C. residents like those of the States.

One final point on the justness of this result.  In its summary judgment ruling, and indeed throughout this protracted litigation, the Court attempted to convey the seriousness of "*any* delayed application [that] threatens the loss of food and nutrition for needy families."  Garnett IV, 485 F. Supp. 3d at 232 (emphasis in original).  At the same time, even plaintiffs must recognize that the challenges of administering a complex public-benefits program like SNAP— including adoption of new and potentially beneficial technologies—will lead to some delays.  Perfection is impossible.  Having pored over the voluminous evidence presented at summary judgment, the Court came away convinced that the District had made "extensive and sustained" efforts to correct the deficiencies in application processing that both FNS and plaintiffs rightly challenged.  Id. at 232.  Those efforts were the opposite of deliberate indifference.  But regardless of whether the Court was correct to apply the Monell standard for liability, or to find no disputed material facts regarding deliberate indifference, it likely would not have granted plaintiffs' requested remedy.  The District's responsive efforts, the corresponding improvements in its timeliness performance, and its continuing oversight by FNS would have tipped the scales of equity against imposition of a permanent injunction.  Plaintiffs thus would have been in the same position had the Court granted summary judgment in their favor on the question of liability. In that light, the Court's ruling was hardly "manifest injustice."

**IV.  Conclusion**

For the foregoing reasons, it is hereby

**ORDERED** that [157] Plaintiffs' Motion to Alter or Amend the Judgment is DENIED.

This is a final appealable order.

**SO ORDERED.**

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  6/11/2021